## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| PARAGON OFFSHORE PLC, *et al.*, | Case No. 16-10386 (CSS) |
| Debtors.[1] | (Jointly Administered) |
| PARAGON LITIGATION TRUST, | |
| Plaintiff, | |
| vs. | Adv. Proc. No. 17-51882 (CSS) |
| NOBLE CORPORATION PLC, NOBLE CORPORATION HOLDINGS LTD, NOBLE HOLDING INTERNATIONAL (LUXEMBOURG) S.A R.L., NOBLE FDR HOLDINGS LIMITED, ASHLEY ALMANZA, JULIE H. EDWARDS, GORDON T. HALL, JON A. MARSHALL, JAMES A. MACLENNAN, MARY P. RICCIARDELLO, JULIE J. ROBERTSON, AND DAVID WILLIAMS, | |
| Defendants. | ***REDACTED PURSUANT TO D.I. 1977*** |

## [REVISED REDACTED] COMPLAINT

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Paragon Offshore plc (6017); Paragon Offshore Finance Company (6632); Paragon International Finance Company (8126); Paragon Offshore Holdings US Inc. (1960); Paragon Offshore Drilling LLC (4541); Paragon FDR Holdings Ltd. (4731); Paragon Duchess Ltd.; Paragon Offshore (Luxembourg) S.à r.l. (5897); PGN Offshore Drilling (Malaysia) Sdn. Bhd. (9238); Paragon Offshore (Labuan) Pte. Ltd. (3505); Paragon Holding SCS 2 Ltd. (4108); Paragon Asset Company Ltd. (2832); Paragon Holding SCS 1 Ltd. (4004); Paragon Offshore Leasing (Luxembourg) S.à r.l. (5936); Paragon Drilling Services 7 LLC (7882); Paragon Offshore Leasing (Switzerland) GmbH (0669); Paragon Offshore do Brasil Ltda.; Paragon Asset (ME) Ltd. (8362); Paragon Asset (UK) Ltd.; Paragon Offshore International Ltd. (6103); Paragon Offshore (North Sea) Ltd.; Paragon (Middle East) Limited (0667); Paragon Holding NCS 2 S.à r.l. (5447); Paragon Leonard Jones LLC (8826); Paragon Offshore (Nederland) B.V.; and Paragon Offshore Contracting GmbH (2832).  The Debtors' mailing address is 3151 Briarpark Drive, Suite 700, Houston, Texas 77042.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................... 1

JURISDICTION AND VENUE ............................................................................................. 5

PARTIES ................................................................................................................................ 5

A.     Plaintiff ......................................................................................................................... 5

B.     Corporate Defendants ................................................................................................. 6

C.     Individual Defendants ................................................................................................. 8

BACKGROUND .................................................................................................................. 11

A.     Noble Decides To Shed Aging Rigs ......................................................................... 11

B.     A Failed Sale .............................................................................................................. 12

C.     The "Deep Spin" ....................................................................................................... 13

       1.     A Failed IPO .................................................................................................. 14

       2.     Deteriorating Prospects For SpinCo ......................................................... 16

             a.     Trouble In Brazil .............................................................................. 16

             b.     Trouble In Mexico ........................................................................... 18

             c.     Stacked In the Gulf Of Mexico ...................................................... 19

       3.     The Rush To Spin .......................................................................................... 19

       4.     Deceptive Marketing ..................................................................................... 20

             a.     False And Misleading Statements Regarding Future Business ............... 20

             b.     False And Misleading Statements Regarding Rig Life........................... 20

             c.     False And Misleading Statements Regarding Taxes ............................... 24

       5.     Noble Dictates The Terms ............................................................................ 25

       6.     Misleading Houlihan ..................................................................................... 27

             a.     Noble Hides The Master Model And Causes Houlihan To Incorrectly Value Paragon As A Going Concern ............... 29

             b.     Noble Misleads Houlihan As To Brazil, Mexico, And The Gulf Of Mexico ................................................................ 33

             c.     Other Errors In The Noble Forecast ............................................... 34

D.     Implementing The Spin............................................................................................. 35

E.     The Aftermath ............................................................................................................ 38

1.      Paragon's Unexpectedly High Effective Tax Rate "Destroys Value"................. 38

2.      Paragon's Billion Dollar Impairment Reveals Dim Prospects In Brazil ............ 39

3.      Paragon's Prospective Tax Bonding Obligations Raise Liquidity Concerns ...... 39

4.      Paragon's Business Disintegrates ....................................................... 40

**CLAIMS FOR RELIEF**

Count 1   Avoidance Of Intercompany Notes And Note Payments As Actual Fraudulent
          Transfers (Federal Law) ................................................................. 43

Count 2   Avoidance Of Intercompany Notes And Note Payments As Actual Fraudulent
          Transfers (State Law) .................................................................... 45

Count 3   Avoidance Of Intercompany Notes And Note Payments As Constructive Fraudulent
          Transfers (Federal Law) ................................................................. 47

Count 4   Avoidance Of Intercompany Notes And Note Payments As Constructive Fraudulent
          Transfers (State Law) .................................................................... 48

Count 5   Recharacterization Of Intercompany Notes As Equity And Avoidance Of Note
          Payments As Dividends (Federal And State Law)....................................... 49

Count 6   Breach Of Fiduciary Duty ............................................................... 51

Count 7   Aiding And Abetting Breaches Of Fiduciary Duty..................................... 53

Count 8   Unjust Enrichment........................................................................ 54

**RESERVATION OF RIGHTS** ............................................................... 55

**PRAYER FOR RELIEF**...................................................................... 55

## INTRODUCTION

1.      In 2014, Noble Corporation jettisoned a fleet of old offshore drilling rigs via a fraudulent corporate "spin-off."  Noble isolated the rigs in a group of subsidiaries it called Paragon Offshore, loaded up Paragon with $1.73 billion in debt, transferred the proceeds to itself, and distributed equity in Paragon to Noble shareholders.

2.      Paragon's shares dropped nine percent (9%) in their first trading day and plummeted straight down from there.  The shares had fallen by eighty-two percent (82%) within six months and were trading for pennies in less than a year.  Paragon was in bankruptcy within eighteen months.

3.      Creditors who had been duped into financing the spin-off were left holding an empty bag, ultimately receiving cents on the dollar in the bankruptcy case.  This action is brought on behalf of the Paragon bankruptcy estate, for the benefit of those creditors and their successors, to recover the payments Paragon made to Noble and damages resulting from the misconduct of Noble and various individuals who enriched Noble at Paragon's expense.

4.      The evidence will show that Paragon was insolvent from the outset and worth far less than the debt Noble heaped on it.  Noble obtained that financing only by lying to the lenders about Paragon and its future prospects.  Noble promised the lenders that the two largest existing customers for the Paragon rigs – Petrobras and Pemex – would continue to contract for Paragon's fleet after the spin-off, claiming that it expected each to "roll over" their rig contracts at current rates for the foreseeable future.  This was critical because those two customers were a huge part of Paragon's projected business, alone accounting for more than fifty-five percent (55%) of Paragon's contract backlog (future revenue under contract) at the time of the spin-off. But Noble knew or should have known that its representations were not true.

5.     Before the spin-off, Petrobras informed Noble that it intended to terminate its most lucrative contracts early, a clear indication that it had no intention of renewing the agreements.  Sure enough, after the spin-off Petrobras followed through and terminated the contracts, leaving Paragon with no rigs working for Petrobras.  Noble, however, told the lenders nothing about Petrobras' asserted intent to cancel the agreements.

6.     Similarly, before the spin-off, Pemex told government regulators that it no longer would contract for rigs older than fifteen years, which disqualified the entire Paragon fleet from any contract renewals from Pemex.  Sure enough, Pemex did not renew its contracts after the spin-off, and ten of the eleven Pemex contracts for Paragon rigs had terminated within thirteen months.  Here again, Noble never disclosed Pemex's modern-rig policy to the lenders.

7.     Noble also misled the lenders about Paragon's aging fleet, which Noble claimed to have an average of ten to fifteen years of remaining useful life.  Noble's internal "Master Model," however, projected that nearly sixty-three percent (63%) of the Paragon rigs (27 of 43) would be retired just seven years after the spin-off (by 2020), with virtually the entire fleet out of commission within a decade.  Noble's various disclosures say nothing about that critical fact.

8.     Noble even misled lenders about basic information like Paragon's expected tax rate and the rationale for the spin-off itself.  While Noble promised lenders that Paragon's effective rate would range between twenty and thirty percent (20%-30%), it knew that Paragon would incur much greater taxes (40%-52%) in the initial periods after the spin-off.  As one stakeholder noted, this deception "end[ed] up destroying a decent amount of value for us."  And, contrary to its claim that the purpose of the transaction was to enable Noble to be a "pure play" operator focused exclusively on new rigs without the drag of the old Paragon assets, Noble

cherry picked from the Paragon fleet five old but profitable rigs (those with favorable contracts and good prospects for renewal) and kept them for itself.

9.      At the same time that it was lying to the market, Noble was misleading Houlihan Lokey, a financial advisor Noble had hired to give a "solvency opinion" in connection with the spin-off.  Although Noble's comprehensive Master Model forecast extended beyond 2030 – more than sixteen years – Noble did not provide that forecast to Houlihan.  Instead, Noble stripped out just the first five years of projections and gave them to Houlihan without the context of the entire Master Model.

10.      This was highly deceptive.  The first five years of the Master Model projected relatively stable revenues and cash flow for Paragon.  As a result, Houlihan assumed Paragon would continue as a stable going concern for the foreseeable future, and it therefore valued Paragon by discounting those five years of projected cash flow and applying a multiple to Paragon's projected EBITDA in year five (2018) in order to derive a "terminal value" (intended to represent the present value of Paragon's cash flows beyond year five).  While appropriate for ongoing businesses, this technique is invalid for declining ones.  There is no logical basis for applying a multiplier to a projected near-term financial metric (like EBITDA) where a firm is anticipated to dissolve in the forecasted future.

11.      Unbeknownst to Houlihan, Noble knew that Paragon would not continue as a going concern.  Rather, the portion of the Master Model concealed from Houlihan projected that half of Paragon's fleet would "age out" and disappear by 2020 (just beyond the period of the forecast given to Houlihan), with revenues falling by nearly $700 million in 2021 and steadily declining thereafter as Paragon's remaining rigs continued to go out of service.

12.    Further, even the truncated five-year projections Noble gave Houlihan were false and misleading.  Among other things, the projections included three vessels that had been "cold stacked" for years.  Despite the fact that those vessels were not anticipated by Noble or market observers to ever work again, the projections somehow contemplated that they would find customers and miraculously begin working in 2015 and 2016 through the remainder of the projection period.  That unsupported assumption resulted in the inclusion of hundreds of millions of dollars of projected revenue that Noble knew Paragon would not realize.  The forecast also provided for every existing rig contract to be renewed at dayrates consistent with (or higher than) current contract rates even though Noble knew or should have known that the Petrobras and Pemex contracts would not be renewed at all and that, in any event, a glut of new rigs coming into the market would depress rates for those older rigs that were able to find ongoing work.  Finally, the projections that Noble gave to Houlihan provided for a lower tax rate than the rate included in the Master Model (and much lower than the materially higher rates Noble knew Paragon would incur after the spin-off) and entirely omitted hundreds of millions of dollars of known potential tax liabilities in several jurisdictions.

13.    Ultimately, Noble's lies and deception enabled it to consummate the spin-off and abscond with more than $1.7 billion, leaving in its wake an insolvent firm saddled with aging assets and no realistic prospect of success.  The transfers to Noble were actual and constructive fraudulent conveyances, and this action seeks to avoid the transfers and recover those funds in order to make Paragon's creditors whole and compensate for damages that were the logical and natural consequence of the misconduct of Noble and various of its insiders.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334,

the *Amended Standing Order of Reference* from the United States District Court for the District

of Delaware dated as of February 29, 2012, and Article XI of the Plan (defined below).

15.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

16.     Plaintiff consents to the entry of final orders or judgments by the Court if it is

determined that the Court, absent consent of the parties, cannot enter final orders or judgments

consistent with Article III of the United States Constitution.

