## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PARAGON OFFSHORE PLC, | Case No. 16-10386 (CSS) |
| Debtor.[1] | (Jointly Administered) |
| | |
| PARAGON LITIGATION TRUST, | |
| Plaintiff | Adversary Proc. No. 17-51882 (CSS) |
| vs. | |
| | **Ref. Docket No. 23** |
| NOBLE CORPORATION PLC, NOBLE CORPORATION HOLDINGS LTD, NOBLE HOLDING INTERNATIONAL (LUXEMBOURG) S.A R.L., NOBLE FDR HOLDINGS LIMITED, ASHLEY ALMANZA, JULIE H. EDWARDS, GORDON T. HALL, JON A. MARSHALL, JAMES A. MACLENNAN, MARY P. RICCIARDELLO, JULIE J. ROBERTSON, AND DAVID WILLIAMS, | |
| Defendants. | |

## THE PARAGON LITIGATION TRUST'S
## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS
## IN FAVOR OF ARBITRATION AND TO STAY THE PROCEEDINGS

---

[1] The Debtor in this case, along with the last four digits of the debtor's federal tax identification number is Paragon Offshore plc (in administration) (6017). The Debtor's mailing address is 3151 Briarpark Drive, Suite 700, Houston, Texas 77042. Neville Barry Kahn and David Philip Soden, each of Deloitte LLP, are the joint administrators of Paragon Offshore plc (in administration) (the "Joint Administrators"). The affairs, business and property of Paragon Offshore plc (in administration) are managed by the Joint Administrators.

## TABLE OF CONTENTS

**Page**

**INTRODUCTION**...................................................................................................... 1

**FACTUAL BACKROUND** ...................................................................................... 4

I.    NOBLE DESIGNED AND CONSUMMATED THE SPIN-OFF .................................. 4

II.   THE FRAUDULENT TRANSFERS AND DEFENDANTS'
      MISCONDUCT OCCURRED WELL BEFORE EXECUTION OF
      THE MSA AND ANCILLARY AGREEMENTS ........................................... 5

III.  THE MSA AND ANCILLARY AGREEMENTS ADDRESSED
      ADMINISTRATIVE MATTERS ...................................................................... 6

IV.   THE NOBLE CLAIMS WERE A FOCUS OF THE BANKRUPTCY CASE
      AND THE COURT EXPRESSLY PRESERVED THEM FOR ITS OWN
      ADJUDICATION ............................................................................................. 8

**ARGUMENT** ................................................................................................... 10

I.    THE PLAN VESTS THE COURT WITH "EXCLUSIVE JURISDICTION"
      TO "ADJUDICATE THE NOBLE CLAIMS" AND SUPERSEDES ANY
      SUPPOSEDLY APPLICABLE ARBITRATION PROVISION.................................. 10

II.   THE COURT DETERMINES ARBITRABILITY ....................................... 15

      A.    The MSA And Ancillary Agreements Do Not "Clearly And
            Unmistakably" Delegate Questions Of Arbitrability To The Arbitrator ............ 15

      B.    The Court Independently Must Evaluate Whether The Individual
            Defendants May Enforce Agreements They Did Not Sign ................................ 20

III.  THE TRUST'S CLAIMS ARE NOT ARBITRABLE .................................... 23

      A.    The Fraudulent Transfer Claims Must Be Adjudicated By The Court................ 23

      B.    The Damage Claims Cannot Be Arbitrated Because
            They Have Nothing To Do With The MSA Or Ancillary Agreements............... 24

            1.    Only Claims That Intertwine With The MSA Or Ancillary
                  Agreements Arguably Could Be Subject To Arbitration......................... 24

            2.    The Trust's Claims Do Not Interwine With The MSA Or
                  Ancillary Agreements ............................................................... 26

**Page**

IV.    EVEN IF THE DAMAGE CLAIMS ARE DEEMED ARBITRABLE,
       THE COURT SHOULD NOT STAY THE NON-ARBITRABLE
       FRAUDULENT TRANSFER CLAIMS ........................................................................ 30

       A.    If The Court Determines That The Damage Claims Are Arbitrable, The
             Applicable Factors Strongly Favor A Stay Of Arbitration ................................. 31

       B.    The Defendants Have Not Satisfied Their Burden Of
             Demonstrating The Need For A Stay................................................................. 35

**CONCLUSION** ................................................................................................................. 37

# TABLE OF AUTHORITIES

**Cases**                                                                                                                                 **Page**

*Adtile Techs. Inc. v. Perion Network Ltd.*, 192 F. Supp. 3d 515 (D. Del. 2016) ........................ 30

*In re All American Semiconductor, Inc.*, No. 07-12963-BKC-LMI,
   2010 WL 2854153 (Bankr. S.D. Fla. July 20, 2010),
   *aff'd,* No. 10-23406-CV, 2011 WL 3843943 (S.D. Fla. Aug. 29, 2011) ........................ 12, 15

*Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199 (E.D.N.Y. 2013) .......................................... 32

*Allstate Ins. Co. v. Toll Bros., Inc.*, 171 F. Supp. 3d 417 (E.D. Pa. 2016) ................................. 17

*American Shipping Line, Inc. v. Massan Shipping Industries, Inc.*,
   885 F. Supp. 499 (S.D.N.Y. 1995) ........................................................................................ 34

*In re APF Co.*, 264 B.R. 344 (Bankr. D. Del. 2001) ................................................................... 33

*Arthur Anderson LLP v. Carlisle*, 556 U.S. 624 (2009) ............................................................. 22

*In re AstroPower Liquidating Trust*, 335 B.R. 309 (Bankr. D. Del. 2005) ........................... 24, 33

*Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7 (1st Cir. 2009) ....................................................... 17

*Binder v. PriceWaterhouse & Co., LLP
   (In re Resorts Int'l, Inc.*, 372 F.3d 154, 167 (3d Cir. 2003) ................................................. 11

*Carder v. Carl M. Freeman Cmtys. LLC*, No. 3319-VCP, 2009 WL 106520
   (Del. Ch. Jan. 5, 2009) .................................................................................................... 22, 30

*CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165 (3d Cir. 2014) .................................. 16, 25

*Century Indem. Co. v. Certain Underwriters at Lloyd's London*,
   584 F.3d 513 (3d Cir. 2009) .................................................................................................. 24

*Certain Underwriters at Lloyd's London v. Westchester Fire Ins. Co.*,
   489 F.3d 580 (3d Cir. 2007) .................................................................................................. 16

*Chesapeake Appalachia, LLC v. Scout Petroleum*, 809 F.3d 746 (3d Cir. 2016) ...................... 19

*In re CIT Grp. Inc.*, No. 09-16565-ALG, 2012 WL 831095
   (Bankr. S.D.N.Y. Mar. 9, 2012) ............................................................................................ 14

*Collins & Aikman Prods. Co. v. Bldg. Sys.*, Inc., 58 F.3d 16 (2d Cir. 1995).............................. 25

*Contec Corp. v. Remote Solution Co.*, 98 F.3d 205 (2d Cir. 2005) .................... 20, 22, 23, 29, 30

**Page**

*Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511 (10th Cir. 1995) .................................. 26

*Degraw Const. Grp, Inc. v McGowan Builders, Inc.*,
  152 A.D.3d 567 (N.Y. App. Div. 2017) ......................................................... 30

*Dickinson v. Heinold Sec., Inc.*, 661 F.2d 638 (7th Cir. 1981).................................... 32

*Donaldson v. Bernstein*, 104 F.3d 547 (3d Cir. 1997).............................................. 11

*Douglas v. Regions Bank*, 757 F.3d 460 (5th Cir. 2014) ......................................... 19

*In re E & G Waterworks, LLC*, 571 B.R. 500 (Bankr. D. Mass. 2017)........................... 33

*Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*,
  304 F.3d 753 (7th Cir. 2002) ...................................................... 2, 11, 13, 14, 15

*E. W. Bank v. Bingham*, 992 F. Supp. 2d 1130 (W.D. Wash. 2014) .................................... 34, 36

*EXDS, Inc. v. Ernst & Young LLP (In re EXDS, Inc.)*,
  316 B.R. 817 (Bankr. D. Del. 2004) ......................................................... 35

*F.D. Imp. & Exp. Corp. v. M/V REEFER SUN*, 248 F. Supp. 2d 240 (S.D.N.Y. 2002)............. 31

*Feeley v. NHAOCG, LLC*, 62 A.3d 649 (Del. Ch. 2012)................................................ 25

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995)........................................... 16, 21

*Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 141 F.3d 243 (5th Cir. 1998).................... 26

*FUJIFILM N. Am. Corp. v. Geleshmall Enterprises LLC*,
  239 F. Supp. 3d 640 (E.D.N.Y. 2017) ......................................................... 25

*In re Gandy*, 299 F.3d 489 (5th Cir. 2002) ........................................................... 4, 31

*Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840 (2d Cir. 1987) ............................... 25

*Gerszberg v. Li & Fung (Trading) Ltd.*, 215 F. Supp. 3d 282 (S.D.N.Y. 2016) ........................ 22

*Griswold v. Coventry First LLC*, 762 F.3d 264 (3d Cir. 2014) .................................... 21

*John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132 (3d Cir. 1998)................................... 16

*In re Hagerstown Fiber Ltd. P'ship*, 277 B.R. 181 (Bankr. S.D.N.Y. 2002)............................ 36

*Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  885 F.2d 1149 (3d Cir. 1989)........................................................... 23, 30

**Page**

*Holzer v. Mondadori*, No. 12 Civ. 5234 (NRB), 2013 WL 1104269
 (S.D.N.Y. Mar. 14, 2013) ................................................... 21

*Home Buyers Warranty Corp. v. Jones*, No. 15-mc-324-RGA-MPT,
 2016 WL 2350103 (D. Del. May 4, 2016), *report and recommendation adopted*,
 2016 WL 3457006 (D. Del. June 21, 2016)................................................... 17, 30

*Ishimaru v. Fung*, No. Civ. A 929, 2005 WL 2899680 (Del. Ch. Oct. 26, 2005) ...................... 29

*Klay v. All Defendants*, 389 F.3d 1191 (11th Cir. 2004) ........................................... 31

*Lapina v. Men Women N.Y. Model Mgmt. Inc.*, 86 F. Supp. 3d 277 (S.D.N.Y. 2015).... 23, 29, 30

*In re Latimer*, 489 B.R. 844 (Bankr. N.D. Ala. 2013) ................................................ 36

*Lepera v. ITT Corp.*, No. 97-1461, 1997 WL 535165 (E.D. Pa. Aug, 12, 1997) ...................... 35

*Lipscomb v. Clairvest Equity Partners Ltd. P'ship (In re LMI Legacy Holdings, Inc.)*,
 553 B.R. 235 (Bankr. D. Del. 2016) ................................................... 23

*Lloyd v. HOVENSA, LLC*, 369 F.3d 263 (3d Cir. 2004)................................................ 31

