## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| PARAGON OFFSHORE PLC, | Case No. 16-10386 (CSS) |
| Debtor. | |

| | |
|---|---|
| PARAGON LITIGATION TRUST, | |
| Plaintiff, | |
| v. | |
| NOBLE CORPORATION PLC, NOBLE CORPORATION HOLDINGS LTD, NOBLE CORPORATION, NOBLE HOLDING INTERNATIONAL (LUXEMBOURG) S.à r.l., NOBLE HOLDING INTERNATIONAL (LUXEMBOURG NHIL) S.à r.l., NOBLE FDR HOLDINGS LIMITED, MICHAEL A. CAWLEY, JULIE H. EDWARDS, GORDON T. HALL, JON A. MARSHALL, JAMES A. MACLENNAN, MARY P. RICCIARDELLO, JULIE J. ROBERTSON, and DAVID WILLIAMS, | Adv. Proc. No. 17-51882 (CSS) |
| Defendants. | |

## THE PARAGON LITIGATION TRUST'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR AN ORDER COMPELLING DEFENDANTS TO PRODUCE DOCUMENTS IMPROPERLY WITHHELD ON PRIVILEGE GROUNDS

## Table of Contents

                                                                        **Page**

**INTRODUCTION**.................................................................................................. 1

**FACTUAL BACKGROUND**...................................................................................4

    A.     Noble Unilaterally Extracts $1.7 Billion From Paragon,
            Misleading Lenders And Rendering Paragon Insolvent ............................... 4

    B.     The Joint Legal Representation Of Noble And Paragon
            In Connection With The Spin ..................................................................... 6

    C.     Paragon's Spiral Into Bankruptcy And
            The Creation Of The Paragon Litigation Trust.......................................... 9

    D.     Noble's Sweeping Privilege Assertions.................................................... 10

**ARGUMENT**........................................................................................................ 14

I.     Legal Standards............................................................................................ 14

II.    Noble Cannot Withhold Communications With And Documents
       Of Counsel Who Jointly Represented Paragon And Noble ............................. 15

    A.     Joint Clients May Not Withhold Privileged Documents
            From Each Other In Adverse Litigation ................................................... 15

    B.     Noble And Paragon Were Co-Clients....................................................... 18

    C.     Section 7.13 Of The MSA Does Not Permit Noble To
            Withhold Documents From The Trust........................................................ 19

III.   Noble Cannot Withhold Communications Copied To
       Individuals Affiliated With Paragon ............................................................. 26

    A.     Noble's "Rebuttable Presumption" For Noble Employees
            Who Transferred To Paragon's Leadership Team Is Unsupportable ......... 26

    B.     Noble Must Produce All Documents Sent Or Received
            By Paragon's Leadership Team Created On Or After December 16, 2013............... 28

**CONCLUSION** ...................................................................................................30

## **Table of Authorities**

**Page**

**Cases**

*Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, 252 F.R.D. 163 (S.D.N.Y. 2008) ....................29

*In re Am. Metrocomm Corp.*, 274 B.R. 641 (Bankr. D. Del. 2002)................................14

*Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985)...........................24, 25

*In re Congoleum Corp.*, 426 F.3d 675 (3d Cir. 2005) ........................................9

*In re Crescent Res., LLC*, 457 B.R. 506 (Bankr. W.D. Tex. 2011) ...........................16, 17, 18, 19

*David v. #1 Mktg. Serv., Inc.*, 979 N.Y.S.2d 375 (N.Y. App. Div. 2014) .....................24

*In re Ginn-LA St. Lucie Ltd., LLLP*, 439 B.R. 801 (Bankr. S.D. Fla. 2010) ................................25

*In re Grand Jury Investigation*, 918 F.2d 374 (3d Cir. 1990) .................................14, 28

*Idenix Pharm., Inc. v. Gilead Scis., Inc.*, 195 F. Supp. 3d 639 (D. Del. 2016)............................14

*In re Investigation Before the February, 1977, Lynchburg Grand Jury*,
    563 F.2d 652 (4th Cir. 1977) .........................................9

*In re Lanza*, 322 A.2d 445 (N.J. 1974) ........................................9

*Medcom Holding Co. v. Baxter Travenol Labs., Inc.*,
    689 F. Supp. 841 (N.D. Ill. 1988) ................................16, 17, 18

*In re Mirant Corp.* 326 B.R. 646 (Bankr. N.D. Tex. 2005)................................. passim

*Newsome v. Lawson*, 286 F. Supp. 3d 657 (D. Del. 2017) .........................................15

*Polycast Tech. Corp. v. Uniroyal, Inc.*, 125 F.R.D. 47 (S.D.N.Y. 1989) ...............................16, 17

*Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851 (3d Cir. 1994) ...............................14

*State v. Avco Fin. Serv. of New York Inc.*, 50 N.Y.2d 383 (N.Y. 1980) .......................................24

*In re Teleglobe Communications Corp.*, 493 F.3d 345 (3d Cir. 2007)................................. passim

*Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414 (3d Cir. 1991)............14, 29

*In re Wynne Residential Asset Mgmt., LLC*, No. 09-50401,
    2009 WL 5169371 (Bankr. W.D.N.C. Dec. 18, 2009) ............................................9

**Rules And Other Material**

Fed. R. Bankr. P. 9017.................................................................................................................14

Tex. Comm. on Professional Ethics, Op. 512, 58 Tex. B.J. 1147 (1995).....................................23

## INTRODUCTION

Plaintiff Paragon Litigation Trust (the "Trust") is forced to bring the Motion because defendants are withholding thousands of responsive and relevant documents through an improper assertion of the attorney-client privilege. The Trust needs these documents to prosecute the Noble Claims for the benefit of the estate.[1]

This case centers on defendants' decision to spin off Noble Corporation plc's ("Noble") "standard specification" assets to Paragon Offshore plc ("Paragon"), a newly created, wholly owned subsidiary of Noble. Paragon and its affiliates were in bankruptcy just eighteen months later. Not surprisingly, the $1.7 billion spin-off (the "Spin") raised a host of complicated corporate, financial, securities, tax, accounting, and legal issues. Both Noble and Paragon needed the services of outside and in-house legal counsel to navigate these critical issues.

As the spinner, Noble faced a choice in selecting legal representation for the Spin. It could (1) provide separate counsel for Paragon, the new corporation that was being formed to purchase the assets from Noble, or (2) require that Paragon be jointly represented by Noble's counsel. Fully aware of the "different approaches" to this issue in "other separation transactions," Noble chose to deny Paragon separate legal representation. Ex. 2. Noble's General Counsel, after consulting with its President, Chief Executive Officer, and Board Chairman (defendant David Williams), specifically rejected the request of Paragon's future President for separate counsel and advised him, in no uncertain terms, that "this is a decision for Noble." *Id.*

---

[1] Given the parties' extensive discussions to date and the importance of the matter, the Trust and defendants have agreed to proceed directly to motion practice in lieu of the pre-motion procedures set forth in the Scheduling Order [D.I. 56 ¶ 5]. Ex. 1. The exhibits cited in this memorandum ("Ex.") are attached as Exhibits to the accompanying Declaration of David S. Torborg. Capitalized terms not defined in this memorandum have the meanings set forth in the Trust's Complaint.

Noble's decision that it and Paragon would be jointly represented by counsel certainly came with benefits for Noble.  Refusing separate legal counsel would allow Noble to exploit Paragon's lack of separate representation in structuring the terms of the Spin.  As detailed throughout the Trust's Complaint, Noble took full advantage of that opportunity.  But Noble's decision also came with risks.  In particular, under the well-established "Adverse Litigation Exception," Noble would be unable to withhold privileged documents from its co-client, Paragon or its successors, in the event the Spin was later challenged.  That risk is why the authorities, including the Third Circuit's leading decision in *In re Teleglobe Communications Corp.*, specifically warn against joint representation where the interests of a parent and subsidiary may diverge.  493 F.3d 345, 372-74 (3d Cir. 2007).

