## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>PARAGON OFFSHORE PLC,<br><br>*Debtor.* | Chapter 11<br><br>Case No. 16-10386 (CSS) |
| PARAGON LITIGATION TRUST,<br><br>*Plaintiff,*<br><br>v.<br><br>NOBLE CORPORATION PLC, NOBLE CORPORATION HOLDINGS LTD, NOBLE CORPORATION, NOBLE HOLDING INTERNATIONAL (LUXEMBOURG) S.à r.l., NOBLE HOLDING INTERNATIONAL (LUXEMBOURG NHIL) S.à r.l., NOBLE FDR HOLDINGS LIMITED, MICHAEL A. CAWLEY, JULIE H. EDWARDS, GORDON T. HALL, JON A. MARSHALL, JAMES A. MACLENNAN, MARY P. RICCIARDELLO, JULIE J. ROBERTSON, and DAVID WILLIAMS,<br><br>*Defendants.* | Adv. Pro. No. 17-51882 (CSS) |

### THE PARAGON LITIGATION TRUST'S MOTION SEEKING ENTRY OF A FINAL ORDER (I) AUTHORIZING THE PARAGON LITIGATION TRUST TO OBTAIN ADDITIONAL FINANCING AND (II) GRANTING RELATED RELIEF

The Paragon Litigation Trust (the "Trust") submits this motion for authorization to obtain additional financing. In support of this motion, the Trust proffers the declaration of Tim Daileader, one of the representatives of Litigation Trust Management,[1] filed contemporaneously herewith. In further support of this motion, the Trust states as follows:

---

[1]   Capitalized terms used but not otherwise defined in this Motion have the meanings ascribed to them in the Litigation Trust Agreement or the Credit Agreement, as applicable.

**Preliminary Statement**

1.      The Trust seeks the Court's approval and authorization for the Trust to enter into a Credit Agreement that will provide it with $40 million of additional financing necessary to fund its ongoing litigation against Noble Corporation plc ("Noble") and the other above-captioned defendants (collectively with Noble, the "Defendants").  This funding is essential to allow the Trust to fully prosecute its claims as the Trust has already utilized the $10 million loan that it received almost two years ago.  If approved and authorized, the Trust will have sufficient funds to fully litigate its claims against Defendants, including through any appeals.

2.      As described in greater detail below, the Credit Agreement is the result of a months-long process that Litigation Trust Management began in July 2018 when it recognized the Trust would require additional funding.  From July 2018 through March 2019, Litigation Trust Management explored obtaining additional financing from law firms, certain holders of Litigation Trust Interests, and third-party litigation funders.  As a result of Litigation Trust Management's efforts, the Trust received financing proposals and indications of interest from a number of parties, including a proposal from a third-party litigation funder that was subsequently improved upon by certain holders of Litigation Trust Interests.  To further market test these proposals and ensure the Trust obtained the best terms possible, Litigation Trust Management then held a bankruptcy-style "auction" wherein holders of Class A Litigation Trust Interests and other parties who elected to participate in the process bid against each other to further improve upon the proposals already provided.  That process took place over the course of 17 hours on March 22 and 23, 2019.  At the end of the auction, the Investor (as defined below), a third-party investor that does not serve on the Litigation Trust Committee, agreed to provide the financing while the members of the Litigation Trust Committee and certain holders of Class A Litigation Trust Interests indicated they

also would participate on those same terms as they are entitled to do under the Litigation Trust Agreement. The result of this process is $40 million of non-recourse financing on the terms contained in the Credit Agreement.

3.       Based on the competitive and open nature of this process, Litigation Trust Management believes the terms of the Credit Agreement are market and commercially-reasonable. The additional funding also is necessary for the Trust to fully pursue its claims against Defendants. Accordingly, Litigation Trust Management has concluded that obtaining Additional Litigation Funding Loans pursuant to the Credit Agreement is in the best interests of the Trust. Under the present circumstances, however, where the members of the Litigation Trust Committee will also be lenders under the Credit Agreement, the Litigation Trust Agreement is ambiguous as to who can authorize the Trust to enter into this financing. Because of the size of the financing, the Litigation Trust Agreement would ordinarily require the unanimous consent of the members of the Litigation Trust Committee. The Litigation Trust Agreement does not, however, provide an alternative approval mechanism where each member of the Litigation Trust Committee is arguably conflicted due to their participation in the financing (as they have the express right to do as holders of Class A Litigation Trust Interests under the Litigation Trust Agreement). When the Litigation Trust Agreement is ambiguous, it allows Litigation Trust Management to seek instructions or an order from the Court. Accordingly, out of an abundance of caution, the Trust seeks the Court's approval and authorization of the Trust's entry into the Credit Agreement.

