# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>PARAGON OFFSHORE PLC,<br><br>　　　　　　　　*Debtor*. | Chapter 11<br><br>Bankr. Case No. 16-10386 (CSS) |
| PARAGON LITIGATION TRUST,<br><br>　　　　　　　　*Plaintiff*,<br><br>　　v.<br><br>NOBLE CORPORATION PLC, NOBLE CORPORATION HOLDINGS LTD., NOBLE CORPORATION, NOBLE HOLDING INTERNATIONAL (LUXEMBOURG) S.à r.l., NOBLE HOLDING INTERNATIONAL (LUXEMBOURG NHIL) S.à r.l., NOBLE FDR HOLDINGS LIMITED, MICHAEL A. CAWLEY, JULIE H. EDWARDS, GORDON T. HALL, JON A. MARSHALL, JAMES A. MACLENNAN, MARY P. RICCIARDELLO, JULIE J. ROBERTSON, and DAVID WILLIAMS,<br><br>　　　　　　　　*Defendants*. | Adv. Pro. No. 17-51882 (CSS) |

## NOTICE OF SUBPOENA FOR RULE 30(b)(6) DEPOSITION OF BARCLAYS BANK PLC AND BARCLAYS CAPITAL INC.

Please take notice that, pursuant to Federal Rule of Civil Procedure 30(b)(6) and 45, made applicable to this proceeding by Rules 7026, 7030, 9014, and 9016 of the Federal Rules of Bankruptcy Procedure, and Local Rules 7026-1 and 7026-2, the Paragon Litigation Trust (the "Trust") will take the deposition upon oral examination of the Rule 30(b)(6) designee(s) of Barclays Bank PLC and Barclays Capital Inc. (collectively, "Barclays") before a Notary Public or other officer authorized to administer oaths, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New Yok 10022 or such other mutually agreed-upon location. Pursuant to the attached subpoena, the deposition will commence at 9:00 a.m. EST on October 1, 2019, and will continue day-to-day until completed.

1

Pursuant to Rule 30(b)(6), Barclays is required to designate one or more knowledgeable persons to testify on its behalf with respect to the matters set forth in Schedule A, and the person(s) so designated shall be required to testify as to those matters known or reasonably available to Barclays. For each person designated, Barclays shall, consistent with the scheduling order entered in this matter, advise counsel for the Trust of the identity of that person, provide a copy of that person's curriculum vitae, and identify the topic(s) on which that person shall testify at least five business days before the deposition. To the extent such person(s) will rely on documents or information not yet produced in this litigation, Barclays is further requested to produce those documents or that information as soon as it is available, and no less than five business days before the deposition.

The deposition will be recorded by stenographic means and by videotape. You are invited to attend and cross-examine.

Dated: August 21, 2019

Respectfully Submitted,

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Timothy P. Cairns*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
          tcairns@pszjlaw.com

– and –

KIRKLAND & ELLIS LLP
David J. Zott, P.C. (admitted *pro hac vice*)
Jeffrey J. Zeiger, P.C. (admitted *pro hac vice*)
William E. Arnault (admitted *pro hac vice*)
Anne I. Salomon (admitted *pro hac vice*)

2

300 N. LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: dzott@kirkland.com
       jzeiger@kirkland.com
       warnault@kirkland.com
       anne.salomon@kirkland.com

*Co-Counsel for Plaintiff Paragon Litigation Trust*

## **CERTIFICATE OF SERVICE**

I, Timothy P. Cairns, hereby certify that on August 21, 2019, I caused a copy of the foregoing Notice of Subpoena for Rule 30(b)(6) Deposition of Barclays Bank PLC and Barclays Capital Inc. to be served by email upon the following counsel for Defendants:

Stephen J. Della Penna
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
Wilmington, DE 19801
Stephen.dellapenna@skadden.com

George A. Zimmerman
Lauren E. Aguiar
Abigail Sheehan Davis
Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, New York 10036
George.zimmerman@skadden.com
lauren.aguiar@skadden.com
Abigail.sheehan@skadden.com

Wallis M. Hampton
Skadden, Arps, Slate, Meagher & Flom LLP
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
wallis.hampton@skadden.com

                                                                                /s/ *Timothy P. Cairns*

## SCHEDULE A

## DEFINITIONS

1. "<u>Affiliate</u>" means any Person or Entity related to, associated with, owning, owned by, under common control with, under the direction of, or with the ability to direct or control another Person. "Affiliate" also means any current and former principal, officer, director, manager, general partner, employee, agent, parent company, or subsidiary of any such Person or Entity, as well as that Person's or Entity's attorneys, accountants, predecessors, successors, assigns, heirs, administrators, executors, supervisors, or representatives.

