**SCHEDULE A**

**DEFINITIONS**

1. "Affiliate" means any Person or Entity related to, associated with, owning, owned by, under common control with, under the direction of, or with the ability to direct or control another Person. "Affiliate" also means any current or former principal, officer, director, manager, general partner, employee, agent, parent company, or subsidiary of any such Person or Entity, as well as that Person's or Entity's attorneys, accountants, predecessors, successors, assigns, heirs, administrators, executors, supervisors, or representatives.

2. "Asset" means all of the right, title, and interest in and to property of whatever type or nature (including real, personal, mixed, intellectual, tangible, and intangible (including goodwill) property).

3. "August 1 Distribution" means the distribution on August 1, 2014 to each Noble shareholder of one ordinary share of Paragon for every three ordinary shares of Noble that the shareholder held at 5 p.m. EST on July 23, 2014.

4. "Communication" or "Communications" means any and all Documents or information constituting, reflecting or evidencing any oral or written transmission or receipt of information, by whatever manner or means, regardless of how or by whom the Communication was initiated, including without limitation: (a) any written contact by means such as letter, memorandum, e-mail, text message, instant message or facsimile, (b) any oral contact by any means including face-to-face meetings and telephone, and (c) any records for telephone or text message Communications.

5. "Concerning," "Regarding," "In Connection With," and "Relating To" shall be construed to mean, without limitation, relating to, referring to, describing, referencing, concerning, evidencing, constituting, discussing, supporting, pertaining to, containing, analyzing, evaluating, studying, recording,

showing, memorializing, reporting on, commenting on, mentioning, reviewing in conjunction with, setting forth, contradicting, refuting, considering, or recommending, in whole or in part.

6. "Document" is defined in the broadest sense possible under Rules 26 and 34 of the Federal Rules of Civil Procedure and Rules 7026 and 7034 of the Federal Rules of Bankruptcy Procedure and includes Communications. Requested Documents include all attachments, exhibits, enclosures, appendices and other documents which refer or relate to the designated Documents.

7. "Employee Matters Agreement" means that certain Employee Matters Agreement dated July 31, 2014, by and between Noble and Paragon, as the same may be amended by the parties thereto from time to time in accordance with the terms thereof.

8. "Entity" means any legal entity including, without limitation, a limited liability company, corporation, trust, general partnership, limited partnership, sole proprietorship, professional corporation, limited liability partnership, professional association, joint venture, non-profit organization, membership, trust, living trust, or testamentary trust.

9. "Intercompany Note" means the intercompany note issued on July 17, 2014 by Paragon to Noble in the amount of $1.73 billion.

10. "Investment Bank" means any investment bank, financial advisor, financial consultant, arranger of credit, financing source or other person in the business of planning, managing, effectuating or advising on financings.

11. "July 17 Revolving Credit Facility" means the Revolving Credit Facility that Paragon entered on June 17, 2014.

12. "July 17 Transfer" means the July 17, 2014 transfer of assets and liabilities from Noble to Paragon, including the issuance by Paragon of the Intercompany Note.

13. "July 18 Financing" means the $1.08 billion of senior notes that Paragon issued on July 18, 2014 and the $650 million Paragon borrowed under a term loan facility, including the use of proceeds of such financing to repay the Intercompany Note.

14. "Noble" means Noble Corporation PLC, a public limited liability company organized under the laws of England and Wales, and its Affiliates.

15. "Noble Retained Rigs" means the *Noble Driller*, the *Noble Discoverer*, the *Noble Gene House*, the *Noble Joe Beall*, the *Noble Charles Copeland*, the *Noble Alan Hay*, and the *Noble David Tinsley*.

16. "Paragon" means Paragon Offshore Limited, a limited liability company incorporated under the laws of England and Wales, and its Affiliates.

17. "Paragon Finance International Transfers" means the transfer from Paragon International Finance Company to Noble Corporation of (i) the $798,663,578.00 of intercompany receivables that Noble International Finance Company owed to Paragon International Finance Company; (ii) the $81,930,778.00 of intercompany receivables that Noble Corporation owed to Paragon International Finance Company; and (iii) the intercompany note in the amount of $55,200,411.00 (principal and interest) executed by Noble International Finance Company and held by Paragon International Finance Company.

18. "Paragon Rigs" means any Asset that Paragon or its Affiliates obtained In Connection With the Spin-Off.

19. "Pemex" means Petroleos Mexicanos S.A. and its Affiliates.

20. "Person" means any natural or artificial person, including, without limitation, (a) legal entities, Affiliates, predecessors in interest, and successors in interest, (b) agents, assigns, representatives (including financial advisors), attorneys, and other persons acting on behalf of that person, party or

business organization, and (c) (for non-natural persons) all officers, directors, current and former employees, and subsidiaries and divisions of such persons.