## PARTIES

A.      **Plaintiff**

17.     Plaintiff is the Paragon Litigation Trust (the "Litigation Trust").  The Litigation

Trust was created pursuant to the *Fifth Joint Chapter 11 Plan of Paragon Offshore plc and Its*

*Affiliated Debtors* (the "Plan"), proposed by Paragon Offshore plc ("Paragon") and the

subsidiaries identified in footnote 1, above (collectively, with Paragon, the "Debtors"), and

confirmed by order entered on June 7, 2017.[2]  Pursuant to the Plan, the Debtors transferred and

vested in the Litigation Trust all "Noble Claims," including the causes of action alleged in this

Complaint, and all rights and powers of the Debtors' Estates in and to the Noble Claims, and the

Debtors distributed interests in the Litigation Trust to specified creditors in partial satisfaction of

their claims against the Estates.  The Litigation Trust has absolute authority and standing to

---

[2]     Unless defined in this Complaint, all capitalized terms have the meaning ascribed to them in
the Plan or the Litigation Trust Agreement, dated July 18, 2017, that governs the Litigation
Trust (the "Litigation Trust Agreement").

assert and prosecute the Noble Claims for the benefit of holders of the Litigation Trust Interests. Plan § 5.7; Litigation Trust Agreement § 6.1.

**B.    Corporate Defendants**

18.    Noble Corporation plc ("Noble") is a public limited company incorporated under the laws of England and Wales.  Noble's shares trade on the New York Stock Exchange under the symbol "NE."  Noble is a mediate transferee of and/or an entity for whose benefit the Note Payments (defined below) were made.  The Court has general and specific personal jurisdiction over Noble due to its extensive contacts with and conduct within the United States and the State of Delaware, including contacts and conduct giving rise to and inextricably linked with the causes of action alleged in this Complaint.

19.    Noble Corporation Holdings Ltd. ("Noble Holdings Cayman") is a Cayman Islands exempted company limited by shares.  Noble Holdings Cayman is a wholly owned subsidiary of Noble and a mediate transferee of and/or entity for whose benefit the Note Payments were made.  The Court has general and specific personal jurisdiction over Noble Holdings Cayman due to its extensive contacts with and conduct within the United States and the State of Delaware, including contacts and conduct giving rise to and inextricably linked with the causes of action alleged in this Complaint.

20.    Noble Corporation ("Noble Cayman") is a Cayman Islands exempted company limited by shares.  Noble Cayman is a wholly owned subsidiary of Noble Holdings Cayman and a mediate transferee of and/or entity for whose benefit the Note Payments were made.  The Court has general and specific personal jurisdiction over Noble Cayman due to its extensive contacts with and conduct within the United States and the State of Delaware, including contacts and conduct giving rise to and inextricably linked with the causes of action alleged in this Complaint.

21.     Noble Holding International (Luxembourg) S.á r.l. ("NHIL 1") is a Luxembourg société à responsabilité limitée (a private limited liability company).  On or about July 18, 2014, Paragon Offshore Finance Company ("Paragon Finance"), a debtor in the above-captioned proceeding, transferred $678,702,904.41 to NHIL 1 (the "NHIL 1 Note Payment") in satisfaction of an Intercompany Promissory Note, dated July 15, 2014, in the principal amount of $678,629,103.49 (the "NHIL 1 Note"), plus $73,800.92 in unpaid interest.  NHIL 1 is a wholly owned subsidiary of Noble Cayman and an immediate transferee of and/or entity for whose benefit the Note Payments were made.  The Court has general and specific personal jurisdiction over NHIL 1 due to its extensive contacts with and conduct within the United States and the State of Delaware, including contacts and conduct giving rise to and inextricably linked with the causes of action alleged in this Complaint.

22.     Noble Holding International (Luxembourg NHIL) S.á r.l. ("NHIL 2") is a Luxembourg société à responsabilité limitée (a private limited liability company).  On or about July 18, 2014, Paragon Finance transferred $678,702,904.41 to NHIL 2 (the "NHIL 2 Note Payment") in satisfaction of an Intercompany Promissory Note, dated July 15, 2014, in the principal amount of $678,629,103.49 (the "NHIL 2 Note" and, together with the NHIL Note 1, the "NHIL Notes"), plus $73,800.92 in unpaid interest.  NHIL 2 is a wholly owned subsidiary of Noble Cayman and an immediate transferee of and/or entity for whose benefit the Note Payments were made.  The Court has general and specific personal jurisdiction over NHIL 2 due to its extensive contacts with and conduct within the United States and the State of Delaware, including contacts and conduct giving rise to and inextricably linked with the causes of action alleged in this Complaint.

23.     Noble FDR Holdings Limited ("FDR" and, together with Noble, Noble Holdings

Cayman, Noble Cayman, NHIL 1, and NHIL 2, the "Corporate Defendants") is a Cayman

Islands exempted company limited by shares.  On or about July 18, 2014, Paragon Finance

transferred $353,330,213.50 to FDR (the "FDR Note Payment" and, together with the NHIL 1

Note Payment and the NHIL 2 Note Payment, the "Note Payments") in satisfaction of an

Intercompany Promissory Note, dated July 15, 2014, in the principal amount of $353,291,793.02

(the "FDR Note" and, together with the NHIL Notes, the "Intercompany Notes"), plus

$38,420.48 in unpaid interest.  FDR is a wholly owned subsidiary of Noble Cayman and an

immediate transferee of and/or entity for whose benefit the Note Payments was made.  The Court

has general and specific personal jurisdiction over FDR due to its extensive contacts with and

conduct within the United States and the State of Delaware, including contacts and conduct

giving rise to and inextricably linked with the causes of action alleged in this Complaint.

**C.     Individual Defendants**

24.     Ashley Almanza is and has been a member of Noble's Board of Directors from

approximately 2013 until the present.  Mr. Almanza is a resident of the United Kingdom.  The

Court has general and specific personal jurisdiction over Mr. Almanza due to his extensive

contacts with and conduct within the United States and the State of Delaware, including contacts

and conduct giving rise to and inextricably linked with the causes of action alleged in this

Complaint.

25.     Michael A. Cawley is and has been a member of Noble's Board of Directors from

approximately 1985 until the present.  Mr. Cawley is a resident of the United States.  The Court

has general and specific personal jurisdiction over Mr. Cawley due to his extensive contacts with

and conduct within the United States and the State of Delaware, including contacts and conduct giving rise to and inextricably linked with the causes of action alleged in this Complaint.

26.     Lawrence J. Chazen was a member of Noble's Board of Directors from approximately 1994 until 2014.  Mr. Chazen is a resident of the United States.  The Court has general and specific personal jurisdiction over Mr. Chazen due to his extensive contacts with and conduct within the United States and the State of Delaware, including contacts and conduct giving rise to and inextricably linked with the causes of action alleged in this Complaint.

27.     Julie H. Edwards is and has been a member of Noble's Board of Directors from approximately 2006 until the present.  Ms. Edwards is a resident of the United States.  The Court has general and specific personal jurisdiction over Ms. Edwards due to her extensive contacts with and conduct within the United States and the State of Delaware, including contacts and conduct giving rise to and inextricably linked with the causes of action alleged in this Complaint.

28.     Gordon T. Hall is and has been a member of Noble's Board of Directors from approximately 2009 until the present.  Mr. Hall is a resident of the United States.  The Court has general and specific personal jurisdiction over Mr. Hall due to his extensive contacts with and conduct within the United States and the State of Delaware, including contacts and conduct giving rise to and inextricably linked with the causes of action alleged in this Complaint.

29.     Jon A. Marshall is and has been a member of Noble's Board of Directors from approximately 2009 until the present.  Mr. Marshall is a resident of the United States.  The Court has general and specific personal jurisdiction over Mr. Marshall due to his extensive contacts with and conduct within the United States and the State of Delaware, including contacts and conduct giving rise to and inextricably linked with the causes of action alleged in this Complaint.

30.      James A. MacLennan served as Noble's Chief Financial Officer at all relevant times until February 2016.  Mr. MacLennan also was the sole member of Paragon's Board of Directors from Paragon's formation until July 31, 2014, the date of the Spin-Off (defined below). Mr. MacLennan is a resident of the United States.  The Court has general and specific personal jurisdiction over Mr. MacLennan due to his extensive contacts with and conduct within the United States and the State of Delaware, including contacts and conduct giving rise to and inextricably linked with the causes of action alleged in this Complaint.

31.      Mary P. Ricciardello is and has been a member of Noble's Board of Directors from approximately 2003 until the present.  Ms. Ricciardello is a resident of the United States. The Court has general and specific personal jurisdiction over Ms. Ricciardello due to her extensive contacts with and conduct within the United States and the State of Delaware, including contacts and conduct giving rise to and inextricably linked with the causes of action alleged in this Complaint.

32.      Julie J. Robertson was a member of Paragon's Board of Directors from shortly before the Spin-Off until 2016, and simultaneously served as Noble's Executive Vice President. Ms. Robertson resigned from the Paragon Board on February 10, 2016, but continues to serve as Noble's Executive Vice President.  Ms. Robertson is a resident of the United States.  The Court has general and specific personal jurisdiction over Ms. Robertson due to her extensive contacts with and conduct within the United States and the State of Delaware, including contacts and conduct giving rise to and inextricably linked with the causes of action alleged in this Complaint.

33.      David W. Williams is and has been Chairman of Noble's Board of Directors from approximately 2008 until the present.  He currently is and at all relevant times has been Noble's President and Chief Executive Officer.  Mr. Williams currently resides in the United Kingdom

but previously was a resident of the United States and still maintains a residence, active voter registration, and active driver's license in the United States.  Prior to the Spin-Off, Mr. Williams conducted a material portion of Noble's business, particularly relating to the Spin-Off, in the United States.  The Court has general and specific personal jurisdiction over Mr. Williams due to his extensive contacts with and conduct within the United States and the State of Delaware, including contacts and conduct giving rise to and inextricably linked with the causes of action alleged in this Complaint.

**BACKGROUND**

**A.      Noble Decides To Shed Aging Rigs**

34.      Offshore drilling rigs typically are classified into one of two categories. "Standard specification" – or "standard spec" – rigs are more than fifteen years old, operate mechanically rather than electronically, and are unable to service deepwater wells of more than 7,500 feet, hoist more than two million pounds, or perform more than one drilling operation at a time.  "High specification" – or "high spec" – rigs are newer, more efficient and capable of operating in deeper water, handling heavier loads, and performing multiple operations simultaneously.

35.      Noble is "a leading offshore drilling contractor for the oil and gas industry" with operations dating back to 1921.  Historically, Noble's strategy was to acquire older standard spec rigs at depressed prices, invest in improvements, and deploy them in places where customers were satisfied with functional rigs.  By 2011, standard spec rigs comprised more than sixty percent (60%) of Noble's fleet, which had an average age approaching thirty years.

36.      Industry dynamics, however, were changing as Noble's competitors brought "newbuild" high spec rigs into the market and announced the construction of many more, fueled

in part by customer safety concerns resulting from the 2010 explosion of the Deepwater Horizon rig in the Macondo field in the Gulf of Mexico.

37.     Assessing the changing landscape, Noble concluded that, "[i]n a post-Macondo world and given the proliferation of newbuild assets, customers and investors will continue to prefer contractors with the newest/highest capability assets."  Noble management candidly told its Board in 2012 that "[o]lder rigs are becoming increasingly commoditized by the continued introduction of newbuilds" and, as a result, "[o]ur historical strategy of buying existing assets at low prices and upgrading and maintaining them is no longer viable."  Simply put, "[w]e do not believe we can outperform with respect to the board's chosen valuation metric, TSR [total shareholder return], with our current fleet composition."

38.     Investors were reporting that they "see high risks in old rigs" and, internally, Noble management confirmed that "our customers . . . have a strong preference for newer assets [and] [t]he older units will continue to be a disincentive for investors to choose Noble over peers because they assign a greater value to new assets."  Consequently, management concluded that "it is time to fundamentally reshape Noble."  Starting in 2010, Noble therefore embarked on a "transformation strategy [that] involves divesting units that have limited future use."

**B.     A Failed Sale**

39.     Noble's initial plan, known as "Project Sahara," was to sell twenty-one standard spec shallow water "jackup" rigs.  After a marketing process run by Barclays, Noble received an $815 million bid, but the buyer (Castle Harlan) eventually walked away from the deal in early 2012 because it was unable to obtain financing.  Noble ultimately concluded that "[t]here are few buyers of older assets who can secure the financing required to consummate a deal of any size."  Lenders apparently would not lend against the assets Noble hoped to dispose, and Noble soon

abandoned efforts to sell those rigs through a traditional asset sale. Revealingly, however, Castle Harlan was able to finance and acquire a set of standard spec rigs from Transocean Ltd. for more than $1 billion within a year of abandoning the Noble deal. Its lenders apparently were more comfortable with Transocean's better mix of customers and geographic regions than with Paragon's fleet and contract position.