*Madison Foods, Inc. v. Fleming Cos.*, 325 B.R. 687 (Bankr. D. Del. 2005).............................. 36

*Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs*,
 357 F.3d 272 (3d Cir. 2004)................................................... 16

*McLaughlin v. McCann*, 942 A.2d 616 (Del. Ch. 2008) ........................................... 22

*McMahon v. RMS Electronics, Inc.*, 618 F. Supp. 189 (S.D.N.Y. 1985) .................................... 35

*Meadows v. Dickey's Barbecue Restaurants Inc.*, 144 F. Supp. 3d 1069 (N.D. Cal. 2015) ....... 17

*Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44 (3d Cir. 2001) ......... 24

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) ...................... 26

*NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417 (Del. Ch. 2007) .............. 25

*OHC Liquidation Tr. v. Am. Bankers Ins. Co. (In re Oakwood Homes Corp.)*, Nos. 02-
 13396 (PJW), 04-56928 (PBL), 2005 WL 670310 (Bankr. D. Del. Mar. 18, 2005)............. 33

*Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069 (9th Cir. 2013)...................................... 17

*Opalinski v. Robert Half Intern. Inc.*, 761 F.3d 326 (3d Cir. 2014) ...................................... 16, 19

*Painewebber Inc. v. Hoffman*, 984 F.2d 1372 (3d Cir. 1993).................................................... 16

**Page**

*Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149 (Del. 2002) .................... 3, 24,28

*In re Pharmacy Benefit Managers Antitrust Litig.*, 700 F.3d 109 (3d Cir. 2012) ...................... 16

*In re Planet Hollywood Int'l*, 274 B.R. 391 (Bankr. D. Del. 2001) ............................................ 11

*Pritzker v. Merrill Lynch, Pierce, Fenner & Smith*, 7 F.3d 1110 (3d Cir. 1993) ....................... 30

*Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172 (3d Cir. 2010) .................................................... 15

*Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366 (Fed. Cir. 2006) ................................................ 20

*Quilloin v. Tenet HealthSystem Philadelphia, Inc.*, 673 F.3d 221 (3d Cir. 2012) ................ 16, 31

*The Republic of Iraq v. BNP Paribas USA*, 472 Fed. Appx. 11 (2d Cir. 2012) ......................... 21

*In re Residential Capital LLC*, 563 B.R. 756 (Bankr. S.D.N.Y. 2016) ................................. 31, 32

*SFC New Holdings, Inc. v. Earthgrains Co. (In re GWI, Inc.),*
    269 B.R. 114 (Bankr. D. Del. 2001) ...................................................................................... 12

*In re Shenango Group, Inc.*, 501 F.3d 338 (3d Cir. 2007) .......................................................... 11

*Shubert v. Wellspring Media, Inc.*, 335 B.R. 556 (Bankr. D. Del. 2005) .................................... 36

*Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17 (2d Cir. 2002) ............................................. 25

*Starglade Properties Ltd v Nash* [2010] EWCA Civ 1314........................................................... 28

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010).......................................... 21

*In re S.W. Bach & Co.*, 425 B.R. 78 (Bankr. S.D.N.Y. 2010) ...................................................... 32

*Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109 (11th Cir. 2001).................... 26

*Turi v. Main Street Adoption Services, LLP*, 633 F.3d 496 (6th Cir. 2011) ................................ 20

*Washington v. William Morris Endeavor Entm't, LLC*, No. 10 Civ. 9647 (PKC) (JCF),
    2011 WL 3251504 (S.D.N.Y. July 20, 2011) ......................................................................... 30

01:23040251.1

**Page**

**Other Authorities**

9 U.S.C § 3 ................................................................................................... 31

Companies Act 2006 § 172(3) ...................................................................... 28

Insolvency Act 1986 §213 ............................................................................. 28

Insolvency Act 1986 §214 ............................................................................. 28

BARRON'S LAW DICTIONARY 11 (Ed. 1996) ............................................. 12

## INTRODUCTION

In 2014, Noble Corporation jettisoned a fleet of old offshore drilling rigs via a corporate "spin-off."  Noble isolated the aging rigs in a group of subsidiaries it called Paragon Offshore, loaded up Paragon with $1.7 billion in debt, and transferred the loan proceeds to itself.  Noble controlled all aspects of the transaction from design to implementation.  With no counsel, no financial advisor, no independent management, and no access to resources with which to retain them, Paragon had no ability to negotiate or refuse to proceed with a deal that, for all intents and purposes, was a transaction by Noble with itself.

With its unsustainable debt load, Paragon was in bankruptcy eighteen months later, and creditors who had been duped into financing the spin-off were left holding an empty bag, ultimately receiving cents on the dollar in the bankruptcy case.  The Paragon Litigation Trust brought this action on behalf of the Paragon bankruptcy estate, for the benefit of those creditors and their successors.  It is, first and foremost, an action to avoid and recover the $1.7 billion in fraudulent transfers that Noble extracted from Paragon.  Secondarily, it is an action for damages resulting from the misconduct of Noble and various insiders who orchestrated the spin-off to enrich Noble at Paragon's expense.

Although they concede, as they must, that the Trust's predominant fraudulent transfer claims cannot be arbitrated, Noble and the other Defendants now assert that the Court not only must send the damage claims to arbitration but also let the tail wag the dog and stay adjudication of the core fraudulent transfer claims "pending completion of the arbitration and any related confirmation proceedings."  Memo. at 22.[2]  This request is unfounded and should be rejected.

---

[2]  "Memo." is the *Memorandum Of Law In Support Of Defendants' Motion To Dismiss In Favor Of Arbitration And To Stay The Proceedings* [D.I. 24].  Capitalized terms not defined

For a number of reasons, the Trust's damage claims – in the form of causes of action for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment – are not subject to arbitration under the agreements on which the Defendants rely.  <u>First</u>, Paragon's Plan and the order confirming it are very specific as to whether the Court or an arbitrator is to decide these claims.  They dictate that the Court – not an arbitrator – has "exclusive jurisdiction . . . to adjudicate the Noble Claims to the fullest extent permitted by law." This was by design.  As the Defendants are well aware, the creation and funding of the Trust, and vesting of the Noble Claims with it, were fundamental components of the Plan.  Indeed, as the documents were being drafted, Noble insisted on certain edits to the Plan and Confirmation Order to preserve certain of their rights relating to the Noble Claims.  But it never objected to the provisions that specifically vested the Court with exclusive jurisdiction to adjudicate the claims. Nor did any of the other Defendants, all of whom are now bound by those provisions.  *E.g.*, *Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*, 304 F.3d 753, 756 (7th Cir. 2002) (arbitration provision "superseded by the terms of the confirmed plan").

<u>Second</u>, and in any event, the arbitration provision in the Master Separation Agreement ("<u>MSA</u>") does not apply because the Trust's damage claims do not arise out of, touch on, depend upon, intertwine with, or have anything whatsoever to do with the MSA or the other administrative "Ancillary Agreements."  To the contrary, the tortious acts giving rise to the Trust's claims had been completed well before the MSA and Ancillary Agreements were executed on July 31, 2014.  Noble established the $1.7 billion Spin-Off price in 2013; Noble procured $1.7 billion in Paragon loans and executed the "intercompany notes" and "share

---

here have the meanings given in the Memo and the Complaint.  Citations to "<u>Ex.</u>" are to the Exhibits appended to the accompanying Declaration of Genna L. Ghaul.

purchase agreements" purportedly obligating Paragon to turn over the loan proceeds to it in mid-July 2014; and Noble transferred the $1.7 billion to itself on July 18, 2014 – this last step a full thirteen days before the MSA and Ancillary Agreements were signed.

The MSA and Ancillary Agreements are mentioned but twice in the Complaint's 200+ paragraphs – once to help describe Noble's absolute control over Paragon (¶ 87); the other to establish that the Court has personal jurisdiction over the Defendants (¶ 111).  The MSA and Ancillary Agreements were administrative documents that set forth "arrangements" between Noble and Paragon necessary to effectuate a transaction that had already occurred.  They dealt with things like intellectual property licenses, bank and brokerage accounts, indemnification obligations, and insurance policies.  Notably, they did not establish, concern, touch upon, or even mention the $1.7 billion that Paragon already had transferred to Noble, the transfer at the heart of the Trust's claims.  Put another way, the MSA and Ancillary Agreements are unnecessary for the establishment of the Trust's claims, and the Trust could and would have brought them had the agreements never been executed.  *E.g.*, *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155-57 (Del. 2002) (no arbitration of fiduciary duty claims because the claims do not "touch on contract rights or contract performance" or "depend on the existence" of the underlying contract and "would be assertable had there been no" agreement).

Third, even if the Trust's claims somehow did arise out of or concern the MSA and Ancillary Agreements, the Individual Defendants cannot compel arbitration because they did not sign the agreements and, in fact, conspicuously were exempted from them.  They have no rights or duties under the MSA and Ancillary Agreements and can make no showing that Paragon agreed to arbitrate ***any*** claims against them.

01:23040251.1

Finally, even if the Trust's damage claims somehow were deemed arbitrable under the administrative MSA and Ancillary Agreements, the Defendants have it backwards in asking the Court to stay the Trust's central fraudulent transfer claims.  Relative predominance of the claims is the critical factor of such a stay request.  Where (as here) the arbitrable claims are "peripheral" to non-arbitrable claims, and "the heart of [a] [d]ebtor's complaint concerns the avoidance of fraudulent transfers," a stay simply is not appropriate.  *In re Gandy*, 299 F.3d 489, 497-98 (5th Cir. 2002).  This is particularly true given the potential for spoliation of evidence respecting events that occurred nearly four years ago and the possibility of preclusive arbitrator findings on overlapping factual issues (such as Paragon's insolvency).

## FACTUAL BACKGROUND

The Trust's Complaint includes a comprehensive description of the Spin-Off and the Defendants' misconduct associated with it.  The following summary provides context helpful for the Court's consideration of the Motion, but is not comprehensive.  Greater detail is found in passages of the Complaint cited below.

## I.    NOBLE DESIGNED AND CONSUMMATED THE SPIN-OFF

Beginning in 2010, Noble tried for four years to rid itself of a dying fleet of standard specification offshore rigs and related assets, which it knew would "have limited future use." Compl. ¶ 38; *see generally id.* ¶¶ 34-107.

During the four-year run up to the Spin-Off, there was no independent Paragon. "Paragon" was merely a collection of assets and entities formed, wholly owned, and controlled by Noble.  Until two weeks before the Spin-Off consummation date (July 31, 2014), and at all times when the Spin-Off was developed and documented, Paragon Offshore had but a single director – Defendant James MacLennan, Noble's Chief Financial Officer.  Paragon had neither independent professionals nor management, and Noble refused to allocate Paragon funds with

which to retain them.  The Spin-Off was a transaction by Noble with itself, and Paragon had no say whatsoever in whether or not to execute the agreements that the Defendants now claim waived Paragon's right to litigate before the Court.  Compl. ¶¶ 81-87.