Noble decided that the advantages of denying Paragon separate representation outweighed the risks.  But now Noble wants to have its cake and eat it, too.  As there can be no dispute that Noble's in-house lawyers and primary outside counsel, Baker Botts and Travers Smith, provided legal advice to both Noble and Paragon – indeed, this is specifically admitted in an after-the-fact "conflicts waiver letter" from Baker Botts (Ex. 3), among many other pieces of evidence – this motion presents a straightforward application of the Adverse Litigation Exception set out in *Teleglob*e.  Nonetheless, Noble has refused to produce joint representation materials to the Trust, which now controls Paragon's privileges in all relevant respects.  While Noble admits there was at least some joint representation, it cites a provision in the July 31, 2014 Master Separation Agreement ("MSA") – which it claims to have "assigned" control over the privilege to itself – to justify its refusal to turn over responsive documents.

As detailed below, however, Noble's position fails on multiple levels.  First, the cited provision – which purports to establish retroactively that outside counsel "has not acted as

counsel for Paragon" – flies in the face of the evidence.  Second, there is no language that "assigns" Paragon's privilege to Noble in that provision.  Third, and more fundamentally, courts routinely invalidate on public policy grounds efforts by a parent corporation to withhold documents from a former co-client subsidiary.  Noble's efforts to keep documents from the Trust here must suffer the same fate.

Another overarching issue with Noble's privilege assertions, overlapping to some extent with the joint representation issue, is Noble's continued withholding of documents sent or received by Noble employees who had transitioned or were in the process of transitioning to key leadership positions at Paragon.  Despite the Trust's undisputed right to Paragon's privileged materials – which necessarily includes access to all privileged documents received or reviewed by Paragon personnel – Noble claims it can withhold documents to the extent it unilaterally determines that these individuals were "acting for Noble" in connection with particular communications, notwithstanding their dual affiliation with both Noble and Paragon.

The "rebuttable presumptions" Noble has employed to guide these determinations, however, are demonstrably false.  These individuals were affiliated with Paragon much earlier than Noble acknowledges.  Moreover, the notion that the individuals were acting entirely with their "Noble hat" in connection with Spin-related communications – as opposed to acting for *both* Noble and Paragon – is unsupported and nonsensical.  Noble's position is also inconsistent with the privilege it asserts.  If Noble shared a communication with an individual who had transitioned to or was in the process of transitioning to Paragon, Noble obviously intended to share that communication with Paragon.  Because the Trust now controls Paragon's privilege with respect to such communications, the documents cannot be withheld.

## FACTUAL BACKGROUND

### A. Noble Unilaterally Extracts $1.7 Billion From Paragon, Misleading Lenders And Rendering Paragon Insolvent

Beginning in 2010, Noble embarked on a "transformation strategy" to rid itself of old, "standard specification" oil rigs that it understood were becoming "increasingly commoditized" in the market. Compl. ¶¶ 34-38. After unsuccessful efforts to sell the older rigs, Noble turned its sights toward "spinning off" the aging fleet into a new, separately traded and managed company initially referred to as "StandardCo" (or "SpinCo") and eventually known as "Paragon." *Id.* ¶¶ 39-47.

It took awhile for Noble to lay the organizational foundation for the Spin. As early as April 2013, Noble formed "Paragon International Finance Corporation" as a Cayman Islands company. Ex. 4. In May 2013, Noble formed Paragon Offshore Finance Company (the entity that ultimately transferred more than $1.7 billion to Noble) as a Caymans Islands company. *Id.* In August 2013, it formed two other related holding companies, Paragon Holding SCS 1 Ltd. and Paragon Holding SCS 12 Ltd., also in the Caymans. Ex. 5. In December 2013, Noble formed "Noble Spinco Limited," the initial name for "Paragon Offshore Limited," which became the top of the Paragon umbrella and the lead debtor in these proceedings. Ex. 6. Each of these entities was involved in the transfer of Noble's standard specification rigs to Paragon. Compl. ¶¶ 21-23.

At all relevant times, from the initial formation of the new Paragon entities in April 2013 to the closing of the Spin in July 2014, Noble ultimately owned all of the Paragon entities' equity. Noble installed James MacLennan, Noble's Chief Financial Officer, as the sole member of Paragon's Board of Directors, Compl. ¶ 30, and selected several of its own executives to be Paragon's putative management team.

These Noble employees assumed their duties for Paragon in the months leading up to the Spin. For example, by September 10, 2013, Lee Ahlstrom, Noble's Senior Vice President of Strategic Development, had been designated to "represent[] Spinco" in upcoming discussions with Petrobras on rig contracts for standard specification assets. Ex. 7. By December 13, 2013, Noble had announced that Ahlstrom, Todd Strickler, Andrew Tietz, and Charlie Yester – all Noble employees – would be assuming senior leadership roles at Paragon. Ex. 8.

Given this lopsided dynamic – including the facts that Paragon's sole director (MacLennan) was an officer of Noble, that almost all members of Paragon's future senior management were paid by and beholden to Noble through consummation of the Spin, and that (as explained below) Noble denied Paragon any independent counsel or advisors – Noble was able to exert complete and total control over the transaction. Paragon had no input into the terms of the Spin, including the price Paragon would pay Noble for the transferred assets, the amount that Paragon would borrow to finance that payment, the Noble liabilities that Paragon would assume, or any other substantive matter. Compl. ¶ 83. Noble dictated all relevant terms, and no one negotiated anything on behalf of Paragon.

As a result, despite clear and obvious evidence that Paragon's standard specification rigs were worth far less than the amount that Noble required Paragon to pay for them, Noble was able to close the transaction, in the process hiding serious issues with the Paragon fleet from prospective lenders and gravely misleading Houlihan Lokey in order to obtain the "fairness opinion" necessary for the deal. *Id.* ¶¶ 4-9, 48-59, 73-80, 93, 97-02, 104, 120-25, 127. At the conclusion of the Spin, Noble had disposed of almost all of its aging standard specification rigs, sucked $1.71 billion in cash from its former subsidiaries, and saddled Paragon with $1.73 billion in funded debt. *Id.* ¶ 110.

B.     **The Joint Legal Representation Of Noble And Paragon In Connection With The Spin**

Noble engaged various lawyers to develop and implement the Spin.  Noble's lead outside counsel was the law firm of Baker Botts, which, according to Noble's privilege log, began to advise Noble on the divestment of its standard specification rigs no later than 2011.  Noble also engaged the law firm of Travers Smith LLP to assist with United Kingdom law and legal issues. Noble's legal team also included a large in-house legal department, led by its General Counsel, William Turcotte.

As Noble's efforts to divest its aging fleet through a sale evolved into an effort to spin off a group of subsidiaries formed to hold those assets, it became clear that the Paragon "spinee" entities would need legal counsel to complete the various steps associated with the Spin, including (a) the formation of multiple Paragon-affiliated legal entities used in connection with the Spin, (b) the documentation of dozens of corporate mergers, separations, transfers, dividends, and related transactions, (c) the preparation and filing of financial disclosures and statements with the SEC, and (d) the negotiation and documentation of debt instruments providing for Paragon to incur more than $1.7 billion in debt.