### Relief Requested

4.       The Trust seeks entry of a final order, substantially in the form attached hereto as **Exhibit A**, approving and authorizing the Trust's entry into the Credit Agreement and granting related relief.

### Jurisdiction and Venue

5.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 of the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  The Trust confirms its consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The bases for the relief requested herein are sections 105 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, Local Rules 2002-1(b) and 4001-2, and the Litigation Trust Agreement.

### Concise Statement Pursuant to Bankruptcy Rule 4001(c) and Local Rule 4001-2[2]

8.      The below chart contains a summary of the material terms of the Credit Agreement, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrower** | Paragon Litigation Trust |

---

[2]      The summaries contained in this motion are qualified in their entirety by the provisions of the Credit Agreement, which is attached hereto as **Exhibit B**.  To the extent anything in this motion is inconsistent with the Credit Agreement, the terms of the Credit Agreement control.  Capitalized terms used in this summary chart but not otherwise defined have the meaning ascribed to them in the Credit Agreement.

DOCS_DE:224298.2 69038/001

| | |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B) | *See* Credit Agreement Preamble. |
| **Lenders**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Cantor Fitzgerald, as Administrative Agent, and each Lender from time to time party thereto, including that certain lender, which serves on the Litigation Trust Committee (the "First Lender"), that other certain lender, which serves on the Litigation Trust Committee (the "Second Lender"), and that other certain lender, which serves on the Litigation Trust Committee (the "Third Lender") and certain funds and accounts managed by a third-party investor that was the successful bidder pursuant to the auction process described herein (the "Investor").<br><br>*See* Credit Agreement Preamble. |
| **Term/Maturity**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Maturity Date means the earliest of (i) the Litigation Trust Termination Date, (ii) such date as any distribution is made by the Borrower to any holder of Class A Litigation Trust Interests, Class B Litigation Trust Interests or the Litigation Trust Loan and (iii) the date that is ten years from the date of funding.<br><br>*See* Credit Agreement § 1.1. |
| **Commitment**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Term Loan Commitment means $40,000,000.<br><br>Commitments.  On and subject to the terms and conditions of the Agreement, each Lender, severally and for itself alone, agrees to make a loan to the Borrower on the Closing Date in an amount equal to such Lender's applicable Pro Rata Share of the Term Loan Commitment as set forth on Annex I to the Credit Agreement.  The Commitments of the Lenders to make Term Loans terminate concurrently with the making of the Term Loans on the Closing Date.  Term Loans which are repaid or prepaid by the Borrower, in whole or in part, may not be reborrowed.<br><br>*See* Credit Agreement §§ 1.1, 2.1, Annex I. |
| **Borrowing Conditions**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Conditions Precedent<br><br>• Payment by Borrower of all reasonable and documented out-of-pocket costs and expenses of the Agent and the Closing Date Material Lenders incurred in connection with the negotiation and documentation of the Commitments, the Agreement, and the other Loan Documents.<br><br>• Delivery of fully executed Loan Documents in form and substance acceptable to the Lenders.<br><br>• Delivery by Borrower of the Agreement, the Agency Fee Letter, the Notes (as requested), documentation required pursuant to the Patriot Act or BSA (as requested), a certification regarding beneficial ownership (as requested), a copy of signature and incumbency certificates of any Person executing the Agreement or any other Loan Documents on behalf of the Borrower, and a Borrowing Notice.<br><br>• The representations and warranties of the Borrower set forth in the Agreement are true and correct in all material respects.<br><br>• No Event of Default or Default has occurred or is occurring. |