2. "<u>Asset</u>" means all of the right, title, and interest in and to property of whatever type or nature (including real, personal, mixed, intellectual, tangible, and intangible (including goodwill) property).

3. "<u>August 1 Distribution</u>" means the distribution on August 1, 2014 to each Noble shareholder of one ordinary share of Paragon for every three ordinary shares of Noble that the shareholder held at 5 p.m. EST on July 23, 2014.

4. "<u>Barclays</u>" means Barclays Bank PLC, Barclays Capital Inc., and their Affiliates.

5. "<u>Castle Harlan</u>" means Castle Harlan, Inc. and its Affiliates.

6. "<u>Communication</u>" or "<u>Communications</u>" means any and all Documents or information constituting, reflecting or evidencing any oral or written transmission or receipt of information, by whatever manner or means, regardless of how or by whom the Communication was initiated, including without limitation: (a) any written contact by means such as letter, memorandum, telegram, telex, e-mail, text message, instant message or facsimile, (b) any oral contact by any means including face-to-face meetings and telephone, and (c) any records for telephone or text message Communications. Communications with any Entity includes Communications by or with its subsidiaries, divisions, subdivisions, Affiliates, predecessor and successor entities, partners, members, shareholders, officers,

directors, employees, agents, representatives, legal counsel, financial advisors, investment bankers, rating agencies, or any other Person(s) acting on its or their behalf.

7. "Concerning," "Referencing," "Regarding," "In Connection With," "Relating To," and "Referring To" shall be construed to mean, without limitation, relating to, referring to, describing, referencing, concerning, evidencing, constituting, discussing, supporting, pertaining to, containing, analyzing, evaluating, studying, recording, showing, memorializing, reporting on, commenting on, mentioning, reviewing in conjunction with, setting forth, contradicting, refuting, considering, or recommending, in whole or in part.

8. "Document" is defined in the broadest sense possible under Rules 26 and 34 of the Federal Rules of Civil Procedure and Rules 7026 and 7034 of the Federal Rules of Bankruptcy Procedure and includes Communications and Electronically-Stored Information. Requested Documents include all attachments, exhibits, enclosures, appendices and other documents which refer or relate to the designated Documents.

9. "Electronically Stored Information" means any portion of data available on a computer or other device capable of storing electronic data (including, without limitation, any data on magnetic or optical storage media stored as an active file or backup file, in its native format). Electronically Stored Information includes, but is not limited to, e-mail, text messages, instant messages, spreadsheets, databases, word processing Documents, images, presentations, application files, executable files, log files, and all other files present on any type of device capable of storing electronic data. Devices capable of storing Electronically Stored Information include, but are not limited to, servers, desktop computers, portable computers, handheld computers, flash memory devices, wireless communication devices, pagers, cellular phones, workstations, minicomputers, mainframes, and any other forms of online or offline storage, whether on or off company premises.

10.   "Employee Matters Agreement" means that certain Employee Matters Agreement dated July 31, 2014, by and between Noble and Paragon, as the same may be amended by the parties thereto from time to time in accordance with the terms thereof.

11.   "Entity" means any legal entity including, without limitation, a limited liability company, corporation, trust, general partnership, limited partnership, sole proprietorship, professional corporation, limited liability partnership, professional association, joint venture, non-profit organization, memberships, trust, living trust, or testamentary trust.

12.   "Houlihan Lokey" means Houlihan Lokey, Inc. and its Affiliates.

13.   "Intercompany Note" means the intercompany note issued on July 17, 2014 by Paragon to Noble in the amount of $1.73 billion.