21. "Petrobras" means Petroleo Brasileiro S.A. and its Affiliates.

22. "Separation Agreement" means that certain Master Separation Agreement dated July 31, 2014, by and between Noble and Paragon, as the same may be amended by the parties thereto from time to time in accordance with the terms thereof.

23. "Spin-Off" means the August 1 Distribution, the July 17 Revolving Credit Facility, the July 17 Transfer, the July 18 Financing, the Separation Agreement, the Tax Sharing Agreement, the Employee Matters Agreement, the Transition Services Agreement, the Paragon Finance International Transfers, and the Transition Services Agreement (Brazil).

24. "Standard Specification Rigs" means the Paragon Rigs and the Noble Retained Rigs.

25. "Tax Sharing Agreement" means that certain Tax Sharing Agreement dated July 31, 2014, by and between Noble and Paragon, as the same may be amended by the parties thereto from time to time in accordance with the terms thereof.

26. "Transition Services Agreement" means that certain Transition Services Agreement dated July 31, 2014, by and between Noble and Paragon, as the same may be amended by the parties thereto from time to time in accordance with the terms thereof.

27. "Transition Services Agreement (Brazil)" means that certain Transition Services Agreement (Brazil) dated July 31, 2014, by and between Noble and Paragon, as the same may be amended by the parties thereto from time to time in accordance with the terms thereof.

28. "Valuation" means the estimated, actual, and/or projected measure of the value of an Asset, including its acquisition cost, carrying cost, appraised or estimated value, replacement cost, sale price, future usefulness, future worth, or disclosed value. "Valuation" includes the Entity's or Asset's estimated, actual, and/or projected economic value, as well as the manner in which that value is accounted

for by Noble, is shown on the books and records of Noble, or is otherwise determined by any Person or Entity with an economic interest in that Entity or Asset.

29. "You" or "Your" means the Noble Corporation Defendants and any Person or Persons acting in any capacity for or on their behalf, including but not limited to partners, members, shareholders, officers, directors, employees, agents, representatives, legal counsel, financial advisors, Investment Banks, or any other Person.

## INSTRUCTIONS

1. Unless otherwise specified, the time period covered by the notice is January 1, 2011 through August 1, 2014.

2. For purposes of interpreting this notice, all terms shall be given their most expansive and inclusive interpretation. This includes the following:

   A. Construing "and" as well as "or" in the disjunctive or conjunctive, as necessary to make the request more inclusive;

   B. Construing the singular form of the word to include the plural, and the plural form to include the singular;

   C. Construing the term "including" to mean "including but not limited to" and construing the term "all" to mean "any," and vice versa.

**TOPICS**

Capital Expenditures

1. Your annual and long-term capital expenditure budgeting or forecasting process, policies, and procedures.

2. Your categorization of capital expenditures as expansionary, maintenance, discretionary, sustaining, initial, additional, annual and dry docking and Your definitions of each of these terms.

3. The total dollar amount You spent on capital expenditures for each of the Paragon Rigs on a rig-by-rig basis, from January 1, 2010 to the Spin-Off, including the categorization of those amounts as expansionary, maintenance, discretionary, sustaining, initial, additional, annual and dry docking.

4. For each Paragon Rig that You contend was refurbished, rebuilt, or upgraded prior to the Spin-Off, (i) the work performed during such refurbishment, rebuilding, or upgrade; (ii) the cost of such capital expenditures, refurbishment, rebuilding, or upgrade; (iii) the date when such refurbishment, rebuilding, or upgrade was completed; (iv) the additional useful life or years of work that You expected to obtain from such refurbishment, rebuilding, or upgrade; and (v) the projected date for the next refurbishment, rebuilding, or upgrade required for such rig.

5. The $1.8 billion in capital expenditures since January 1, 2010 discussed during the Term Loan B roadshow.  (*See, e.g.,* PGN20190533607)

6. Any estimates that You had in 2014 for capital expenditures, upgrades, refurbishments, or rebuilding projects to extend the useful life or years of work of any Paragon Assets and the additional useful life or years of work that You expected to obtain from such capital expenditure, refurbishment, rebuilding, or upgrade.

7. Your analysis and calculation of the remaining useful life or projected retirement dates for each of the Paragon Rigs, on a rig-by-rig basis, as of the Spin-Off.

8. Your analysis before the Spin-Off of the replacement costs for any Paragon Rigs upon retirement.

9. Your purchase or potential purchase of any standard specification rigs from January 1, 2011 to the Spin-Off.

10. Your estimates prior to the Spin-Off of the cost, time, and work required to reactive a cold-stacked rig.

11. The bases for Your assumption that the *Noble Lorris Bouzigard*, the *Noble Murvalenko*, and the *Noble Seillean* would return to work after the Spin-Off.