## C.    The "Deep Spin"

40.    Unable to consummate an arms-length sale for the older assets that were dragging down value and shareholder returns, Noble next developed what it called the "deep spin," "big spin" or "Project Shark" – all names for a transaction by which Noble would transfer ("spin off" or "spin out") its old rigs to a new, separately traded and managed company.

41.    Noble began developing the deep spin in the second half of 2012 with the help of consultants from McKinsey and Company and bankers from Barclays, who touted the benefits to Noble. McKinsey noted that the "HiSpecCo" (Noble after ridding itself of lower spec rigs) would have "[l]imited sensitivity to downturn due to long-term contracts and ability to keep fleet working under most scenarios." Management gushed that "a spin-off would position Noble as a premium player in the offshore drilling space," enabling it to become "an industry leader with best-in-class assets" that would "trade at a premium to a majority of its peers due to the strong capabilities of its rigs, its corporate longevity and strong customer relationships."

42.    The new company to which the old rigs would be "spun" ("StandardCo" or "SpinCo") would be marketed as "a pure-play offshore driller levered to the standard shallow, mid-water and deepwater markets." But Noble's management already had concluded that such a business model no longer was viable, and the risks to stakeholders in the new entity were readily apparent. McKinsey noted that "StandardCo" would have "[h]igher sensitivity to downturn as

- 13 -

older rigs will be out of work first."  Barclays observed that "[t]his is a bold proposal, not

without risk" to StandardCo, and it bluntly warned that the risk to the new company was an

inability to survive ("Failure of Standard Co. to survive").

43.    Knowing that this would be a hard sell in the market, Noble and its consultants

began to develop their story.  They postulated that risks to the new spin co could be managed

through more efficient, "lean" operations, "management focus," and a "flexible workforce which

can be scaled quickly to adjust to demand."  The consultants told Noble to "[a]rticulate how

focus and simpler governance will lead to reduced overhead, OpEx and downtime," to "[c]learly

position company as steady source of high dividend and/or consolidator for lower-spec rig

market," and to "[s]how how control of own cashflow leads to better re-investment decisions."

The consultants speculated that, after ridding itself of the old rigs, Noble itself would be able to

boast of "long-term contracts and strong ties with most stable customers."  Contrary to Noble's

subsequent deceptive marketing efforts (detailed below), the consultants could not say the same

about the standard spec business that became Paragon.

**1.    A Failed IPO**

44.    As initially conceived, the deep spin was to be a two-step transaction.  First,

Noble would transfer its standard spec rigs to a group of newly formed subsidiaries (the entities

that ultimately became the Paragon Debtors) and sell twenty percent (20%) of the new company

in an initial public offering (IPO).  Next, following expiration of restricted periods on the shares,

Noble would "spin" the remaining shares in new Paragon to Noble's existing shareholders.

Barclays told Noble that it had "[h]igh confidence in doability" of this two-step transaction,

which had the advantage of "rais[ing] proceeds for Noble upfront," the "[b]roadest investor

base," "creat[ing] trading liquidity pre-spin," and enabling Noble to "take[] active role establishing shareholder base and driving story."

45.     Noble worked through the latter part of 2013 and into early 2014 to bring the IPO to market.  During that time, however, the offshore drilling market weakened substantially as investors observed a "supply/demand imbalance from 2014 newbuild deliveries and contract rollovers" (*i.e.*, new and existing rigs coming into the market) and a softening in overall demand for rigs.  Reflective of this decline, Noble's share price dropped by twenty-two percent (22%) between September 2013 and February 2014.

46.     By the end of February 2014, Noble CEO David Williams reported to the Board that "the concern around the floating market is universal and justified" and that "[t]here will be pressure on rates as we move through the year."  Ultimately, in April 2014 Noble and its bankers recognized the writing on the wall and decided to abandon the IPO in favor of a spin-off of the entirety of Paragon standard spec entities to Noble shareholders.  This "straight spin" had the advantage of avoiding the need to sell equity to the public and enabled Noble to press ahead notwithstanding market skepticism and unfavorable industry conditions.

47.     In explaining its failure to execute the IPO to lenders and rating agencies, Noble dissembled.  It told them that abandoning the IPO was "most pragmatic" for Noble because it would allow it to "accelerate the Paragon spin-off" and because Noble was performing so well that it did not need the influx of cash from an IPO.  Noble management consciously avoided "citing the state of the deepwater/midwater markets as a consideration" and was prepared to respond to questions about the markets by noting that "the board thinks the long-term prospects for Paragon remain strong despite the current market concerns."  Internally, however, Noble

recognized that "an IPO for Paragon in the time frame we have been discussing – late Q2 – would be less favorably received than one done 6 or 8 months ago."

### 2. Deteriorating Prospects For Paragon SpinCo

48.     At the same time, the standard spec business that Noble hoped to jettison was showing signs of severe distress.

### a. Trouble In Brazil

49.     Petróleo Brasileiro S.A., commonly known as Petrobras, is a Brazilian oil producer that was the largest customer and contract counterparty for Noble's standard spec business.  As of Spring 2014, Petrobras represented more than forty percent (40%) of the contract backlog (future revenue under contract) of what would become Paragon.

50.     By that time, however, Noble knew that Petrobras was unlikely to be a significant source of future business for Paragon.  In July 2013, Petrobras had announced that, starting in 2016, it planned to replace imported rigs it currently had under contract (including those under contract with Noble) with Brazilian-built rigs as they were built and delivered.  Noble understood this was a significant risk and immediately began considering its impact on the Spin-Off.  By February 2014, Noble CEO Williams was concerned about "what happens if things don't line up (like Brazil) and the IPO is late or, even, much later than anticipated."

51.     Concurrently, Petrobras announced that it was shifting its focus from "post-salt" drilling (shallow wells into oil fields above salt deposits) to "pre-salt" drilling (deeper wells into oil fields below salt deposits).  Pre-salt drilling required rigs with ultra-deepwater capability beyond that of the Paragon fleet.

52.     Then, in March 2014 Brazil launched an investigation of money laundering and corruption at Petrobras – Operação Lava Jato or "Operation Car Wash" – that has grown into

what some now call "the biggest corruption scandal in history."[3]  Petrobras continues to reel

from that scandal, which resulted in its disclosure of $2.1 billion in bribes and a total of almost

$17 billion in write-downs.[4]

53.    Perhaps because of the scandal, its shift to "pre-salt" drilling, or its desire to

replace imported rigs with Brazilian-built equipment, Petrobras notified Noble prior to the Spin-

Off that Petrobras intended to terminate its two most important and lucrative Noble contracts –

for the drillships *Noble Leo Segerius* (renamed the *Paragon DPDS2* after the Spin-Off) and

*Noble Roger Eason* (renamed the *Paragon DPDS3* after the Spin-Off) – years earlier than Noble

believed they could be terminated.  While Noble believed that the Petrobras contracts could be

extended to account for non-working "shipyard" time in which the vessels were undergoing

maintenance and not available to work (and generate revenue), Petrobras claimed that it could

terminate the contracts at their stated maturity despite the extensive shipyard downtime (which

was far longer than Noble initially had projected).

54.    Regardless of the merits of the contract dispute, this was a clear signal that, at a

minimum, Petrobras would not be renewing the contracts when they were terminated.  Those two

contracts accounted for more than twelve percent (12%) of the revenue (nearly $229 million) that

Noble had forecast for the entire Paragon fleet for 2014.

55.    Noble took the threat of early termination seriously and, by no later than

May 2014, had commissioned Brazilian lawyers to analyze the Petrobras threat.  Ultimately, as

---

[3]    Jonathan Watts, *Operation Car Wash: Is This The Biggest Corruption Scandal In History?*, THE GUARDIAN (June 1, 2017), https://www.theguardian.com/world/2017/jun/01/brazil-operation-car-wash-is-this-the-biggest-corruption-scandal-in-history.

[4]    Paul Kiernan, *Brazil's Petrobras Reports Nearly $17 Billion in Asset and Corruption Charges*, WALL ST. J. (Apr. 22, 2015), https://www.wsj.com/articles/brazils-petrobras-reports-nearly-17-billion-impairment-on-assets-corruption-1429744336.

discussed more fully below, Petrobras in fact did terminate the drillship contracts early, costing

Paragon more than $200 million in contracted revenue.

### b.    Trouble In Mexico

56.    Meanwhile, Noble's other primary customer for the Paragon business was

sending distressing signals about its future contract needs.  As of Spring 2014, the Mexican state-

owned oil company Petroleos Mexicanos, commonly known as "Pemex," represented more than

fifteen percent (15%) of the contract backlog (future revenue under contract) of what would

become Paragon.

57.    In September 2013, however, Pemex had informed government regulators that it

would no longer enter into new contracts for rigs older than fifteen years, something that would

disqualify the entire Paragon fleet from contract renewals (or "rollovers").  This was a great

concern to Noble.  As early as February 2013, seeing the writing on the wall, Noble asked

Barclays to conduct a "Pemex Case" analysis that assumed that all eleven rigs working for

Pemex would become "stacked" (not in use) as of 2014.  A few months later, Barclays warned

that, "[w]ithout the Mexico rigs, a spin-off of Standard Co may become more challenging"

because, among other things, "free cash flow at Standard Co would be reduced by ~60%."  In

October 2013, Noble reported "concern among investors who know the exposure Spinco has in

Mexico" in light of information that Pemex "is considering starting its own jackup drilling arm

to address shallow water needs."

58.    By December 2013, Noble's auditors at PricewaterhouseCoopers ("PwC") had

concluded that Noble's "assets will not remain in the jurisdiction [Mexico] for a sufficient time

to incur future tax consequences."  Pemex was Noble's only customer in Mexico at the time.  In

April 2014, Noble warned internally that "PEMEX needs for standard jackups declining, critical

for Paragon," and a few weeks later speculated that Pemex did not "have enough money to keep all the rigs that are already under contract."

59.      Ultimately, as discussed below, Pemex in fact did terminate or let lapse all eleven of its remaining contracts for Paragon rigs, with ten of the rigs out of service within thirteen months of the Spin-Off.

### c.      Stacked In The Gulf Of Mexico

60.      Reflecting its standard spec troubles, Noble also had two standard spec rigs (the *Noble Muravlenko* and *Noble Lorris Bouzigard*) and a floating production and storage vessel (FPSO) (the *Noble Seillean*) that were cold stacked in the Gulf of Mexico and, according to contemporaneous analyst reports and internal Noble commentary, never expected to work again.

61.      All three of those assets became part of the Paragon fleet in the Spin-Off and, in fact, have never been deployed by Paragon.  However, as described below, Noble gave Houlihan Lokey – the firm charged with providing a solvency opinion for the Spin-Off – projections that forecast around <u>$200 million in annual revenue attributable to those obsolete assets</u> despite the market consensus (and Noble's own assessment) that they would never be under a new contract.

### 3.      The Rush To Spin

62.      Rather than prompting a reassessment of the strategy, Noble's struggles with the Paragon fleet caused it to redouble its efforts to complete the Spin-Off as rapidly as possible before more bad news came to light.  In direct contrast to Noble's public statements that it did not need the cash that would have been generated by the IPO, Noble also was concerned about its ability to refinance more than $1.7 billion in debt that was maturing in July and August 2014 and increasingly desperate for proceeds to satisfy that debt.

63.    Thus, in February 2014, Noble CEO Williams reported to the Board that the number one Noble objective "[f]irst and foremost is to get the spin done" notwithstanding "weakness in the sector." He urged the Board, "we need to execute the transaction and move on."

64.    Internally, Noble was observing "a downward trend in rig value" and was concerned that it would not "be able to extract the targeted proceeds to Noble." By the time the IPO was abandoned in April 2014, investor skepticism was rising, but management declared that "reconsidering the divestment is not an option." CEO Williams advised Chastain, Noble's head of investor relations, that Noble was "moving ahead with the straight spin and skipping the IPO because we want to get it done!!"

### 4.    Deceptive Marketing

65.    Of course, even without having to sell shares in the IPO, Noble still needed to convince lenders to put up the $1.7 billion in "targeted proceeds" that Noble required to pay off its maturing debt. To induce them to do so, Noble crafted a set of deceptive marketing materials that it knew or had reason to believe was false and misleading.