Ultimately, by concealing critical information from lenders (Compl. ¶¶ 65-80) and the firm tasked with providing a "solvency opinion" for Paragon (Compl. ¶¶ 88-107), Noble (with the knowledge and assistance of the other Defendants) was able to encumber Paragon with more than $1.7 billion in debt and transfer the loan proceeds to itself, leaving Paragon insolvent, severely overlevered, and unable to survive any meaningful period of time before being forced to seek the shelter of bankruptcy.

## II. THE FRAUDULENT TRANSFERS AND DEFENDANTS' MISCONDUCT OCCURRED WELL BEFORE EXECUTION OF THE MSA AND ANCILLARY AGREEMENTS

The evidence will show that Noble had concluded as early as 2013 that it could extract approximately $1.7 billion in "targeted proceeds" from the Paragon assets, a sum it needed to pay off debt that was maturing in July and August 2014.  Noble and the Defendants spent the latter part of 2013 and the first half of 2014 working to implement the scheme necessary to capture those funds.  Compl. ¶¶ 40-107.

By the middle of July 2014, Noble had all of the pieces in place.  By that time, according to Noble's own internal timeline (Ex. A), all of the official Board and governance actions taken by the Individual Defendants had occurred:

- June 11, 2014:  The Paragon Board, acting exclusively through Noble CFO MacLennan, approved Paragon's bank financing.

- June 30, 2014:  The Paragon Board, acting exclusively through Noble CFO MacLennan, approved the "spin-off plan" and Paragon bond offerings.

- July 11, 2014:  A Noble "Transaction Committee" (Defendants Edwards, Hall, and Williams) approved bond and bank loan pricing.

- <u>July 11, 2014</u>:  The Noble Board received a solvency opinion, provided "general approval of Separation and Spin-Off," and delegated powers to its Transaction Committee to finalize the deal.

- <u>July 15, 2014</u>:  The Paragon Board, acting exclusively through Noble CFO MacLennan, approved issuance of the Intercompany Notes and authorized implementation of the Separation and Spin-Off.

These are some the pertinent actions of the Individual Defendants who are subject to the Trust's damage claims.

Ultimately, on July 15, 2014, Noble caused Paragon to execute two Share Purchase Agreements (Exs. C and D), and three Intercompany Promissory Notes (Exs. E, F, and G), by which a Paragon subsidiary (Paragon Finance) "agreed" to pay a "purchase price" totaling $1,710,550,000.  None of those contracts contained an arbitration clause.  Three days later, on July 18, 2014, the Paragon bank and bond financing closed, and Paragon Finance used the loan proceeds to pay off the Intercompany Notes, transferring $1,710,736,022.32 (a sum including three days of interest) to Noble affiliates.  Compl. ¶¶ 21-23, 109.  By the end of the day on July 18, 2014, payment of the Spin-Off price was complete.  Two weeks later, Noble addressed the remaining administrative details associated with its separation from Paragon.

## III.    THE MSA AND ANCILLARY AGREEMENTS ADDRESSED ADMINISTRATIVE MATTERS

On July 31, 2014, Noble and Paragon executed the MSA and the other agreements on which the Defendants now rely.  (Copies are attached as Exhibits A-E of the Declaration of Stephen Della Penna accompanying the Defendants' Motion).  Notably, those agreements are not called the "Spin-Off Agreements" as Noble now labels them.  Rather, they are defined in the MSA as the "Ancillary Agreements."  MSA § 2.5.

The term chosen by Noble at the time is apt.  The MSA and Ancillary Agreements govern technical go-forward business arrangements between Noble and Paragon as independent

entities.  The MSA specifically provides that it is intended "to set forth the principal arrangements between them regarding the separation of the Paragon *Business* from the Noble *Business* and the Distribution" of Noble-owned shares in newly independent Paragon to Noble shareholders.  *Id.* Recitals (emphasis added).  Thus, for example, it includes provisions related to continuing intellectual property licenses (§ 2.2); recording the transfer of assets (§ 2.3); bank and brokerage accounts (§ 2.7); indemnification obligations (§§ 3.3-3.12); distributing Noble-owned Paragon shares to Noble shareholders (§§ 4.1-4.3); accessing corporate records and maintaining legal privileges (§§ 6.3-6.6); insurance policies (§ 6.11); and cooperation in FCPA and other litigation matters (§§ 6.12-6.13).

Likewise, the four Ancillary Agreements address technical and administrative matters respecting the separation:

- The Employee Matters Agreement concerns the parties' respective obligations on employee plans (*e.g.*, retirement, medical, life and disability insurance, and executive compensation) (§§ 2.1-2.2, 3.1, 4.1, 5.1, 5.2, 6.1, 6.2, 7.1, 7.2) and the secondment and transfer of employees (§§ 2.5, 9.1).

- The Tax Sharing Agreement provides country-specific rules and administrative procedures on the filing and allocation of taxes and tax benefits (§§ 2.1-2.3), related indemnification obligations (§§ 4.2-4.3), procedures for notice and control of tax contests (§§ 5.1-5.2), and restrictions on Paragon's ability to liquidate or sell substantially all of its assets (§ 7.3).

- The Transition Services Agreement outlines the financial and other terms by which the parties would provide services to each other after the separation, including in the areas of accounting, finance, treasury, payroll, human resources, training, and technical support.

- The Brazil Services Agreement sets forth the terms by which a Paragon subsidiary in Brazil, Limitada, would provide certain administrative services to certain Noble rigs after the separation.

Notably, *neither the MSA nor any other Ancillary Agreement mention or include any provision respecting what Paragon would pay Noble for the transferred assets*.  That is because

Noble already had dictated and finalized those terms, and Paragon already had transferred $1.7 billion to Noble, two weeks ***before*** the MSA and Ancillary Agreements were executed.

The MSA has an arbitration clause that is incorporated by the other Ancillary Agreements.  MSA § 5.1.  However, it is not accurate to claim, as the Defendants insist, that "Paragon agreed to arbitrate all claims – whether based in contract, tort or any other theory – arising out of and/or related to the Spin-Off."  Memo. at 2.  As demonstrated below, that is a gross exaggeration of the scope of the MSA's arbitration provision, which does not extend to the claims asserted by the Trust in this case.  Moreover, and more fundamentally, Paragon never "agreed" to anything.  Due to Noble's absolute dominion and control over Paragon and the transaction, it is more accurate to describe the MSA's arbitration clause as Noble's agreement with itself that post-separation disputes over certain administrative aspects of the Spin-Off should be arbitrated.

## IV.    THE NOBLE CLAIMS WERE A FOCUS OF THE BANKRUPTCY CASE AND THE COURT EXPRESSLY PRESERVED THEM FOR ITS OWN ADJUDICATION

Paragon underperformed from Day One (Compl. ¶¶ 115-127) and could not get out from under the debt Noble had imposed on it.  Paragon filed for bankruptcy on February 14, 2016, a little more than eighteen months after the separation.

At the time of bankruptcy, Paragon was in a liquidity crisis, fearing that it would be required to post cash-backed bonds for massive contingent pre-closing tax liabilities that Noble had concealed from both Paragon and its lenders but forced Paragon to assume.  Compl. ¶¶ 121-23.  Taking advantage of Paragon's dire straits, in the days before bankruptcy Noble had extracted a proposed settlement with Paragon that would have released it from all liability associated with the Spin-Off in exchange for assistance with Paragon's potential bonding

01:23040251.1

obligations.[3]  The Court, however, rejected the settlement in the course of denying confirmation of Paragon's first proposed plan of reorganization.  Stakeholders returned to the negotiating table and ultimately agreed upon the Plan, which the Court confirmed by the Confirmation Order entered on June 7, 2017.  [Main Case D.I. 1614]

Rather than settle Paragon's rights against Noble, the Plan preserved them.  Under the Plan, Paragon transferred and vested in the Trust all "Noble Claims," including the causes of action alleged in the Complaint,[4] and provided the Trust with a $10 million non-recourse loan for prosecution of those claims.  Plan § 5.7.  Critically, the Plan specified that the Court would have "exclusive jurisdiction . . . to adjudicate the Noble Claims to the fullest extent permissible under law," Plan § 11.1(r), and the Court found in the Confirmation Order that it "may properly, and upon the Effective Date shall, retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases . . . , including the matters set forth in Article XI of the Plan." Confirmation Order ¶¶ OO, 45.

Noble was aware of the relevant provisions of the Plan and Confirmation Order well before confirmation.  It insisted on certain edits to those provisions in exchange for its agreement not to object to the Plan.  But the Defendants chose not to comment on or object to the Court's retention of exclusive jurisdiction over the Noble Claims.  Noble specifically inserted into the Plan an express reservation of certain of its alleged rights and defenses respecting the Noble Claims (Ex. B), but to the best of the Trust's knowledge it never even suggested that the "exclusive jurisdiction" provision should be modified in any way.

---

[3]    That proposed settlement was memorialized into a "Definitive Settlement Agreement" executed on April 29, 2016.  [Main Case D.I. 399-4]

[4]    The Defendants concede that the claims in this action are "Noble Claims."  Memo. at 7-8.

After the Confirmation Order was entered and the Plan consummated, and after a thorough investigation of the claims, the Trust filed its Complaint on December 15, 2017. It first asserted five causes of action for avoidance of the $1.7 billion in fraudulent transfers Paragon made to Noble (Counts I-V, referred to as the "fraudulent transfer claims") and then three damage claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment (Counts VI-VIII, referred to as the "damage claims"). At no time until February 12, 2018 (three days before the extended answer deadline), did Noble or the other Defendants assert that the Court's exclusive jurisdiction provision was invalid or that any of the Noble Claims were subject to arbitration. To date, the Defendants have not commenced an arbitration proceeding.

## ARGUMENT

The Defendants' request to send the Trust's damage claims to arbitration, and to stay the Trust's predominant fraudulent transfer claims pending that arbitration, is without merit for several independent reasons.

## I.    THE PLAN VESTS THE COURT WITH "EXCLUSIVE JURISDICTION" TO "ADJUDICATE THE NOBLE CLAIMS" AND SUPERSEDES ANY SUPPOSEDLY APPLICABLE ARBITRATION PROVISION

The Plan explicitly provides that the Court "shall retain exclusive jurisdiction" to "adjudicate the Noble Claims to the fullest extent permitted by law." Plan § 11.1(r). This was not an accident. The creation and funding of the Trust, and vesting of the Noble Claims with the Trust, were fundamental components of the Plan. Plan § 5.7; Confirmation Order ¶¶ N(e), N(j), 33. Nor was the Court's retention of jurisdiction a surprise to the Defendants given the Court's rejection of the proposed settlement and the creditors' subsequent decision to preserve claims against Noble for the Trust to pursue after confirmation. Yet, although Noble indisputably was aware of the provisions of the Plan and Confirmation Order, and indeed commented on drafts of

them, it never objected or even attempted to change the provisions that gave exclusive

jurisdiction over the Noble Claims to the Court.