Paragon, however, did not retain separate counsel to represent its interests in any of those transactions.  It was not for lack of trying.  In fact, Paragon requested separate representation and Noble expressly refused.  On March 14, 2014, Paragon's future Chief Executive Officer, Randall Stilley, one of the few Paragon executives recruited from outside Noble, suggested to Noble that it would "be useful to have outside counsel review the separation agreements specifically on behalf of Paragon Offshore prior to the IPO."  Ex. 2.  Noble's General Counsel (Turcotte), copying Noble's Chief Executive Officer (Williams) and other high-level Noble executives, flatly rejected that request:

> [W]ith respect to Paragon engaging separate counsel to review (or otherwise advise Paragon), ***we (Noble including Paragon) do not intend to engage additional counsel for separation matters***.  I understand there have been different approaches to this in some other separation transactions, but David [Williams] and I have discussed this and ultimately this is a decision for Noble.

*Id.* (emphasis added).

Instead, Noble chose to have Baker Botts, Travers Smith, and its in-house lawyers represent the Paragon entities in connection with Spin-related matters.  This is made crystal clear throughout the documents.  Baker Botts, for example, is listed as counsel for Noble Spinco Limited (*i.e.*, Paragon) in the December 20, 2013 preliminary Form S-1 filed with the SEC as a necessary prerequisite for the distribution of publicly traded Paragon shares, again in the amended Form S-1 filed on March 7, 2014, and again in multiple other public filings made with the SEC.  Exs. 9, 10.  Baker Botts also is listed as counsel for Paragon in the documents governing Paragon's incurrence of $650 million in secured term loans and $1.08 billion in unsecured notes (the proceeds of which were immediately transferred to Noble).  Exs. 11, 12.

Indeed, to this day multiple individual Baker Botts lawyers tout their experience, in website biographies, in representing ***Paragon*** "in connection with its spin-off from Noble Corporation."  Ex. 13.  Baker Botts itself posted on its website an article in *Legalease* that announced the Spin in its "Dealwatch" feature and observed that "Noble ***and Paragon*** were advised by Baker Botts partners David Emmons and Hillary Holmes."  Ex. 14.  The same is true for Travers Smith, which issued multiple press releases touting its work for both Paragon and Noble in connection with the Spin, stating, for example, that it "advised Paragon Offshore plc and Noble Corporation plc on the creation of Paragon and its demerger from Noble Group."  Ex. 15.

Despite its open and notorious representation of Paragon, Baker Botts delivered a curious letter to Noble and Paragon on July 29, 2014 – 11 days *after* Noble had pocketed the proceeds of Paragon's $1.73 billion debt issuance on July 18, 2014 (Compl. ¶¶ 21-23) and just two days before Noble and Paragon executed the Master Separation Agreement ("MSA") on July 31, 2014.  The letter, which is countersigned by the respective CFOs of Noble and Paragon with no indicated date, is a study in contradiction.

On the one hand, Baker Botts confirms that it represented Paragon in connection with Spin-related matters:

> [A]t your request and with your consent, **we have provided** (and will continue to provide until the completion of the proposed separation) *legal advice to each of Noble and the Paragon Entities* in connection with the proposed separation, *including in connection with matters as to which the interests of Noble and the Paragon Entities are materially and directly adverse*.

Ex. 3 (emphasis added).  The letter does not specify the matters as to which "the interests of Noble and Paragon Entities are materially and directly adverse," but it claims that Baker Botts has "not represented and does not represent any of the Paragon Entities in connection with the negotiation and preparation of the Master Separation Agreement to which a subsidiary of Noble and Paragon are to become parties or any of the 'Ancillary Agreements' referred to therein (the Paragon Entities will rely on their own in-house counsel with respect to those activities)."  *Id.*

On the other hand, Baker Botts states that "[o]ur role with respect to this transaction has been the representation of Noble, and any representation of any Paragon Entities by us has been incidental to, and in furtherance of, our representation of Noble."  *Id.*  The letter then provides for Noble and Paragon to purport to "acknowledge[]" that Baker Botts is to:

> *follow the instructions* of the management and personnel *of Noble* with respect to the resolution of any issues that may arise between Noble and Paragon in connection with those matters, and . . .

- 8 -

> ***furnish our advice solely to Noble***, unless otherwise determined
> by Noble.

*Id.* (emphasis added).

Thus, the Baker Botts letter (1) confirms that the firm represented Paragon in connection with various Spin-related matters, including on matters where the respective interests of Noble and Paragon were materially and directly adverse, but (2) admits that the firm was taking direction from Noble and representing only its interests. Although there is no language purporting to waive any conflict (much less providing the disclosure necessary for an informed consent), Noble now characterizes this letter as a "conflicts waiver letter" between Noble and Paragon. Ex. 16. However, because the letter was countersigned no earlier than July 29, 2014 – ***after*** Noble had executed its scheme to extract $1.73 billion from Paragon's lenders – any "conflicts waiver" putatively executed by Paragon (still under the control of Noble and without any independent management or counsel of its own) was obviously after the damage had been done.[2]

### C.    Paragon's Spiral Into Bankruptcy And The Creation Of The Paragon Litigation Trust

Not long after the Spin closed on July 31, 2014, cracks in the façade that Noble had erected for Paragon began to surface. Compl. ¶¶ 115-27. On November 10, 2014, just three months after the Spin, Paragon reported a $929 million non-cash asset impairment charge

---

[2] *See, e.g.*, *In re Congoleum Corp.*, 426 F.3d 675, 691 (3d Cir. 2005) (effectiveness of conflicts waiver depends upon whether the clients have given truly informed consent, after attorney has "*first* explained . . . all the facts and indicated in specific detail all of the areas of potential conflict that foreseeably might arise") (quoting *In re Lanza*, 322 A.2d 445 (N.J. 1974) (emphasis added); *In re Investigation Before the February, 1977, Lynchburg Grand Jury*, 563 F.2d 652, 657-658 (4th Cir. 1977) (rejecting waiver of conflict of interest by target and non-target grand jury witnesses subject to multiple representation arrangement because no evidence that attorney explained to each client precise nature of actual, rather than potential, conflict and consequences of this conflict, including possible use of confidential facts to sacrifice one client's best interest in order to perform duty to other clients); *In re Wynne Residential Asset Mgmt., LLC*, No. 09-50401, 2009 WL 5169371, at *1 (Bankr. W.D.N.C. Dec. 18, 2009) (finding "after the fact waivers of these conflicts of interests" were unlikely to be effective under the governing rules of professional responsibility).

relating largely to drillships that had been contracted with Petrobras in Brazil, reflecting

Petrobras' earlier indications (hidden by Noble from Houlihan and Paragon's lenders) that it

would no longer engage those rigs.  *Id.* ¶ 120.  Trading in Paragon's long-term debt fell to

depressed levels just two months after the Spin closed, Ex. 17, and its shares were trading for

less than a dollar within eleven months.  By October 2015, just fifteen months after the Spin,

more than half of the Paragon rigs had been "stacked," meaning they were no longer operating

and Paragon was generating no revenue on rigs that Noble had indicated would be fully utilized

for the entire projection period provided to Houlihan.

Facing a liquidity crisis magnified by pre-closing tax liabilities Noble had concealed prior

to the Spin, Paragon filed for bankruptcy on February 14, 2016.  Compl. ¶¶ 121-23.  The Court

subsequently confirmed a plan of reorganization (the "Plan") on June 7, 2017.  [Main Case

D.I. 1614].  The Plan preserved Paragon's claims against Noble related to the Spin, referred to as

the "Noble Claims," and transferred to the Trust the rights to prosecute or settle them.