DOCS_DE:224298.2 69038/001

| | |
|---|---|
| | • The Order shall have been entered by the Bankruptcy Court or other court of competent jurisdiction (a) as to which the time to appeal shall have expired and as to which no appeal shall then be pending or (b) if a timely appeal shall have been filed or sought, either (i) no stay of the Order shall be in effect, (ii) no motion or application for a stay of the Order shall be filed and pending or such motion or application shall have been denied, or (iii) if such a stay shall have been granted, then (A) the stay shall have been dissolved or (B) a final order of the district court or circuit court having jurisdiction to hear such appeal shall have affirmed the Order and the time allowed to appeal from such affirmance or to seek review or rehearing (other than a motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure) thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such district court or circuit court Order or timely motion to seek review or rehearing of such Order shall have been made, any appellate court having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or lower appellate court's) order upholding the Order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible; provided, however, that the Lenders in their sole discretion may treat any Order as a Final Order by affirmatively agreeing to such treatment in writing.<br><br>*See* Credit Agreement § 4. |
| **Repayment Features and Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Repayment. The outstanding principal balance of the Term Loans shall be Paid in Full on the Maturity Date. Any repayment pursuant to Section 2.7 of the Credit Agreement shall be accompanied by the applicable Contingent Interest and any other amount then owing.<br><br>Interest. The Obligations (including all Term Loans) shall be non-interest bearing except for Contingent Interest.<br><br>Contingent Interest.  The Borrower agrees that the Term Loans outstanding hereunder shall accrue interest in an amount equal to the Contingent Interest, which shall be payable as and when due as provided in the Agreement.  The obligation of the Borrower to pay the Contingent Interest shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms hereof under all circumstances and shall survive (and not be reduced, modified or impaired by) any repayment or prepayment of the Term Loans, cancellation of the Notes, or termination of this Agreement.  The Borrower expressly waives the provisions of any present or future statute or law that prohibits or may prohibit the collection of the Contingent Interest.  The Borrower expressly agrees that (i) the Contingent Interest is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel, (ii) the Contingent Interest shall be payable notwithstanding the then prevailing market rates at the time payment is made, (iii) there has been a course of conduct between the Borrower and the Lenders giving specific consideration in this transaction for such agreement to pay the Contingent Interest, (iv) the Borrower shall be estopped hereafter from claiming differently than as agreed to in Section 2.5 of the Credit Agreement, and (v) the Borrower's agreement to pay the Contingent Interest is a |

DOCS_DE:224298.2 69038/001

|  | material inducement to the Lenders to make the Term Loans. Notwithstanding anything to the contrary set forth in the Credit Agreement, the Agent shall have no obligation to calculate or verify the calculation of Contingent Interest. |
|---|---|
|  | Contingent Interest means an amount, in cash or other form of consideration, equal to (a) 14% of the Aggregate Gross Proceeds received by the Borrower in respect of the Noble Claims if and to the extent such Proceeds are received prior to the date that is 270 calendar days following the Closing Date and (b) 16.5% of the Aggregate Gross Proceeds received by the Borrower in respect of the Noble Claims if and to the extent such Proceeds are received on or after the date that is 270 calendar days following the Closing Date. |
|  | *See* Credit Agreement §§ 1.1, 2.4, 2.5, 2.7. |
| **Use of Financing**<br><br>Local Rule 4001-2(a)(ii) | Use of Proceeds. Borrower agrees that it will use the proceeds of the Term Loans solely to pay the Specified Litigation Trust Expenses and to pay a $500,000 structuring fee to Drivetrain, LLC, in its capacity as the Litigation Trust Management, in each case in accordance with Section 2.5 of the Litigation Trust Agreement.<br><br>*See* Credit Agreement § 7.3. |
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Drivetrain, LLC will receive a $500,000 structuring fee.<br><br>*See* Credit Agreement § 7.3. |
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Events of Default. Failure to pay when due principal or Contingent Interest in respect of the Term Loans, Non-payment of credit, bankruptcy or insolvency of Borrower, non-compliance with Loan Documents, termination of Litigation Trust, Borrower's breach of any representations or warranties, entry against the Borrower one or more final judgments or orders for the payment of money in an aggregate amount exceeding $100,000, failure by the Borrower to pay when due any principal or other amount payable in respect of the Litigation Trust Loan, and a breach or default by the Borrower with respect to any other material term of the Litigation Trust Loan beyond the grace period.<br><br>*See* Credit Agreement § 8. |
| **Liens**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Liens. No interest in the Litigation Trust Assets or the Noble Claims is subject to any assignments or Liens (other than Permitted Liens). The Term Loans shall be senior obligations of the Borrower and shall rank senior in right of payment to all obligations owed by the Borrower under the Litigation Trust Loan and to the Litigation Trust Beneficiaries, as set forth in Section 6.6 of the Litigation Trust Agreement.<br><br>*See* Credit Agreement § 5.7. |