14.   "Investment Bank" means any investment bank, financial advisor, financial consultant, arranger of credit, financing source or other person in the business of planning, managing, effectuating or advising on financings, including without limitation Barclays and Houlihan Lokey.

15.   "July 17 Revolving Credit Facility" means the Revolving Credit Facility that Paragon entered on June 17, 2014.

16.   "July 17 Transfer" means the July 17, 2014 transfer of assets and liabilities from Noble to Paragon, including the issuance by Paragon of the Intercompany Note.

17.   "July 18 Financing" means the $1.08 billion of senior notes that Paragon issued on July 18, 2014 and the $650 million Paragon borrowed under a term loan facility, including the use of proceeds of such financing to repay the Intercompany Note.

18.   "Noble" means Noble Corporation PLC, a public limited liability company organized under the laws of England and Wales, and its Affiliates.

19.   "Paragon" means Paragon Offshore Limited, a limited liability company incorporated under the laws of England and Wales, and its Affiliates.

20. "Paragon IPO" means the proposed initial public offering of ordinary shares of Noble Spinco Limited as set forth in the Form S-1 Registration Statement (File No. 333-192999) filed with the United States Securities and Exchange Commission on December 20, 2013, and withdrawn on May 23, 2014 (also referred to as "The Big Spin," "The Deep Spin," or "Project Shark").

21. "Pemex" means Petroleos Mexicanos S.A., and its Affiliates.

22. "Person" means any natural or artificial person, including, without limitation, (a) legal entities, affiliates, predecessors in interest, and successors in interest, (b) agents, assigns, representatives (including financial advisors), attorneys, and other persons acting on behalf of that person, party or business organization, and (c) (for non-natural persons) all officers, directors, current and former employees, and subsidiaries and divisions of such persons.

23. "Petrobras" means Petroleo Brasileiro S.A. and its Affiliates.

24. "Project Sahara" means Noble's plan in 2011 and 2012 to sell certain of its standard spec shallow water rigs.

25. "Separation Agreement" means that certain Master Separation Agreement dated July 31, 2014, by and between Noble and Paragon, as the same may be amended by the parties thereto from time to time in accordance with the terms thereof.

26. "Solvency Analysis" means any Document Concerning Noble's or Paragon's solvency, including whether Noble or Paragon would face solvency challenges, regardless of who performed such analysis or held such understanding.

27. "Spin-Off" refers to the August 1 Distribution, the July 17 Revolving Credit Facility, the July 17 Transfer, the July 18 Financing, the Separation Agreement, the Tax Sharing Agreement, the Employee Matters Agreement, the Transition Services Agreement, and the Transition Services Agreement (Brazil).

28. "Tax Sharing Agreement" means that certain Tax Sharing Agreement dated July 31, 2014, by and between Noble and Paragon, as the same may be amended by the parties thereto from time to time in accordance with the terms thereof.

29. "Transition Services Agreement" means that certain Transition Services Agreement dated July 31, 2014, by and between Noble and Paragon, as the same may be amended by the parties thereto from time to time in accordance with the terms thereof.

30. "Transition Services Agreement (Brazil)" means that certain Transition Services Agreement (Brazil) dated July 31, 2014, by and between Noble and Paragon, as the same may be amended by the parties thereto from time to time in accordance with the terms thereof.

31. "Valuation" means the estimated, actual, and/or projected measure of the value of an Asset, including its acquisition cost, carrying cost, appraised or estimated value, replacement cost, sale price, future usefulness, future worth, or disclosed value. "Valuation" includes the Entity's or Asset's estimated, actual, and/or projected economic value, as well as the manner in which that value is accounted for by Noble or Paragon, is shown on the books and records of Noble or Paragon, or is otherwise determined by any Person or Entity with an economic interest in that Entity or Asset.

32. "You" or "Your" means Barclays and any Person or Persons acting in any capacity for or on its behalf, including but not limited to partners, members, shareholders, officers, directors, employees, agents, representatives, legal counsel, financial advisors, investment bankers, or any other Person.