Pemex

12. Any Communications or knowledge You had prior to the Spin-Off Regarding the September 17, 2013 Pemex Letter from Carlos A. Morales Gil (produced in this litigation as Olivares_00003145) and the policies set forth in that letter.

13. Any Communications or knowledge You had Regarding the August 20, 2014 Pemex Letter from Gustavo Hernandez Garcia to Armando Rodriguez Garcia and Alejandro Ostos Hernandez and the policies set forth in that letter.

14. Daniel Olivares' receipt of the Pemex letters You produced in this litigation as Olivares_00003145 and Olivares_00003147, including the name of the former Pemex employee from whom Mr. Olivares received those letters, the date on which he first received the letters and first learned of the policies set forth in those letters, and anyone at Noble with whom he shared those letters.

Impairment

15. Any consideration by You of an impairment or potential impairment of any of the Paragon Rigs prior to the Spin-Off.

Master Model

16.	Your creation, preparation, and maintenance of the Noble Master Model, including but not limited to the "Shipyard Spend" tab in the master model.

17.	The information You provided to Houlihan Lokey for its solvency opinion.

18.	Your projections and forecasts before the Spin-Off for the Paragon business.

19.	Your assumed business model for Paragon at the time of the Spin-Off.

The Spin-Off

20.	Your use of any proceeds from the Spin-Off.

21.	Any debt or commercial paper Noble had that was maturing between June 1, 2014 and December 31, 2014.

22.	The Assets at each of Noble Corporation Plc, Noble Corporation Holdings Ltd., Noble Holding International (Luxembourg) S.a.r.l., Noble Holding International (Luxembourg NHIL) S.a.r.l., Noble FDR Holdings Limited, Noble Holding International Limited, Noble Holding (U.S.) LLC, and Noble International Finance Company at the time of the Spin-Off.

23.	The Valuation of the Assets at each of Noble Corporation Plc, Noble Corporation Holdings Ltd., Noble Holding International (Luxembourg) S.a.r.l., Noble Holding International (Luxembourg NHIL) S.a.r.l., Noble FDR Holdings Limited, Noble Holding International Limited, Noble Holding (U.S.) LLC, and Noble International Finance Company at the time of the Spin-Off.

24.	Any Assets transferred out of each of Noble Corporation Plc, Noble Corporation Holdings Ltd., Noble Holding International (Luxembourg) S.a.r.l., Noble Holding International (Luxembourg NHIL) S.a.r.l., Noble FDR Holdings Limited, Noble Holding International Limited, Noble Holding (U.S.) LLC, and Noble International Finance Company after the Spin-Off.

25.	The Valuation of any Assets transferred out of each of Noble Corporation Plc, Noble Corporation Holdings Ltd., Noble Holding International (Luxembourg) S.a.r.l., Noble Holding

International (Luxembourg NHIL) S.a.r.l., Noble FDR Holdings Limited, Noble Holding International Limited, Noble Holding (U.S.) LLC, and Noble International Finance Company after the Spin-Off.

26. The current Assets at each of Noble Corporation Plc, Noble Corporation Holdings Ltd., Noble Holding International (Luxembourg) S.a.r.l., Noble Holding International (Luxembourg NHIL) S.a.r.l., Noble FDR Holdings Limited, Noble Holding International Limited, Noble Holding (U.S.) LLC, and Noble International Finance Company.

27. The current Valuation of the Assets at each of Noble Corporation Plc, Noble Corporation Holdings Ltd., Noble Holding International (Luxembourg) S.a.r.l., Noble Holding International (Luxembourg NHIL) S.a.r.l., Noble FDR Holdings Limited, Noble Holding International Limited, Noble Holding (U.S.) LLC, and Noble International Finance Company.

28. The Paragon Finance International Transfers.

29. Your decision not to include the Noble Retained Rigs in the Spin-Off.

30. The revenues, margins, and profits earned by the Noble Retained Rigs after the Spin-Off.

31. All Communications You had with potential customers Regarding the potential customers' intentions to contract for the *Noble Don Walker*, the *Noble Earl Frederickson*, the *Noble Sam Noble*, the *Noble Chuck Syring*, the *Noble Gus Androes*, the *Noble Roy Butler*, the *Noble Charlie Yester*, the *Noble Tommy Craighead*, the *Noble Percy Johns*, and the *Noble Gene Rosser* after the Spin-Off.

Taxes

32. Your projected effective tax rate for Paragon after the Spin-Off.

33. Your estimates at the Spin-Off of any bond Paragon may be required to post after the Spin-Off In Connection With an assessment from any Mexican taxing authority.

Ratings

34. Ratings from credit agencies Standards & Poor's and Moody's for Noble from January 1, 2014 to December 31, 2014 and for Paragon from January 1, 2014 to the Spin-Off.