### a.    False And Misleading Statements Regarding Future Business

66.    Noble told lenders that Paragon had a "low risk strategy" and was "[w]ell positioned to capture investor demand as a focused operator of standard specification drilling rigs." The stated thesis was that Paragon would be able to maintain a "strong backlog and established diverse customer base." "Paragon believes that the scale of its geographically diverse fleet, well-established customer relationships and multi-year contract backlog position the Company to take advantage of strong market dynamics in the offshore drilling industry."

67.     In contrast to its internal conclusion that the Paragon business model no longer was viable, Noble touted Paragon's "[c]ontracts with blue-chip customers such as Petrobras, Total, Pemex and Nexen," and its "focus on customers with stable long-term drilling requirements."  Noble said that Paragon "has well-established relationships with many of its customers, including Petróleo Brasileiro S.A., or Petrobras [and] Petróleos Mexicanos, or Pemex," and Paragon would "[l]everage strategic relationships with high-quality, long-term customers," including "Petrobras, the world's largest consumer of floater services, and Pemex and ONGC, two of the world's three largest consumers of jackup services."  Noble boasted of a twenty-six year relationship with Petrobras and a twenty-three year relationship with Pemex.

68.     Noble claimed those customers would continue to be there for Paragon after the Spin-Off, as "22 of Paragon's rigs have worked an average of approximately 4.6 years for their current customers.  In addition, the Company has provided services for six of its top ten customers for more than ten years."  To prove the point, Noble cited Paragon's contract backlog with Petrobras and Pemex as a source of "[v]isibility, [s]tability and [f]lexibility."  And Noble repeatedly pointed to Paragon's "[s]trong [t]rack [r]ecord of [r]e-[c]ontracting" with its existing customers, including Petrobras and Pemex, as a major driver of stability and future success.  Noble, however, said nothing about (a) Petrobras' assertion that it could terminate its drillship contracts before the maturity dates Noble had reported to the public, or (b) Pemex's declaration that it would not renew contracts for rigs older than fifteen years.

69.     Noble management repeated the party line in its road show and responses to lender questions.  When asked about future business from Pemex, management said that Noble expected all of the contracts in Mexico to be renewed, variously representing to lenders that:

- "We expect all 5 of ours to roll over with Pemex";

- "We are Pemex's largest supplier and have positioned ourselves well in that market";

- "We believe Pemex contracts will be extended 1 year by the end of 2014";

In response to questions about Pemex's statement that it wanted new rigs rather than standard spec equipment like Paragon's, management downplayed the risk:

- "[T]hey now have a new central contracts department.  []They're not going to be as interested in new builds . . . .  They're going to need additional rigs (PEMEX), some will be new rigs but a lot will be rigs they already have";

- "[T]hey have, but now they're going to a new regime . . . Pemex may not actually want new rigs (as they previously said)";

- "A lot of the people who were leading that charge are now gone, and it's hard to justify new rigs (which may make them less competitive) for projects they don't need."

70.    As shown above, Noble knew or had reason to know that these statements were false.  Based on its own statements to Mexican regulators, Pemex had no intention of renewing its Paragon contracts and, in fact, did not do so.  Within thirteen months of the Spin-Off, ten of the eleven of Pemex contracts for Paragon rigs had terminated, and the eleventh ended only months later.

71.    Similarly, when asked about future business from Petrobras, management was slightly more circumspect but said that Noble expected all of the contracts in Brazil to be renewed, variously representing to lenders that:

- "We expect to renew after contracts go up";

- "[T]he 3 [drillships] we have in Brazil are likely to continue to work in Brazil";

- "Petrobras not transparent about their drilling plans.  We expect to have conversations on Petrobras closer to contract end dates."

72.    As with its assurances about Pemex, Noble knew or had reason to know those statements about Petrobras were false.  Indeed, Noble was on notice that Petrobras was actively

trying to <u>terminate</u> two of Paragon's most lucrative contracts <u>early</u>, a sure indication that Petrobras would not be renewing those contracts in any event, but disclosed nothing about Petrobras' claimed right to terminate in advance of the maturity dates that Noble believed to apply. After the Spin-Off, Petrobras followed through with its intention to terminate the contracts and Paragon no longer has any rigs under contract in Brazil.

**b.    False And Misleading Statements Regarding Rig Life**

73.    Noble also misled lenders about the remaining useful life of Paragon's fleet of old standard spec rigs. Its marketing material touted Paragon's "well-maintained 'workhorse' fleet of rigs" and proclaimed that, due to Noble's active investment "in capital expenditures for maintenance, rig reactivations, major projects and upgrades to Paragon's fleet," Noble believed "that the quality of its fleet and its well-developed maintenance program result in low downtime and strengthen its ability to secure contracts." "By investing in its fleet, the Company believes that it can prolong rigs' lives, reduce operational downtime and generate better returns for shareholders."

74.    In the road show, management told lenders to "[e]xpect at least 10-15 years of useful life remaining in all rigs in [Paragon's] fleet." It argued that "you need to think about our assets as not necessarily 'older'. [*sic*] We think our rigs are going to be some of the last rigs replaced[, as] we have all new equipment on our old fleet." In response to a question about whether Paragon's rigs could last beyond a useful life of thirty to thirty-five years, the answer was "yes, pretty easily. Even though a lot were built to have that lifespan, we think some could get ~50 years out of them."

75.    Noble knew or had reason to believe that was not true. Noble's internal "Master Model" – which it has represented to be the source of all of its financial forecasts and modeling –

projected much shorter remaining lives for Paragon's fleet.  Under the Master Model, Noble

projected that <u>nearly sixty-three percent (63%) of its rigs – 27 of 43 – would be retired and out of</u>

<u>service by 2021 (seven years after the Spin-Off)</u> with virtually the entire fleet (39 of 42) retired

by 2025.  Noble was confident enough in that forecast of future rig life that it provided this data

to KPMG, which was charged with analyzing rig age and future productivity for purposes of

determining whether Noble needed to recognize a book value impairment of any particular rigs

in its audited financial statements.  Noble's statements to prospective lenders directly

contradicted that forecast.

76.     Moreover, while Noble repeatedly emphasized the amount of capital expenditures

it had made in connection with the Paragon rigs – proclaiming that its "investment" served to

"upgrade and extend the lives of the rigs" – Noble's financial statements show virtually no

increase in value of those assets.  There were no "upgrades."  At best, the capital expenditures

maintained rather than enhanced or increased Noble's investment in the rigs.

### c.     False And Misleading Statements Regarding Taxes

77.     Noble also misled lenders about the taxes it expected Paragon to incur after the

Spin-Off.  On the roadshow, management stated that Paragon would have an effective tax rate of

between twenty and thirty percent (20%-30%).

78.     In fact, however, Paragon's effective tax rate for the first quarter after the Spin-

Off was an astronomical forty-eight to fifty-two percent (48%-52%) and forty to forty-four

percent (40%-44%) in the following quarter.  Paragon management believes that the high rates

resulted from improper pre-spin structuring by Noble and that Noble knew but did not disclose

that Paragon would suffer higher rates than forecast.

79.    Upon learning of the issue, Randall Stilley, the Paragon CEO following the Spin-Off, wrote to Noble CEO Williams to express his dismay and observe that "James [MacLennan (Noble CFO)] and Barb [Beaulieu (Noble VP Tax)] knew this all along, but chose not to disclose it."  Paragon CFO Steve Manz speculated that MacLennan knew of the issue but "kept it [in a] tight hole" out of fear that Paragon representatives or lenders would learn of it.

80.    When the news did break (after the Spin-Off), investors were blindsided.  One shareholder wrote that "this is pretty material" as the higher taxes "end[] up destroying a decent amount of value for us."

**5.    Noble Dictates The Terms**

81.    Meanwhile, Noble management was crafting the terms of the Spin-Off, which it explicitly dictated should "be more spinner friendly than spinee."

82.    Paragon nominally was represented by its CEO, Stilley, who had been hired by Noble in February 2014 to run Paragon when it became independent.  All but one member of the rest of the Paragon team (CFO Steve Manz) consisted of Noble employees, who were beholden to and dependent upon Noble for future employment if the Spin-Off failed.  Stilley had no involvement in selecting any of them other than Manz.

83.    As a consequence, and because Noble had failed to execute an asset sale or IPO – which might have imposed market discipline on the process and provided Paragon with at least some leverage to resist Noble demands – Paragon had no meaningful input into or control over the terms of the transaction.  As one of Noble's consultants recognized, "there is no one on the SpinCo side of the table 'pulling' for the best fit / best value.  The effort has largely been focused on the safest and easiest path for Noble to 'push' SpinCo out.  This is a highly unusual situation

in a divestiture and may have long-term ramifications. . . . [T]he lack of SpinCo drivers can create an imbalance in decision criteria."[5]

84.    From early in the process, Stilley recognized this dynamic.  After being consistently rebuffed in his requests for information and changes to terms, Stilley capitulated to Noble CEO Williams:  "I realize we don't have a lot of room to negotiate, and the final decision on such issues is entirely yours, but I will continue to question proposals that might impact the viability of Paragon Offshore after the spin-off."

85.    Noble took full advantage of its leverage.  When Stilley asked for funds to retain independent counsel for Paragon, Noble refused.  Noble general counsel William Turcotte wrote, "with respect to Paragon engaging separate counsel to review (or otherwise advise Paragon), we (Noble including Paragon) do not intend to engage additional counsel for separation matters.  I understand there have been different approaches to this in some other separation transactions, but David [Williams, Noble CEO] and I have discussed this and ultimately this is a decision for Noble" (emphasis added).  After Paragon engaged a firm at the eleventh hour to review the Tax Sharing Agreement (described below), Noble CFO MacLennan was irate and directed Noble Controller Dennis Lubojacky to "ensure that Noble does not pay one cent toward this cost."

86.    When Paragon representatives suggested that Noble disclose certain information to KPMG, which was in the process of performing rig valuations before the IPO, Noble VP Tax Beaulieu made clear that Paragon was to have no independent voice whatsoever before the transaction was consummated:  "I'm not sure who came up with these questions but these are not

---

[5]    Ironically, Noble CFO MacLennan later complained about Paragon representatives' vacations, grousing:  "Guess the spin-off is easy when Noble's doing all the work. Following [Paragon co-CFO] Manz' Med cruise, it turns out that Lee A[hlstrom, Paragon co-CFO] was on vacation the whole of last week and the whole of this week.  Not a care in the world!"

all questions for KPMG, that should be brought up to KPMG, or up for debate at all. . . .  Clearly

these questions are slighted to favor Paragon and what you must remember is that Noble owns

Paragon and will continue to be the majority shareholder after the fact.  Clearly you don't

understand the transaction economics when you make statements like 'Paragon does not receive

any of the economics.'  That is bullshit.  <u>You still work for Noble and you still report to me</u>"

(emphasis added).

87.     Ultimately, with Stilley and Paragon's team stripped of any leverage, Noble was

free to make the transaction as one-sided as possible.  Among other things, the Master Separation

Agreement (described below) effectuating the Spin-Off provided for:

- Paragon to assume all "Paragon Liabilities" whenever they occurred – including hundreds of millions of dollars of potential pre Spin-Off tax liability (described below) – while giving Noble a full release of those liabilities;

- Paragon to "agree" that all corporate opportunities of directors and officers employed by Paragon and Noble belonged solely to Noble;

- Paragon to "agree" that the attorney-client privilege for lawyers working on the Spin-Off belonged solely to Noble;

- Paragon to pay $39 million in debt issuance costs; and

- Noble to make no representations or warranties (thereby enabling it to avoid disclosing its disputes with Petrobras, the state of its relationship with Pemex, and its concerns with the Paragon business).

**6.     Misleading Houlihan**

88.     One final hurdle remained for Noble's plan to shed itself of the deteriorating

Paragon assets via a unilateral Spin-Off:  Noble and its Board needed the cover of a financial

advisor's "solvency opinion" for the transaction.

89.     To that end, Noble hired Houlihan Lokey Financial Advisors, Inc., for a fee of

$███████.  Houlihan was tasked with providing the Noble Board with its opinion as to whether:

- The fair value and present fair saleable value of the assets of Paragon on a consolidated basis would exceed its stated liabilities and identified contingent liabilities on a consolidated basis (the "Balance Sheet Test");

- Paragon should be able to pay its debts as they become absolute and mature (the "Cash Flow Test"); and

- Paragon should not have unreasonably small capital for the business in which it is engaged, as management of Paragon has indicated its business is now conducted and as management of Paragon has indicated the business is proposed to be conducted immediately following the consummation of the Spin-Off (the "Reasonable Capital Test").