To state the obvious, the Defendants are bound by the Plan and Confirmation Order.  *See Donaldson v. Bernstein*, 104 F.3d 547, 554 (3d Cir. 1997) ("a confirmation order is res judicata as to all issues decided or which could have been decided at the hearing on confirmation"); *In re Planet Hollywood Int'l*, 274 B.R. 391, 399 (Bankr. D. Del. 2001) ("[t]he Plan binds all creditors and other parties in interest").  And the Court, of course, has jurisdiction to interpret and enforce the Plan and its Confirmation Order.  *E.g.*, *In re Shenango Group, Inc.*, 501 F.3d 338, 343 (3d Cir. 2007) (bankruptcy court has post-confirmation jurisdiction over "[m]atters that affect the interpretation, implementation, consummation, execution or administration of the confirmed plan") (quoting *Binder v. PriceWaterhouse & Co., LLP (In re Resorts Int'l, Inc.*, 372 F.3d 154, 167 (3d Cir. 2003)).

The Court therefore should do what the Plan and its Confirmation Order contemplate – exercise its jurisdiction to enforce the Plan as plainly written and hold that its post-confirmation "exclusive jurisdiction" to "adjudicate" the Noble Claims supersedes the prepetition arbitration provision on which the Defendants rely.  This is what other courts have done when faced with the same circumstances.  In *Ernst & Young*, for example, the confirmed plan retained bankruptcy court jurisdiction for the purpose of "adjudication of any pending adversary proceeding, or other controversy or dispute."  304 F.3d at 755.  After confirmation, E&Y moved to compel arbitration of an adversary proceeding that had been pending at confirmation.  The bankruptcy court denied the motion, holding that "arbitration was precluded by the terms of the confirmed plan."  *Id*.  The Seventh Circuit affirmed, reasoning that "[a] confirmed plan of reorganization is in effect a contract between the parties" and the arbitration provision was "superseded by the terms of the

confirmed plan." *Id.* at 756.  The Seventh Circuit rejected E&Y's argument that the bankruptcy

court could "satisfy its obligation to retain jurisdiction over the pending adversary proceeding by

simply hearing arguments on the motion to compel arbitration," explaining that, while "the terms

of the plan could have called for the bankruptcy court to retain jurisdiction over a dispute while

its merits are arbitrated, the terms of this plan specifically called for the bankruptcy court to

retain jurisdiction ***to adjudicate*** such disputes." *Id.* (citing BARRON'S LAW DICTIONARY 11 (Ed.

1996) (defining "adjudication" as "the determination of a controversy and a pronouncement of a

judgment based on evidence present, [which] implies a final judgment . . . as opposed to a

proceeding in which the merits of the cause of action were not reached")).  Contrasting the facts

at issue in *SFC New Holdings, Inc. v. Earthgrains Co. (In re GWI, Inc.)*, 269 B.R. 114 (Bankr.

D. Del. 2001) (Walrath, J.), where the parties "expressly adopted arbitration provisions of the

pre-petition agreements into a plan of reorganization," the Seventh Circuit reasoned that E&Y

could have protected its right to arbitrate by objecting to the plan and requesting that it expressly

assume the arbitration provisions but failed to do so.  304 F.3d at 756.

Similarly, in *In re All American Semiconductor, Inc.*, No. 07-12963-BKC-LMI, 2010 WL

2854153 (Bankr. S.D. Fla. July 20, 2010), *aff'd*, No. 10-23406-CV, 2011 WL 3843943 (S.D. Fla.

Aug. 29, 2011), a confirmed plan provided for the bankruptcy court to have exclusive

jurisdiction over "all matters arising out of, arising in or related to, the Chapter 11 Cases to the

full extent permitted by applicable law," including various "Litigation Claims" that could be

brought by a liquidation trust to be formed pursuant to the plan.  *Id.* at *4.  After the trust later

brought suit, the defendants moved to stay or dismiss the proceedings due to arbitration and

forum-selection provisions in their prepetition contracts with the debtors.  The District Court

denied the motion, reasoning that "[a] chapter 11 plan is a contract that binds both debtors and

creditors" and "all prior obligations and rights of the parties are extinguished and replaced by the plan." *Id.* at *5 (quotation omitted). The District Court held that the defendants' "failure to contest the venue and exclusive jurisdiction provisions . . . constitute[d] a waiver of those provisions," noting that they "had to know [they were] a potential target" of claims by the liquidation trust but failed "to object to confirmation and raise the issue of the exclusive jurisdiction and venue provisions" of the plan. *Id.* at *6-*9.

The facts are even more compelling here. In *Ernst & Young*, general language that the bankruptcy court would retain jurisdiction to adjudicate "any pending adversary proceeding" was sufficient to supersede arbitration rights. Paragon's Plan, on the other hand, includes not only that general language (Plan § 11.1(b)) but also a ***specific*** provision indicating that the Court has "exclusive jurisdiction" to "adjudicate the Noble Claims" (Plan § 11.1(r)). And it is clear that Noble was fully aware of the Plan, knew that the Defendants were "targets" of potential claims,[5] and insisted upon edits preserving purported rights and defenses to those claims in exchange for its agreement not to object to confirmation, yet Noble said nothing about and did not object to the Court's being given exclusive jurisdiction to adjudicate the Noble Claims.

Tellingly, the Defendants ignore the "exclusive jurisdiction" provision of the Plan and Confirmation Order and do not address this issue at all in their Motion. The few precedents they belatedly may cite in response are readily distinguishable. In *GWI*, the court stayed a post-confirmation adversary proceeding in favor of arbitration even though the debtor's plan included general language that conferred jurisdiction on the court over "all matters arising out of or related to the Chapter 11 case and the Plan, including jurisdiction to determine any and all

---

[5]    By confirmation, the proposed settlement of those claims had been rejected and the Official Committee of Unsecured Creditors had even initiated discovery in anticipation of the Trust's pursuit of them after confirmation. [Main Case D.I. 1605]

adversary proceedings, motions, applications, and contested or litigation matters."  269 B.R. at

118.  The *GWI* plan, however, did not provide for the court to "adjudicate" specified causes of

action, omitting language that was central to the Seventh Circuit's decision in *Ernst & Young*.

More importantly, the *GWI* plan included a provision "which specifically ***adopts*** all of the terms

of the Purchase and Escrow Agreements" containing the relevant arbitration clauses.  *Id.*

(emphasis added).  The court held that this "more specific" provision "controls" over the general

jurisdictional provision.  *Id.* ("By adopting the provisions of the Purchase Agreement in the Plan,

[the debtor] specifically agreed to the arbitration provisions.  It is bound by that choice.").  Here,

the situation is reversed.  The Plan ***rejected*** the MSA and Ancillary Agreements (Plan § 8.1;

*Notice Of Executory Contracts And Unexpired Leases To Be Rejected By The Debtors Pursuant*

*To The Fifth Joint Chapter 11 Plan Of Paragon Offshore PLC And Its Affiliated Debtors* [Main

Case D.I. 1517]) while specifically providing for the Court to have exclusive jurisdiction "to

adjudicate the Noble Claims to the fullest extent permitted by law."[6]

Likewise, in *In re CIT Grp. Inc.*, No. 09-16565-ALG, 2012 WL 831095 (Bankr.

S.D.N.Y. Mar. 9, 2012), the court sent a post-confirmation adversary proceeding to arbitration

notwithstanding general plan language that the court would maintain jurisdiction "over all

matters arising out of or related to the Chapter 11 Cases and the Plan, to the fullest extent

permitted by law."  *Id.* at *2.  Undercutting that general language, the *CIT* plan specifically

provided that claims "shall be determined, resolved or adjudicated, as the case may be, in the

---

[6]   Any suggestion that the phrase "to the fullest extent permitted by law" preserves existing
arbitration rights would be groundless.  This language retains the Court's jurisdiction to
adjudicate the Noble Claims to the fullest extent permitted "***by law***," not to the fullest extent
permitted by ***contract***.  Nothing in the law prevents the Court from adjudicating the Noble
Claims, as contractual arbitration rights can be waived.  *See Ernst & Young*, 304 F.3d at 756-
57 (E&Y's failure to object to plan provision providing for bankruptcy court "to adjudicate"
pending adversary proceeding waived alleged arbitration rights).

manner in which such Claim would have been determined, resolved or adjudicated *if the Chapter 11 Cases had not been commenced*." *Id.* (emphasis added).  Given those "two contradictory Plan provisions," the court could not infer that the general plan language had the effect of overriding an arbitration clause that would have been applicable "if the Chapter 11 Cases had not been commenced." *Id.* at *2.  Here, in contrast, the Plan specifically provides for the Court to adjudicate the Noble Claims, with no language preserving the Defendants' alleged arbitration rights.

As in *Ernst & Young* and *All American*, the specific provisions of the Plan and Confirmation Order control here.  Unlike the general and contradictory plan provisions at issue in *GWI* and *CIT*, the Plan and Confirmation Order expressly provide that adjudication of the Noble Claims is the exclusive province of the Court.  Those express provisions supersede the allegedly applicable arbitration of the MSA and Ancillary Agreements.

## II.    THE COURT DETERMINES ARBITRABILITY

If the Court finds that the Plan supersedes the alleged arbitration provision in the MSA and Ancillary Agreements, the Defendants' Motion fails.  Only if the Court for some reason does not believe that the specific jurisdiction provision in the Plan controls here will it have to address the Defendants' contention that "any potential questions regarding the arbitrability" of the Trust's damage claims "must be decided by the arbitration panel" and not the Court.  Memo. at 2.  The Defendants are mistaken.

### A.    The MSA And Ancillary Agreements Do Not "Clearly And Unmistakably" Delegate Questions Of Arbitrability To The Arbitrator.

The Third Circuit has long recognized that courts "have a limited but important threshold role to play when a litigant moves to compel arbitration."  *Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 178 (3d Cir. 2010); *accord Opalinski v. Robert Half Intern. Inc.*, 761 F.3d 326, 331 (3d

Cir. 2014). "In determining whether arbitration should be compelled, the court considers two threshold questions: '(1) Did the parties seeking or resisting arbitration enter into a valid arbitration agreement?  (2) Does the dispute between those parties fall within the language of the arbitration agreement?'" *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 172 (3d Cir. 2014) (quoting *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 137 (3d Cir. 1998)); *In re Pharmacy Benefit Managers Antitrust Litig.*, 700 F.3d 109, 116 (3d Cir. 2012) (court considers "narrow 'gateway matters' that touch on the question of arbitrability, such as whether an arbitration agreement applies to a particular controversy, or whether the parties are bound by the arbitration clause") (quoting *Certain Underwriters at Lloyd's London v. Westchester Fire Ins. Co.*, 489 F.3d 580, 585 (3d Cir. 2007)).