To facilitate that prosecution, Section 5.7(e) of the Plan provided the Trust with

authorization "to exercise and perform all rights and powers held by the Estates with respect to

the Noble Claims," and Section 10.2 of the Litigation Trust Agreement (incorporated into the

Plan) provided that "any and all attorney-client privileges, work product immunity, and other

privileges of the Debtors related solely to the Noble Claims shall be vested in the Litigation Trust

and the Litigation Trust Management."  Ex. 18.  Accordingly, the Trust now "stands in

Paragon's shoes" with respect to pre- and post-Spin privileged documents and communications

relevant to the Noble Claims.

### D.    Noble's Sweeping Privilege Assertions

The predecessor to the Trust (the Official Committee of Unsecured Creditors) issued

document requests to Noble in June 2017 and, after the parties negotiated search parameters,

Noble began producing documents in August 2017, ultimately declaring its production "substantially complete" in January 2018.  Noble, however, did not provide privilege logs until three months later, a delay likely explained by the sheer magnitude and breadth of Noble's privilege assertions.

Noble's initial logs collectively spanned 752 pages and listed some 15,872 documents that Noble refused to produce in unredacted form, nearly all on the basis of the attorney-client privilege.  Torborg Decl. ¶ 21.[3]  Noble included an "Affiliation List" with its logs, which purported to associate several hundred individuals copied on the withheld documents with their respective employers.  Ex. 21.  The Affiliation List identified some thirty-two individuals as being affiliated with both Noble and Paragon – the so-called "dually affiliated" individuals – including the aforementioned members of Paragon's leadership team.

As detailed in an April 24, 2018, letter from the Trust, Noble's sweeping privilege assertions were flawed in at least the following critical respects:

- Noble improperly withheld documents where outside and/or in-house counsel represented both Noble and Paragon;

- Noble failed to identify whether the "dually affiliated" individuals were acting on behalf of Noble or Paragon, or both, in connection with withheld documents;

- Noble improperly withheld documents on the basis of the "common interest" doctrine, including a purported common interest with Paragon itself;

- Noble improperly withheld documents that had been shared with non-lawyer third parties; and

---

[3] Noble's latest privilege and redaction logs are attached as Exhibits 19 and 20 to the Torborg Declaration. There are two privilege logs, one used to withhold documents responsive to the Trust's 2004 discovery (dated August 1, 2018) and one used to withhold documents originally produced in response to discovery issued by the Unsecured Creditors Committee (dated July 27, 2018).  Because Noble has marked the voluminous privilege and redaction logs as Confidential, the Torborg Declaration, as filed contemporaneously with the redacted version of this memorandum, includes slip sheets for the logs.

- Noble appeared to assert the attorney-client privilege over communications that primarily concern business matters, not legal advice.

Ex. 22.

Over the past four months, the parties narrowed the issues in dispute.  Noble conceded that many of the Trust's concerns were valid, effectively admitting that many documents should not have been withheld in the first place.  For example, Noble agreed that it could not assert privilege, under a "common interest" theory, over any document copied to someone affiliated with or "acting on behalf of Paragon."  Ex. 16.  Noble subsequently produced those documents, including documents copied to one or more of the "dually affiliated" individuals to the extent that Noble determined that the individual was "acting on behalf" of Paragon in connection with a communication.  *Id.*[4]

However, while the parties resolved some of their differences, two overarching issues – which collectively impact thousands of withheld documents – remain.

*First*, the parties disagree on whether Noble may withhold documents where in-house and outside counsel represented both Noble and Paragon in connection with Spin-related matters (hereafter, "Joint Representation Documents").[5]  Consistent with Baker Botts' July 29, 2014 letter and other materials cited above, Noble does not dispute that Baker Botts represented and performed work for Paragon.  *See also* Ex. 23 (recounting conversation where Noble "[did] not

---

[4] Noble also agreed to review its privilege assertions over certain documents pertinent to the Trust's concerns regarding documents that may primarily concern business matters and documents that were shared with non-lawyer third parties.  Noble has withdrawn its privilege assertions over certain of these documents, although its review is ongoing with respect to other documents.  Should Noble continue to withhold materials without persuasive explanations, the Trust may be forced to seek supplemental relief as to specific documents.

[5] Noble has refused to provide information necessary to determine exactly when Baker Botts and other counsel began representing the Paragon entities and the nature of their engagements, including basic information like engagement agreements, statements of work, conflicts waivers, invoices, and opinion letters.  *See* Ex. 16 ("Given this legal bar, Noble need not provide the full range of materials requested by the Trust.").  Regardless, the Trust believes that the Joint Representation Documents would potentially include applicable communications made subsequent to the formation of the first new Paragon entity in April 2013.

dispute that Baker Botts LLP did, in fact, perform work for Paragon entities"). Nor does there appear to be any dispute that, under well-established law (discussed below), one joint client cannot withhold privilege communications from another joint client.

Instead, Noble claims that, pursuant to Section 7.13 of the MSA, Noble and Paragon "expressly agreed that Noble would own the attorney-client privilege for matters relating to the Spin-Off," and that Paragon "assigned" its privileges to Noble through that provision. Ex. 16. As explained below, Noble's efforts in the MSA to re-write history in order to insulate its abusive conduct from discovery is not supported by Section 7.13 and is foreclosed by applicable law rejecting analogous efforts to withhold privileged documents from a co-client.

The dispute over the Joint Representation Documents impacts a considerable number of documents on Noble's privilege logs. Just with respect to Baker Botts, ***Noble withheld nearly 2,700 documents*** dated on or after April 2013 (the date Paragon International Finance Corporation was formed) for which one or more attorneys from Baker Botts are copied or as to which Baker Botts is listed as the "legal source." Noble withheld hundreds of additional post-April 2013 documents copied or sourced from Travers Smith lawyers. All qualify as Joint Representation Documents.

*Second*, Noble continues to improperly withhold documents copied to "dually affiliated" individuals, refusing the Trust's request that it produce all withheld documents sent to or received by members of Paragon's leadership team after the formation of Paragon Offshore Limited (the lead debtor in this case) – and the announcement of Paragon's senior leadership team – in December 2013.

## ARGUMENT

As detailed below, Noble's continued withholding of documents in the disputed categories is contrary to well-established law.

## I.    LEGAL STANDARDS

Rule 9017 of the Federal Rules of Bankruptcy Procedure provides that "[t]he Federal Rules of Evidence . . . apply in cases under the Code."  Fed. R. Bankr. P. 9017.  Under Federal Rule of Evidence 501, federal common law governs evidentiary privileges in federal cases, except in civil cases where state law governs an element of a claim or defense.  The Trust's Complaint predominantly sounds in federal law – Counts I thorough V are for avoidance, recharacterization and recovery of fraudulent transfers under sections 544, 548 and 550 of the Bankruptcy Code.  Therefore, as in all cases governed by federal bankruptcy law, federal common law applies to Noble's assertion of control over Paragon's privileges.  *See, e.g.*, *In re Am. Metrocomm Corp.*, 274 B.R. 641, 653 (Bankr. D. Del. 2002) ("[F]ederal common law governs control of Debtor's privileges.").

"The attorney-client privilege protects communications between a client and an attorney related to the purpose of securing legal advice."  *Idenix Pharm., Inc. v. Gilead Scis., Inc.*, 195 F. Supp. 3d 639, 642 (D. Del. 2016) (citing *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 862 (3d Cir. 1994)).  "Because the attorney-client privilege obstructs the truth-finding process, it is construed narrowly." *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1423 (3d Cir. 1991).  As the party asserting the privilege to prevent disclosure of otherwise relevant and responsive documents, Noble carries the burden of proving its applicability to the documents in question.  *See In re Grand Jury Investigation*, 918 F.2d 374, 385 (3d Cir. 1990) ("[I]t is clear, in this Circuit, that a party who asserts a privilege has the burden of proving its existence and applicability.") (citing cases).