**Background**

I.    **The Litigation Trust Agreement**

9.    On February 14, 2016, the Debtors filed for bankruptcy in this Court. (Litigation Trust Agreement, Recitals) Approximately 16 months later, the Court confirmed the *Fifth Joint Chapter 11 Plan of Paragon Offshore plc and Its Affiliated Debtors* (as confirmed, the "Plan"). (*Id.*)

10.    Among other things, the Plan provided for the creation of the Trust to prosecute the Noble Claims and distribute any proceeds from that litigation in accordance with the terms of the Plan and the Litigation Trust Agreement. (*Id.* § 2.1) The Plan also provided for the creation of the Litigation Trust Committee that would, in turn, select Litigation Trust Management. (*Id.* § 2.2) The Litigation Trust Committee currently includes the First Lender, the Second Lender, and the Third Lender. Drivetrain, LLC serves as Litigation Trust Management. (*Id.*) The Plan and Litigation Trust Agreement also created two interests that were distributed to Litigation Trust Beneficiaries: Class A Litigation Trust Interests and Class B Litigation Trust Interests. (*Id.* §§ 3.2, 3.3., 3.4)

11.    Pursuant to the provisions in the Plan and Litigation Trust Agreement, the Trust was initially funded with a Litigation Trust Loan of up to $10 million. (*Id.* §§ 1.1, 4.1) If that initial funding proved insufficient, the Litigation Trust Agreement also permits the Trust to supplement the funding of the Litigation Trust Expenses by, among other things, obtaining Additional Litigation Funding Loans. (*Id.* § 4.2) In that situation, "[a]ll holders of the Class A Litigation Trust Interests who are 'accredited investors' (as defined in Rule 501(a) of Regulation D under the Securities Act) shall have the right to participate in the funding of all Additional Litigation Funding Loans based on their pro rata share of Class A Litigation Interests held by all

8

'accredited investors.'" (*Id.*) Furthermore, "[t]o the extent that any holders of Class A Litigation Trust Interests decline to participate, the Litigation Trust Management shall have discretion to obtain Additional Litigation Funding first from the participating holders of Class A Litigation Trust Interests, regardless of their pro rata shares, and then from any other party or entity." (*Id.*)

12.    If Litigation Trust Management decides to obtain Additional Litigation Funding Loan, the Litigation Trust Agreement requires (i) a majority of the Litigation Trust Committee consent to any additional Additional Litigation Funding Loans up to $15 million; and (ii) the unanimous consent of the Litigation Trust Committee for any Additional Litigation Funding Loans in excess of $15 million. (*Id.*) The Litigation Trust Agreement does not, however, specify whether the Litigation Trust Committee can consent to obtaining Additional Litigation Funding Loans where all of the members of the committee are participating in the financing.

13.    Where, as here, the Litigation Trust Agreement is ambiguous, it allows the Litigation Trust Management to seek instructions or an order from the Court:

> Section 7.7: The Litigation Trust Management shall have the right at any time to seek instructions from the Bankruptcy Court concerning the administration or disposition of the Trust Assets and the Noble Claims required to be administered by the Litigation Trust. The Litigation Trust Management and Litigation Trust Committee shall not be liable for any act that has been approved by the Bankruptcy Court, and all such actions shall be deemed not to constitute fraud, gross negligence, intentional misconduct or willful misconduct.

> Section 7.10(a): If (i) in performing the Litigation Trust Management's and Litigation Trust Committee's respective duties under this Agreement a party is required to decide between alternative courses of action, or (ii) the Litigation Trust Management or Litigation Trust Committee is unsure of the application of any provision of this Agreement, then such party may promptly deliver a notice to the Bankruptcy Court and to all Litigation Trust Beneficiaries pursuant to Section 10.6, requesting written instructions of the Bankruptcy Court as to the course of action deemed appropriate by the Bankruptcy Court. The Bankruptcy Court is authorized to make any determination required pursuant to this Section. If the Litigation Trust Management or Litigation Trust Committee does not receive such written direction or instruction within ten (10) Business Days after the applicable party has given such notice, or such shorter period of time set forth in such notice, the party giving us notice may, but shall be under no duty to, take or refrain from taking such action not inconsistent with this Agreement as such party shall deem advisable.