**INSTRUCTIONS**

1. Unless otherwise specified, the time period covered by the notice is January 1, 2011 through February 14, 2016.

2. For purposes of interpreting this notice, all terms shall be given their most expansive and inclusive interpretation. This includes the following:

A. Construing "and" as well as "or" in the disjunctive or conjunctive, as necessary to make the request more inclusive;

B. Construing the singular form of the word to include the plural, and the plural form to include the singular;

C. Construing the term "including" to mean "including but not limited to" and construing the term "all" to mean "any," and vice versa.

## TOPICS

1. Barclays' work and analysis related to Project Sahara or any other effort to sell some or all of the Assets that were ultimately included in the Spinoff, including (i) the rationale or reasons for Project Sahara or such other sale, (ii) the sale process, negotiation and terms of Project Sahara or such other sale, (iii) Valuations performed in connection with Project Sahara or such other sale, and (iv) Communications with Noble, Castle Harlan, or any other third parties concerning Project Sahara or such other sale.

2. Barclays' work and analysis related to the Paragon IPO, including (i) the proceeds the Paragon IPO was expected to generate, (ii) the rationale or reasons for the Paragon IPO, (iii) the decision not to proceed with the Paragon IPO, and (iv) Communications with Noble or any third parties relating to the Paragon IPO.

3. Barclays' work and analysis related to the Spin-Off, including (i) Noble's decision to pursue only the Spin-Off and not the Paragon IPO, (ii) the Assets that would be included in the Spin-Off, (iii) the rationale or reasons for the Spin-Off, (iv) the effect of the Spin-Off on Paragon, and (v) Communications with Noble or any third party concerning the Spin-Off.

4. Barclays' involvement in the work Houlihan Lokey performed related to the Spin-Off, including the models and information Barclays prepared for or provided to Houlihan Lokey.

5. Sensitivity analyses performed or considered by Barclays related to Noble or Paragon.

6.Barclays' understanding of Noble's or Paragon's relationship with Pemex, including Communications from Pemex concerning Pemex's current or future policies, preferences or contracting plans with respect to the age, functionality, technical specifications or capabilities, or identity of drilling rigs Pemex planned to use in connection with its business.

7.Barclays' understanding of Noble's or Paragon's relationship with Petrobras.

8.Barclay's understanding or awareness of the termination, non-renewal, or potential termination or non-renewal of contracts for any of the Assets that were included in the Spin-Off.

9.Models, forecasts, or projections Barclays prepared, reviewed, or obtained concerning Paragon or the Assets that were included in the Spin-Off, including the process used to create those models, forecasts or projections and any assumptions contained in those models, forecasts or projections.

10.Barclays' work, analysis, and Communications related to any presentations, models, forecasts, projections or information that Noble or Paragon provided to any ratings agencies, Houlihan Lokey, any Investment Banker, the United States Securities & Exchange Commission, or potential lender or investor concerning the Paragon IPO and Spin-Off.

11.Any analyses Barclays performed from January 1, 2011 through August 1, 2014 concerning the offshore drilling market, oil prices, demand for drilling rigs, dayrates, newbuilds, or rig utilization.

12.Barclays' work or analysis related to any Valuation of Paragon or the Assets included in the Spin-Off, including any Solvency Analysis.

13.Barclays' work or analysis related to Noble's or Paragon's actual or contemplated representations, warranties, disclosures, or public statements concerning the Paragon IPO or the Spin-Off, including what information should be disclosed to ratings agencies or potential investors.

11

14. The fees Barclays received or expected to receive concerning Project Sahara or any other effort to sell some or all of the Assets that were included in the Spin-Off, the Paragon IPO, or the Spin-Off.

15. Barclays' business relationship, revenue, and lending history with Noble.

16. Barclays' business relationship and lending history with Paragon.

17. Barclays' knowledge of why other lenders and investors participated in the Spin-Off, including the July 17 Revolving Credit Facility and July 18 Financing.

18. The roadshows related to the Spin-Off, including the July 17 Revolving Credit Facility, the July 18 Financing, and the equity.

19. Any ratings agency presentations related to the Spin-Off.