90.    On July 11, 2014, Houlihan issued a letter in which it answered those questions affirmatively.  By any measure, however, Houlihan's opinion was not the product of an independent investigation or a thorough examination of Paragon's value.  Houlihan disclaimed any opinion "as to whether the Company or the Company's assets (including goodwill) could actually be sold for the estimated amounts derived in our analyses."  Houlihan also did not:

- make any physical inspection or independent appraisal or evaluation of any of the specific assets, properties or liabilities (fixed, contingent, derivative, off-balance-sheet or otherwise) of Noble, Paragon or any other party;

- conduct or provide contingent liability assessments of any kind, or express any opinion as to the completeness, reasonableness or propriety of contingent liability assessments, if any, provided to it;

- opine as to the fairness of any portion or aspect of the Spin-Off to Noble, Paragon, the holders of any class of securities, creditors or other constituencies of Noble or Paragon, or to any other party; or

- opine as to whether Paragon received reasonably equivalent value in the Spin-Off.

91.    Most critically, <u>Houlihan relied exclusively on Noble's projections</u> as to Paragon's future financials, did not attempt to verify those projections, and did not prepare projections of its own.  Houlihan "relied upon and assumed, without independent verification, the accuracy and completeness of all data, material and other information furnished, or otherwise made available, to" it by Noble.  Houlihan expressly disclaimed any responsibility for the

accuracy of Noble's projections and assumptions:  "management of the Company has advised us, and we have assumed, that the Projections have been reasonably prepared in good faith on bases reflecting the best currently available estimates and judgments of such management as to the future financial results and condition of the Company. . . ."

92.     The projections that Noble gave Houlihan, however, were knowingly false, misleading, and fatally flawed, and Houlihan's absolute deference to Noble and its projections renders Houlihan's opinion as to Paragon's solvency irrelevant.

**a.     Noble Hides The Master Model And Causes Houlihan To Incorrectly Value Paragon As A Going Concern**

93.     Noble historically has maintained a detailed long-term "Master Model," which Noble has represented to be its "primary forecasting tool."  The Master Model is a large, comprehensive spreadsheet with a long-term forecast of revenue and a multitude of expenses, on a consolidated, rig-by-rig, and region-by-region basis.  At the time of the Spin-Off, the Master Model forecast ran from 2014 beyond 2030 – <u>more than sixteen years</u>.

94.     Noble, however, did not give the Master Model to Houlihan.  Instead, it stripped out the first <u>five years</u> of projections – for the years 2014-2018 – from the Master Model and gave them to Houlihan without any of the context of the Master Model.

95.     This unusual maneuver was rooted in a fundamental deception.  By giving Houlihan only the first five years of the forecast, Noble led Houlihan to believe that Paragon would continue as a stable going concern for the foreseeable future.  Having been led to believe that to be the case, Houlihan then valued Paragon as a going concern by (a) discounting Paragon's five years of projected unlevered free cash flow (2014-2018) to present value, and (b) applying a multiplier to Paragon's projected EBITDA for year five (2018) in order to derive Paragon's "terminal value."  To calculate Paragon's total value, Houlihan added the terminal

value to the discounted present value of the five years of projected cash flow.  Ultimately, Houlihan's calculated terminal value – premised on the assumption that Paragon would be a stable going concern beyond the five-year forecast Houlihan had received from Noble – accounted for sixty percent (60%) of Houlihan's total valuation of Paragon.

96.     The discounted cash flow (DCF) valuation employed by Houlihan is a standard methodology for valuing businesses that are going concerns.  The fundamental assumption underlying a DCF valuation with a terminal multiple is that the "firm is a going concern, with potentially an infinite life."[6]  The methodology makes no sense otherwise, because there is no basis for applying a multiplier to a projected near-term financial metric (like EBITDA) for a firm that is anticipated to decline and dissolve in the forecasted future.

97.     Unbeknownst to Houlihan, however, Noble's Master Model did not project Paragon to be a going concern.  Rather, because of the age of its fleet, Noble projected that Paragon would wither to nothing in the foreseeable future.  Indeed, while the customized forecast provided to Houlihan showed healthy revenues for all five years (through 2018), the Master Model forecast dramatically lower revenue starting in 2020 – when revenues were forecast to decrease by thirty-four percent (34%) in a single year (from $2.046 billion to $1.349 billion) – and continuing to decline steeply thereafter until dropping to virtually nothing by 2031.

98.     Figure 1 below highlights the decline, as projected by Noble, from the last year of the forecast given to Houlihan (2018) through 2031:

---

[6]     Aswath Damodaran, VALUING DISTRESSED AND DECLINING COMPANIES 31 (2009), available at http://people.stern.nyu.edu/adamodar/pdfiles/papers/NewDistress.pdf.

**Figure 1 – Master Model Revenue Forecast**

| ($ in Millions) | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Contract Drilling Revenue | $1,966 | $1,980 | $1,962 | $1,264 | $1,035 | $794 | $669 | $637 | $339 | $339 | $400 | $405 | $127 | $0 |
| Reimbursables | 43 | 43 | 43 | 43 | 43 | 43 | 43 | 43 | 43 | 43 | 43 | 43 | 43 | 43 |
| Contract Labor Revenue | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 |
| Other | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 |
| *Total Revenue* | 2,047 | 2,063 | 2,046 | 1,349 | 1,121 | 881 | 757 | 725 | 427 | 427 | 488 | 493 | 215 | 88 |
| | | | | | | | | | | | | | | |
| Contract Drilling Costs | 1,144 | 1,171 | 1,177 | 768 | 663 | 532 | 454 | 443 | 293 | 296 | 314 | 322 | 105 | 0 |
| Reimbursables | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 |
| Labor Contract Costs | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 |
| DD&A | 462 | 492 | 570 | 385 | 359 | 285 | 252 | 268 | 201 | 195 | 173 | 202 | 64 | 1 |
| SG&A | 70 | 71 | 72 | 72 | 39 | 31 | 26 | 25 | 15 | 15 | 17 | 17 | 7 | 3 |
| *Operating Costs* | 1,732 | 1,790 | 1,875 | 1,281 | 1,117 | 904 | 789 | 792 | 565 | 562 | 560 | 597 | 232 | 60 |
| | | | | | | | | | | | | | | |
| *Operating Income* | 316 | 273 | 171 | 68 | 4 | (23) | (32) | (67) | (138) | (135) | (72) | (104) | (17) | 28 |
| | | | | | | | | | | | | | | |
| *EBITDA* | 801 | 795 | 779 | 492 | 397 | 294 | 249 | 230 | 92 | 89 | 129 | 127 | 75 | 57 |
| | | | | | | | | | | | | | | |
| *Operating Cash Flow* | 641 | 644 | 653 | 393 | 330 | 262 | 220 | 240 | 120 | 117 | 141 | 146 | 72 | 43 |
| | | | | | | | | | | | | | | |
| *Depreciation/Amortization* | 462 | 492 | 570 | 385 | 359 | 285 | 252 | 268 | 201 | 195 | 173 | 202 | 64 | 1 |
| | | | | | | | | | | | | | | |
| *Capital Expenditures* | 296 | 201 | 192 | 147 | 121 | 84 | 73 | 63 | 47 | 47 | 47 | 48 | 11 | 0 |

99.     The reason for the steep projected decline in Paragon's revenue is found in the

Master Model. Quite simply, Noble believed that the Paragon rigs would reach the end of their

useful lives and begin to be retired in 2018 – not coincidentally, the end of the five-year

projection for the forecast that Noble provided Houlihan. As Figure 2 below demonstrates,

Noble projected that, <u>by 2021</u> – just eight years after the Spin-Off and three years after the end of

the forecast it had customized for Houlihan – <u>sixty-three percent (63%) of Paragon's fleet (27 of</u>

<u>43 rigs) would be out of service</u>. Notably, Paragon was projected to have $650 million in debt

mature in 2021 and another $1.08 billion in debt mature in 2022 and beyond, when the large

majority of Paragon's fleet was projected to disappear.

**Figure 2 – Master Model Rig Life Forecast**

| | | | Cumulative Expected Rig Expirations | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paragon Name | Built | Projected To Expire | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
| Dhabi II | 1982 | 2020 | | | X | X | X | X | X | X | X | X | X | X | X |
| B152 | 1982 | 2020 | | | X | X | X | X | X | X | X | X | X | X | X |
| L1111 | 1982 | 2021 | | | | X | X | X | X | X | X | X | X | X | X |
| L1115 | 1976 | 2024 | | | | | | | X | X | X | X | X | X | X |
| L784 | 1981 | 2020 | | | X | X | X | X | X | X | X | X | X | X | X |
| L786 | 1983 | 2020 | | | X | X | X | X | X | X | X | X | X | X | X |
| M1161 | 1980 | 2018 | X | X | X | X | X | X | X | X | X | X | X | X | X |
| M1162 | 1979 | 2025 | | | | | | | | X | X | X | X | X | X |
| L785 | 1981 | 2020 | | | X | X | X | X | X | X | X | X | X | X | X |
| DPDS1 | 1979 | 2029 | | | | | | | | | | | | X | X |
| DPDS2 | 1981 | 2029 | | | | | | | | | | | | X | X |
| DPDS3 | 1977 | 2030 | | | | | | | | | | | | | X |
| MSS2 | 1977 | 2023 | | | | | | X | X | X | X | X | X | X | X |
| L1112 | 1981 | 2020 | | | X | X | X | X | X | X | X | X | X | X | X |
| MDS1 | 1975 | 2020 | | | X | X | X | X | X | X | X | X | X | X | X |
| B301 | 1976 | 2020 | | | X | X | X | X | X | X | X | X | X | X | X |
| L1113 | 1975 | 2021 | | | | X | X | X | X | X | X | X | X | X | X |
| L1114 | 1982 | 2020 | | | X | X | X | X | X | X | X | X | X | X | X |
| L1116 | 1977 | 2021 | | | | X | X | X | X | X | X | X | X | X | X |
| L781 | 1982 | 2020 | | | X | X | X | X | X | X | X | X | X | X | X |
| M531 | 1972 | 2021 | | | | X | X | X | X | X | X | X | X | X | X |
| M821 | 1976 | 2020 | | | X | X | X | X | X | X | X | X | X | X | X |
| M823 | 1979 | 2020 | | | X | X | X | X | X | X | X | X | X | X | X |
| M824 | 1982 | 2020 | | | X | X | X | X | X | X | X | X | X | X | X |
| M841 | 1975 | 2021 | | | | X | X | X | X | X | X | X | X | X | X |
| M842 | 1975 | 2021 | | | | X | X | X | X | X | X | X | X | X | X |
| M822 | | 2020 | | | X | X | X | X | X | X | X | X | X | X | X |
| B391 | 1981 | 2023 | | | | | | X | X | X | X | X | X | X | X |
| C20051 | 1982 | 2025 | | | | | | | | X | X | X | X | X | X |
| C20052 | 1982 | 2022 | | | | | X | X | X | X | X | X | X | X | X |
| C461 | 1982 | 2025 | | | | | | | | X | X | X | X | X | X |
| C462 | 1982 | 2025 | | | | | | | | X | X | X | X | X | X |
| C463 | 1982 | 2020 | | | X | X | X | X | X | X | X | X | X | X | X |
| HZ1 | 1981 | 2022 | | | | | X | X | X | X | X | X | X | X | X |
| MSS1 | 1979 | 2025 | | | | | | | | X | X | X | X | X | X |
| DPDS4 | 1982 | 2022 | | | | | X | X | X | X | X | X | X | X | X |
| MSS3 | 1975 | 2022 | | | | | X | X | X | X | X | X | X | X | X |
| B153 | 1982 | 2018 | X | X | X | X | X | X | X | X | X | X | X | X | X |
| L782 | 1981 | 2020 | | | X | X | X | X | X | X | X | X | X | X | X |
| L783 | 1982 | 2020 | | | X | X | X | X | X | X | X | X | X | X | X |
| M825 | 1984 | 2020 | | | X | X | X | X | X | X | X | X | X | X | X |
| M826 | 1979 | 2020 | | | X | X | X | X | X | X | X | X | X | X | X |
| FPSO1 | | 2029 | | | | | | | | | | | | X | X |
| *Total Expired* | | | 2 | 2 | 21 | 27 | 31 | 33 | 34 | 39 | 39 | 39 | 39 | 42 | 43 |

Noble did not disclose any of this information to Houlihan or make it publicly available.