"In the vast majority of cases, the arbitrability of a dispute is a question for judicial determination." *CardioNet*, 751 F.3d at 171 (citations omitted).  "[Q]uestions of arbitrability, including challenges to an arbitration agreement's validity, are presumed to be questions for judicial determination." *Quilloin v. Tenet HealthSystem Philadelphia, Inc.*, 673 F.3d 221, 228 (3d Cir. 2012) (citation omitted).  "The burden of overcoming the presumption" that a court must decide questions of arbitrability "is onerous, as it requires express contractual language unambiguously delegating the question of arbitrability to the arbitrator." *Opalinski*, 761 F.3d at 335 (citing *Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs*, 357 F.3d 272, 280-81 (3d Cir. 2004)).  The intention to delegate must be "clear and unmistakable." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Painewebber Inc. v. Hoffman*, 984 F.2d 1372, 1379 n.4 (3d Cir. 1993).

The Defendants argue that Paragon "explicitly agreed that any disputes as to arbitrability or the scope of issues and/or parties subject to arbitration must be decided by the arbitration

panel." Memo. at 3.  Paragon, however, had no capacity to make any such "agreement."  Noble absolutely and completely dominated Paragon at all times through execution of the MSA and Ancillary Agreements.  Paragon was owned by Noble, Paragon's sole director was Noble's CFO, and Paragon had no counsel and no ability to hire counsel.  As courts have recognized in other contexts, it is untenable for parties in a position of dominance akin to Noble's to impose arbitration – and all questions of arbitrability – on those they dominate.  *See, e.g.*, *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074-75 (9th Cir. 2013); *Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 8, 12-13 (1st Cir. 2009); *Allstate Ins. Co. v. Toll Bros., Inc.*, 171 F. Supp. 3d 417, 427-28 (E.D. Pa. 2016); *Meadows v. Dickey's Barbecue Restaurants Inc.*, 144 F. Supp. 3d 1069, 1078 (N.D. Cal. 2015) ("an inquiry about whether the parties clearly and unmistakably delegated arbitrability by incorporation should first consider the position of those parties").

Even if Noble-controlled Paragon had had the capacity to "agree" to arbitration of all disputes arising out of a contract that Noble directed Paragon to sign (it did not), the MSA and Ancillary Agreements evince no such agreement.  <u>First</u>, nothing in the arbitration provision can be construed as an "explicit" agreement that disputes on arbitrability "must be decided by the arbitration panel," as the Defendants would have the Court believe.  Rather, the provision states that the arbitrator "shall have full power and authority to determine issues of arbitrability."  MSA § 5.6(b).  This text does not specify that ***only*** an arbitrator may determine those issues; merely that an arbitrator has the power to do so.  It is distinguishable from the clause used in the case the Defendants cite, *Home Buyers Warranty Corp. v. Jones*, No. 15-mc-324-RGA-MPT, 2016 WL 2350103 (D. Del. May 4, 2016), *report and recommendation adopted*, 2016 WL 3457006 (D. Del. June 21, 2016), which specified that disputes concerning "the scope of arbitrable issues . . . ***shall*** be decided by the arbitrator."  *Id.* at *3 (emphasis added).

Second, it is far from "clear and unmistakable" that Paragon agreed to arbitrate – much less delegate the question of arbitrability to an arbitrator – disputes that go beyond the interpretation, construction, implementation, or breach of the MSA and Ancillary Agreements. The Defendants' selective quotation of Section 5.6(b) of the MSA, *see* Memo. at 9, omits language (emphasized below) that bears directly on this issue:

> The arbitrators shall have full power and authority to determine issues of arbitrability but shall otherwise be ***limited to interpreting or construing the applicable provisions of this Agreement or any Ancillary Agreement*** and will have ***no authority or power to limit or expand, alter, amend, modify, revoke or suspend any condition of [the MSA] or any Ancillary Agreement***; it being understood however, that the arbitrators will have full authority to implement the provisions of this Agreement or any Ancillary Agreement, and to fashion appropriate remedies for breaches of this Agreement (including interim or permanent injunctive relief). . . .

MSA § 5.6(b) (emphasis added).  Thus, while Section 5.1 purports to mandate arbitration of a dispute that "arises out of or relates to" the MSA or Ancillary Agreements "or the transactions contemplated hereby or thereby," Section 5.6(b) limits the arbitrator's powers to "interpreting or construing" the MSA and Ancillary Agreements, "implement[ing] the provisions" of the MSA and Ancillary Agreements, and "fashion[ing] appropriate remedies for breaches" of the MSA and Ancillary Agreements.

Any delegation of the question of arbitrability in Section 5.6(b) of the MSA necessarily must be limited to matters on which the arbitrator is authorized to rule – "interpreting or construing the applicable provisions of this Agreement or any Ancillary Agreement" and "fashion[ing] appropriate remedies for breaches of this Agreement."  But, as explained below, ***none of the Trust's claims in this action involve interpretation, construction, or breach of the MSA or Ancillary Agreements***.  Indeed, the Trust's claims do not implicate those agreements at all.  It is absurd to suggest, as the Defendants impliedly do, that Noble-controlled Paragon

somehow "agreed" that an arbitrator simultaneously could conclude that extra-contractual damage claims like those asserted by the Trust are subject to arbitration but are nevertheless beyond the arbitrator's authority to remedy.

Third, the MSA's incorporation of AAA rules into the arbitration provision is not "clear and unmistakable evidence that the parties agreed to arbitrate arbitrability."  Memo at 9.  The Third Circuit has rejected the incorporation rule in the context of class arbitrations and expressed outright skepticism of decisions adopting an incorporation rule like that urged by the Defendants in any context.  In *Chesapeake Appalachia, LLC v. Scout Petroleum*, 809 F.3d 746 (3d Cir. 2016), the court repeatedly reiterated (fourteen times) the "onerous" standard necessary to overcome the presumption that a court decides questions of arbitrability and doubted that the incorporation of arbitration rules possibly could be sufficient evidence of an intent to delegate. *See id.* at 754 (incorporation of rules is "far from the 'clear and unmistakable' allowance needed for the arbitrators to decide the question of class arbitrability") (citations omitted), *id.* at 761 ("[I]t is not enough . . . to establish that the AAA rules provide for the arbitrators to decide, *inter alia*, the question of arbitrability, and that, in turn, these rules are incorporated by reference pursuant to state law. . . .  As we explained in *Opalinski*, the onerous burden of overcoming the presumption requires express contractual language unambiguously delegating the question.").

Fourth, and most fundamentally, even if there was an unambiguous and explicit delegation of the question of arbitrability to an arbitrator – surely not the case here – the Court still is required to determine that a rational relationship exists between the claims and the arbitration contract.  *See, e.g.*, *Douglas v. Regions Bank*, 757 F.3d 460, 462-63 (5th Cir. 2014) (delegation provision did not bind plaintiff "to arbitrate gateway questions of arbitrability in ***all*** future disputes with the other party, no matter their origin," only those with a rational

relationship between claim and arbitration contract) (emphasis in original); *Turi v. Main Street Adoption Services, LLP*, 633 F.3d 496, 511 (6th Cir. 2011) ("even where the parties expressly delegate to the arbitrator the authority to decide the arbitrability of the claims related to the parties' arbitration agreement, this delegation applies only to claims that are at least arguably covered by the agreement"); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1371 (Fed. Cir. 2006) (same).

Thus, at a minimum, the Court must determine whether there is any relationship, connection or correlation between the Trust's claims and the MSA and Ancillary Agreements. As shown, below, there simply is not.

### B. The Court Independently Must Evaluate Whether The Individual Defendants May Enforce Agreements They Did Not Sign.

Another reason the Court needs to determine arbitrability here is the fact that the Individual Defendants never signed any agreement that included an arbitration provision. The Defendants admit that the Individual Defendants "are not signatories themselves" to the MSA or Ancillary Agreements. Memo. at 10. Yet, citing a curated selection of Delaware and New York cases, they maintain that the Individual Defendants are "entitled to enforce the Arbitration Provision," including its "mandate" that "the parties arbitrate questions of arbitrability." *Id.* The authorities the Defendants cite do not support their claim that an arbitrator should decide whether claims against the non-signatories are arbitrable.

"Just because a signatory has agreed to arbitrate issues of arbitrability with another party does not mean that it must arbitrate with any non-signatory." *Contec Corp. v. Remote Solution Co.*, 98 F.3d 205, 209 (2d Cir. 2005). "[A] *court* must first determine whether the parties have a sufficient relationship to each other and to the rights created under the agreement" before it can address "the more precise question presented here: whether a non-signatory can compel a

signatory to arbitrate under an agreement where the question of arbitrability is itself subject to question." *Id.* at 209-10 (citing *First Options*, 514 U.S. at 944-45) (emphasis added). And, as the Third Circuit has held, "the presumption in favor of arbitration does not extend . . . to non-signatories to an agreement." *Griswold v. Coventry First LLC*, 762 F.3d 264, 271 (3d Cir. 2014).

In *The Republic of Iraq v. BNP Paribas USA*, 472 Fed. Appx. 11 (2d Cir. 2012), for example, the Second Circuit addressed whether incorporation of certain arbitration rules was "clear and unmistakable evidence" of an agreement to have an arbitrator decide a motion to compel arbitration filed by a non-signatory. The court concluded that it was not, observing that "evidence of intent to have an arbitrator determine its jurisdiction with regard to disputes 'referred by either Party' . . . does not clearly and unmistakably demonstrate their intent to have the arbitrator determine its jurisdiction with respect to any dispute raised by a ***non-party***." *Id.* at *2 (citing *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010) (emphasis in original); *see also Holzer v. Mondadori*, No. 12 Civ. 5234 (NRB), 2013 WL 1104269, at *6-8 (S.D.N.Y. Mar. 14, 2013) (same, applying *BNP Paribas*).

Here, as in *BNP Paribas*, the MSA's arbitration provision only binds each "Party" and "each member of its respective Group." MSA § 5.1. The MSA makes clear that the Individual Defendants are not included within that definition. *See* MSA § 1.1 (including "directors and officers" within the definition of "Noble Group" solely "[f]or purposes of Section 6.12," which is not relevant here). There is no evidence – much less "clear and unmistakable evidence" – that anyone intended for an arbitrator to decide whether the non-signatory Individual Defendants could enforce the arbitration provision of the MSA and Ancillary Agreements.

The Defendants ignore this authority and come up with their own test. They assert that, "so long as a non-signatory's arguments in favor of arbitration are not frivolous, 'a signatory to

an agreement vesting questions of substantive arbitrability to the arbitrator must resolve disputes about arbitrability against a nonsignatory before the arbitrator.'" Memo. at 10-11 (quoting *Carder v. Carl M. Freeman Cmtys. LLC*, No. 3319-VCP, 2009 WL 106520, at *7 (Del. Ch. Jan. 5, 2009), and citing *McLaughlin v. McCann*, 942 A.2d 616, 625 (Del. Ch. 2008)).