II.  **NOBLE CANNOT WITHHOLD COMMUNICATIONS WITH AND DOCUMENTS OF COUNSEL WHO JOINTLY REPRESENTED PARAGON AND NOBLE**

    A.  **Joint Clients May Not Withhold Privileged Documents From Each Other In Adverse Litigation**

As the Third Circuit recognized in its seminal *Teleglobe* decision, it is often expedient for two or more individuals or entities to be represented by a single attorney or law firm.  *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 362 (3d Cir. 2007).  "When co-clients and their common attorneys communicate with one another, those communications are 'in confidence' for privilege purposes" and remain privileged as to third parties.  *Id.* at 363.

However, "[t]he great caveat of the joint-client privilege is that it only protects communications from compelled disclosures to parties outside the joint representation."  *Id.* at 366.  "[W]hen former co-clients sue one another, the default rule is that all communications made in the course of the joint representation are discoverable."  *Id.*; *see also Newsome v. Lawson*, 286 F. Supp. 3d 657, 664 (D. Del. 2017) ("[A] joint attorney may not withhold from one joint client privileged communications from the joint representation, even if the other (non-party) joint client refuses to consent to the disclosure.").  This is known as the "Adverse Litigation Exception."  *Teleglobe*, 493 F.3d at 366.

The Third Circuit confirmed in *Teleglobe* that the Adverse Litigation Exception applies with equal force to joint representations that, as here, involve parent companies and their wholly owned subsidiaries.  *Id.* at 367-68.  Because it is "inevitable that on occasion parents and subsidiaries will see their interests diverge, particularly in spin-off, sale, and insolvency situations," the Third Circuit warned that "it is wise for the parent to secure for the subsidiary outside representation."  *Id.* at 373.  "Maintaining a joint representation for the spin-off transaction too long" results in the parent company "risk[ing]" being "forced to turn over

documents to their former subsidiaries in adverse litigation." *Id.* (citing prior decisions compelling parent companies to produce documents). *Teleglobe* further advises corporations to "tak[e] care" to clearly define and delineate "the scope of joint representations." *Id.* at 373-74.

The rule set forth in *Teleglobe* controls this case. As shown below, Paragon and Noble were joint clients of Baker Botts, Travers Smith and in-house corporate counsel in connection with the Spin. As plainly acknowledged in the Baker Botts letter of July 29, 2014, the interests of Paragon and Noble "diverge[d]." *Id.*; Ex. 3 (stating that Baker Botts provided "legal advice to each of Noble and the Paragon Entities in connection with the proposed separation, including in connection with matters as to which the interests of Noble and the Paragon Entities are materially and directly adverse"). In order to consummate the Spin on terms most favorable to it, Noble made no effort to limit or delineate the bounds of counsels' respective representations of Noble and Paragon and, instead, had its lawyers generally represent both sides in all Spin-related matters. As a consequence, Noble must be "forced to turn over documents to [its] former subsidiaries in [this] adverse litigation" that involves and directly implicates the very matter as to which the joint representation was based. *Teleglobe*, 494 F.3d at 373.

That, in fact, is exactly what happened in at least four other cases that addressed the precise scenario present here: privilege disputes emanating from counsel's joint representation of both a parent corporation and its subsidiary in connection with a spin-off, sale, or divestiture. *See, e.g.*, *In re Crescent Res., LLC*, 457 B.R. 506, 516 (Bankr. W.D. Tex. 2011); *Polycast Tech. Corp. v. Uniroyal, Inc.*, 125 F.R.D. 47 (S.D.N.Y. 1989); *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 689 F. Supp. 841 (N.D. Ill. 1988); *In re Mirant Corp.* 326 B.R. 646 (Bankr. N.D. Tex. 2005). These decisions all hold that, in the event of subsequent adversity, privileged

communications with and advice by an attorney who represented both parent and subsidiary cannot be withheld from the parent or the subsidiary.

*Crescent*, in particular, shares many similarities to this case.  Both cases involve fraudulent transfer claims filed by a litigation trust relating to the spin-off of an energy company.  In both, the parent caused the subsidiary to incur over a billion dollars in debt to fund the subsidiary's purchase of assets from the parent.  457 B.R. at 509.  In both, the subsidiary's privilege passed to a litigation trust through a plan of reorganization.  *Id.* at 525.  In neither was the subsidiary represented by separate counsel during the structuring and documentation of the spin-off.  *Id.* at 518.

On those facts, the court in *Crescent* granted the litigation trust's motion to compel turnover of files held by Robinson, Bradshaw & Hinson, P.A. ("RBH"), the law firm that had provided advice in connection with the spin-off transaction.  The court rejected RBH's claim that it had represented only the parent company (Duke), noting (a) the lack of any other legal representation for the subsidiary, *id.* at 521 ("Factor 1" in the analysis was that "Crescent was not separately represented by other counsel"); (b) RBH's prior representation of Crescent in other matters; (c) RBH's access to Crescent's confidential or secret information; and (d) the scope of representation contained in RBH's engagement letter.  *Id.* at 521-24.  The court held that, had they desired to prevent Crescent's access to privileged materials, "RBH and in-house counsel for Duke should have heeded the warnings in *Teleglobe* and taken greater care to have in place an information shielding agreement or ensured that Crescent was represented by outside counsel."  *Id.* at 524.

The courts in *Polycast*, *Medcom* and *Mirant* reached the same conclusion.  *Polycast*, 125 F.R.D. at 49-51 (new owner of corporate subsidiary could access and waive joint privilege "with

respect to confidential communications occurring prior to the sale"); *Medcom*, 689 F. Supp. at 842-44 (same); *Mirant*, 326 B.R. at 649-55 (in investigating fraudulent conveyance and other claims, chapter 11 debtors could access privileged communications with lawyers who jointly represented debtors and corporate parent in connection with transaction in which debtors were spun off from corporate parent).

In sum, under *Teleglobe* as the controlling law of this Circuit and the related authority cited above, attorney-client communications made in a joint representation relating to a spin-off transaction cannot be withheld from the spun-off subsidiary when it later sues the parent in connection with the spin-off transaction that gave rise to the joint representation. Indeed, Noble's outright refusal to provide Paragon with separate counsel (Ex. 2) only further demonstrates that it knowingly assumed the risk of subsequent disclosure.

### B.     Noble And Paragon Were Co-Clients

As explained above, Noble concedes that at least Baker Botts represented both Noble and Paragon in connection with the Spin. In fact, Baker Botts specifically memorialized the fact of this joint representation in the letter it delivered to Noble and Paragon on July 29, 2014, two days before the Spin was concluded. Ex. 3. Likewise, Travers Smith's press releases and public statements establish that it, too, represented both Paragon and Noble in connection with the Spin. Ex. 15. And it stands to reason that Noble's in-house counsel, including both Strickler (who was designated to transition to Paragon) and his boss, Noble's General Counsel William Turcotte, similarly provided simultaneous and joint legal advice to both Noble and Paragon. That is true even if – as Baker Botts has admitted – counsel had only Noble's interests in mind.