Section 10.14: The principal purpose of this Agreement is to aid in the implementation of the Plan and therefore this Agreement incorporates the provisions of the Plan. To that end, the Litigation Trust Management shall have full power and authority to take any action consistent with the purpose and provisions of the Plan, and to seek any orders from the Bankruptcy Court in furtherance of the implementation of the Plan and this Agreement. If any provisions of this Agreement are found to be inconsistent with the provisions of the Plan, the provisions of the Plan shall control.

## II.    Litigation Trust Management Obtains Additional Financing

14.    By July 2018, Litigation Trust Management recognized that the Trust required additional funding to continue to prosecute its claims against Defendants. (Daileader Dec. ¶ 2) As an initial step, Litigation Trust Management scheduled a meeting with the then-current members of the Litigation Trust Committee to discuss the need for funding, the process for obtaining it given the provisions in the Litigation Trust Agreement, and the rights of holders of Class A Litigation Trusts Interests to participate in any such financing. (*Id.*)

15.    Around the same time, Litigation Trust Management and the Litigation Trust Committee held discussions with other law firms where they solicited proposals that would address, at least in part, the Trust's funding needs. (*Id.* ¶ 3) While this process did not fully resolve the Trust's funding needs, Litigation Trust Management and the Litigation Trust Committee ultimately retained Kirkland & Ellis LLP ("Kirkland"). (*Id.*)

16.    At that point, Litigation Trust Management, at the direction of the Litigation Trust Committee,[3] began to work with Kirkland to run a formal process for obtaining additional financing. (*Id.* ¶ 4) On the one hand, Litigation Trust Management had already developed an informed view of the market based on proposals it had received from the members of the Litigation Trust Committee and the law firms it interviewed. (*Id.*) But they also believed a more formal

---

[3] Given the expressed interests of the members of the Litigation Trust Committee to provide the financing, the process for identifying the proposal with terms most favorable to the Trust was thereafter run by Litigation Trust Management and counsel.

process that included other third parties and holders of Litigation Trust Interests would ensure that the Trust received additional funding on the best terms possible. (*Id.*)

17.    Litigation Trust Management began the formal process in December 2018. (*Id.* ¶ 5) Initially, it contacted the largest holder of Class A Litigation Trust Interests, a significant holder of Class B Litigation Interests, and a highly-regarded third-party litigation funder to determine whether they were interested in providing funding. (*Id.*) All three of these parties entered into non-disclosure agreements ("NDAs") and participated in discussions with Litigation Trust Management regarding the potential funding. (*Id.*)

18.    Throughout January 2019, Litigation Trust Management continued to contact additional parties it believed might be interested in providing additional financing, including two other holders of Class A Litigation Trust Interests and another third-party litigation funder. (*Id.* ¶ 6) As with the parties Litigation Trust Management contacted in December 2018, the Trust required these parties to sign an NDA if they were interested in participating. (*Id.*) In addition, Litigation Trust Management provided additional information to the prospective lenders who had signed an NDA. (*Id.*)

19.    By February 18, 2019, Litigation Trust Management had contacted 11 parties that it believed might be interested in providing financing. (*Id.* ¶ 7) Of those 11, nine parties had signed NDAs, received additional information, and held discussions with Litigation Trust Management. (*Id.*) Of the nine parties who signed NDAs, four parties had submitted term sheets that provided full financing of up to $40 million,[4] and four other parties were willing to participate in any financing. (*Id.*)

---

[4]    The three members of the Litigation Trust Committee submitted one combined term sheet and another party submitted a separate term sheet.

DOCS_DE:224298.2 69038/001

20.     Of the four parties that submitted term sheets, one of those parties was a third-party litigation funder. (*Id.* ¶ 8) That proposal was ultimately improved upon by another proposal Litigation Trust Management received.

21.     Litigation Trust Management did not, however, stop there. (*Id.* ¶ 9) Instead, consistent with the provision in the Litigation Trust Agreement allowing all holders of Class A Litigation Trust Interests to participate in the funding of Additional Litigation Funding Loans, on March 11, 2019, Litigation Trust Management notified all holders of Class A Litigation Trust Interests that they would have the opportunity to provide either alternative financing or participate in any agreed-upon financing. (*Id.*) Litigation Trust Management also contacted the additional parties that had previously signed NDAs and requested an alternative financing proposal or a proposal to participate in financing. (*Id.*)