**b.    Noble Misleads Houlihan As To Brazil, Mexico, And The Gulf Of Mexico**

100.    Further, even the limited five-year projections that Noble provided to Houilhan were false and misleading.  Among other things, the projections assumed that every single existing rig contract would be renewed (or "rolled over") at maturity despite the fact that eighty percent (80%) of Paragon's contracts (34 of 43) were due to expire by 2015, just one year into the projection period.  The projections also assumed that each contract would be renewed at similar or higher dayrates than the existing contract rate, despite the glut of competition coming into the market.  Noble knew that, during the projection period alone, approximately 135 "newbuild" jackup rigs and approximately 100 floaters would be completed and available for service in direct competition with the Paragon fleet, driving down dayrates in the process.

101.    As demonstrated above, Noble knew or had reason to believe those assumptions to be false.  Noble knew that Petrobras was trying to terminate several contracts early (and, at a minimum, would not be renewing those contracts).  Noble knew or had reason to believe that Pemex had declared that it no longer would contract for rigs older than fifteen years (*i.e.*, Paragon's entire fleet) and, at a minimum, was at risk of not renewing its existing contracts. Noble knew that an influx of new rigs was coming into the market and would depress prices for older rigs.

102.    Yet Noble hid all of this from Houlihan, and assured Houlihan that "the standard jackup market is strong worldwide" and the market in Mexico was "strong and [Paragon] expected [its] rigs to continue to find work."  Noble similarly told Houlihan that its floater rigs "are in relatively good position to secure follow-on work" and that it was in discussions with Petrobras "to make some alterations to the rigs that could put them in workover service with

long-term contracts."  Noble said nothing about Petrobras' notice of early termination of its

Paragon contracts.

103.     Incredibly, the forecast Noble gave Houlihan also provided for the *Noble*

*Muravlenko* and *Noble Lorris Bouzigard* to begin working in 2015, and for the *Noble Seillean* to

begin working in 2016, with each generating revenue and EBITDA for the five-year projection

period, despite the fact that (a) those vessels had been "cold stacked" for years (the *Seillean* was

cold stacked in 2011 and the *Bouzigard* and *Muravlenko* in 2012), (b) the Master Model forecast

<u>zero revenue</u> for them in 2014, and (c) Noble and market analysts never expected them to work

again.  In 2016 alone, those three vessels accounted for $196 million of the projected revenue for

Paragon (ten percent (10%) of the total revenue projection) and $99 million of the projected

EBITDA for Paragon (twelve percent (12%) of the total EBITDA projection).  For the entire

five-year projection period, the three vessels accounted for seven percent (7%) of the total

projected revenue and eight percent (8%) of the total projected EBITDA for Paragon.

c.     **Other Errors In The Noble Forecast**

104.     Noble manipulated its forecast for Houlihan in other ways as well.  Among other

things, the forecast –

- Provided a 19% post-spin tax rate for Paragon, materially lower than the 26% rate included in the Master Model, not to mention the 48%-52% effective rate actually incurred by Paragon in the first quarters after the Spin-Off;

- Failed to account for the prospect of Paragon having to provide cash collateral for bonds relating to at least $228 million in contested Mexican tax assessments, an issue that (as described below) ultimately caused a liquidity crisis for Paragon;

- Failed to account for any liabilities other than borrowed money debt, including liabilities associated with known tax audit claims that Noble was foisting upon Paragon; and

- Failed to account for material post-spin capital expenditures included in the Master Model.

105.    More generally, Noble's forecast for Houlihan was unduly optimistic and rosy. As shown in Figure 3 below, despite the generally declining state of the industry, the forecast given to Houlihan was substantially more favorable for Paragon than one that Noble had provided just months earlier, in September 2013.

<u>**Figure 3 – Comparison Of Projections Given To Houlihan**</u>

|  | Revenue (millions) | Growth Rate | EBITDA (millions) | Growth Rate |
|---|---|---|---|---|
| 2013 Projections | 2014: $1,884<br>2017: $1,841 | (0.8%) | 2014: $800<br>2017: $652 | (6.6%) |
| Final Projections | 2014: $1,841<br>2017: $2,047 | 2.7% | 2014: $796<br>2017: $777 | (0.6%) |

106.    Moreover, Noble refused to update its projections after April 2014, three full months before the Spin-Off.  When members of the Paragon team prepared updated financials to provide to potential lenders (and hence Houlihan) at the end of May 2014, Noble refused to disseminate them, claiming that it would be "stepping on very dangerous ground if we depart from those numbers."

107.    The consequence of all of this is that Houlihan's opinion of Paragon's solvency at the time of the Spin-Off was fundamentally flawed because it was grounded in a knowingly false, inflated and unrealistic forecast of Paragon's future performance.

**D.    Implementing The Spin-Off**

108.    Having procured a solvency opinion on the basis of false and misleading projections, and financing commitments on the basis of false and misleading marketing, Noble finally was able to jettison its aging Paragon assets at the end of July 2014.

109.    The complicated transaction (the "<u>Spin-Off</u>") consisted of dozens of "steps" by which (a) Paragon Finance issued the Intercompany Notes totaling $1,710,550,000 to Noble

subsidiaries; (b) equity in the Noble subsidiaries denominated as part of the Paragon group was

transferred up through the chain of Noble entities and distributed to existing Noble shareholders;

(c) Paragon issued and incurred $1,730,000,000 in new debt ($650 million in secured term loans

issued by Paragon Finance and guaranteed by Paragon and other Paragon entities, and

$1.08 billion in senior unsecured notes issued by Paragon and guaranteed by Paragon Finance

and other Paragon entities); and (d) Paragon contributed the bond proceeds to Paragon Finance

which in turn satisfied the Intercompany Notes through Note Payments totaling

$1,710,736,022.32.

110.    At the conclusion of the Spin-Off, Noble had disposed of the majority of its

standard spec assets, consisting of five drillships, three semisubmersibles, thirty-four jackups, the

FSPO and related assets, sucked $1.71 billion in cash from its former subsidiaries, and saddled

Paragon with $1.73 billion in funded debt plus substantial contingent tax liabilities.  Notably,

despite the stated rationale of the transaction (which was to enable Noble to be a "pure play"

high spec operator), Noble did not actually transfer <u>all</u> of its standard spec fleet to Paragon.  It

cherry picked five rigs in the Middle East – those with advantageous contracts with favorable

rates and prospects for renewal – and kept them for itself even after Paragon CEO Stilley

requested that they be included in the assets to be received by Paragon.

111.    The Spin-Off was governed by five agreements, each dated as of July 31, 2014,

between Noble and Paragon on their own behalf and on behalf of their respective subsidiaries or

"Groups" (the "Noble Group" and the "Paragon Group"):  a Master Separation Agreement, a Tax

Sharing Agreement, a Transition Services Agreement, an Employee Matters Agreement, and a

Brazil Services Agreement.  Each agreement is denominated in United States dollars (where

applicable), governed by New York law and provides for arbitration of disputes in Houston,

Texas pursuant to the Federal Arbitration Act and "other applicable U.S. federal Law."  The agreements bind at least thirty-two different Delaware corporations and limited liability companies and, in certain respects, the directors and officers of each entity within each Group. Noble hired a United States law firm (Baker Botts LLP) to prepare the agreements.

112.    Paragon's Senior Secured Term Loan Agreement dated as of July 18, 2014 (the "Term Loan Agreement"), and Senior Notes Indenture dated as of July 18, 2014 (the "Indenture") – which provided the financing for the Spin-Off – each (a) are denominated in United States dollars, (b) are guaranteed by at least four Paragon entities organized under Delaware law, (c) are governed by New York law, (d) provide for disputes to be adjudicated in a New York state court located in Manhattan or a federal court in the Southern District of New York; and (e) provide for relevant notices to be delivered to addresses within the United States. The Term Loan Agreement is administered by a United States-based Administrative Agent (JP Morgan Chase) and the Indenture Trustee for the Senior Notes (Deutsche Bank Trust Company Americas) also is based in the United States.

113.    The Intercompany Notes are governed by New York law and denominated in United States dollars.

114.    Paragon itself has its principal place of business in Houston, Texas.  Paragon's general counsel has testified that Houston is Paragon's "centre of main interest" and that Paragon's directors are based in the United States, Paragon's main creditors are in the United States, Paragon's main financial liabilities are governed by New York law, Paragon's primary operating accounts are in the United States, and Paragon's main operating currency is United States dollars.  At least thirteen of the Paragon rigs transferred from Noble are owned by entities organized under Delaware law and/or located within the United States.

### E.    The Aftermath

115.    Paragon shares began trading on August 4, 2014, at $11.21 per share.  Within a week, Paragon shares had lost more than twelve percent (12%) of their opening value.  As Noble's deceptions gradually were revealed to the market, Paragon became the proverbial "falling knife."

#### 1.    Paragon's Unexpectedly High Effective Tax Rate "Destroys Value"

116.    Just three days after the Spin-Off closed, Paragon's management was shocked to learn that Paragon's near-term estimated effective tax rate ("ETR") approached fifty percent (50%) rather than the nineteen percent (19%) rate forecast Noble management had given Houlihan or the twenty-six percent (26%) rate forecast in the Master Model.

117.    Stilley told Noble CEO Williams that he "was never told about this before the spin-off, and all the models developed by [Noble] indicated an effective tax rate of 26% for Paragon. . . .  I assume that [Noble CFO] James [MacLennan] and [Noble Vice President, Tax] Barb [Beaulieu] knew this all along, but chose not to disclose it."

118.    During the Barclays CEO Energy-Power Conference held in New York City on September 2-4, 2014, Paragon disclosed that its actual ETR would be "significantly higher" than anticipated and that, instead of 26%, ETR was anticipated to be 48%-52% for the third quarter and 40%-44% for the fourth quarter.  Paragon advised that it was "actively evaluating restructuring opportunities to address tax inefficiencies resulting from the spin-off."  Investors punished Paragon, with its share price falling by approximately twelve percent (12%) between August 29, 2014, and September 5, 2014.

119.    Paragon's largest shareholder complained that the change "ends up destroying a decent amount of value."  A few days later, Noble Director of Investor Relations Chastain

reported that "[m]any investors are left wondering how a Company's management can have such a limited understanding of something as important as the financial structure and openly admit this in public. . . . [W]ith the shares of Paragon off 40% since trading began on August 1, investors also question Noble's strategy for the spin and whether the strategy was flawed, or worse, whether Noble placed the wrong people into leadership roles at Paragon."

### 2.    Paragon's Billion Dollar Impairment Reveals Dim Prospects In Brazil

120.    On November 10, 2014 – just three months after the Spin-Off – Paragon reported third quarter earnings and announced that it had taken a $929 million non-cash impairment charge related to its three drillships in Brazil and the FPSO.  The impairment charge was required by Paragon's assessment of diminishing prospects for future contracts for the assets, specifically the likelihood that Petrobras would not renew or roll over its agreements.

### 3.    Paragon's Prospective Tax Bonding Obligations Raise Liquidity Concerns

121.    Before the Spin-Off, Paragon CEO Stilley asked Noble for a schedule of bonding requirements related to Mexican tax assessments that Paragon was obligated to assume under the Spin-Off terms dictated by Noble.  Noble initially was unresponsive and, on information and belief, Noble CFO MacLennan threatened to fire at least one Noble employee if she provided Stilley the information he had requested.  Noble, in fact, did not provide the information until Paragon CFO Manz threatened not to sign the certification for the solvency opinion without a schedule of bonding requirements.

122.    Ultimately, in late June 2014 Noble estimated that Paragon might have to post bonds of approximately $228 million relating to Mexican tax years 2007 through 2010.  Noble, however, told Stilley not to worry because it had arranged for Paragon to have a $150 million unsecured surety line available and because Paragon was not likely to have actual tax liability for

anything but a tiny fraction of that bonded amount.  Noble did not publicly disclose anything about potential bonding requirements.

123.    Following the Spin-Off, after Paragon announced the impairment charges noted above, the lender on its surety line demanded that Paragon cash collateralize any tax bond to be posted, meaning that any material bonding requirement would consume huge amounts of Paragon's liquidity.  At the same time, Paragon's assessment of its potential exposure to tax bonding requirements continued to increase, all the way to $312 million by the end of 2015.  By July 2015, Stilley had advised the Paragon Board that "the impact [of cash-backed tax bonds] on Paragon liquidity could be substantial."