The two Delaware cases cited by the Defendants are distinguishable on their facts.[7]  More importantly, the rule advanced by the Defendants has been explicitly rejected in New York, the law of which governs by virtue of the choice of law provision in the MSA and Ancillary Agreements.[8]  Specifically, in *Gerszberg v. Li & Fung (Trading) Ltd.*, 215 F. Supp. 3d 282 (S.D.N.Y. 2016), a signatory to a settlement agreement sought to bar a non-signatory from arbitrating its claim that the signatory had violated the settlement agreement.  Citing *Contec*, the court made clear that the "question of relation[al] sufficiency" necessary to allow a non-signatory to compel arbitration "is for the Court, not the arbitrator, to resolve." *Id.* at 288.  In so holding, it specifically rejected *Carder* and the non-signatory's argument that "any 'non-frivolous' or 'colorable' claim of [third-party beneficiary] status is sufficient to pull a signatory into arbitration to resolve that issue of arbitrability." *Id.* at 289-90.  The court instead "underscore[d] the ***judicial duty***, at the threshold, to determine whether a non-signatory to an

---

[7]    *Carder* and *McLaughlin* involved claims inextricably intertwined with the contract containing the arbitration provision.  In *Carder*, the plaintiff was suing a mortgage company affiliated with the developer who executed the sales agreement the plaintiff sought to rescind. In *McLaughlin*, the plaintiff was suing the affiliate of sellers who executed the sales contract that was the subject of the suit.  Because the nexus between the claims and the contracts was so clear, there was no occasion for the courts to consider arbitrability in any detail.

[8]    MSA § 7.2; *see Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009) (state law governs enforceability of arbitration contract).

agreement is in fact a third-party beneficiary entitled to compel a signatory to arbitrate claims thereunder." *Id.* at 289-90 (emphasis added) (citing cases).[9]

Thus, it is the Court that must determine whether the Trust's damage claims are subject to arbitration.  As shown below, they are not.

## III.   THE TRUST'S CLAIMS ARE NOT ARBITRABLE

Because the Trust's claims do not have anything to do with the MSA or Ancillary Agreements, the arbitration provision in the MSA does not apply.

### A.   The Fraudulent Transfer Claims Must Be Adjudicated By The Court.

To start, the parties agree on one thing – the Trust's fraudulent transfer claims are not subject to arbitration.  *See* Memo. at 4, 15 (referring to the Trust's constructive and actual fraudulent transfer and recharacterization claims as "nonarbitrable").  "The Third Circuit has found that fraudulent transfer claims under 11 U.S.C. § 544(b) and § 548 are creatures of the Bankruptcy Code, . . . [and] therefore, the Debtor's pre-petition agreements would not bind these claims."  *Lipscomb v. Clairvest Equity Partners Ltd. P'ship (In re LMI Legacy Holdings, Inc.)*, 553 B.R. 235, 246-47 (Bankr. D. Del. 2016) (citing *Hays & Co. v. Merrill Lynch, Pierce, Fenner*

---

9    The Defendants quote *Lapina v. Men Women N.Y. Model Mgmt. Inc.*, 86 F. Supp. 3d 277, 284 (S.D.N.Y. 2015), for the proposition that "where a party seeking to avoid arbitration is a signatory to an arbitration agreement which incorporates rules that delegate arbitrability questions to the arbitrator, a court need not reach the issue of whether a non-signatory may compel arbitration, because that is an issue properly resolved by the arbitrator."  Memo. at 10.  This misreads the court's opinion.  *Lapina* holds that an arbitrator can make a ***final decision*** on whether a non-signatory could compel arbitration once the matter is before it.  *Lapina*, however, did not dispense with the initial, important ***threshold*** determination of relatedness, as required by *Contec* and the other Second Circuit decisions it cited.  To the contrary, the court in *Lapina* followed the precise approach mandated by *Contec*, first examining whether the claims, contract and parties were related and intertwined and then concluding that, "[u]nder these circumstances, the parties 'have sufficient relationship to each other and to the rights created under the agreement,' that [the non-signatory] may compel arbitration."  86 F. Supp. 3d at 285-86.

& *Smith, Inc.*, 885 F.2d 1149, 1155 (3d Cir. 1989); *In re AstroPower Liquidating Trust*, 335 B.R.

309, 328 (Bankr. D. Del. 2005)).  In moving to compel arbitration only of the damage claims, the

Defendants concede that the fraudulent transfer claims cannot be arbitrated.

> **B.      The Damage Claims Cannot Be Arbitrated Because
> They Have Nothing To Do With The MSA Or Ancillary Agreements**

> 1.      Only Claims That Intertwine With The MSA Or
> Ancillary Agreements Arguably Could Be Subject To Arbitration.

As for the damage claims, they would be arbitrable only if they "fall[] within the

substantive scope of" the arbitration provision of the MSA and Ancillary Agreements.

*Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 54-55 (3d Cir. 2001)

(citations omitted).[10]  Specifically, courts will send claims to arbitration only when they arise

from, touch on, depend upon, concern the performance of, or otherwise intertwine with the

contract.

The Delaware Supreme Court's decision in *Parfi*, which reversed a Court of Chancery

finding that breach of fiduciary duty claims fell within a broadly worded arbitration clause,

illustrates this point.  The Supreme Court held that the "issue is whether the fiduciary duty

claims implicate any of the rights and obligations provided for in the Underwriting Agreement,"

including whether the claims "touch on contract rights or contract performance" or "depend on

the existence" of the underlying contract.  817 A.2d at 156.  It concluded that the lower court's

determination that the claims were "in connection with" the contract gave "far too expansive a

---

[10]   While it is unnecessary to reach the issue here, the Trust does not concede that there exists an
enforceable agreement to arbitrate in the first place.  Given Noble's absolute domination of
Paragon in connection with the Spin-Off, any potentially applicable arbitration provision was
coerced and therefore is unenforceable.  *See Century Indem. Co. v. Certain Underwriters at
Lloyd's London*, 584 F.3d 513, 523 (3d Cir. 2009) ("For a court to compel arbitration, it
initially must find that there is a valid agreement to arbitrate because the basis for contractual
arbitration is consent, not coercion.").  The Trust reserves all rights in this regard.

meaning to the word 'connection,'" and stressed that the claims "*would be assertable had there been no Underwriting Agreement*."  *Id.* at 157 (emphasis added).  Delaware courts subsequently have confirmed that arbitration is not appropriate for "causes of action that were 'not to any degree intertwined' with the contract containing the arbitration clause, . . . or *where the party could plead its affirmative claim 'without ever mentioning' the contract containing the arbitration clause*."  *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 655-57 (Del. Ch. 2012) (emphasis added) (quoting *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 434 (Del. Ch. 2007)).

The Third Circuit similarly holds that an arbitration clause is not operative where the plaintiff's claim "does not require construction of, or even reference to, any provision of the" agreement providing for arbitration.  *CardioNet*, 751 F.3d at 175-76 (no arbitration of healthcare providers' claim against insurance company on various theories unrelated to the providers' agreement with the insurer).  Likewise, the Second Circuit has held that even "[w]here the scope of an arbitration agreement is broad," if "the dispute . . . is clearly collateral to the contract, then a court should test the presumption [in favor of arbitration] by reviewing the allegations underlying the dispute and by asking whether the claim alleged implicates issues of contract construction or the parties' rights and obligations under it."  *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35-36 (2d Cir. 2002) (citing *Collins & Aikman Prods. Co. v. Bldg. Sys.*, Inc., 58 F.3d 16, 23 (2d Cir. 1995) (claims for violation of rights under federal computer privacy and fraud statutes not subject to arbitration clause of software license agreement); *see also Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987) (tortious interference claim did not "touch matters" covered by the parties' sales agreements and was not subject to arbitration); *FUJIFILM N. Am. Corp. v. Geleshmall Enterprises LLC*, 239 F. Supp. 3d 640, 648-49 (E.D.N.Y.

2017) ("there have been different rules announced related to this inquiry: some of these rules ask, for example, whether the factual allegations 'touch matters' governed by the parties' contracts; whether the allegations 'arise from' contract performance; whether they are 'integrally linked' to the contractual relation; or whether they somehow 'pertain to' it") (citations omitted).[11]

2.      The Trust's Claims Do Not Intertwine With
        The MSA Or Ancillary Agreements.

The Defendants assert that "[a]ll of the Trust's claims arise directly out of the Spin-Off," which they maintain was "effectuated through five principal agreements (the 'Spin-Off Agreements')." Memo. at 2-3. This is misdirection that, as noted above, does not correspond to how Noble itself described and named the agreements at the time of the transaction. While the Trust's claims do indeed relate to the Spin-Off, none fall within the language of the arbitration provision or touch upon or in any way implicate the MSA and Ancillary Agreements themselves.

By its terms, the MSA's arbitration clause relates only to claims that "arise out of" or "relate to" the MSA and Ancillary Agreements, claims for "breach" of those agreements, and claims relating to "the transactions contemplated" by or the "actions taken in furtherance of the transactions contemplated by" those agreements. MSA § 5.1.

---

[11]   These authorities are consistent with holdings across the country. *See, e.g.*, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 n.13 (1985) (claims subject to arbitration if they "touch matters covered by" the contract); *Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1116 (11th Cir. 2001) ("Disputes that are not related – with at least some directness – to performance of duties specified by the contract do not count as disputes 'arising out of' the contract, and are not covered by the standard arbitration clause."); *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 141 F.3d 243, 250-51 (5th Cir. 1998) (a claim is "arbitrable if it is so interwoven with the contract that it could not stand alone, but is not arbitrable if it is completely independent of the contract and could be maintained without reference to a contract") (citation omitted); *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1515-17 (10th Cir. 1995) (although arbitration provision "encompasse[d] antitrust disputes," certain antitrust claims did not touch on or have "a reasonable factual connection" to the contract and therefore were not subject to arbitration).

The Trust's claims do not "arise out of" or "relate to" the MSA or Ancillary Agreements. The claims do not involve, for example, any dispute over intellectual property licenses, indemnification obligations, the operation or assumption of employee plans, or the administrative services provided for under the agreements. Tellingly, the Defendants do not attempt to connect any of the Trust's claims to any provision in the MSA or Ancillary Agreements or assert that the Trust's claims involve the construction, interpretation, enforcement, validity, or breach of the MSA or Ancillary Agreements.

Nor do the Trust's claims have anything to do with "the transactions contemplated" by or the "actions taken in furtherance of the transactions contemplated by," the MSA and Ancillary Agreements. While those agreements contemplate post-closing activity between Noble and Paragon that would effectuate the technical separation of Paragon from Noble (*i.e.*, performance of various administrative services, transfer of employees, payment of taxes, etc.), the Trust's claims do not arise out of or relate to those matters in any way.