Even without Noble's concession, the facts clearly support a finding of joint representation. As in *Crescent*, Noble expressly refused to provide Paragon with independent separate legal counsel. Given the legally-intensive nature of the Spin – which required numerous

filings with the SEC, negotiation and documentation of multiple debt instruments that resulted in more than $1.7 billion in financing, extensive tax and accounting analysis, and literally hundreds of documented corporate formations, mergers, transfers, dividends, and transactions – Paragon had to have legal representation.  It could not have acted otherwise, which of course is why Paragon's President asked Noble for such representation in the first place.  As in *Crescent*, outside and in-house counsel indisputably performed work for Paragon and had ready access to Paragon's confidential information.  And, at least with respect to Baker Botts, what engagement material Noble has agreed to share (Baker Botts' July 29, 2014 letter) demonstrates that counsel was representing both Noble and Paragon.  Indeed, as in *Crescent*, both Baker Botts and Travers Smith have touted their representation of Paragon on their websites.  Exs. 15-17; *see Crescent*, 457 B.R. at 524 (noting as evidence of joint representation "statements by RBH [the law firm] attorneys on RBH's website . . . that RBH represented Crescent [the subsidiary] in connection with certain aspects of Project Galaxy [the spin off]").

As a result of this joint representation, Paragon is entitled to the communications and documents of its counsel.[6]

### C.    Section 7.13 Of The MSA Does Not Permit Noble To Withhold Documents From The Trust

Implicitly acknowledging that the law does not permit it to withhold Joint Representation Documents from the Trust, Noble seeks refuge in Section 7.13 of the MSA, which provides:

---

[6] As noted, Noble's refusal to provide additional information requested by the Trust makes it difficult to fully assess when and on what particular matters outside and in-house counsel represented both Noble and Paragon entities.  The subject-matter descriptions from Noble's privilege logs – which generally refer to legal advice concerning "the Spin-Off," "the Paragon IPO," "the actual or potential divestiture of Noble Assets," "corporate disclosures," "financial reporting issues," "foreign" and/or "domestic tax issues," "the Petrobras business or market," "the Pemex business or market," "litigation," and the "Noble-Paragon Settlement" – provide little guidance in this regard.  Accordingly, absent a compelling showing to the contrary, the Court should conclude that the joint representation began when the first Paragon entity was formed in April 2013, and the Joint Representation Documents should include all privileged materials from that time forward.

**Advisors**.  It is acknowledged and agreed by each of the parties hereto that Noble, on behalf of itself and the other members of the Noble Group, has retained each of the Persons identified on Schedule 7.13[7] to act as counsel in connection with this Agreement, the Ancillary Agreements, the Separation, the Distribution and the other transactions contemplated hereby and thereby and that ***the Persons listed on Schedule 7.13 have not acted as counsel for Paragon*** or any other member of the Paragon Group in connection with this Agreement, the Ancillary Agreements, the Separation, the Distribution and the other transactions contemplated hereby and thereby and that ***none of Paragon or any member of the Paragon Group has the status of a client of the Persons listed on Schedule 7.13*** for conflict of interest or any other purposes as a result thereof.

* * *

Paragon further agrees, on behalf of itself and each other member of the Paragon Group that, with respect to this Agreement, the Ancillary Agreements, the Separation, the Distribution and the other transactions contemplated hereby and thereby, the attorney-client privilege and the expectation of client confidence ***belongs to Noble*** or the applicable member of the Noble Group and ***may be controlled by*** Noble or such member of the Noble Group and ***shall not pass to or be claimed by Paragon*** or any member of the Paragon Group.  Furthermore, Paragon acknowledges and agrees that Baker Botts, LLP is representing Noble, and not Paragon or any member of the Paragon Group, in connection with this Agreement, the Ancillary Agreements, the Separation, the Distribution and the other transactions contemplated hereby and thereby.

Ex. 24 (emphasis added).

Noble claims that this language – presumably drafted by Baker Botts – "forecloses the Trust's argument" on the Joint Representation Documents, arguing that "Noble and Paragon expressly agreed that Noble would own the attorney-client privilege for matters relating to the Spin-Off."  Ex. 16.  Noble further contends that Section 7.13 served to "assign" Paragon's privilege to Noble and that, "[b]ecause Noble is the sole owner of the attorney-client privilege

---

[7] Schedule 7.13 identifies Baker Botts and Travers Smith as the referenced "Persons."

over these documents, Noble has properly withheld them." *Id.* at 2.  Noble's argument fails for

multiple reasons.

*First*, the entire premise of Section 7.13 – that Baker Botts and Travers Smith did not

"act[] as counsel for Paragon or any other member of the Paragon Group" in connection with

Spin-related matters and that no Paragon entity "has the status of a client" – is, as detailed above,

demonstrably false.  The Paragon entities were clients.  Insertion of contrary language into the

Noble-dictated MSA after the fact cannot change history.

*Second*, Section 7.13 did not "assign" Paragon's privilege over Spin-related

communications to Noble.  There is no assignment language in Section 7.13 at all.  Instead,

Section 7.13 seeks to establish – contrary to reality – that Baker Botts and Travers Smith never

represented Paragon at all, such that attorney-client privileges "belonged" to Noble in the first

instance.  As shown above, that is not true and, under *Teleglobe* and like authority, the attorney-

client privilege for jointly represented clients "belongs" equally to both clients.  Indeed, Noble's

"assignment" argument is logically flawed and contradictory:  Section 7.13 cannot operate to

"assign" Paragon privileges and simultaneously provide that Paragon had no privilege rights to

assign in the first place.

*Third*, Noble's "assignment" argument is inconsistent with the Litigation Trust

Agreement, which provides that the Trust controls Paragon's privileges pertinent to the Noble

Claims.  Adopting Noble's position – that it alone controls and owns privileged communications

of Paragon – would render the provision meaningless.[8]

---

[8] It would also lead to absurd and legally indefensible results down the road in this litigation.  If Noble's position that it controls Paragon's privileges in connection with the Spin was validated, Noble presumably would be allowed to silence Paragon employees asked in deposition or at trial to testify about joint representation matters Noble considers privileged.  Such an outcome could not be squared with *Teleglobe*.

*Fourth*, Noble's after-the-fact effort to strip away Paragon's privileges is inconsistent with *Teleglobe*. The Third Circuit held that, "when former co-clients sue one another, the default rule is that all communications made in the course of the joint representation are discoverable." 493 F.3d at 366. The Circuit speculated, without deciding, that it might be "permissible for co-clients to agree *in advance* to shield information from one another in subsequent adverse litigation," thus altering the default rule. *Id.* (citing RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS) (emphasis added).[9]

But Section 7.13 was putatively "agreed" to more than a year *after* the joint representation of Noble and Paragon commenced. There was no prior agreement to change the default rule. In fact, Noble has indicated that, amazingly, "Baker Botts did not have a separate engagement letter with Noble or Paragon concerning the Spin-Off." Ex. 16. Even if co-clients may agree "in advance" of signing an engagement letter with a joint attorney to shield confidential information from one another, and even if a joint attorney can purport to limit the scope of its engagement or duties to a co-client, that did not happen here. The MSA was signed well over a year after the joint representation began and any last-minute effort by Noble to cover its tracks and shield information – likely with the knowledge that the Spin would be challenged as a fraudulent conveyance – was ineffective as a matter of law.

So, too, was the purported "conflicts waiver" letter sent by Baker Botts after Paragon had transferred $1.7 billion to Noble and just two days before the final Spin transactions were

---

[9] The RESTATEMENT provision cited in *Teleglobe* is properly understood to mean that one party in a joint representation can agree that the sharing of its *independent* confidential information with joint counsel will not serve to waive any privilege or confidentiality over that information as against the co-client. The provision does not mean that one client may control all access to *privileged* materials generated in the course of the *joint* representation. Indeed, the Third Circuit noted that "the only case we have found dealing with" an agreement that purported to prevent one joint client from accessing privileged information generated during a joint representation (*Mirant*) "refused to give it effect." *Teleglobe*, 493 F.3d at 366 n.23.

consummated.  Upon perceiving the (obvious) conflict between Paragon and Noble, the proper course of action for Baker Botts, Travers Smith and in-house counsel was not to foist an after-the-fact waiver upon Paragon but to withdraw.  *See* Tex. Comm. on Professional Ethics, Op. 512, 58 Tex. B.J. 1147 (1995) ("the lawyer must promptly withdraw" when a conflict arises between joint clients).