22.     In total, Litigation Trust Management contacted 205 holders of Class A Litigation Trust Interests. (*Id.* ¶ 10) Of those 205 holders, 13 account managers responded and requested a form of the NDA, eight of whom executed the NDA and received a draft term sheet containing the best proposal Litigation Trust Management had received to date. (*Id.*) Of those eight, two committed to participate in the financing and one provided an alternative financing proposal that was superior to the prior proposals Litigation Trust Management had received. (*Id.*)

23.     On March 20, 2019, Litigation Trust Management informed all parties who had expressed an interest in the financing that it would hold a meeting at Kirkland's New York office. (*Id.* ¶ 11) The purpose of this meeting was to finalize the terms of the additional funding by seeking any additional offers that were superior to the terms it had previously received. (*Id.*)

24.     On March 22, 2019, Litigation Trust Management held an in-person and telephonic meeting that lasted from 9 a.m. to 2 a.m. the following morning. (*Id.* ¶ 12) Over the course of the

day and night, Litigation Trust Management conducted an "auction" where the participating parties bid against each other over several rounds. (*Id.*) By the end of the meeting, Litigation Trust Management had obtained financing for the Trust on terms that materially improved the prior proposals. (*Id.*) The Investor, a third-party investor that does not sit on the Litigation Trust Committee, set the terms of the proposal. (*Id.*) Certain other holders of Litigation Trust A Interests, as well as the members of the Litigation Trust Committee, agreed to participate in that financing. (*Id.*)

25.    On March 26, 2019, Litigation Trust Management distributed the final term sheet to the participating parties. (*Id.* ¶ 13) Over the course of the next few months, Litigation Trust Management, with the assistance of Kirkland, drafted the Credit Agreement and finalized the remaining open terms, including the loan maturity, Litigation Trust Management's financing fee, permitted Trust expenses, and events of default and remedies. (*Id.*)

**Basis for Relief**

26.    Section 364 of the Bankruptcy Code authorizes a trustee to obtain unsecured credit under certain circumstances. Courts grant a trustee considerable deference in acting in accordance with its business judgment in obtaining credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment

DOCS_DE:224298.2 69038/001

to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."). To determine whether the business judgment standard is met, a court need only "examine whether a reasonable person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business judgment when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

27.    The Court should authorize the Trust's entry into the Credit Agreement because it is a sound exercise of business judgment following an arm's length process and careful evaluation of alternatives. As discussed above, Litigation Trust Management undertook a months-long process that involved the solicitation of proposals from all holders of Class A Litigation Trust Interests and several third-party litigation funders. Litigation Trust Management then organized a 17-hour auction further designed to ensure the financing the Trust obtained was on the best terms possible. Given Litigation Trust Management's extensive efforts to market-test the financing, there can be no dispute that the terms of the additional financing are reasonable and the Trust's entry into the Credit Agreement reflects sound business judgment.

28.    Moreover, the Litigation Trust Agreement explicitly allows Litigation Trust Management and the Litigation Trust Committee to seek Additional Litigation Funding Loans. The decision to do so was a proper exercise of business judgment—and, in fact, necessary to allow the Trust to continue to litigate its claims against Defendants. Moreover, Litigation Trust Management took all reasonable steps to ensure it complied with the provisions of the Litigation

DOCS_DE:224298.2 69038/001

Trust Agreement. Specifically, Litigation Trust Management provided all holders of Class A Litigation Trust Interests with the opportunity to participate in the financing process. Accordingly, the Trust's entry into the Credit Agreement is consistent with the terms of the Litigation Trust Agreement and should be approved and authorized.

### Notice

29.     The Trust will provide notice of this motion to: (a) counsel to the Administrative Agent; (b) all Litigation Trust Beneficiaries; (c) all holders of Class A Litigation Trust Interests; (d) all holders of Class B Litigation Trust Interests; (d) counsel for Defendants; (e) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (f) the U.S. Trustee.

### No Prior Request

30.     No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Trust respectfully requests that the Court enter the order attached hereto and grant the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: June 25, 2019

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Timothy P. Cairns*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
        tcairns@pszjlaw.com

– and –

KIRKLAND & ELLIS LLP
David J. Zott, P.C. (admitted *pro hac vice*)
Jeffrey J. Zeiger, P.C. (admitted *pro hac vice*)
William E. Arnault (admitted *pro hac vice*)
Anne I. Salomon (admitted *pro hac vice*)
300 N. LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: dzott@kirkland.com
        jzeiger@kirkland.com
        warnault@kirkland.com
        anne.salomon@kirkland.com

*Co-Counsel for Paragon Litigation Trust*

16