### 4.    Paragon's Business Disintegrates

124.    Meanwhile, Paragon's business was disintegrating.  On August 20, 2014, just weeks after consummation of the Spin-Off, Pemex again told government regulators that it no longer would contract for, or renew contracts for rigs older than fifteen years.  It specified that, "for purposes of clarifying the measures contained in [its September 2013] official letter, we had deemed it best to re-express them as follows:

- Vessels no older than 15 years are requested in all procurement processes for activities carried out by Pemex Exploración y Producción, regardless of whether the vessels are for logistics, maintenances, construction or providing services.

- However, in cases in which, after justification and market research, there are no vessels newer than 15 years old, older vessels can be chartered for a maximum period that may not extend beyond September 17, 2016.

- Starting on September 18, 2016, suppliers are obligated to observe the following rule: If during the term for performing the contract the vessel undertaking the work reaches the aforementioned age, it must be replaced previously and in a timely fashion by another vessel of similar or superior specifications that meets the age requirements, that is, during the term of the contract, all vessels must be no older than 15 years.

- Vessels that are currently directly or indirectly chartered shall continue operating until the end of the contract, provided they meet the foregoing conditions."

- 40 -

In accord with that guidance, Pemex terminated or let lapse three rig contracts in November and December 2014, followed by six additional contracts in the first nine months of 2015. By the end of 2015, Pemex had gone from being one of Paragon's largest customers to employing a single working rig.

125.    Similarly, as promised, Petrobras terminated the contract for the *Paragon DPDS2* (formerly the *Noble Leo Segerius*) in September 2015 and for the *Paragon DPDS3* (formerly the *Noble Roger Eason*) in August 2016. At the same time, crude oil prices also were falling from over $100 per barrel at the time of the Spin-Off to around $30 per barrel by the end of 2015, weakening demand and virtually assuring that other contracts would not be renewed at current market prices and dayrates.

126.    By late 2014, the prospects for business for Paragon's existing fleet was so poor that Paragon had no choice but to seek newer, more competitive rigs. At the end of 2014, Paragon acquired Prospector Offshore Drilling for approximately $202 million in cash and the assumption of debt associated with Prospector's two new rigs. Those new rigs were under contract with Total, an important Paragon customer, and Paragon was able to deploy them immediately, generating substantial cash flow and EBITDA. Ultimately, however, the Prospector rigs were unable to stem the tide of Paragon's losses.

127.    Figure 4 below compares Paragon's actual results for the first two full years after the Spin-Off with the forecast Noble provided to Houlihan and the downside "sensitivity" case that Houlihan applied to that forecast. It demonstrates just how wildly inaccurate Noble's forecast was.

**Figure 4 – Comparison Of Projections To Actual Results**

|                                       | **2015** | **2016** |
|---------------------------------------|---------:|---------:|
| Revenues (Management Projection)      | 2,043    | 2,032    |
| Revenues (Houlihan Sensitivity)       | 1,710    | 1,469    |
| Revenues (Actual)                     | *1,369*  | *575*    |
| EBITDA (Management Projection)        | 910      | 837      |
| EBITDA (Houlihan Sensitivity)         | 644      | 429      |
| EBITDA (Actual)                       | *562*    | *181*    |
| EBIT (Management Projection)          | 528      | 432      |
| EBIT (Houlihan Sensitivity)           | 273      | 61       |
| EBIT (Actual)                         | *222*    | *(39)*   |
| Net Income (Management Projection)    | 319      | 249      |
| Net Income (Houlihan Sensitivity)     | 75       | (90)     |
| Net Income (Actual)                   | *(1,000)*| *(338)*  |

128.     Insolvent and undercapitalized, with extremely volatile margins to start, Paragon could not weather these foreseeable setbacks and filed for bankruptcy on February 14, 2016 (the "Petition Date").  As the reasons for its bankruptcy, Paragon cited Pemex's failure to renew its contracts, termination of the two Petrobras contracts, requests by other customers to renew or renegotiate contracts at lower day rates, and tax audit claims and related bonding requirements. Paragon also noted that, "[b]ecause of the amount of debt [Paragon] incurred in connection with the Spin-Off and the nature of the assets acquired, [Paragon] w[as] not equipped to absorb the ongoing and precipitous decline in oil and gas prices and the corresponding decline in demand for their services."

129.     Ultimately, the Court confirmed the Plan on June 7, 2017.  The Plan became effective on July 18, 2017, and the Litigation Trust was formed to investigate and pursue the Noble Claims.  This action ensued.

## CLAIMS FOR RELIEF

## COUNT I (AGAINST THE CORPORATE DEFENDANTS)

## AVOIDANCE OF INTERCOMPANY NOTES AND NOTE PAYMENTS AS ACTUAL FRAUDULENT TRANSFERS
11 U.S.C. §§ 548(a)(1)(A) and 550(a)

130.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 129 as though fully set forth herein.

131.    At all relevant times through consummation of the Spin-Off, Noble dominated and controlled Paragon and all of its subsidiaries, including Paragon Finance.

132.    Noble had sole and exclusive dominion and control of the terms of the Spin-Off and all of its components, including the Intercompany Notes and the Note Payments.  For purposes of the Spin-Off, including the Intercompany Notes and Note Payments, Noble's intent is imputed to Paragon and its subsidiaries, including Paragon Finance.

133.    Obligations under the Intercompany Notes were incurred and the Note Payments were made within two years of the Petition Date.

134.    Paragon Finance, acting under the control and direction of Noble, incurred obligations under the Intercompany Notes and made the Note Payments with the actual intent to hinder, delay or defraud entities to which Paragon and its subsidiaries were indebted or became indebted, including the creditors who loaned Paragon and Paragon Finance $1.73 billion under the Term Loan Agreement and Indenture.  The intent to hinder, delay or defraud creditors is demonstrated, among other things, by:

a.    Knowingly false and misleading statements made to prospective lenders, rating agencies, and shareholders regarding, among other things, Paragon's future business, the expected useful life of Paragon's fleet, Paragon's anticipated effective tax rate, and Paragon's anticipated future tax liabilities;

- 43 -

> b.      Concealment of the Master Model from Houlihan;
>
> c.      Provision of knowingly false and misleading information to Houlihan regarding, among other things, Paragon's future business, the expected useful life of Paragon's fleet, Paragon's anticipated effective tax rate, and Paragon's anticipated future tax liabilities;
>
> d.      Concealment of material information from Stilley and others charged with representing the interests of Paragon; and
>
> e.      Refusal to provide independent counsel to Paragon or negotiate an arms' length transaction.

135.    The Note Payments were made directly to Defendants NHIL 1, NHIL 2, and FDR, each of which is an immediate transferee of and/or entity for whose benefit the Note Payments were made.  Defendants NHIL 1, NHIL 2, and FDR are insiders of Paragon and Paragon Finance.

136.    Defendants Noble, Noble Holdings Cayman and Noble Cayman are mediate transferees of and/or entities for whose benefit the Note Payments were made.  Defendants Noble, Noble Holdings Cayman and Noble Cayman are insiders of Paragon and Paragon Finance.

137.    As a consequence of the foregoing, Plaintiff is entitled to avoid the Intercompany Notes and avoid and recover the Note Payments, together with interest from July 18, 2014, from each Noble, Noble Holdings Cayman, Noble Cayman, NHIL 1, NHIL 2, and FDR pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550(a).

## COUNT II (AGAINST THE CORPORATE DEFENDANTS)

### AVOIDANCE OF INTERCOMPANY NOTES AND NOTE PAYMENTS
### AS ACTUAL FRAUDULENT TRANSFERS
11 U.S.C. §§ 544(b)(1) and 550(a); Del. Code Ann. tit. 6, § 1304(a)(1)

138.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 129 as though fully set forth herein.

139.    At all relevant times through consummation of the Spin-Off, Noble dominated and controlled Paragon and all of its subsidiaries, including Paragon Finance.

140.    Noble had sole and exclusive dominion and control of the terms of the Spin-Off and all of its components, including the Intercompany Notes and the Note Payments.  For purposes of the Spin-Off, including the Intercompany Notes and Note Payments, Noble's intent is imputed to Paragon and its subsidiaries, including Paragon Finance.

141.    Obligations under the Intercompany Notes were incurred and the Note Payments were made within two years of the Petition Date.

142.    Paragon Finance, acting under the control and direction of Noble, incurred obligations under the Intercompany Notes and made the Note Payments with the actual intent to hinder, delay or defraud entities to which Paragon and its subsidiaries were indebted or became indebted, including the creditors who loaned Paragon and Paragon Finance $1.73 billion under the Term Loan Agreement and Indenture.  The intent to hinder, delay or defraud creditors is demonstrated, among other things, by:

   a.    Knowingly false and misleading statements made to prospective lenders, rating agencies, and shareholders regarding, among other things, Paragon's future business, the expected useful life of Paragon's fleet, Paragon's anticipated effective tax rate, and Paragon's anticipated future tax liabilities;

   b.    Concealment of the Master Model from Houlihan;

c.      Provision of knowingly false and misleading information to Houlihan regarding, among other things, Paragon's future business, the expected useful life of Paragon's fleet, Paragon's anticipated effective tax rate, and Paragon's anticipated future tax liabilities;

d.      Concealment of material information from Stilley and others charged with representing the interests of Paragon; and

e.      Refusal to provide independent counsel to Paragon or negotiate an arms' length transaction.

143.    The Note Payments were made directly to Defendants NHIL 1, NHIL 2, and FDR, each of which is an immediate transferee of and/or entity for whose benefit the Note Payments were made.  Defendants NHIL 1, NHIL 2, and FDR are insiders of Paragon and Paragon Finance.

144.    Defendants Noble, Noble Holdings Cayman and Noble Cayman are mediate transferees of and/or entities for whose benefit the Note Payments were made.  Defendants Noble, Noble Holdings Cayman and Noble Cayman are insiders of Paragon and Paragon Finance.

145.    As a consequence of the foregoing, Plaintiff is entitled to avoid the Intercompany Notes and avoid and recover the Note Payments, together with interest from July 18, 2014, from each Noble, Noble Holdings Cayman, Noble Cayman, NHIL 1, NHIL 2, and FDR pursuant to 11 U.S.C. §§ 544(b)(1) and 550(a) and Del. Code Ann. tit. 6, § 1304(a)(1).

## COUNT III (AGAINST THE CORPORATE DEFENDANTS)

### AVOIDANCE OF INTERCOMPANY NOTES AND NOTE PAYMENTS AS CONSTRUCTIVE FRAUDULENT TRANSFERS
11 U.S.C. §§ 548(a)(1)(B) and 550(a)

146.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 129, as though set forth fully herein.

147.     At all relevant times through consummation of the Spin-Off, Noble dominated and controlled Paragon and all of its subsidiaries, including Paragon Finance.

148.     Noble had sole and exclusive dominion and control of the terms of the Spin-Off and all of its components, including the Intercompany Notes and Note Payments. For purposes of the Spin-Off, including the Intercompany Notes and Note Payments, Noble's intent is imputed to Paragon and its subsidiaries, including Paragon Finance.

149.     Obligations under the Intercompany Notes were incurred and the Note Payments were made within two years of the Petition Date.

150.     Paragon Finance received less than a reasonably equivalent value in exchange for its obligations under the Intercompany Notes and the Note Payments.

151.     At the time it incurred obligations under the Intercompany Notes and made the Note Payments, Paragon Finance (a) was insolvent or became insolvent as a result of such obligations and transfers; (b) was engaged in business or a transaction for which it was left with an unreasonably small capital; and (c) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

152.     The Note Payments were made directly to Defendants NHIL 1, NHIL 2, and FDR, each of which is an immediate transferee of and/or entity for whose benefit the Note Payments were made. Defendants NHIL 1, NHIL 2, and FDR are insiders of Paragon and Paragon Finance.

- 47 -

153.    Defendants Noble, Noble Holdings Cayman and Noble Cayman are mediate transferees of and/or entities for whose benefit the Note Payments were made.  Defendants Noble, Noble Holdings Cayman and Noble Cayman are insiders of Paragon and Paragon Finance.