To the contrary, as the Defendants acknowledge, "[a]ll of the Trust's claims center on the value Paragon received during the Spin-Off; whether Paragon was insolvent at the time of the Spin-Off; and whether the Individual Defendants acted in good faith with the Spin-Off." Memo. at 17. Those issues do not concern or intertwine with the MSA and Ancillary Agreements. *All of the actions that determined what Paragon paid to acquire the assets and that otherwise bear on the Trust's claims – such as arranging financing to be delivered to Noble – occurred independently from, and well before execution of, the MSA and Ancillary Agreements*. In fact, the $1.7 billion transfer of funds that gives rise to the Trust's claims occurred two weeks prior to the MSA and Ancillary Agreements. The Trust's claims have nothing to do with the subsequently executed contracts that the Defendants now cite.

Beyond this obvious temporal disconnect, the Trust's damage claims arise out of rights created by law, not upon rights conferred by the MSA and Ancillary Agreements.  *See, e.g.*, *Parfi* 817 A.2d at 156-57 (lower court "should have concentrated on the similarity of the separate **rights** pursued by plaintiffs under both the contract and the independent fiduciary duties") (emphasis in original).  Here again, each of the required elements of the Trust's fiduciary duty claims – duty, breach, substantial assistance, causation, and damages – occurred weeks prior to execution of the MSA and Ancillary Agreements, and the Trust's proof at trial on those claims will have nothing to do with the terms and conditions of those agreements.[12]

In their brief, the Defendants purport to summarize the factual allegations that "underpin" the Trust's fiduciary duty claims.  Memo. at 18.  All of the allegations identified – providing false and misleading statements to prospective lenders, Houlihan and others about Paragon's future business; concealing Noble's "Master Model" from Houlihan; and failing to provide Paragon with independent counsel to negotiate the terms of the Spin-Off – occurred well before and have no connection to the matters addressed by the MSA and Ancillary Agreements that attended to the administrative details of the separation.  None of those allegations, nor any of the other allegations detailed over a course of thirty pages in the Complaint (see Compl. ¶¶ 1-3, 34-

---

[12]   Paragon and Noble are both public limited companies incorporated under the laws of England and Wales.  Any assertion that English law applies, however, would not advance the Defendants' argument because English law imposes similar duties.  Under English law, once a company is approaching a situation of insolvency, its directors – including any "shadow" directors who exercise control over the entity – must carefully consider the best interest of the company's creditors.  *See* Section 172(3) of the Companies Act 2006 (Ex. H).  Directors who fail to do so are at risk of personal liability.  *See, e.g.*, Sections 213 and 214 of the Insolvency Act 1986 (liability for "fraudulent trading" and "wrongful trading") (Exs. I and J).  Similarly, analogous to United States jurisprudence on aiding and abetting breach of fiduciary duty, those who provide "dishonest assistance" to a breach of fiduciary duty are also at risk of personal liability.  *See Starglade Properties Ltd v Nash* [2010] EWCA Civ 1314 (Ex. K).

110), arise out of, touch on, or depend upon the MSA and Ancillary Agreements.  Indeed, the

Complaint refers to the MSA and Ancillary Agreements only twice.  Compl. ¶ 87 (citing MSA to

demonstrate Noble's dominion over the transaction) and ¶ 111 (citing choice of law, currency

and venue provisions for purpose of showing Defendants' connections to the United States).

Finally, the Trust's damage claims also fail the relational sufficiency test that would

permit the non-signatory Individual Defendants to take advantage of MSA's arbitration provision

in the first place.  *See supra*, Section II.B, *Contec*, 98 F.3d at 209-10.  The Individual

Defendants' status as non-signatories to the MSA and Ancillary Agreements, and to the MSA's

arbitration provision in particular, appears to have been deliberate.  The MSA explicitly defines

the "Noble Group" as including directors and officers only "[f]or purposes of Section 6.12,"

which deals with cooperation obligations in certain FCPA matters not relevant here.  *See* MSA

§ 1.1.  Had Noble wanted to include the directors and officers within the arbitration provision, it

could easily have done so.  But the MSA expressly provides to the contrary in a provision, titled

"No Third Party Beneficiaries," stating that the "Agreement is solely for the benefit of the Parties

and their respective Groups and is not intended to confer upon any other Person except the

Parties and their respective Groups any rights or remedies hereunder, except for any Indemnitee

under Article III."  MSA § 7.7.[13]

---

[13]   Notably, unlike in cases where non-signatories are allowed to enforce the arbitration contract,
the Trust is not "trying to have [its] cake and eat it too," by relying on the MSA and
Ancillary Agreements as the basis for its claims but then "repudiat[ing] [the agreements]
when it works to its disadvantage."  *Lapina*, 86 F. Supp. 3d at 284; *Ishimaru v. Fung*, No.
Civ. A 929, 2005 WL 2899680, *18 (Del. Ch. Oct. 26, 2005) ("One of the primary
justifications for estopping a signatory from denying a non-signatory a right to arbitrate is
that it is unfair for the signatory to have it both ways by attributing to a non-signatory the
duties of a contract for purposes of pressing claims but denying the non-signatory the right to
invoke the arbitration clause") (citations omitted).

The cases cited by Defendants to suggest that the Trust's claims relate to the MSA and Ancillary Agreements (Memo. at 9-12) are readily distinguishable. In each, there was a clear connection between the claims at issue and the underlying contract; in many cases, the plaintiffs were seeking to avoid the contract altogether.[14] Unlike the litigants in those cases, the Defendants have not established, and cannot establish, any connection between the Trust's damage claims and the MSA and Ancillary Agreements. The claims therefore are not arbitrable.

## IV. EVEN IF THE DAMAGE CLAIMS ARE DEEMED ARBITRABLE, THE COURT SHOULD NOT STAY THE NON-ARBITRABLE FRAUDULENT TRANSFER CLAIMS

If, notwithstanding the foregoing, the Court concludes that the Trust's damage claims are subject to arbitration, it should not stay litigation of the Trust's fraudulent transfer claims as the Defendants request.[15] Rather, any arbitration of the damage claims should be stayed pending adjudication of the predominant fraudulent transfer claims.

---

[14]  *See Home Buyers Warranty*, 2016 WL 2350103 at *5 (purchaser's claim for rescission of purchase contract with arbitration clause); *Adtile Techs. Inc. v. Perion Network Ltd.*, 192 F. Supp. 3d 515 (D. Del. 2016) (plaintiff's claim for improper use of trademarks and copyrights after termination of license agreement with arbitration clause); *Lapina*, 86 F. Supp. 3d at 286 (claims "involve the 2013 Agreement" with arbitration clause); *Washington v. William Morris Endeavor Entm't, LLC*, No. 10 Civ. 9647 (PKC) (JCF), 2011 WL 3251504, at *9 (S.D.N.Y. July 20, 2011) (employee's claim to avoid employment contract with arbitration clause); *Carder*, 2009 WL 106510 at *7 (purchaser's claim for rescission of sale agreement with arbitration  clause); *McLaughlin*, 942 A.2d at 625 (same); *Contec*, 398 F.3d at 209 (purchaser's claim to enforce arbitration of indemnification dispute under sale agreement with arbitration clause); *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith*, 7 F.3d 1110, 1122 (3d Cir. 1993) (trustee's ERISA claim against broker within scope of brokerage contract with arbitration clause); *Degraw Const. Grp, Inc. v McGowan Builders, Inc.*, 152 A.D.3d 567, 570 (N.Y. App. Div. 2017) (plaintiff's mechanic's lien claim subject to construction contract with arbitration clause, but tort claims were not); *Hays & Co.*, 885 F.2d at 1155 (customer's claim against broker subject to brokerage agreement with arbitration clause).

[15]  The Court also should not dismiss the damage claims as the Defendants request. Under the FAA, if a court finds that a proceeding presents "any issue referable to arbitration under an agreement in writing for such arbitration," it "shall on application of one of the parties ***stay***

---

01:23040251.1

A.    **If The Court Determines That The Damage Claims Are Arbitrable, The Applicable Factors Strongly Favor A Stay Of Arbitration.**

If the Court believes that both arbitrable and non-arbitrable claims are present in this action, it has complete discretion as to which should be stayed and which should be arbitrated. The Defendants agree that the Court can stay arbitration of otherwise arbitrable claims, stay litigation of non-arbitrable claims, or allow both to proceed simultaneously.  *See* Memo. at 16-22; *Klay v. All Defendants*, 389 F.3d 1191, 1204 (11th Cir. 2004) ("it is well established that a district court may order arbitration and refuse to stay nonarbitrable proceedings"); *In re Residential Capital LLC*, 563 B.R. 756, 774 (Bankr. S.D.N.Y. 2016) ("the Court has authority to stay an arbitration where appropriate").

In considering a request for a stay of an action with arbitrable and non-arbitrable claims, courts assess a number of factors, including "the predominance of the arbitrable claims, the merit of the non-arbitrable claims, the court's concern with controlling its own docket, and overall judicial economy."  *F.D. Imp. & Exp. Corp. v. M/V REEFER SUN*, 248 F. Supp. 2d 240, 250–51 (S.D.N.Y. 2002) (citation omitted).  Here, each of these factors would weigh heavily in favor of not delaying adjudication of the Trust's paramount, non-arbitrable fraudulent transfer claims and staying the damage claims if the Court believes they are arbitrable.

The relative importance of the claims is a critical factor in this determination.  Where "the heart of [a] [d]ebtor's complaint concerns the avoidance of fraudulent transfers" and, as here, the arbitrable claims are "peripheral," courts refuse a stay.  *Gandy*, 299 F.3d at 497-98; *see,*

the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C § 3 (emphasis added).  The Third Circuit is clear:  "the plain language of § 3 affords a district court ***no discretion to dismiss a case*** where one of the parties applies for a stay pending arbitration."  *Lloyd v. HOVENSA, LLC*, 369 F.3d 263, 268-69 (3d Cir. 2004) (emphasis added); *see Quilloin*, 673 F.3d at 227 n.2 ("A stay, rather than a dismissal, is the required course of action when compelling arbitration.") (quotation omitted).

*e.g.*, *In re S.W. Bach & Co.*, 425 B.R. 78, 99 (Bankr. S.D.N.Y. 2010) (staying arbitration of ancillary claims pending adjudication of fraudulent transfer claim).  And there can be no dispute that the fraudulent transfer claims predominate this action.  They are the first claims listed in the Complaint and, without question, provide the greatest source of potential recoveries for Paragon creditors – in essence, the return of all of the $1.7 billion the creditors loaned to Paragon, plus interest.  This dwarfs any realistic potential recoveries the Trust may obtain from the Individual Defendants for their misconduct.