*Fifth*, regardless of how one interprets Section 7.13, it provides no basis to withhold Joint Representation Documents involving in-house counsel.  Section 7.13 applies only to the "Noble Advisors" listed in Schedule 7.13 – Baker Botts and Travers Smith.  Under *Teleglobe*, Noble must produce Joint Representation Documents involving in-house counsel.

*Finally*, even if it could overcome each of the foregoing arguments, Section 7.13 as interpreted by Noble would be void and unenforceable as a matter of public policy.  There is no dispute that Noble alone dictated the terms of MSA.  As detailed in the Trust's Complaint, Noble assured that the MSA was entirely one-sided.  Compl. ¶ 87 (highlighting the one-sided provisions in the MSA).  Noble drafted and implemented the MSA with no input or independent assent by Paragon.  Indeed, Section 7.13 – which falsely states that Paragon was never a client of Baker Botts or Travers Smith and allegedly strips Paragon of its rights to access communications created in the joint representation – exemplifies the MSA's one-sided nature.  That is why Baker Botts went out of its way to claim that, despite its representation of Paragon in other aspects of the Spin, it has "not represented and do[es] not represent any of the Paragon Entities in connection with the negotiation and preparation of the Master Separation Agreement."  Ex. 3.  No lawyer for Paragon ever would have agreed to the terms of the MSA that Noble unilaterally imposed on Paragon.

The law does not enforce such an adhesive and unconscionable contractual provision. *See, e.g.*, *State v. Avco Fin. Serv. of New York Inc.*, 50 N.Y.2d 383, 389 (N.Y. 1980); *David v. #1 Mktg. Serv., Inc.*, 979 N.Y.S.2d 375, 378-79 (N.Y. App. Div. 2014).[10]  Indeed, in *Commodity Futures Trading Comm'n v. Weintraub*, the Supreme Court specifically rejected efforts to seize control of the debtor's attorney-client privilege in insolvency situations, noting that such control would "obstruct[] the careful design of the Bankruptcy Code."  471 U.S. 343, 354 (1985). Stressing the trustee's need "to investigate the conduct of prior management to uncover and assert causes of action against the debtor's officers and directors," the Court held that control over a debtor's privilege must pass to the trustee.  *Id.* at 351-58.

Citing the public policy considerations outlined in *Weintraub*, courts have rejected efforts to "contract around" the Adverse Litigation Exception.  In *Mirant*, for example, the court refused to enforce a pre-bankruptcy agreement between a parent corporation and its divested subsidiary that purported to require joint counsel to "protect the confidences of each Client and take whatever measures are necessary to assure that confidential information is not shared with the other Client." 326 B.R. at 648.  The court found that enforcing the agreement – which would grant "special" attorney-client privilege protections to the parent corporation – "would be contrary to considerations" underlying the attorney-client privilege.  *Id.* at 652.  The court explained that "it would be bad precedent to carve . . . a limitation on the usual rule respecting assertion of privilege in investigation of claims arising from transactions where common counsel is used," among other things, because "the need for investigation [in a bankruptcy case] is far more acute than is any concern for attorney-client communications."  *Id.* at 654 (citing *Weintraub*).

---

[10] Section 7.2 of the MSA provides for New York law to apply.  Ex. 24.

- 24 -

Likewise, in *In re Ginn-LA St. Lucie Ltd., LLLP*, the court refused to enforce a similar agreement between a parent and subsidiary containing a "Privilege Protection Clause" that "purport[ed] to protect all applicable privileges even if an adversity of interests may subsequently be discerned or arise." 439 B.R. 801, 807 (Bankr. S.D. Fla. 2010). Accepting the argument that the Privilege Protection Clause was an attempt by a parent company to "contract out" of *Weintraub*, the court found that enforcing the clause "creates a situation that is ripe for abuse." *Id.* at 804, 807. The court elaborated:

> [The] Privilege Protection Clause invites collusion among the entities that allegedly controlled the Debtors and creates the potential for wrongdoers to shield evidence of their wrongdoing. Therefore, it is against public policy and unfair . . . to handcuff the Trustee's pursuit of claims . . . by withholding documents that would be discoverable if not for the [agreement].

*Id.* at 807-808. The court was so concerned with the concept of fairness "in the context of bankruptcy," that it stated it "would not enforce the [agreement] for policy reasons . . . [e]ven if there had been no joint representation." *Id.* at 806-07 (citing *Mirant*).

This reasoning and rationale applies with equal force here. Section 7.16 as interpreted by Noble would enable Noble to rewrite the facts, cover up evidence of its wrongdoing, and thwart the Trust's investigation and prosecution of claims on behalf of the bankruptcy estate. Noble's effort to "contract out" of *Teleglobe* should be deemed unenforceable.[11]

---

[11] *Teleglobe* identifies an independent basis for production of the Joint Representation Documents: because Paragon was insolvent at the time of the Spin, *see* Compl. ¶¶ 4, 13, 128, 151, 160, 173, the Trust can access otherwise privileged material in order to prove its breach of fiduciary duty claims under the "fiduciary exception" to the attorney-client privilege. *Teleglobe*, 493 F.3d at 383-86. Given the Trust's allegations of insolvency, the Trust reserves all rights to assert this alternative ground for the production of documents the defendants have withheld.

III.   **NOBLE CANNOT WITHHOLD COMMUNICATIONS COPIED TO INDIVIDUALS AFFILIATED WITH PARAGON**

   A.   **Noble's "Rebuttable Presumption" For Noble Employees Who Transferred To Paragon's Leadership Team is Unsupportable**

As noted above, Noble's privilege logs were accompanied by an "Affiliation List" that purports to associate individuals, who authored or received documents Noble has withheld on privilege grounds, with their respective employers.  Ex. 21.  Thirty-two individuals, including many who would comprise Paragon's leadership team, are identified on that list as being affiliated with "Noble/Paragon."  When the Trust raised Noble's failure to indicate whether these individuals were acting for Paragon, Noble, or both in connection with the withheld communications, Noble stated that it had "originally withheld two categories of privileged communications involving these individuals:  (1) communications while the individuals were acting on behalf of Noble, and (2) communications that Noble concluded were subject to a shared common interest between Paragon and Noble."  Ex. 16.  After the Trust challenged Noble's privilege assertions, Noble decided to produce "documents falling into the latter category."  *Id.*

The Trust then inquired *how* Noble determined that individuals were allegedly "acting on behalf of Noble" in connection with those documents it continued to withhold.  Acknowledging that the dates the dually affiliated individuals "formally transferred to Paragon" would not be a fair guide for when those individuals started acting for Paragon, Noble advised that it had employed a "rebuttable presumption that certain individuals began acting on Paragon's behalf as of certain dates."  Ex. 25.  For Todd Strickler, who would become Paragon's General Counsel, Noble selected the date of March 4, 2014.  For four other Noble employees who would become members of Paragon's leadership team (Lee Ahlstrom, Steven Donley, Todd McElreath, and

Andrew Tietz), Noble used the date of May 1, 2014.  *Id.*  Noble did not initially provide the reasoning behind these dates or explain how its unilateral "presumption" could be "rebutted."