154.    As a consequence of the foregoing, Plaintiff is entitled to avoid the Intercompany Notes and avoid and recover the Note Payments, together with interest from July 18, 2014, from each Noble, Noble Holdings Cayman, Noble Cayman, NHIL 1, NHIL 2, and FDR pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550(a).

### COUNT IV (AGAINST THE CORPORATE DEFENDANTS)

### AVOIDANCE OF INTERCOMPANY NOTES AND NOTE PAYMENTS AS CONSTRUCTIVE FRAUDULENT TRANSFERS
11 U.S.C. §§ 544(b)(1) and 550(a); Del. Code Ann. tit. 6, § 1304(a)(2)

155.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 129, as though set forth fully herein.

156.    At all relevant times through consummation of the Spin-Off, Noble dominated and controlled Paragon and all of its subsidiaries, including Paragon Finance.

157.    Noble had sole and exclusive dominion and control of the terms of the Spin-Off and all of its components, including the Intercompany Notes and Note Payments.  For purposes of the Spin-Off, including the Intercompany Notes and Note Payments, Noble's intent is imputed to Paragon and its subsidiaries, including Paragon Finance.

158.    Obligations under the Intercompany Notes were incurred and the Note Payments were made within two years of the Petition Date.

159.    Paragon Finance received less than a reasonably equivalent value in exchange for its obligations under the Intercompany Notes and the Note Payments.

160.    At the time it incurred obligations under the Intercompany Notes and made the Note Payments, Paragon Finance (a) was insolvent or became insolvent as a result of such obligations and transfers; (b) was engaged in business or a transaction for which it was left with an unreasonably small capital in relation to its business or transactions; and (c) intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

161.    The Note Payments were made directly to Defendants NHIL 1, NHIL 2, and FDR, each of which is an immediate transferee of and/or entity for whose benefit the Note Payments were made.  Defendants NHIL 1, NHIL 2, and FDR are insiders of Paragon and Paragon Finance.

162.    Defendants Noble, Noble Holdings Cayman and Noble Cayman are mediate transferees of and/or entities for whose benefit the Note Payments were made.  Defendants Noble, Noble Holdings Cayman and Noble Cayman are insiders of Paragon and Paragon Finance.

163.    As a consequence of the foregoing, Plaintiff is entitled to avoid the Intercompany Notes and avoid and recover the Note Payments, together with interest from July 18, 2014, from each Noble, Noble Holdings Cayman, Noble Cayman, NHIL 1, NHIL 2, and FDR pursuant to 11 U.S.C. §§ 544(b) and 550(a) and Del. Code Ann. tit. 6, § 1304(a)(2).

## COUNT V (AGAINST THE CORPORATE DEFENDANTS)

### RECHARACTERIZATION OF INTERCOMPANY NOTES AS EQUITY AND AVOIDANCE OF NOTE PAYMENTS AS DIVIDENDS
11 U.S.C. §§ 105(a), 544(b), 548(a)(1)(B) and 550(a); Del. Code Ann. tit. 6, § 1304(a)(2)

164.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 129, as though set forth fully herein.

165.     At all relevant times through consummation of the Spin-Off, Noble dominated and controlled Paragon and all of its subsidiaries, including Paragon Finance.

166.     Noble had sole and exclusive dominion and control of the terms of the Spin-Off and all of its components, including the Intercompany Notes and Note Payments.  For purposes of the Spin-Off, including the Intercompany Notes and Note Payments, Noble's intent is imputed to Paragon and its subsidiaries, including Paragon Finance.

167.     At all relevant times, Paragon Finance was a wholly owned subsidiary of Noble.

168.     Paragon Finance received no consideration in exchange for its purported obligations under the Intercompany Notes.

169.     Any transfer of assets to any Noble subsidiary denominated as part of the Paragon group was in the nature of a capital contribution rather than a bona fide loan or sale.

170.     The Intercompany Notes were unsecured, bore a negligible interest rate of 1.305%, had an immaterial term of two weeks, and had no sinking fund or other mechanism to secure payment.

171.     Based on the real nature of the Intercompany Notes and Noble's relationship with its Paragon subsidiaries, the Intercompany Notes should be recharacterized as equity and the Note Payments should be recharacterized as capital distributions or dividends on that equity (the "Dividends").

172.     Paragon Finance received less than a reasonably equivalent value in exchange for the Dividends.

173.     At the time it made the Dividends, Paragon Finance (a) was insolvent or became insolvent as a result of such obligations and transfers; (b) was engaged in business or a

transaction for which it was left with an unreasonably small capital; and (c) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

174.    The Dividends were made directly to Defendants NHIL 1, NHIL 2, and FDR, each of which is an immediate transferee of and/or entity for whose benefit the Dividends were made.  Defendants NHIL 1, NHIL 2, and FDR are insiders of Paragon and Paragon Finance.

175.    Defendants Noble, Noble Holdings Cayman and Noble Cayman are mediate transferees of and/or entities for whose benefit the Dividends were made.  Defendants Noble, Noble Holdings Cayman and Noble Cayman are insiders of Paragon and Paragon Finance.

176.    As a consequence of the foregoing, Plaintiff is entitled to avoid and recover the Dividends, together with interest from July 18, 2014, from each Noble, Noble Holdings Cayman, Noble Cayman, NHIL 1, NHIL 2, and FDR pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B) and 550(a) and Del. Code Ann. tit. 6, § 1304(a)(2).

## COUNT VI (AGAINST INDIVIDUAL PARAGON DIRECTORS)

## <u>BREACH OF FIDUCIARY DUTY</u>

177.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 129, as though set forth fully herein.

178.    At all times relevant to this Complaint, Defendants James A. MacLennan and Julie J. Robertson were directors of Paragon with fiduciary duties to Paragon and its creditors. At all times relevant to this Complaint, MacLennan also served as an officer and director of Noble, and Robertson served as an officer of Noble.

179.    During their respective tenures as Paragon Board Members and executives of Noble, MacLennan and Robertson, acting at the direction of Noble, exercised actual control over Paragon.

- 51 -

180. By reason of this fiduciary relationship, MacLennan and Robertson each owed Paragon the highest obligation of care and loyalty in managing and administering Paragon's affairs. However, as a result of their dual roles on behalf of Paragon and Noble, MacLennan and Robertson were hopelessly conflicted.

181. MacLennan and Robertson abdicated and disregarded their corporate responsibilities and duties to Paragon with gross negligence, reckless indifference and in bad faith by, among other things:

       a.      Putting the interests of Noble above the interests of Paragon.

       b.      Providing or causing Paragon to provide knowingly false and misleading statements to prospective lenders, rating agencies, and shareholders regarding, among other things, Paragon's future business, the expected useful life of Paragon's fleet, Paragon's anticipated effective tax rate, and Paragon's anticipated future tax liabilities;

       c.      Concealing or causing Paragon to conceal the Master Model from Houlihan;

       d.      Providing or causing Paragon to provide knowingly false and misleading information to Houlihan regarding, among other things, Paragon's future business, the expected useful life of Paragon's fleet, Paragon's anticipated effective tax rate, and Paragon's anticipated future tax liabilities;

       e.      Concealing material information from Stilley and others charged with representing the interests of Paragon;

       f.      Refusing to provide Paragon with independent counsel in connection with the Spin-Off; and

       g.      Causing and/or facilitating the Spin-Off.

182.    MacLennan and Robertson acted with gross negligence, or recklessness and in bad faith in connection with the Spin-Off.

183.    The conduct of MacLennan and Robertson cannot be attributed to any rational business purpose as to Paragon.

184.    MacLennan and Robertson recklessly disregarded the fact that they were acting in a manner adverse to the interests of Paragon.

185.    The conduct of MacLennan and Robertson constituted a breach of their fiduciary duties, including but not limited to their duties of loyalty, care, good faith, and candor.

186.    As a direct and proximate result of MacLennan and Robertson's breaches of their fiduciary duties, Paragon suffered significant damages in an amount to be proven at trial.

## COUNT VII (AGAINST INDIVIDUAL NOBLE DIRECTORS)

### AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY

187.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 129, as though set forth fully herein.

188.    At all times relevant to this Complaint, Defendant David Williams was Chairman of Noble's Board of Directors and Noble's President and Chief Executive Officer.

189.    At all times relevant to this Complaint, Defendants Ashley Almanza, Michael A. Cawley, Lawrence J. Chazen, Julie H. Edwards, Gordon T. Hall, Jon A. Marshall, and Mary P. Ricciardello were members of Noble's Board of Directors (together with Williams, "Noble's Board of Directors").

190.    At all relevant times, Defendants MacLennan and Robertson directly or indirectly reported to Noble's Board of Directors.

- 53 -

191.    As described above, MacLennan and Robertson breached their fiduciary duties to Paragon.

192.    Noble's Board of Directors knew that MacLennan and Robertson had fiduciary duties to Paragon and were breaching those duties in the context of the Spin-Off.

193.    Noble's Board of Directors colluded in and aided and abetted those breaches of fiduciary duties, and were active and knowing participants in those breaches of fiduciary duties. Among other things, Noble's Board of Directors exerted dominion and control over MacLennan, Robertson and Paragon in connection with the Spin-Off and assisted MacLennan and Robertson in facilitating and/or causing the Spin-Off.

194.    As a direct and proximate result of MacLennan's and Robertson's breaches of their fiduciary duties, as aided and abetted by Noble's Board of Directors, Paragon suffered significant damages in an amount to be proven at trial.

## COUNT VIII (AGAINST THE CORPORATE DEFENDANTS)

## UNJUST ENRICHMENT

195.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 129, as though set forth fully herein.

196.    As a result of the conduct set forth above, including the Note Payments made directly to Defendants NHIL 1, NHIL 2, and FDR, the Corporate Defendants unjustly retained, and Paragon and its subsidiaries were unjustly deprived of, cash, credit and other things of value.

197.    The retention of such cash, credit and other things of value by the Corporate Defendants did not result from enforceable agreements between Paragon and its subsidiaries and the Corporate Defendants and was not justified.  As a result, the Corporate Defendants have been unjustly enriched and Paragon and its subsidiaries have been impoverished.

198.     The unjust enrichment of the Corporate Defendants was inequitable and in violation of fundamental principles of justice, equity and good conscience.

199.     As a result of the foregoing, the Corporate Defendants should be compelled by the Court to make restitution in the amount of the Note Payments, together with interest from July 18, 2014 onward.

## RESERVATION OF RIGHTS

200.     Plaintiff reserves the right, to the extent permitted under the Bankruptcy Code, the Federal Rules of Civil or Bankruptcy Procedure, or by agreement or other applicable law, to assert any and all other additional claims relating to the subject matter of this action or otherwise falling within the definition of Noble Claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

a.     Avoiding the Intercompany Notes and Note Payments;

b.     Recharacterizing the Intercompany Notes as equity and the Note Payments as capital contributions or dividends;

c.     Granting recovery of the Note Payments and Dividends;

d.     Awarding compensatory damages in an amount to be proven at trial;

e.     Imposing a constructive trust on assets of the Defendants in the amount of all proceeds received by them in connection with the Note Payments;

f.     Declaring that MacLennan and Robertson breached their fiduciary duties to Paragon and its creditors;

g.     Declaring the Noble's Board of Directors aided and abetted the breaches of fiduciary duties committed by MacLennan and Robertson;

h.      Awarding pre- and post-judgment interest at the legal rate;

i.      Awarding Plaintiff its reasonable costs and expenses incurred in this action

including attorneys' fees and expert fees; and

j.      Awarding such other and further relief as the Court may deem just and proper.

Dated:  December 15, 2017
        Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Jaime Luton Chapman*

Pauline K. Morgan (Bar No. 3650)
Joel A. Waite (Bar No. 2925)
Jaime Luton Chapman (Bar No. 4936)
Michael S. Neiburg (Bar. No. 5275)
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:         pmorgan@ycst.com
               jwaite@ycst.com
               jchapman@ycst.com

-and-

JONES DAY
Bruce Bennett
Sidney P. Levinson
James O. Johnston
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, California 90071
Telephone:    (213) 489-3939
Facsimile:    (213) 243-2539
Email:         bbennett@jonesdy.com
               slevinson@jonesdy.com
               jjohnston@jonesday.com

- and -

Jennifer L. Del Medico
Genna L. Ghaul
JONES DAY
250 Vesey Street
New York, New York  10281
Telephone:    (212) 326-3939
Facsimile:    (212) 755-7306
Email:         jdelmedico@jonesday.com
               gghaul@jonesday.com

*Counsel To The Paragon Litigation Trust*