Courts also will stay any arbitration that might undermine their docket or "severely threaten [or delay] any judgment" on non-arbitrable claims.  *Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199, 220 (E.D.N.Y. 2013).  Where non-arbitrable issues "permeate the entire case," it is appropriate to stay arbitration so that the "district court can preserve its full authority to decide the non-arbitrable federal issues."  *Dickinson v. Heinold Sec., Inc.*, 661 F.2d 638, 644 (7th Cir. 1981); *see S.W. Bach*, 425 B.R. at 99 (staying arbitration pending adjudication by bankruptcy court of non-arbitrable fraudulent transfer claims; absent a stay, the debtor would be exposed "to risks of collateral estoppel or res judicata" and the "Court's exclusive jurisdiction with respect to the Debtor's bankruptcy" might be impaired); *Residential Capital*, 563 B.R. at 774 ("the most relevant factors to consider here are the possibility of inconsistent judgments and the risk of collateral estoppel and res judicata").

That is the case here.  If an arbitration of the damage claims goes forward, the arbitrator may make findings regarding Paragon's insolvency, the intent and purpose of the Spin-Off, what the Defendants knew about the declining prospects for Paragon's business, the unreasonableness of Noble's financial projections for Paragon and a host of other issues that will be at the core of the Trust's fraudulent conveyance claims.  Any such findings – made without the benefit of full

discovery or adversarial litigation – necessarily will be less informed than findings the Court would make after trial.  The arbitrator's findings are likely to be based on incomplete information and, in the worst case, would be inaccurate.  It would be extremely prejudicial to expose the Trust to the risk that those findings someday might be found to have a preclusive effect on the fraudulent transfer claims to be adjudicated by the Court.[16]

Bankruptcy courts also have acknowledged the importance of having fraudulent transfer claims adjudicated by courts with the requisite discovery tools and judicial experience, as opposed to arbitrators who are, at best, far less experienced in such matters.  *See, e.g.*, *OHC Liquidation Tr. v. Am. Bankers Ins. Co. (In re Oakwood Homes Corp.)*, Nos. 02-13396 (PJW), 04-56928 (PBL), 2005 WL 670310, *5 (Bankr. D. Del. Mar. 18, 2005) ("To subject these [fraudulent transfer] matters to arbitration, before individuals or tribunals with little or no experience in bankruptcy law or practice, . . . would introduce variables into the equation which could potentially bring about totally inconsistent results.").

A stay of arbitration also is appropriate in order to promote judicial economy, avoid duplicative proceedings, and prevent "waste[d] estate resources."  *In re E & G Waterworks, LLC*, 571 B.R. 500, 509 (Bankr. D. Mass. 2017).  Here, there is no doubt that an arbitrator would be less familiar with the bankruptcy issues, the Court's prior rulings, and the complex factual circumstances presented by the Spin-Off.  Moreover, where – as here – "the parties have not commenced or requested arbitration outside of bankruptcy," a bankruptcy court "is the most efficient and effective forum in which to resolve these fundamental Bankruptcy Code issues."  *In re APF Co.*, 264 B.R. 344, 364 (Bankr. D. Del. 2001); *see AstroPower*, 335 B.R. at 326 ("The

---

[16]   The Trust does not concede that any findings by the arbitrator can or will have preclusive effect, particularly given the cursory and summary nature of the arbitration proceeding that the Defendants seek to impose upon the Trust.

arbitration process has not yet begun . . . [and] [i]n light of this potential prejudice to the Plaintiff, the Court declines to stay litigation of the core claims at this time."); *E. W. Bank v. Bingham*, 992 F. Supp. 2d 1130, 1136 (W.D. Wash. 2014) (similar).

A final consideration is the degree to which the resolution of disputed issues of fact common to both arbitrable and non-arbitrable claims would benefit from court-supervised discovery and adversarial litigation in accordance with the applicable federal rules.  For example, in *American Shipping Line*, the court refused to stay non-arbitrable claims pending arbitration of related contract claims despite "[t]he moving defendants offer to participate in discovery notwithstanding the stay" because the "offer [wa]s not an adequate substitute for court-ordered discovery pursuant to the Federal Rules of Civil Procedure."  *American Shipping Line, Inc. v. Massan Shipping Industries, Inc*., 885 F. Supp. 499, 503 (S.D.N.Y. 1995).  This point is particularly apt here, as the MSA severely limits discovery of all kinds.  It provides only for "limited document production from the other party or parties of specific and expressly relevant documents, with the reasonable expenses of the producing party incurred in such production paid by the requesting party."  MSA § 5.6.  This expressly is intended to "be substantially less than discovery rights prevailing under the Federal Rules of Civil Procedure."  *Id*.  The MSA does not provide for *any* depositions, *any* interrogatories, or *any* third-party discovery without agreement of the parties or a determination by the arbitrator that it is "essential to a fair resolution of the Dispute."  *Id*.  Because the Trust does not control any of the witnesses or evidence in the case – unlike Noble – the Trust would be disproportionately disadvantaged by these limitations.

Accordingly, should the Court find that the Trust's damage claims are arbitrable, it should stay any arbitration pending adjudication of the fraudulent transfer claims.[17]

**B.    The Defendants Have Not Satisfied Their Burden Of Demonstrating The Need For A Stay.**

The Defendants' brief does not mention or apply any of the aforementioned considerations.  Instead, the Defendants devote five pages to establishing the unremarkable proposition that there is overlap between the factual allegations of the fraudulent transfer claims and the allegedly arbitrable damage claims.  Memo. at 17-22.  The Defendants' suggestion that this factual overlap supports staying the non-arbitrable claims is both contrary to law and, as addressed above, inconsistent with the factors considered by courts.  *See, e.g.*, *Lepera v. ITT Corp.*, No. 97-1461, 1997 WL 535165, *8 (E.D. Pa. Aug, 12, 1997) ("the fact that arbitrable and nonarbitrable claims are factually intertwined is insufficient to require that the nonarbitrable claims be stayed") (citing *McMahon v. RMS Electronics, Inc.*, 618 F. Supp. 189, 192 (S.D.N.Y. 1985)).

The cases cited by Defendants bear no resemblance to this case.  Unlike here, each involved predominant claims subject to arbitration and minor ancillary claims that were not.  In *EXDS, Inc. v. Ernst & Young LLP (In re EXDS, Inc.)*, 316 B.R. 817, 826 (Bankr. D. Del. 2004), for example, the debtor asserted claims for negligence, negligent misrepresentation, breach of contract, breach of fiduciary duty, unjust enrichment, and fraudulent transfer arising out of E&Y's alleged failure to oversee bills submitted by an entity providing internet data services to the debtor.  The court stayed the tangential fraudulent transfer claim, "adopt[ing] the position

---

[17]    A stay of the damage claims would have the added benefit of potentially mooting the arbitration entirely.  Full avoidance and recovery of Paragon's payments to Noble, with interest, would make the Trust and Paragon's bankruptcy estate whole and obviate the need for further prosecution of the damage claims that the Defendants seek to have arbitrated.

taken by the court" in *In re Hagerstown Fiber Ltd. P'ship*, which had "similar facts."  277 B.R.

181, 208 (Bankr. S.D.N.Y. 2002).  As in *EXDS*, the claims in *Hagerstown* "[at] their core" were

"contractual in nature," and the "fraudulent conveyance claims are directly connected to the

contract disputes, and present alternative theories of disaffirmance."  *Id*.[18]

As explained above, the fraudulent transfer claims in this case do not depend in any way

on interpretation of the MSA or any other contract between the parties.  And it is those claims

that are the driving force behind this action.

Finally, the Defendants neglect that "[t]he party seeking a stay must make out a clear case

of hardship or inequity in being required to go forward, if there is even a fair possibility that the

stay for which he prays will work damage to someone else."  *E. W. Bank*, 992 F. Supp. 2d at

1136.  The Defendants can articulate no harm from litigating the admittedly non-arbitrable

fraudulent transfer claims now.

Rather, it is the Trust that would be prejudiced by any stay involving these claims.  Given

Noble's tenuous financial condition,[19] additional delay in waiting months if not years for an

arbitration to conclude can only jeopardize the Trust's potential recoveries and risk evidence

spoliation given that the Spin-Off occurred nearly four years ago.  *See In re Latimer*, 489 B.R.

---

[18]  Similarly, in *Madison Foods, Inc. v. Fleming Cos.*, 325 B.R. 687, 695 (Bankr. D. Del. 2005), the court stayed claims under section 552 of the Bankruptcy Code related to the sale of a grocery store because the claims were "all dependent on the Plaintiffs' succeeding on their fraud and contract claims" which were subject to arbitration.  *Id*. at 695.  Likewise, in *Shubert v. Wellspring Media, Inc.*, 335 B.R. 556, 569 (Bankr. D. Del. 2005), the court stayed a chapter 7 trustee's claim under section 542 seeking turnover of estate property in connection with the sale of the debtor's assets because there was "only one issue [in the case], the proper calculation of Working Capital," and that issue was not "premised on provisions of the Bankruptcy Code."  *Id*. at 566.  The court also found that the section 542 claim "would be rendered moot" by the arbitration's determination of the Working Capital issue, which was squarely covered by the arbitration clause.  *Id*. at 562, 566.

[19]  Noble has admitted that "[a]n adverse result in the Paragon suit could have a material adverse effect on the Company's financial condition and results of operations."  (Ex. L).

844, 867 (Bankr. N.D. Ala. 2013) (a stay pending arbitration "increase[s] the danger of prejudice resulting from the loss of evidence, including the inability of witnesses to recall specific facts, or the possible death of a party").

## **CONCLUSION**

For the foregoing reasons, the Court should deny the Motion. Alternatively, if the Court concludes that the Trust's damage claims are arbitrable, it should stay arbitration pending adjudication of the Trust's predominant fraudulent transfer claims.

Dated: March 30, 2018
      Wilmington, Delaware      YOUNG CONAWAY STARGATT & TAYLOR, LLP

     */s/ Pauline K. Morgan*
     Pauline K. Morgan (No. 3650)
     Joel A. Waite (No. 2925)
     Jaime Luton Chapman (No. 4936)
     Michael S. Neiburg (No. 5275)
     1000 North King Street
     Wilmington, Delaware 19801
     Telephone: (302) 571-6600
     Facsimile: (302) 571-1253
     Email: pmorgan@ycst.com
            mneiburg@ycst.com

     -and-

     JONES DAY
     Bruce Bennett
     James O. Johnston
     555 South Flower Street, 50th Floor
     Los Angeles, California 90071
     Telephone: (213) 489-3939
     Facsimile: (213) 243-2539
     Email: bbennett@jonesday.com
            jjohnston@jonesday.com

     -and-

01:23040251.1

Gregory M. Shumaker
David S. Torborg
51 Louisiana Ave., N.W.
Washington, DC 20001
Telephone:  (202) 879-3939
Facsimile:   (202) 626-1700
Email:  gshumaker@jonesday.com
        dstorborg@jonesday.com

-and-

Jennifer L. Del Medico
Genna L. Ghaul
250 Vesey Street
New York, New York 10281
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Email:  jdelmedico@jonesday.com
        gghaul@jonesday.com

*Counsel to Paragon Litigation Trust*

01:23040251.1