When the Trust pressed for an explanation, Noble indicated that it chose March 4, 2014 for Strickler on the basis of a prior Declaration he had submitted in this case (which stated he had worked as Noble's Associate General Counsel "from January 2013 to February 2014") and because it "had identified a March 4, 2014 email in which Strickler was acting on behalf of Paragon."  Ex. 1.[12]  For the others, Noble stated that it selected a May 1, 2014 transition date "because the Paragon management team was largely in place by that time."  *Id.*

The Trust then provided Noble with evidence showing that these individuals were "in place" and acting for Paragon long before Noble's rebuttable presumption dates.  Ex. 27.  This included, among other things, a December 13, 2013 announcement from Noble's CEO, David Williams, that Ahlstrom, Strickler, Tietz, and Charlie Yester, would be joining Paragon's senior leadership team (Ex. 8), as well as a February 4, 2014 email inviting members of the "Paragon senior team" to some – but not all – of a meeting involving the Spin.  Ex. 28.

Accordingly, the Trust asked Noble to produce all documents dated on or after the December 16, 2013 creation of Noble Spinco Limited that were copied to one or more of Strickler, Ahlstrom, Donley, McElreath, and Tietz.  Ex. 27.  Noble declined, offering only to conduct an additional review of documents sent by or to these individuals on or after February 4, 2014 "to determine whether any of these persons can reasonably be considered to have been acting on behalf of Paragon in connection with the communication."  Ex. 29.[13]

---

[12] Noble's March 4, 2014 date for Strickler conveniently insulates a large number of documents in the February-March 2014 period (and before), including a large number of documents created on March 3, 2014, the day before Noble's chosen date.  Ex. 26.

[13] The Trust further asked that Noble review all withheld documents copied to James MacLennan, Noble's CFO and Paragon's sole Board member until shortly before the Spin, to assess whether those communications

### B.      Noble Must Produce All Documents Sent Or Received By Paragon's Leadership Team Created On Or After December 16, 2013

Noble has not met its burden to withhold, on privilege grounds, documents sent or received by those Noble employees – including Strickler, Ahlstrom, Donley, McElreath, and Tietz – that transitioned to Paragon's leadership team.  *See Grand Jury Investigation*, 918 F.2d at 385.  In fact, there are numerous flaws in Noble's approach.

*First*, the entire premise of Noble's approach – that these individuals were acting either for Noble or for Paragon, but not both, in connection with the withheld communications – is misguided.  Despite the Trust's requests for clarification, Noble has not articulated how it decided whether a person was wearing a "Noble hat" or a "Paragon hat" in connection with a particular communication or document.  Given that Noble has largely described the subject communications as related to "the Spin-Off" or the "Paragon IPO," the communications presumably relate in some respect to Paragon.  How Paragon's "senior team" – largely announced no later than December 2013 and functioning by at least February 4, 2014 – were communicating on these matters without in any way wearing their "Paragon hats" is difficult to fathom.[14]  As one of the Travers Smith press releases on the Spin states, "[t]he Transaction involved a massive amount of coordination among Travers Smith, Baker Botts, Noble, Paragon, KPMG, and PwC."  Ex. 15.  Just as Noble's in-house and outside counsel represented both

---

related in any way to his service as a Paragon Board member.  While Noble has agreed to conduct that review, it has yet to communicate its determinations to the Trust.  As with certain other outstanding issues, the Trust may seek further relief applicable to this category of documents.

[14] That is not to say that there might be some subset of communications where the dually affiliated individuals really were acting solely on behalf of Noble.  Noble's letter of August 8 cites "Todd Strickler's work on Noble's 2014 proxy statement" as something that "would not have involved work on behalf of Paragon."  While Noble's privilege log includes some communications described as "legal advice regarding corporate disclosures," such entries are in the distinct minority.

Noble and Paragon in the Joint Representation Documents, the dually affiliated individuals could have acted – and likely did act – for both Noble and Paragon in communications about the Spin.

*Second*, Noble's withholding of documents created after the formation of Paragon entities – and shared with Paragon's leadership team – is inconsistent with principles of waiver. *See Westinghouse*, 951 F.2d at 1424 ("[V]oluntary disclosure to a third party of purportedly privileged communications has long been considered inconsistent with an assertion of the privilege."); *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, 252 F.R.D. 163, 169 (S.D.N.Y. 2008) (holding communications between members of PwC International Limited and its member firms were not privileged, reasoning: "If a privileged PwCIL attorney-client communication is shared with an individual not acting on behalf of PwCIL, the privilege has been lost (barring the applicability of the common interest rule). Thus, the capacity in which these individuals acted when they viewed these documents is critical to the assertion of the privilege.").

The act of including individuals affiliated with Paragon at the time of the communication demonstrates an intention to share that communication with Paragon.  This is true regardless of whether that individual was allegedly wearing a "Paragon hat" or a "Noble hat" in connection with a particular document.  Indeed, the February 4, 2014 email referencing the "Paragon senior team" shows that Noble understood how to exclude Paragon from its communications when it desired to do so. Ex. 28.  In that email, MacLennan stated that "only Noble senior management team" would attend that part of an upcoming meeting related to "post Spin discussions," noting that "Paragon people can exit." *Id.*

*Third*, Noble's "rebuttable presumption" dates have proven unreliable – and possibly constructed to avoid disclosing damaging information.  Noble's initial "rebuttable presumption" dates of March 4, 2014 (Strickler) and May 1, 2014 (others) fall months after Noble's CEO had

announced members of Paragon's leadership team and the "Paragon senior team" was in place and operating.  Noble's latest offer to re-review documents sent by or to Strickler, Ahlstrom, Donley, McElreath, and Tietz after February 4, 2014 is unsatisfactory.  There is ample reason to believe these individuals were acting at least in part for Paragon months before.  And, in any event, Noble has not agreed to produce those post-February 4, 2014 documents.  It offers only to re-review those documents, employing its own self-selected faulty premises.

Accordingly, Noble should be compelled to produce all withheld documents, created on or after December 16, 2013, that were copied to members of Paragon's senior leadership team, including Stilley, Strickler, Ahlstrom, Donley, McElreath, and Tietz.[15]

## **CONCLUSION**

For the foregoing reasons, the Court should grant the Trust's *Motion For An Order Compelling Defendants To Produce Documents Improperly Withheld On Privilege Grounds*.

---

[15] If the Court grants the Motion as to the Joint Representation Documents, this portion of the requested relief will become moot because all documents withheld as to the Paragon senior leadership team also qualify as Joint Representation Documents.

Dated: August 24, 2018

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/Michael S. Neiburg*
Pauline K. Morgan (No. 3650)
Joel A. Waite (No. 2925)
Jaime Luton Chapman (No. 4936)
Michael S. Neiburg (No. 5275)
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email: pmorgan@ycst.com
         mneiburg@ycst.com

- and -

JONES DAY
Bruce Bennett
James O. Johnston
555 South Flower Street, 50th Floor
Los Angeles, California 90071
Telephone:  (213) 489-3939
Facsimile:  (213) 243-2539
Email: bbennett@jonesday.com
         jjohnston@jonesday.com

- and -

Gregory M. Shumaker
David S. Torborg
51 Louisiana Ave., N.W.
Washington, DC 20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
Email: gshumaker@jonesday.com
         dstorborg@jonesday.com

- and -

Jennifer L. Del Medico
Genna L. Ghaul
250 Vesey Street
New York, New York 10281
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Email: jdelmedico@jonesday.com
       gghaul@jonesday.com

*Counsel to Paragon Litigation Trust*