## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| PARAGON OFFSHORE PLC, et al., | Case No. 16-10386 |
| Debtors. | |
| PARAGON LITIGATION TRUST, | |
| Plaintiff, | |
| v. | |
| NOBLE CORPORATION PLC, NOBLE CORPORATION HOLDINGS LTD, NOBLE CORPORATION, NOBLE HOLDING INTERNATIONAL (LUXEMBOURG) S.à.r.l., NOBLE HOLDING INTERNATIONAL (LUXEMBOURG NHIL) S.à.r.l., NOBLE FDR HOLDINGS LIMITED, NOBLE HOLDING INTERNATIONAL LIMITED, NOBLE HOLDING (U.S.) LLC, NOBLE INTERNATIONAL FINANCE COMPANY, MICHAEL A. CAWLEY, JULIE H. EDWARDS, GORDON T. HALL, JON A. MARSHALL, JAMES A. MACLENNAN, MARY P. RICCIARDELLO, JULIE J. ROBERTSON, AND DAVID W. WILLIAMS, | Adv. Proc. No. 17-51882 (CSS) |
| Defendants. | |

### APPENDIX AND DECLARATION OF JEFFREY J. ZEIGER
### IN SUPPORT OF THE REPLY IN SUPPORT OF THE PARAGON LITIGATION
### TRUST'S MOTION TO EXCLUDE THE TESTIMONY OF EMILIE FELDMAN

I, Jeffrey J. Zeiger, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746,

that the following is true and correct to the best of my knowledge:

1.      I am duly admitted to the practice of law in the State of Illinois and a partner

at the law firm of Kirkland & Ellis LLP, with an office located at 300 N. LaSalle St,

Chicago, IL 60654.  Kirkland & Ellis is counsel to the Paragon Litigation Trust in the above-captioned matter.

2.      I respectfully submit this Declaration in Support of the Reply in Support of the Paragon Litigation Trust's Motion to Exclude the Testimony of Emilie Feldman and to submit true and correct copies of the attached documents.

3.      Attached are true and correct copies of the following documents:

### APPENDIX

| Date | Description | Page Nos. |
|------|-------------|-----------|
| 8/13/2013 | Beastie Boys, et al., v. Monster Beverage Corp. Expert Report of Dr. Erich Joachimsthaler | C1 - C24 |
| 9/16/2015 | E. Feldman, Managerial Compensation and Corporate Spinoffs [Noble_01382979] | C25 - C44 |
| 5/27/2016 | E. Feldman Pittsburgh Post Gazette Interview | C45 - C46 |
| 4/21/2020 | Excerpts from Deposition of Lord Jonathan Hugh Mance | C47 - C49 |
| 4/24/2020 | Excerpts from Deposition of Emilie Feldman | C50 - C53 |

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and information.

Dated: July 7, 2020

                                        */s/ Jeffrey J. Zeiger*
                                        Jeffrey J. Zeiger

**8/13/2013 Beastie Boys, et al., v. Monster Beverage Corp.
Expert Report of Dr. Erich Joachimsthaler**

*BEASTIE BOYS, ET. AL. V. MONSTER BEVERAGE CORP.*

12-CIV.-6065

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

EXPERT REPORT OF DR. ERICH JOACHIMSTHALER

August 13, 2013

## CREDENTIALS

1.      I am the founder and Chief Executive Officer of Vivaldi Partners Group, a strategic consulting firm with a focus on strategy, marketing and innovation with headquarters in New York and offices in Munich, Hamburg, Zurich and London.  I have been a professional in the brand and marketing field for more than twenty years and have provided expert brand and marketing advice to a diverse set of clients in industries such as consumer packaged goods, retail, professional services, hospitality, healthcare, technology, telecommunications and financial services, among others.

2.      Over the past twenty years, I have been involved in building strong brands for many clients in North America, South America, Europe, and Asia. I have worked for clients in virtually every area relevant to building strong brands. I have assessed the value of brands and their potential for development in several hundred situations and I have led academic research on brand management. My firm Vivaldi Partners Group's clients include 20 of the current Fortune 100 companies and in the consumer packaged goods sector, our client portfolio includes companies and brands such as The Coca-Cola Company, Campbell's, Del Monte, Jose Cuervo, Lay's, Philips, Samsung, Wrigley, and numerous others.

3.      I have published many articles and two books on marketing strategy and building strong brands. My book, *Brand Leadership: The Next Level of the Brand Revolution*, which I co-authored with David A. Aaker, was published by The Free Press in January 2000 and has been a top seller among books on brands over the years. It was also republished by Pocket Books in 2010. My other book, *Hidden in Plain Sight: How to Find and Execute Your Next Growth Strategy,* was published by the Harvard Business Press in May 2007, and was awarded the Berry Book Prize for Best Book in Marketing by the American Marketing

2

**C2**

Association. I have published extensively in academic journals on a range of marketing topics including brand building, strategic brand growth, marketing science, quantitative research and survey methodology issues. These journals include the *Harvard Business Review, Journal of Marketing Research, Journal of Marketing, Journal of Consumer Research*, and *Sloan Management Review*.

4. I have held faculty positions at the Darden Graduate School of Business Administration at the University of Virginia, the University of Southern California, the University of Houston, and IESE (Instituto Superiores de la Empresa) in Barcelona, New York, London and Munich. IESE is one of the leading global business schools offering MBA and executive education programs and ranks among the top ten global business schools by *The Financial Times*.

5. In 1979, I received my Economics Degree from the Hochschule Giessen-Friedberg, Germany. I received my Ph.D. in Business Administration, with emphasis on statistics and marketing, from the University of Kansas in 1985, where I also received my Master's Degree in Science, with emphasis in quantitative methods, in 1981. I wrote my doctoral thesis on statistical and methodological issues in survey research. In 1988, I completed a Postdoctoral Fellowship at the Harvard Business School. In addition, I am a member of the American Marketing Association, and the European Society for Opinion and Marketing Research.

6. My full credentials, resume and publications are included as exhibits. I am being compensated at my customary hourly rate of $700 per hour. My consulting firm is also being compensated for the time spent by its research staff at their customary hourly rates.

3

**C3**

## SUMMARY OF ISSUES AND OPINIONS

7.      I have been engaged to render my expert professional opinion on specific issues

concerning Monster Energy Company ("Monster") and the Monster Energy brand ("Monster

brand"), namely:

   a.      The marketing and branding impact of the "Ruckus in the Rockies" recap video
          on Monster and the Monster brand;

   b.      The likelihood of a consumer association between the Monster brand and the
          Beastie Boys as a result of watching the "Ruckus in the Rockies" recap video;
          and

   c.      The value to Monster of the use of the Beastie Boys' music on the "Ruckus in
          the Rockies" recap video.

8.      In order to analyze these issues, I considered and relied upon the following

materials. A full list of documents I relied upon is listed in Exhibit 3 of this report.

   a.      Documents produced in this matter and relating to the case

   b.      Industry reports related to the energy drink market and its target audience

   c.      Monster's business and brand-related materials

   d.      Monster's website (monster.com), Monster's YouTube channel
          (youtube.com/user/monsterenergy), and other sites related to the energy drink
          market and brands, such as BevNET (bevnet.com), Rockstar
          (rockstarenergy.com) and Redbull (redbull.com)

4

**C4**

e.  Research from empirical studies and written work in academic journal articles, books and other academic literature relating to marketing, branding and consumer behavior

f.  My own and my peers' conceptual theories, empirical research and professional work on cognitive psychology, branding and marketing strategy

9.  Based on the materials that I have reviewed and the analyses I have conducted on Monster and the energy drink market, I conclude that:

a.  Monster's success is driven by the following factors: (i) distribution strategy and network powered by The Coca-Cola Company and Anheuser-Busch; (ii) product assortment and innovation; (iii) visual brand identity; and (iv) marketing promotions.

b.  Monster employs a "push" marketing strategy, which is effective in this category since energy drink products are generally an impulse purchase and that their functional benefits are well understood by consumers. Monster has executed on this strategy effectively through its focus on dominating distribution and shelf space - this has ensured that its products are ubiquitous on store shelves. Monster's sales and business success has little, if anything, to do with music or musicians.

c.  Monster also engages in certain nontraditional marketing initiatives, including events, sponsorships, and promotions; these initiatives are supported by different communication tactics, including brand ambassadors, parties, media relations and press releases, posters, and branded apparel.

5

**C5**

d. Recap videos like "Ruckus in the Rockies" are just one of numerous communication tactics that play a supporting role in Monster's larger marketing initiatives. These recap videos do not play a major role in building the Monster brand; they are inherently limited in importance and utility.

e. The "Ruckus in the Rockies" recap video was insignificant to Monster for the following reasons:

    i. It was only one of hundreds of videos produced by Monster and uploaded to its YouTube channel;

    ii. It was viewed by less than 14,000 viewers;

    iii. It was only available to view for approximately 5 weeks;

    iv. In terms of actual viewership, it performed in the bottom 4% of videos produced, uploaded and available on Monster's YouTube channel as of July 29, 2013

    v. It does not possess the typical characteristics of what is considered within the marketing industry to be an engaging video for marketing purposes.

f. The ability of the video to create an association between, or an implicit endorsement from, the Beastie Boys and the Monster brand is extremely unlikely, because:

    i. It is unlikely the Beastie Boys songs were established as aural cues for the Monster brand, given the extremely short 5-week period that the video was publicly available on YouTube, and also based on empirically accepted

6

**C6**

standards of what it takes for music or aural cues to be associated with a
particular brand; and

ii. No additional efforts existed to enhance the memorability of the association
between the Beastie Boys and the Monster brand.

I.    **Key Success Factors for Monster**

10.    Success in Monster's energy drink space is contingent upon several key factors:
(i) Brand Identity, (ii) Product Innovation, (iii) Distribution Network and Presence, and (iv)
Marketing and Promotions.  I will analyze these in turn.

11.    ***Brand Identity:***  Typically meant for immediate consumption, energy drinks are
regarded as unplanned impulse purchases with relatively little consideration and consumer
deliberation prior to purchase.  This impulse to purchase is typically driven by a functional
need:  66% of consumers say they purchase energy drinks because they "give me an energy
boost."[1]   In a functionally driven category, where every product offers the same functional
benefit and consumers either cannot or are unable to discern product differences, a brand with
a strong visual identity enables it to be successful.  Monster has developed a strong visual
identity for its brand.  The power of a strong visual identity, what I call Brand as a Symbol, is
well-accepted today.[2]  A strong visual brand identity helps the product stand out at the retail

---

[1] M.A. Heckman, K. Sherry, E. Gonzales de Mejia, "Energy Drinks: An Assessment of Their Market Size,
Consumer Demographics, Ingredient Profile, Functionality, and Regulations in the United States."
Comprehensive Reviews in Food Science and Food Safety, (2010).Referencing Research from U.S. Food Link.
[2] David Aaker and Erich Joachimsthaler, *Brand Leadership*, New York, NY: The Free Press, 2000.

7

shelf, and differentiate one from the other to shoppers. This is critical where in an average supermarket, a typical shopper passes 300 products per minute.[3]

12.     A brand's visual brand identity can comprise symbols, such as a color or print (Tiffany Blue, Monster's black and green); a logo (McDonald's golden arches); a package (Method's distinctive bottle shapes; Monster's oversized 16 oz cans); a tagline (Nike's "Just Do It"); a musical sound (NBC's tri-tone); product design (OXO's ergonomic products); or a signature (Sean John's signature logo).

13.     I believe Monster has created a distinctive brand visual identity around a stylized logo (the M-claw) atop a contrasting black backdrop. This visual identity is used as a cue to consumers for Monster products both in and out of the beverage purchase context.

14.     While Monster has built a strong visual identity, the brand also relies on verbal brand identity elements. These identity elements primarily serve to achieve category relevance and acceptance, also known as points of parity.  In other words, they are elements of the Monster brand that are shared with other brands in the energy drink market.

15.     The Monster brand's verbal identity elements are high energy, active, fast-paced, adventurous, aggressive, and lifestyle oriented. These elements are shared by several brands in the energy drink category, including Monster, Red Bull, and Rockstar. These elements do not serve to differentiate between brands, but are nevertheless important to be able to compete in the energy drinks market. These elements evoke certain positive traits or

---

[3] Kotler, Philip and Kevin Lane Keller. Marketing Management. Upper Saddle River, NJ: Pearson Prentice Hall, 2009.  pg 368

8

attributes helpful to a brand in the energy drink category, and strengthen the relationship a brand has with consumers.[4]

16.    The second success factor, *product innovation,* encompasses new product development, flavor innovations or variants (e.g. cherry flavored Coke), or packaging innovations. In order to address the crowded in-store environment, companies may increase their portfolio of product variants to gain precious physical retail shelf space. Adding product mix width through more product lines, or depth through a wider array of variants, is an opportunity for retailers to stock more products from one brand in a given space.[5]

17.    Monster's product innovation started with its packaging size. It came to market doubling the size of the standard package size to 16oz cans while maintaining a similar price point, thereby signaling new value to consumers.[6] Currently, Monster maintains a portfolio of over thirty product variants, helping to ensure continued shelf-presence and extending its brand and product appeal to a wide audience. This success factor is particularly important because it differentiates Monster from Red Bull, the global energy drinks leader and early market pioneer. While Monster has focused on product innovation, Red Bull has only six product variants and has instead focused on brand positioning and marketing promotions as its competitive strategy.

18.    The third factor, *distribution,* plays a pivotal role in a consumer goods brand's growth and market expansion. It has been reported that an energy drink company that wishes to sell its products in all 50 states needs between 250 and 300 distributors to reach the many

---

[4] David Aaker and Erich Joachimsthaler, *Brand Leadership,* New York, NY: The Free Press, 2000.
[5] Kotler, Philip and Kevin Lane Keller. Marketing Management. Upper Saddle River, NJ: Pearson Prentice Hall, 2009. p 368
[6] *Red Bull and Energy Drinks 2010.* Darden Business Publishing University of Virginia Press.

9

thousands of retail stores and point of sales outlets.[7] Of all retail stores, convenience stores are the most important for energy drinks, accounting for about 80% of total market sales; they are considered sampling grounds that provide consumers an opportunity to try the product without having to commit to buying a whole six pack.[8] Because of their smaller size, convenience and gas stores typically require just-in-time inventory and frequent restocking.

19.    Monster's primary distribution partners in North America are Anheuser-Busch and The Coca-Cola Company.  The Coca-Cola Company is the world's largest soft-drink maker, and also distributes almost half of Monster's U.S. volume.  This strong distribution infrastructure allows Monster to maximize its reach and ensure product availability not only through convenience stores, but also grocery stores, vending machines, and other key distribution channels that many smaller players cannot access. Distribution is a significant factor of success for Monster over the former U.S. market leader Red Bull.

20.    *Marketing and promotional* initiatives in the energy drink category are the final driver of success.  As a functional and/or impulse driven category, energy drink marketing is particularly reliant on in-store and point of sale initiatives and promotions. Sampling in particular, has been reported to have a strong effect on immediate sales, especially for functionally driven products where the benefit to consumers is experienced directly.[9]

21.    As part of its field marketing efforts, Monster has reportedly deployed over 400 student ambassadors in 300+ college markets, and peer ambassadors in the top 27 markets.[10]

---

[7] Helm, Burt, "Energy Drinks Build Their Buzz." Bloomberg Businessweek, (January 2005).
[8] Goel-lal, Garmina, "Energy Drinks and Energy Shots – U.S. – July 2009." Mintel Report, (July 2009).
[9] Heiman, Amir, Bruce McWilliams, Zhihua Shen, David Zilberman, "Learning and Forgetting: Modeling Optimal Product Sampling over Time." Department of Agricultural Economics and Management, Hebrew University, Department of Agricultural and Resource Economics, University of California at Berkley, April 2001.
[10] Monster Game Plan 2012

10

Additionally, Monster dispenses free samples of the product at Monster lifestyle events. The company's operational success is strongly reliant on these sales-directed efforts.[11]

22.　　In summary, to effectively gain a foothold in the highly competitive energy drink market, companies must have an extensive distribution infrastructure, a good product mix, strong visual packaging design, and strong marketing and promotional efforts. Monster has chosen to focus on a particular strategy to leverage these success factors. This strategy and its effective execution make up the success of Monster in the U.S.

23.　　Based on the above, I have come to the conclusion that Monster's business and sales success has little, if anything, to do with associations with any particular music or musicians.

## II.　Monster's Marketing Efforts

24.　　In Section 1, I described how Monster achieved a leadership position in the U.S. energy drink market. In this section, I will describe Monster's various marketing initiatives.

25.　　When marketing products to consumers, there are two general strategies companies employ: push or pull. Companies will employ a combination of both push and pull strategies; however, there is typically an emphasis toward one or the other. Under a push strategy, a company uses its distributors, promotions, and incentives to induce sales intermediaries to carry and sell its products to consumers. This ensures wide availability of the company's products throughout sales channels. A push strategy is most effective in categories

---

[11] Deposition of Sam Pontrelli, Senior Vice President of Marketing

where the brand choice is made in store, the products are impulse purchases, and the product benefits are well understood by consumers.[12]

26.    In a pull strategy, a company uses advertising, promotions, events, sponsorships and other communications to persuade consumers to demand the product from sales intermediaries.  A pull strategy is effective in categories where consumers are able to perceive differences between brands, and when they choose a brand before they go to the store.[13]

27.    The nature of the energy drinks market lends itself particularly to success with the push strategy. This is so because energy drinks are generally an impulse purchase for immediate consumption, and their functional benefits are well understood by consumers.[14] A push strategy emphasizes the well-known AAA success formula: availability, affordability, and acceptability.

28.    This is the primary marketing approach Monster has employed. This approach has ensured ubiquitous availability through its strong and extensive distribution network, affordability through a reasonable price point, and acceptability through massive marketing promotions, events and other non-traditional marketing efforts.  That is, Monster's marketing success does not rely on associations with bands like the Beastie Boys to build its business or drive sales.

*Marketing Initiatives*

29.    While Monster relies primarily on a push strategy (as described above), it does engage in elements of a pull strategy to build its brand.  Although the company does not

---

[12] Kotler, Philip and Kevin Lane Keller. Marketing Management. Upper Saddle River, NJ: Pearson Prentice Hall, 2009.
[13] Ibid
[14] Goel-lal, Garmina, "Energy Drinks and Energy Shots – U.S. – July 2009." Mintel Report, (July 2009).

12

engage in traditional advertising, it does undertake initiatives like events, promotions, and sponsorships that are meant to directly engage and activate its consumer base.[15]  These initiatives support the "lifestyle marketing" endemic to the energy drink category and are employed not only by Monster, but also by Rockstar Energy and Red Bull.

30.     Monster undertakes various marketing initiatives that highlight the high-energy lifestyle prevalent in this category.  These initiatives include events, sponsorships, promotions and online content, and occur regularly and simultaneously throughout the year.

31.     *Events* include both events organized by Monster and events where Monster is a sponsor along with other brands. These are typically oriented around action sports, gaming, and music concerts.   In 2012, Monster events in North America included the "4[th] Monster Energy Outbreak Tour," "Monster Freestyle Snowmobile Demo," and the "2012 Monster Energy AMA Supercross."

32.     *Sponsorships* include sponsorships of athletes and musicians that represent the high-energy lifestyle characteristic of the energy drink market, and that also align to Monster's guiding themes.  Sponsored athletes include Sarah Price (motorcross), Jason Britton (stunt riding), and Shannon Campbell (rock crawling). Sponsored musicians represent a variety of genres, but tend to skew towards rock.  Some of these musicians include Slash (rock), Neon Trees (rock), and Jonathan Davis (hip hop/pop).  Importantly, it is my understanding that the role of these musicians is limited to live music events, interactions with fans, and exclusive access to content, and *not* for use as background music or otherwise in marketing materials.[16]

---

[15] Monster Game Plan 2012
[16] Deposition of Brent Hamilton, Director of Music Marketing; and Monster's website www.monsterenergy.com

33. *Promotions* include sales driven events, such as in-store price promotions and sampling efforts. Additionally, Monster offers giveaways of Monster-branded gear (hats, clothing, skateboards/snowboards, bikes, etc.) and promotional contests, which often involve free tickets or trips. These promotions all work towards supporting the Monster lifestyle.

34. *Monster online content* refers to the originally curated content that Monster posts to its own website and various online platforms. Often, this content is created in-house by virtual and social media teams. Other times, Monster utilizes sponsored artist or athlete content to provide fans with early or exclusive access to content.

35. All of the above marketing initiatives are supported by a variety of communication tactics. These tactics occur both before and after the initiatives, and utilize a mix of channels and media. These include press releases, posters, Facebook posts, the Monster Ambassador Team, and YouTube videos among numerous others. Collectively, these tactics widen the reach of the marketing initiatives, but the individual impact of any given tactic is minimal.

36. Recap videos, like "Ruckus in the Rockies" are one particular type of video produced by Monster. Recap videos have a very specific purpose – to highlight key moments that occurred during a particular marketing initiative. The audience for recap videos generally falls into two categories. The first is those who attended the event and want to remember the experience. The second is those who could not attend, but are interested in understanding what transpired. Because of this narrow audience, and the fact that recap videos are tied to an event that has already occurred, their importance and utility are inherently limited.

37. In summary, recap videos like "Ruckus in the Rockies" are just one of numerous communication tactics that play a supporting role in Monster's larger marketing

14

**C14**

initiatives. Recap videos play only a minor role in building the Monster brand, and are inherently limited in importance and utility.

### III.    The "Ruckus in the Rockies" Video was an Ineffective Marketing Tool

38.    As I already concluded, the role of the "Ruckus in the Rockies" video in the success of Monster and its overall strategy is minimal – using video is merely one tactic that is part of a larger marketing program that is itself part of a larger strategy Monster employs in the energy drinks market (where distribution, product innovation, and visual brand identity play key roles). In this section, I describe my analyses specifically concerning the impact of the "Ruckus in the Rockies" video on Monster's marketing efforts.

39.    The video recap of "Ruckus in the Rockies" was created by the Monster team in Canada. I have analyzed various videos produced and uploaded by Monster to its YouTube channel, and I have found that the success and reach of these videos as promotional efforts vary greatly from video to video. To assess the success of the "Ruckus in the Rockies" video, I have compared it against other videos produced and posted by Monster that have been on Monster's YouTube channel for roughly the same length of time.

40.    As of July 29, 2013 there were three Monster videos that had been uploaded to YouTube for 5 weeks (Exhibit 1). These videos average 74,952 total views at a rate of 14,990 views per week, compared to 13,361 total views and an average rate of 2,672 views per week "Ruckus in the Rockies" achieved before being taken down. As a group, these videos accumulated views 4.6 times faster than "Ruckus in the Rockies," which suggests "Ruckus in the Rockies" was perceived as less engaging or interesting to viewers. Even the least popular video of this group, "Monster Energy: In the Driver's Seat with Vaughn Gittin Jr.," attracted viewers 1.7 times more quickly.

15

**C15**

41. If the analysis is expanded to include videos that have been posted for between 3 and 7 weeks, "Ruckus in the Rockies" performs even more poorly; as a group, these videos attracted viewers 16.4 times faster (Exhibit 2). This underperformance again suggests that "Ruckus in the Rockies" was not perceived as an engaging, and therefore not successful, promotional effort.

42. If compared to all 870 videos Monster has produced and posted to YouTube, "Ruckus in the Rockies" would rank in the bottom 4% in terms of total number of views. Based on this analysis, the "Ruckus in the Rockies" video cannot be deemed a successful marketing effort as compared to other efforts undertaken by Monster, given the below average number of views and low weekly tracking.

43. Engaging videos tend to share several characteristics: community participation, unexpectedness, and occasionally an introduction from a tastemaker. As a recap video, "Ruckus in the Rockies" exhibits none of these characteristics, as I describe below.

44. "Ruckus in the Rockies" had no inspiration for community participation, and the video spawned no parodies or related content. In this way, it was not perceived as particularly engaging by the wider community.

45. As an event recap video, there was no unexpected or surprise factor in the video's content that would capture the wider audience's attention and result in viewership interest or viewership spikes.

46. The "Ruckus in the Rockies" video was posted on Monster's YouTube channel, monsterenergy.com, snowboardmag.com, snowboardcanada.com, and snowand.com websites with minimal promotional effort of the video. There was no involvement of a public figure, or

16

promotional effort from a tastemaker, nor was there any other factor that would cause an uptake in viewership.

47.     In short, the "Ruckus in the Rockies" video had only 13,361 total views. It was not one that optimized or amplified this relatively low level of viewership. And, the "Ruckus in the Rockies" video did not maximize the full audience promotional value for Monster.

## IV.    The "Ruckus in the Rockies" Video Did Not Create an Association or Endorsement with the Beastie Boys or their Music

*Consumer Information Processing, Memory and Retrieval*

48.     In this subsection, I will discuss how consumers store and retrieve information associated with brands within their minds. This has important implications on the extent to which the Beastie Boys' songs could be associated with the Monster brand.

49.     The role of advertising is to deliver information and messages about a brand to intended consumers. However, consumers' capacity to process and retrieve information about a brand is limited and continuously challenged by surrounding stimuli. It is commonly accepted that it is very difficult for brands to break through the clutter and catch consumers' attention, as consumers are constantly dealing with information overload. As a marketing effort, the "Ruckus in the Rockies" video would have been competing for consumers' attention with more than 1,500 other brand messages a day.[17]

50.     That consumers forget about advertising is well documented and referred to by marketers as "the half-life of advertising." The half-life refers to the time it takes for the

---

[17] Kotler, Philip and Kevin Lane Keller. Marketing Management. Upper Saddle River, NJ: Pearson Prentice Hall, 2009.

17

effectiveness of an ad to fall to half of its original level. Marketers report time frames between two to twelve weeks.[18] BehaviorScan studies found that 50% of the impact from advertising awareness on purchase vanishes within three to four weeks.[19]

51.     The persuasiveness of an ad declines exponentially if a consumer has not repeatedly perceived an ad.[20] An estimation of the exact time is not possible, as ad wear out strongly depends on its relevance for the consumer and the quality in terms of memorability. However, as previously mentioned the "Ruckus in the Rockies" video was a recap video and did not contain any surprising elements to make it particularly memorable. Given this, it is likely the half-life of the video is low, making it an ineffective from a marketing standpoint.

52.     Consumer memory reflects the prior knowledge a consumer has stored about products, services, and consumption experiences. It is memory that holds the associations a consumer has with a particular brand. Retrieval is the process of remembering or accessing what consumers have stored in memory.[21]

53.     Memory ranges in duration from very short to very long.  Short-term memory reflects our conscious thoughts and perceptions, and is relied on to carry out everyday tasks.[22] A common example of short-term memory is remembering a phone number long enough to place a call, and it is short-term memory that is used when watching a television commercial. As its name implies, short-term memory is short-lived. Research has shown that consumers

---

[18] Leone, Robert, "Generalizing What Is Known About Temporal Aggregation and Advertising Carryover." P.I Marketing Science; 1995 Part 2 of 2, Vol. 14 Issue 3.
[19] Leonard M. Lodish, Magid Abraham, Stuard Kalmenson, Jeanne Livelsberger, Beth Lubetkin, Bruce Richardson and Mary Ellen Stevens, "How TV Advertising Works: A Meta-Analysis of 389 Real World Split Cable TV Advertising Experiments." Journal of Marketing Research, Vol 32, No 2 (May 1995). pp 125-139.
[20] Blair, Margaret H. (1987) "An Empirical Investigation of Advertising Wearin and Wearout," Journal of Advertising Research, (December/January).45-50
[21] Wayne D. Hoyer and Deborah J. MacInnis, Consumer Behavior (4th ed.). Boston, MA: Houghton Mifflin, 2007.pg. 170
[22] Revlin, Russell. *Cognition: Theory and Practice.* First Edition (2013). Chapter 5. Worth Publishers.

18

retain information in short-term memory for about 18 seconds.[23] Marketers who want their communication, brands, and brand associations remembered must take steps to increase the likelihood that information is transferred to long-term memory.[24]

54.    Cognitive psychologists and marketers often conceptualize the organization of long-term memory as a network of nodes, representing individual memory elements that are connected to one another.[25] When a consumer thinks of a particular brand, that brand is connected to a set of associations and beliefs in memory.  Those associations are formed through learning based on personal experiences or information the consumer saw or heard.[26] How strongly these associations are connected to the brand varies based on how strongly they are established in memory.

55.    On page 8 of her report, Lisa Thomas states that if a "song and/or artist are prominently featured," associations between the song and/or artist will be formed in the "mind of the public."[27]  Further, on pages 18-19 of her report, Ms. Thomas states that the use of the Beastie Boys songs is "more than a typical association between product and artist."[28]  Ms. Thomas is incorrect, because for any of the Beastie Boys songs to be associated with the Monster brand, the link between the songs and/or artist and the brand would have to be firmly

---

[23] Peterson, L.R., & Peterson, M.J., "Short-term retention of individual verbal items." Journal of Experimental Psychology. 58, 193-198

[24] Wayne D. Hoyer and Deborah J. MacInnis, Consumer Behavior (4th ed.).  Boston, MA: Houghton Mifflin, 2007. 177

[25] John R. Anderson, The Architecture of Cognition, Cambridge: Harvard University Press, 1983; Allan M. Collins and Elizabeth F. Loftus, "Spreading Activation Theory of Semantic Processing," Psychological Review, 1975, 82 (6) 407-428

[26] Wayne D. Hoyer and Deborah J. MacInnis, Consumer Behavior (4th ed.).  Boston, MA: Houghton Mifflin, 2007. 177

[27] Expert Witness Report by Lisa Thomas.  August 6, 2013.

[28] Ibid

19

established in long-term memory. This transference to long-term memory did not occur, as I will describe below.

56.     Several processes can be used to enhance memorability. One is called "rehearsal," which involves consumers repeating information or actively thinking about information and its meaning in order to keep it in mind.[29] In the context of marketing, rehearsal typically only happens when consumers are actively motivated to remember information for a particular purpose.[30] In this case, there is no indication that anybody viewing the "Ruckus in the Rockies" video was actively motivated to remember that Beastie Boys songs were used as background music.

57.     Another process is called "recirculation," which occurs when consumers encounter the same information repeatedly. Marketers typically utilize recirculation by repeating the brand messages and associations they want consumers to remember across different ads and channels, so that they are encountered frequently.[31] As the Beastie Boys songs were used in just one of the hundreds of Monster videos produced and uploaded to YouTube, there is little evidence that recirculation was employed to enhance the memorability of the songs being tied to the Monster brand. Further, within the "Ruckus in the Rockies" video, no explicit reference to the Beastie Boys is made until nearly the end of the video, after the end credits have started to roll – at minute 3:51 of 4:06. And even then, the reference is onscreen for only 2 seconds. Again, it is clear that there was no recirculation to enhance the memorability of any of the Beastie Boys songs being associated with the Monster brand.

---

[29] Revlin, Russell. *Cognition: Theory and Practice.* First Edition (2013). Chapter 5. Worth Publishers.
[30] Wayne D. Hoyer and Deborah J. MacInnis, Consumer Behavior (4th ed.). Boston, MA: Houghton Mifflin, 2007, pg. 177
[31] Ibid, pg 178

20

58.     In summary, for associations between the Beastie Boys and Monster to have formed "in the mind of the public," as Ms. Thomas suggests occurred, the link between the two would have to be stored in long-term memory. Monster took no actions to enhance the memorability of the video, making it unlikely that association with the Beastie Boys was transferred from short-term memory to long-term memory.

59.     In conclusion, apart from the video's poor performance on key metrics like viewership numbers, it is my opinion that the "Ruckus in the Rockies" video is also not impactful given the way consumers form, recognize, encode, and comprehend brands and associations within their minds.

60.     Similarly, to the extent that Ms. Thomas has opined that there was an implied sponsorship or endorsement of Monster by the Beastie Boys, I conclude that there was no such sponsorship or endorsement, either express or implied for the following reasons.

61.     A brand does not automatically get linked to a sponsored property.  Many sponsorship efforts fail because the associations are not created or supported adequately. Significant financial investment and energy is often required to both build and strengthen associations.[32]

62.     The most direct approach to create an association between a brand and sponsored property is to advertise on the property – to visually link elements of a brand's identity to the sponsored property.  For sponsored events, this can be achieved through placement of signage or program ads at the event site.  In the case of sponsored athletes or musicians, this can be achieved through wearing branded clothing, endorsements in ads, or

---

[32] Aaker, David and Erich Joachimsthaler. *Brand Leadership*. New York, NY: The Free Press, 2000.

21

product use during performances. Monster employs all these tactics to associate its brand with various events, athletes and musicians. It did not engage in any of these tactics to visually associate its brand with the Beastie Boys. The Beastie Boys did not wear Monster gear, were not included in posters for Monster events, and were not seen drinking Monster products. Without this visual connection, it is very difficult for any association between Monster and the Beastie Boys to have been created.

63.     After an association is created, it must be strengthened to be of any value. This is typically achieved through repeated exposure of the link to consumers over an extended period of time.[33] Notwithstanding that no association between Monster and the Beastie Boys was even created (as stated above), the fact that the alleged association between Monster and the Beastie Boys was limited to just one video that was available for just 5 weeks suggests that there was not enough time for any association to be strengthened.

64.     In summary, because no associations were formed, it is not possible for there to be any endorsement between the Beastie Boys and Monster, implied or otherwise, as Ms. Thomas suggests.

65.     Below, I further opine on the importance of duration to the formation of associations.

66.     Brands rely on a variety of cues to trigger desired memories and associations. Brand cues can consist of a number of senses – sight, smell, sound, and touch. However, establishing cues – that is, turning images, scents, words or songs into cues for brand associations – requires time and consistency. Researchers McCracken and Macklin describe

---

[33] Ibid

22

**C22**

this as follows: "the marketer can capitalize on associated visual cues and/or names prior associated to product categories, in that these visual cues and names can provide a larger number of links in a memory network, which in turn provide a greater number of potentially successful cues for remembering."[34]

67.     Research on audio branding suggests that to be memorable, the audio should have been heard many times.[35] In the marketplace, seven of the top ten most recognized audio brands have run campaigns consistently for more than five years.[36] This can be compared to conditioning, a process that requires many repetitions to eventually associate a song like "So Whatcha Want," which has no existing link to the Monster brand, into an effective cue.

68.     Establishing this link is even more difficult when using full songs and preexisting compositions that do not mention the brand by name, as opposed to jingles or songs composed specifically for linking with a brand.  A study found that when British Airways used Delibe's 'Flower Duet' from the opera Lakme as brand signal, approximately 60% of respondents liked the audio branding, but only 2% of respondents were able associate the song with the brand.[37] Despite the campaign's 24-year lifespan and the appeal of the music, brand association and recall was much more difficult to achieve using such a piece of music. In my opinion, Monster's use of the Beastie Boys music falls into that same shortcoming, especially given the short period of time the video was available.[38]

---

[34] McCracken, J. Colleen  and M. Carole Macklin. *The Role of Brand Names and Visual Cues in Enhancing Memory for Consumer Packaged Goods*. Kluwer Academic Publishers, 1998.
[35] Jackson, Dan, "Orchestrating a sound strategy." Brand Strategy (Feb 2006).
[36] Ibid
[37] Ibid
[38] Based on the above analysis, it does not appear that the Wheels Fest video, which I understand was not produced by Monster, but was a recap of an event that many companies sponsored, could have created an association between Monster and the Beastie Boys.

23

**C23**

69.     Given that the "Ruckus in the Rockies" video was only available for a 5 week period, and that it was seen by fewer than 14,000 people it is highly unlikely that any of the Beastie Boys songs used in the video were established as cues that would associate the Beastie Boys with the Monster brand.

Dated this 13th day of August, 2013

_____

**Erich Joachimsthaler**

24

**C24**

**9/16/2015 E. Feldman, Managerial Compensation and Corporate Spinoffs [Noble_01382979]**

*Strategic Management Journal*

*Strat. Mgmt. J.*, **37**: 2011–2030 (2016)

Published online EarlyView 16 September 2015 in Wiley Online Library (wileyonlinelibrary.com) DOI: 10.1002/smj.2434

*Received 7 August 2014; Final revision received 27 July 2015*



# MANAGERIAL COMPENSATION AND CORPORATE SPINOFFS

EMILIE R. FELDMAN*

*Management Department, The Wharton School, University of Pennsylvania, Philadelphia, Pennsylvania, U.S.A.*

**Research summary:** *This article investigates how corporate spinoffs affect managerial compensation. These deals are found to improve the alignment of spinoff firm managers' incentive compensation with stock market performance, especially among spinoff firm managers that used to be divisional managers of the spun-off subsidiary, and particularly when the spun-off subsidiary performs better than or is unrelated to its parent firm's remaining businesses. By contrast, incentive alignment does not improve for the parent firm managers running the divesting companies. This finding appears to be driven by a significant post-spinoff increase in these managers' incentive compensation, the magnitude of which is inversely related to governance quality in their firms. Together, these results elucidate how spinoffs influence managerial compensation in diversified firms and the companies they divest.*

**Managerial summary:** *This article explores how spinoffs affect incentive alignment: the correlation between incentive compensation and stock market performance. The incentive alignment of spinoff firm managers improves following these deals. These gains are the largest when spinoff firm managers used to be divisional managers of the spun-off subsidiary and when the spun-off subsidiary performs better than or is unrelated to the other businesses in the parent firm. By contrast, incentive alignment does not improve for parent firm managers. Instead, the level of these managers' incentive compensation rises significantly post-spinoff, and the magnitude of this increase is inversely related to governance quality in these firms. Together, these results shed light on the ways in which spinoffs influence managerial compensation in diversified firms and in the companies they divest.* Copyright © 2015 John Wiley & Sons, Ltd.

"The spinoff will enable AOL to create incentives for its management and employees that are more closely tied to its business performance and shareholder expectations. Separate compensation arrangements should more closely align the interests of AOL's management and employees with the interests of its shareholders."

*Source: AOL Inc.'s Registration Statement (Form 10-12b), filed with the Securities and Exchange Commission (SEC) on July 27, 2009, to effectuate its separation from Time Warner Inc.*

## INTRODUCTION

Corporate spinoffs are a type of divestiture in which a "parent firm" distributes shares in one of its businesses *pro-rata* to its shareholders, resulting in the creation of an independent, publicly-traded "spinoff firm." These deals are thought to create shareholder value in a number of ways—by

Keywords: corporate spinoffs; incentive compensation; stock market performance; corporate strategy; firm scope

*Correspondence to: Emilie R. Feldman, The Wharton School, University of Pennsylvania, 2000 Steinberg-Dietrich Hall, 3620 Locust Walk, Philadelphia, PA 19104, U.S.A. E-mail: feldmane@wharton.upenn.edu

Copyright © 2015 John Wiley & Sons, Ltd.

 
Confidential

Noble_01382979

separating unrelated businesses and reducing complexity (Cusatis, Miles, and Woolridge, 1993; Daley, Mehrotra, and Sivakumar, 1997; Desai and Jain, 1999; Krishnaswami and Subramaniam, 1999), by improving the focus of managerial and financial resources (Gertner, Powers, and Scharfstein, 2002; Hambrick and Stucker, 1999; Miles and Woolridge, 1999; Schipper and Smith, 1983), and by reducing information asymmetry and clarifying capital market perceptions (Bergh, Johnson, and DeWitt, 2008; Feldman, 2015; Feldman, Gilson, and Villalonga, 2014; Gilson *et al.*, 2001; Zuckerman, 2000).

The introductory anecdote points to an additional benefit that could be associated with spinoffs: their ability to improve (relative to pre-spinoff levels) the alignment of spinoff firm managers' incentive compensation with stock market performance. For example, the above description of one of the key advantages of AOL-Time Warner's 2009 spinoff of AOL suggests that the incentive compensation of AOL's managers was expected to be more closely aligned with AOL's performance after the spinoff than it had been with AOL-Time Warner's performance before the spinoff. A few studies have theorized that the incentive compensation of the "spinoff firm managers" (who run a spinoff firm after it has been divested) should be more closely aligned with spinoff firm performance than the incentive compensation of the "divisional managers" (who ran the spun-off subsidiary before it was divested) was with parent firm performance (Aron, 1991; Seward and Walsh, 1996). However, existing research has yet to test this possibility empirically.

In addition to undertaking this task in this study, I extend the idea that spinoffs might improve the incentive alignment of spinoff firm managers in two novel directions. First, I argue that the predicted improvement in spinoff firm managers' incentive alignment should be the greatest among the spinoffs that most clarify how the effort these managers put into running their companies determines the incentive compensation they receive. Second, I explore, as an empirical question, whether or not spinoffs produce a parallel improvement (relative to pre-spinoff levels) in the incentive alignment of the "parent firm managers" who run the divesting parent firms before and after the spinoffs they undertake, as well as the reasons why this might or might not be the case.

Using proprietary panel data on 228 spinoffs that were undertaken from 1995 to 2010, I find that the alignment of spinoff firm managers' incentive compensation with stock market performance improves post-spinoff, especially when one or more divisional managers of the spun-off subsidiary become spinoff firm managers, when the spun-off subsidiary performs better than the remaining businesses within its parent firm, and when the spun-off subsidiary is unrelated to its parent firm's primary operations, all of which represent spinoffs that clarify the link between these managers' effort and their incentive compensation. By contrast, I find no post-spinoff improvement in the incentive alignment of parent firm managers. Further investigation of these results reveals that the *level* of parent firm managers' incentive compensation rises significantly post-spinoff, and that the magnitude of this compensation increase is inversely related to governance quality. This provides one potential explanation for why the incentive alignment of parent firm managers does not improve post-spinoff.

In sum, this study investigates a predicted benefit of spinoffs, an improvement in the alignment of spinoff firm managers' incentive compensation with stock market performance, and sheds light on the mechanisms that may be driving these expected gains. Interestingly, however, although spinoffs appear to improve incentive alignment among spinoff firm managers, they fail to do so for parent firm managers, potentially because these deals facilitate opportunistic behavior on the part of these individuals. Together, these findings yield important insights into the consequences of spinoffs for managerial compensation in diversified firms and the companies they divest.

## THEORY AND HYPOTHESES

### Incentive compensation in diversified firms

Executive compensation packages are typically comprised of a fixed (salary and bonus) and a variable (incentive-based) component (Finkelstein and Hambrick, 1988). The incentive-based component of compensation packages has received much attention in the literature, in large part, due to its motivational properties (Devers *et al.*, 2007). The logic behind this benefit is that in firms in which ownership and control are separate, the interests of managers may not match those of shareholders (Berle and Means, 1932), leading managers to make decisions that maximize their own earnings

Copyright © 2015 John Wiley & Sons, Ltd.

*Strat. Mgmt. J.*, **37**: 2011–2030 (2016)
DOI: 10.1002/smj

Confidential

Noble_01382980

rather than shareholder value (Jensen and Meckling, 1976). However, when incentive compensation is aligned with firm performance—that is, when a manager's incentive-based pay is set to increase in proportion to the stock market performance of the firm he oversees—managers bear the full costs of any perquisites they consume through a deterioration in the value of their incentive compensation. Thus, managers will be motivated to take actions that maximize shareholder value, since doing so maximizes the value of their own earnings as well (Gabaix and Landier, 2008; Hall and Liebman, 1998; Jensen and Murphy, 1990). Incentive compensation that is aligned with firm performance is therefore an efficient means of compensating managers.

While setting managers' compensation packages is a complex process in most companies, the challenges it poses in diversified firms are even more significant because the task of aligning incentive compensation with firm performance must be undertaken for the "divisional managers" who run the company's divisions. Divisional managers' incentive compensation consists of two components: one based on divisional profitability, and one linked to the firm's overall stock market performance (Wulf, 2002, 2007). The higher a divisional manager sits within his or her divisional hierarchy, the greater is the share of his or her incentive compensation that is based on corporate (rather than divisional) performance (Eisenreich, 2014).

Divisional managers face two challenges due to this two-part incentive compensation scheme. First, the fact that part of divisional managers' incentive compensation is linked to divisional performance might lead to distortions in behavior. As Aron (1991: 507) notes:

> "The difficulty with compensating a manager as a function of the accounting value of his division is that as long as net cash flows differ from accounting income, the manager's incentives will differ from the desires of shareholders. For example, suppose the manager knows that it is an appropriate time to build a new plant . . . . The effect of the investment may well be to increase the value of the firm but to depress the current accounting return because of the large expenditure. A manager with a short expected tenure at the firm relative to the life of the investment

> may choose not to make the investment at all."

Second, and even more importantly, the part of divisional managers' incentive compensation that is linked to the company's overall stock market performance may not appropriately motivate divisional managers to act in the best interests of shareholders. As noted by Seward and Walsh (1996: 28), "the motivational property of market-based contracts for the division manager is suspect since too many factors beyond the manager's control are responsible for the firm's performance (Hill, Hitt, and Hoskisson, 1992). Such a market-based compensation contract . . . would be based upon the relative financial performance of all of the parent's operations. As such, it would be a noisy indicator of the division manager's performance." Aron (1991: 506) comes to a similar conclusion: "When a division is part of a multiproduct corporation, the stock value of the firm is a noisy signal of the market's evaluation of any one divisional manager's productivity. Loosely speaking, the more noise there is in the signal, the costlier it is to properly motivate the manager." This has been shown to result in divisional managers taking actions that are not necessarily in line with shareholder interests, such as reducing research and development (R&D) or capital expenditures below their optimal levels (Hoskisson, Hill, and Kim, 1993a; Hoskisson, Hitt, and Hill, 1993b).

A spinoff results in the creation of two publicly-traded companies, one consisting of the assets that pertain to the division that is spun-off into the "spinoff firm" (run by "divisional managers" pre-spinoff and "spinoff firm" managers'' post-spinoff), and one consisting of the remaining assets that are left behind within the divesting "parent firm." As legally-independent entities, spinoff firms now have their own stock market performance, as well as the right to set their own managers' incentive compensation. This means that the spinoff firm managers' incentive compensation can now be based more directly on the performance of the actual entity that they oversee. As a result, spinoff firm managers should be better motivated to take actions that maximize shareholder value for the spinoff firms. Seward and Walsh (1996: 27, *emphasis* added) came to this exact conclusion: "the creation of separately traded equity claims allows for the opportunity to design *more efficient* market-based incentive

Copyright © 2015 John Wiley & Sons, Ltd.

*Strat. Mgmt. J.*, **37**: 2011–2030 (2016)
DOI: 10.1002/smj

Confidential

Noble_01382981

compensation contracts." These points offer the following baseline hypothesis:

> *Baseline Hypothesis 1: Spinoff firm managers' incentive compensation will be more closely aligned with spinoff firm performance post-spinoff than divisional managers' incentive compensation had been with parent firm performance pre-spinoff.*

While the foregoing discussion suggests that spinoffs would be expected to improve spinoff firm managers' motivation to maximize shareholder value, an important question remains outstanding: under what conditions will the improvement in the alignment of spinoff firm managers' incentive compensation with stock market performance be most pronounced? I use the literatures on diversified firms and spinoffs to elucidate this issue.

### Spinoff firm managers' incentive compensation

Why might spinoffs result in improved incentive alignment for spinoff firm managers? Existing research points to three potential explanations, all having to do with the possibility that certain spinoffs may more significantly clarify the link between the effort spinoff firm managers put into running their firms and the incentive compensation these managers earn.

The first of these explanations concerns spinoff firm managers' career histories. In theory, the managers of a newly-created spinoff firm could originate from one of five pre-spinoff employment positions: (1) they could be divisional managers of the spun-off subsidiary; (2) they could be divisional managers of subsidiaries of other companies; (3) they could be corporate managers of the divesting parent firm that is undertaking the spinoff; (4) they could be corporate managers of other companies; or (5) they could come from non-corporate backgrounds. Existing research indicates that spinoff firm managers typically originate from the first, third, and fourth of these categories. For example, Seward and Walsh (1996) found that 61 percent of spinoff firm CEOs used to be divisional managers of the spun-off subsidiary, 21 percent were former CEOs of the divesting parent company, and 15 percent were CEOs of other companies. Similarly, Wruck and Wruck (2002) found that 56 percent of spinoff firms have

managers who used to be divisional managers of the spun-off subsidiaries, 22 percent of spinoff firms have managers who used to be executives of the divesting parent firms, and 32 percent of spinoff firms have managers who used to be top executives of other companies. However, according to these two studies, spinoff firm managers do not typically originate as divisional managers of subsidiaries of other companies, or from non-corporate backgrounds, the second and fifth categories.[1] Thus, for the purposes of the discussion that follows, the incentive alignment of spinoff firm managers originating from three types of pre-spinoff employment positions is considered: divisional managers of spun-off subsidiaries, managers of parent firms, and managers of other companies.

For spinoff firm managers who used to be the divisional managers of spun-off subsidiaries, overseeing a subsidiary within a diversified firm may not carry the same reputational prestige or financial remuneration as running a publicly-traded company. As a result, divisional managers may perceive themselves as being under-rewarded, a tendency that may be heightened by their incentive compensation being linked to overall firm performance. Spinoffs can resolve this problem by promoting the divisional managers who ran the spun-off subsidiaries to become CEOs and top executives of the spinoff firms. As noted by Seward and Walsh (1996: 27–28):

> "A spinoff represents a powerful promotion-based motivation for incumbent divisional or subsidiary managers. That is, the former SBU or divisional manager may have been implicitly or explicitly promised that he or she might be the CEO of a free-standing company one day. A corporate spinoff allows managers of the formerly combined entity to fulfill that promise and install an insider as the CEO of the new firm."

Divisional managers who become spinoff firm managers face an entirely new set of responsibilities

---

[1] This point is corroborated by the data in the sample of spinoffs I analyze in this study. Of the 1,208 managers of the spinoff firms in my sample in the effective years of those deals, 930 of them (77%) were divisional managers of the spun-off subsidiary, 209 of them (17%) were former top managers of the divesting parent firm, 52 of them (4%) were former top managers of other companies, 10 of them (0.8%) were partners or principals of financial services firms, and 7 of them (0.6%) were divisional managers of subsidiaries of other companies.

Copyright © 2015 John Wiley & Sons, Ltd.

*Strat. Mgmt. J.*, **37**: 2011–2030 (2016)
DOI: 10.1002/smj

Confidential

Noble_01382982

and requirements. Wruck and Wruck (2002: 5186) provide several examples:

> "Rather than being 'governed' by and reporting to headquarters staff, the top manager of a spun off business is governed by and reports to a board of directors elected by shareholders; rather than becoming skilled at requesting resources from headquarters through an internal capital market, the top manager must raise funds externally; rather than being constrained by, or subjected to, the internal control systems and policies of the parent corporation, the top manager can choose a set of systems and practices that best suit the purposes of the newly independent company; and rather than relying on (providing) cross-subsidization from (to) other business units in hard times, the company must be organized and managed to be self-sufficient, which requires developing capital acquisition and/or payout policies."

Given the newfound functions with which divisional managers who become spinoff firm managers are tasked, these individuals' incentive compensation must reflect the increase in responsibility and duties associated with their new positions. Aligning these managers' incentive compensation with spinoff firm performance should accomplish this aim. As such, the foregoing discussion suggests that the incentive compensation of divisional managers who become spinoff firm managers will be more closely aligned with spinoff firm performance post-spinoff than it had been with parent firm performance pre-spinoff.

By comparison, for spinoff firm managers who used to be corporate executives of the divesting parent firms or of other companies, the alignment of their incentive compensation with firm performance is unlikely to change post-spinoff. As top-level executives of the original companies they ran pre-spinoff, these managers' incentive compensation would have been aligned with those firms' stock market performance. Analogously, as top-level executives of the spinoff firms they run post-spinoff, these managers' incentive compensation will be aligned with the spinoff firms' stock market performance. Thus, for this group of managers, incentive compensation would be expected to be well-aligned with stock market performance in both the pre- and post-spinoff time periods.

Taken in conjunction with the earlier prediction of a post-spinoff improvement in incentive alignment among divisional managers who become spinoff firm managers, this point implies the following hypothesis:

> *Hypothesis 1a: The post-spinoff improvement in spinoff firm managers' incentive alignment will be greater when one or more divisional managers of the spun-off subsidiary become spinoff firm managers than when this is not the case.*

Second, multi-business firms frequently use the cash flows generated by their better-performing divisions to cross-subsidize their worse-performing divisions (Duchin and Sosyura, 2013). For example, Lamont (1997) presents evidence that oil firms took advantage of the 1986 decline in the price of oil to fund increased capital investments in their non-oil divisions (e.g., chemicals, mining, etc.). Along these lines, Stein (1997) and Scharfstein and Stein (2000) respectively theorized that corporate headquarters engage in "winner picking" and "corporate socialism" in deciding how to allocate funds across their divisions.

One challenge that this set of issues poses for divisional managers is that cross-subsidization is linked to undervaluation in diversified firms' stock market performance (Rajan, Servaes, and Zingales, 2000). This suggests that aligning divisional managers' incentive compensation with overall corporate performance is likely to under-reward divisional managers who run a division that performs better than the firm's remaining businesses since the metric to which these managers' incentive compensation is linked is lower than it would be if the division operated as a pure-play firm (Berger and Ofek, 1995). Another problem is that cross-subsidization may induce shirking among divisional managers, since the returns to their effort may be used to support worse-performing divisions (Nickerson and Zenger, 2008; Zenger and Marshall, 2000). Thus, when a division that performs better than its peers is spun off, the spinoff firm managers can be more directly rewarded for their efforts, suggesting:

> *Hypothesis 1b: The post-spinoff improvement in spinoff firm managers' incentive alignment will be greater when the spun-off subsidiary performs better than the remaining businesses in its parent firm than when this is not the case.*

Copyright © 2015 John Wiley & Sons, Ltd.

*Strat. Mgmt. J.*, **37**: 2011–2030 (2016)
DOI: 10.1002/smj

Confidential

Noble_01382983

Third, multi-business firms are often under-valued because their operations are difficult for investors and analysts to understand (Feldman *et al.*, 2014), which typically occurs when these firms run businesses that are unrelated to their primary operations (Gilson *et al.*, 2001; Zuckerman, 1999). As a result, diversified firms frequently spin off (and otherwise divest) unrelated divisions (Bergh, 1995, 1998; Bergh *et al.*, 2008; Zuckerman, 2000), thereby reducing their complexity (Cusatis *et al.*, 1993). Furthermore, spinoffs of unrelated businesses are associated with greater improvements in stock market performance than spinoffs of related businesses (Daley *et al.*, 1997; Desai and Jain, 1999; Krishnaswami and Subramaniam, 1999).

Divisional managers who run unrelated subsidiaries face two problems because of these issues. For one thing, when a division is unrelated to the main business in which its parent company operates, the drivers of performance for each of the two entities, as well as the horizons over which positive returns may be earned, are likely to be totally different from one another (Jones and Hill, 1988; Rumelt, 1974; Thompson, 1967), making stock market performance a particularly "noisy" measure of productivity for these managers (Aron, 1991: 506). For another thing, the fact that firms that operate in unrelated businesses may be under-valued in the stock market should under-reward divisional managers for their work, since the metric to which these managers' incentive compensation is linked is again lower than it would be if the division operated as a pure-play firm (Berger and Ofek, 1995). As a result, managers of unrelated divisions may not be adequately remunerated for their efforts. Thus, when a diversified firm spins off an unrelated division, the spinoff firm managers of that new company can be rewarded solely on the basis of their own firm's independent performance, suggesting:

*Hypothesis 1c: The post-spinoff improvement in spinoff firm managers' incentive alignment will be greater when the spun-off subsidiary is unrelated (rather than related) to the parent firm's primary operations.*[2]

---

[2] A noteworthy nuance to Hypothesis 1c emerges from Hill *et al.*'s (1992) and Hoskisson *et al.*'s (1993b) arguments that relatedly-diversified firms are more likely to align divisional managers' incentive compensation with corporate profitability to foster cooperation, while unrelatedly-diversified firms are

## METHODS

### Sample and data

The sample employed in this article is the universe of 228 spinoffs undertaken by Fortune 500 firms between 1995 and 2010. SDC Platinum's Mergers and Acquisitions database was used to compile a list of all of the spinoffs that were announced and completed by Fortune 500 firms between January 1, 1995 and December 31, 2009. There were 260 such spinoffs. Thirty-two of these deals were eliminated because SDC had mis-classified tracking stock issuances as spinoffs (e.g., Applera's 1999 tracking stock issuance for Celera Genomics) or because the spinoff firm lost its independence through acquisition, bankruptcy, or some other deal immediately following the completion of the spinoff (e.g., Cargill's acquisition of Agribrands International immediately following its 1998 spinoff from Ralston Purina).

Spinoff firm data were gathered from registration and proxy statements, accessible from the Securities and Exchange Commission (SEC). When a company undertakes a spinoff, it is required to disclose fairly extensive backward-looking information on the pre-spinoff operations of the business unit it will spin off, providing otherwise inaccessible data about the functioning of that subsidiary within its diversified parent company. The registration statements include pre-spinoff data on the financial characteristics of the spun-off subsidiaries and on the compensation earned by the divisional managers who ran them. The proxy statements provide analogous post-spinoff data on these spinoff firms' executive compensation and financial characteristics. Thus, these data were gathered for the three years before each spinoff, the year in which each deal took place, and the three years after each spinoff, resulting in a seven-year panel for each spinoff firm.

---

more likely to align divisional managers' incentive compensation with divisional profitability to foster autonomy. These studies imply that Hypothesis 1c is more likely to be supported in relatedly-diversified firms. These firms set their divisional managers' incentive compensation on the basis of corporate performance, suggesting that in these companies, the post-spinoff improvement in spinoff firm managers' incentive alignment will be greater among unrelated (rather than related) spinoffs. By contrast, the predicted effect of Hypothesis 1c should be smaller in unrelatedly-diversified firms, in which divisional managers are already compensated on the basis of divisional performance. While this nuance is not formalized as a hypothesis, it will be tested later in the article.

Copyright © 2015 John Wiley & Sons, Ltd.

*Strat. Mgmt. J.*, **37**: 2011–2030 (2016)
DOI: 10.1002/smj

**C30**

Confidential

Noble_01382984

## Modeling approach

Jensen and Murphy's (1990) model facilitates an analysis of the alignment of incentive compensation with firm performance by predicting changes in incentive compensation (Compensation) based on changes in stock market performance (Market Capitalization):

$$\text{Compensation}_{it} = \alpha + \beta_1 \text{Market Capitalization}_{it} + \Sigma_{j=2}^{n} \beta_j \text{Control}_{jit} + \varepsilon_{it}, \quad (1)$$

where $\beta_1$ represents the dollar change in incentive compensation that is associated with a 1,000-dollar change in market capitalization, reflecting the overall alignment of incentive compensation with stock market performance.

Baseline Hypothesis 1 predicts an improvement in the alignment of spinoff firm managers' incentive compensation with stock market performance following the completion of a spinoff. This post-spinoff improvement can easily be represented by interacting Market Capitalization with an indicator variable (Post) that takes the value 1 in years after a spinoff, and 0 in the years prior. Thus, Equation 1 can be re-written as follows:

$$\text{Comp}_{it} = \alpha + \beta_1 \text{Market Cap}_{it} + \beta_2 \text{Post}_{it} + \beta_3 \text{Post} \times \text{Market Cap}_{it} + \Sigma_{j=4}^{n} \beta_j \text{Control}_{jit} + \varepsilon_{it}, \quad (2)$$

where $\beta_3$ represents the post-spinoff change in the alignment of incentive compensation with stock market performance. This coefficient is the key test of Baseline Hypothesis 1, measuring the dollar change in incentive compensation that is associated with a 1,000-dollar change in post-spinoff market capitalization.

Hypotheses 1a–c consider how the magnitude of the post-spinoff change in the alignment of incentive compensation with stock market performance might vary depending on the characteristics of the spun-off subsidiary. To test these contingencies, variables representing these characteristics (Subsidiary Characteristic) are interacted with Post × Market Capitalization. Accordingly, Equation 2 can be modified as follows:

where $\beta_5$ represents the post-spinoff change in the alignment of incentive compensation with stock market performance when the spun-off subsidiary exhibits a hypothesized characteristic. This coefficient serves to test Hypotheses 1a–c by measuring the dollar change in incentive compensation that is associated with a 1,000-dollar change in post-spinoff market capitalization for spinoffs that exhibit the hypothesized characteristics.

Given that this modeling approach compares the pre- and post-spinoff incentive alignment of spinoff firm managers, the appropriate empirical methodology is first-differences regressions. To account for the potential biasing effects of non-random selection on these first-differences results, I also use differences-in-differences regressions to compare the pre- and post-spinoff incentive alignment of spinoff firms to a benchmark set of control firms.

## Variables

### Dependent variable

Consistent with both the theoretical development and the empirical setup of this article, the dependent variable in the upcoming regressions must measure incentive compensation, that is, the portion of an executive's total compensation that is linked to stock market performance. Under Execu-Comp's definition, total compensation consists of seven components: salary, bonus, other annual compensation, the total value of restricted stock granted, the total value of stock options granted, long-term incentive payouts, and other long-term compensation. Salary and bonus are the only two of these components that are not somehow equity-linked. Accordingly, following Jensen and Murphy (1990), and Zajac and Westphal (1994), incentive compensation is calculated as the difference between an executive's total compensation and the sum of his salary and bonus.

Thus, in the post-spinoff years, Spinoff CEO Compensation is the incentive compensation earned by the CEO of a spinoff firm, while in the pre-spinoff years, Spinoff CEO Compensation is the incentive compensation of the divisional

$$\text{Comp}_{it} = \alpha + \beta_1 \text{Market Cap}_{it} + \beta_2 \text{Post}_{it} + \beta_3 \text{Post} \times \text{Market Cap}_{it} + \beta_4 \text{Subsidiary Characteristic}_{it} + \beta_5 \text{Post} \times \text{Market Cap} \times \text{Subsidiary Characteristic}_{it} + \Sigma_{j=6}^{n} \beta_j \text{Control}_{jit} + \varepsilon_{it}, \quad (3)$$

Copyright © 2015 John Wiley & Sons, Ltd.

*Strat. Mgmt. J.*, **37**: 2011–2030 (2016)
DOI: 10.1002/smj

Confidential

Noble_01382985

president of a spun-off subsidiary. Analogously, in the post-spinoff years, Spinoff Executive Compensation is the average incentive compensation earned by the top management team of a spinoff firm, whereas in the pre-spinoff years, Spinoff Executive Compensation is the average incentive compensation earned by the divisional management team that ran a spun-off subsidiary.

*Key independent variables*

Spinoff Market Capitalization is defined as (1) the spinoff firm's end-of-year market capitalization in the spinoff's effective year and the three years thereafter, and (2) the parent firm's end-of-year market capitalization in the three years before the spinoff (since divisional managers' incentive compensation is aligned with the *parent firm's* stock market performance pre-spinoff). Post is an indicator variable taking the value 1 in the effective year and three years after a spinoff, and 0 pre-spinoff.

To test Hypothesis 1a, Divisional Managers to Spinoff Firm is an indicator variable that takes the value 1 if one or more divisional managers of the spun-off subsidiary become top managers of the spinoff firm, and 0 otherwise. To test Hypothesis 1b, Cross-Subsidization is defined as an indicator variable that takes the value 1 if (a) a spun-off division has positive operating income (a good proxy for cash flows (Lamont, 1997)), and (b) at least one of the parent firm's remaining businesses have negative operating income. Finally, to test Hypothesis 1c, Unrelated is an indicator variable taking the value 1 if a division does not share a three-digit SIC code with its parent firm, and 0 otherwise.

*Control variables*

Several control variables are also included in the upcoming regressions. For example, ln(Total Assets), measuring firm size, is calculated as the natural log of total assets. Leverage, measuring a firm's relative debt level, is defined as the sum of short- and long-term debt, scaled by market capitalization. Negative Net Income, representing financial distress, is an indicator variable that takes the value 1 if a firm has negative net income in a given year, and 0 if not. Number of Segments, measuring a firm's diversification level, is a count of the total number of business segments in which a spinoff firm operates in the post-spinoff years; in

the pre-spinoff years, Number of Segments takes the value 1, under the assumption that subsidiaries operating within diversified firms only consist of one business segment. Finally, Total Executives, representing the size of a top management team, is a count of the total number of top executives running a firm or a division. Table 1 presents descriptive statistics for all of the variables described in this subsection of the article.

## RESULTS

### First-differences results

Tables 2 and 3 present the results of first-differences regressions testing how the alignment of spinoff firm managers' incentive compensation with firm performance changes following the completion of a spinoff. Table 2 presents these results for CEO compensation, and Table 3 presents analogous results for average top management team compensation. All models include deal and year fixed effects with robust standard errors clustered by deal.

In both tables, Regression (1) is the baseline regression testing the overall relationship between incentive compensation and firm performance. The coefficients on Market Cap are not statistically significant, indicating that incentive compensation is not aligned with firm performance overall. While the coefficients on Market Cap are still not significant in Regression (2), the coefficients on Post × Market Cap are both positive and highly significant. These findings provide support for Baseline Hypothesis 1, indicating that the alignment of spinoff firm managers' incentive compensation with firm performance improves following the completion of a spinoff. Economically, the coefficient estimates on Market Cap and Post × Market Cap in Table 2 reveal that overall, spinoff firm CEOs lose about 50 cents for every 1,000-dollar increase in market capitalization, whereas post-spinoff, they earn about 12 dollars for every 1,000-dollar increase in market capitalization. Similarly, from Table 3, while executives of spinoff firms earn, overall, about 47 cents for every 1,000-dollar increase in market capitalization, post-spinoff, they earn about 3 dollars for every 1,000-dollar increase in market capitalization.

Regressions (3), (4), and (5) test whether this improvement in the alignment of incentive compensation with firm performance is greater when spinoffs exhibit the characteristics

Copyright © 2015 John Wiley & Sons, Ltd.

*Strat. Mgmt. J.*, **37**: 2011–2030 (2016)
DOI: 10.1002/smj

Confidential

Noble_01382986

*Managerial Compensation and Corporate Spinoffs*    2019

Table 1.    Descriptive statistics, spinoff firms

| Variable | Mean | Std. dev. | Min | Max |
|---|---|---|---|---|
| Spinoff CEO compensation ($000) | 314.794 | 681.494 | 0.000 | 6, 894.635 |
| Spinoff executive compensation ($000) | 107.283 | 233.611 | 0.000 | 2, 832.408 |
| Market cap ($000) | 14, 339.760 | 32, 781.760 | 5.106 | 310, 218.700 |
| Post | 0.571 | 0.495 | 0.000 | 1.000 |
| Post × market cap ($000) | 1, 728.679 | 7, 486.997 | 0.000 | 199, 279.800 |
| Divisional managers to spinoff | 0.939 | 0.240 | 0.000 | 1.000 |
| Cross-subsidization | 0.374 | 0.407 | 0.000 | 1.000 |
| Unrelated | 0.923 | 0.266 | 0.000 | 1.000 |
| ln(total assets) | 7.309 | 1.760 | 0.000 | 13.736 |
| Negative net income | 0.751 | 0.433 | 0.000 | 1.000 |
| Leverage | 0.229 | 0.216 | 0.000 | 1.264 |
| Number of segments | 2.355 | 1.506 | 1.000 | 8.000 |
| Total executives | 5.276 | 2.182 | 1.000 | 19.000 |

Table 2.    First-differences regressions, spinoff firm CEOs

| DV: Spinoff CEO compensation | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| Hypothesis | – | 1 | 1a | 1b | 1c |
| Market cap | 0.001 | −0.000 | −0.000 | −0.000 | −0.001 |
| | (0.002) | (0.001) | (0.001) | (0.001) | (0.001) |
| Post | | 86.112 | 94.284 | 85.954 | 82.466 |
| | | (105.548) | (106.690) | (104.440) | (106.229) |
| Post × market cap | | 0.012*** | 0.014 | 0.000 | 0.011 |
| | | (0.002) | (0.012) | (0.023) | (0.012) |
| Post × mkt cap × div mgrs to spinoff | | | 0.026** | | |
| | | | (0.013) | | |
| Post × mkt cap × cross-subsidization | | | | 0.012*** | |
| | | | | (0.004) | |
| Post × mkt cap × unrelated | | | | | 0.024** |
| | | | | | (0.012) |
| ln(total assets) | 41.996 | 27.438 | 28.525 | 27.432 | 29.463 |
| | (46.469) | (44.553) | (44.848) | (44.613) | (43.965) |
| Negative net income | 11.589 | 18.941 | 17.292 | 18.931 | 21.167 |
| | (97.120) | (95.392) | (95.962) | (95.650) | (95.761) |
| Leverage | −74.994 | −116.529 | −125.275 | −116.563 | −107.253 |
| | (188.931) | (178.068) | (179.797) | (176.647) | (177.523) |
| Number of segments | 44.174 | 38.748 | 38.037 | 38.752 | 39.384 |
| | (57.403) | (57.189) | (57.189) | (57.304) | (57.019) |
| Total executives | 33.923* | 25.126 | 25.664 | 25.121 | 27.200 |
| | (18.459) | (20.035) | (20.078) | (20.134) | (19.695) |
| Constant | −443.548 | −220.872 | −256.499 | −220.746 | −248.786 |
| | (336.906) | (527.153) | (531.539) | (524.745) | (524.686) |
| Observations | 577 | 577 | 577 | 577 | 577 |
| $R^2$ | 0.074 | 0.094 | 0.097 | 0.094 | 0.098 |

***$p < 0.01$; **$p < 0.05$ (not mentioned in this table); *$p < 0.1$
All regressions include deal and year fixed effects. Robust standard errors clustered by deal in parentheses.

identified in Hypotheses 1a–c. These hypotheses are tested by interacting Post × Market Cap with Divisional Managers to Spinoff Firm, Cross-Subsidization, and Unrelated. In Regressions (3), (4), and (5), the coefficients on these interaction terms are positive and significant (except for Post × Market Cap × Unrelated in Table 3). Additionally, Figures 1–3 show that the post-spinoff improvement in the alignment of incentive compensation with firm performance is greater when spinoffs exhibit the hypothesized characteristics than when they do not. Together,

Copyright © 2015 John Wiley & Sons, Ltd.

*Strat. Mgmt. J.*, **37**: 2011–2030 (2016)
DOI: 10.1002/smj

C33

2020    *E. R. Feldman*

Table 3.    First-differences regressions, spinoff firm executives

| DV: Spinoff executive compensation | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| Hypothesis | – | 1 | 1a | 1b | 1c |
| Market cap | 0.001 | 0.000 | 0.000 | 0.000 | 0.000 |
| | (0.001) | (0.000) | (0.000) | (0.000) | (0.000) |
| Post | | 17.114 | 19.007 | 19.009 | 17.081 |
| | | (38.769) | (38.802) | (37.932) | (38.908) |
| Post × market cap | | 0.003** | 0.003 | 0.002 | 0.003 |
| | | (0.000) | (0.002) | (0.006) | (0.003) |
| Post × mkt cap × div mgrs to spinoff | | | 0.006** | | |
| | | | (0.002) | | |
| Post × mkt cap × cross-subsidization | | | | 0.003** | |
| | | | | (0.001) | |
| Post × mkt cap × unrelated | | | | | 0.000 |
| | | | | | (0.003) |
| ln(total assets) | 2.621 | −0.944 | −0.702 | −0.836 | −0.929 |
| | (11.087) | (10.178) | (10.243) | (10.277) | (10.174) |
| Negative net income | 12.219 | 10.093 | 9.518 | 10.103 | 10.095 |
| | (21.832) | (21.797) | (21.751) | (21.788) | (21.823) |
| Leverage | −23.674 | −31.303 | −33.336 | −30.987 | −31.253 |
| | (50.032) | (47.860) | (47.782) | (47.858) | (48.037) |
| Number of segments | 11.570 | 10.125 | 9.954 | 10.082 | 10.128 |
| | (12.329) | (12.106) | (12.101) | (12.147) | (12.106) |
| Total executives | 1.536 | −0.837 | −0.738 | −0.772 | −0.825 |
| | (5.771) | (7.140) | (7.146) | (7.163) | (7.205) |
| Constant | 121.914 | 186.267* | 197.045* | 195.084* | 193.410* |
| | (94.773) | (98.736) | (101.333) | (100.543) | (101.327) |
| Observations | 604 | 604 | 604 | 604 | 604 |
| $R^2$ | 0.060 | 0.077 | 0.079 | 0.078 | 0.077 |

**$p < 0.01$; *$p < 0.1$
All regressions include deal and year fixed effects. Robust standard errors clustered by deal in parentheses.

these findings provide support for Hypotheses 1a–c.[3]

[3] In the Theory and Hypotheses section, I argued that Hypothesis 1c was more likely to be supported in relatedly-diversified firms than in unrelatedly-diversified firms (Hill *et al.*, 1992; Hoskisson *et al.*, 1993b). To confirm this intuition, I created two sub-sample: unrelatedly-diversified firms (defined as having more than half of their business segments operating in three-digit SIC codes that are different than their firms' primary SIC codes) and relatedly-diversified firms (defined as having less than half of their business segments operating in three-digit SIC codes that are different than their firms' primary SIC codes). In the relatedly-diversified sub-sample, the coefficient on Post × Market Cap × Unrelated is positive and highly significant, indicating that the improvement in the post-spinoff alignment between incentive compensation and firm performance is greater when unrelated (rather than related) divisions are spun off. By contrast, in the unrelatedly-diversified sub-sample, the coefficient on Post × Market Cap × Unrelated is not significant. A Wald test reveals that the coefficients on Post × Market Cap × Unrelated are significantly different from one another across these two regressions. Accordingly, these findings confirm the intuition that the post-spinoff improvement in the alignment of incentive compensation with stock market performance among unrelated spinoffs should be greater in relatedly-diversified firms than in unrelatedly-diversified firms.

## Differences-in-differences results

The results presented thus far indicate that spinoffs improve the incentive alignment of spinoff firm managers. However, the incentive compensation of the divisional managers running the spun-off subsidiaries (rather than those firms' remaining divisions) could have been the most misaligned pre-spinoff. While the purpose of this study is not to establish conclusively that spinoffs *cause* improvements in the alignment of spinoff firm managers' incentives, it is nevertheless important to determine whether the above results hold using methods that account for non-random selection. This subsection of the article endeavors to do this using a propensity score matching model. The first-stage regression in this model predicts the likelihood that a given firm is or is not involved in a spinoff, facilitating the identification of a control group against which to benchmark the changes in incentive alignment that occur among the spinoff firms. Differences-in-differences regressions are then run

Copyright © 2015 John Wiley & Sons, Ltd.

*Strat. Mgmt. J.*, **37**: 2011–2030 (2016)
DOI: 10.1002/smj

**C34**

Confidential

Noble_01382988



Figure 1.   Improvement in the alignment of the spinoff firm's CEO incentive compensation with firm performance when one or more divisional managers become spinoff firm managers



Figure 2.   Improvement in the alignment of the spinoff firm's CEO incentive compensation with firm performance when a division may have been used to cross-subsidize other businesses

to test how incentive alignment changes pre- to post-spinoff, for the spinoff firms versus the control group.

To implement this model, compensation data were initially gathered for the entire ExecuComp universe, except for the spinoff and parent firms, from 1995 through 2009. The firm-year pairs in this universe of companies were then combined with the observations pertaining to the spinoff firms. The

first-stage probit regression of the above-referenced propensity score matching model predicts the likelihood that a given company is involved in a spinoff. As such, its dependent variable takes the value 1 if a firm was involved in a spinoff (i.e., if it is one of the spinoff firms), and 0 if it was not (i.e., if it is a non-spinoff company from the remaining ExecuComp universe). To ensure that this regression is matching comparable firms over the same

Copyright © 2015 John Wiley & Sons, Ltd.

*Strat. Mgmt. J.*, **37**: 2011–2030 (2016)
DOI: 10.1002/smj

Confidential

Noble_01382989



Figure 3.    Improvement in the alignment of the spinoff firm's CEO incentive compensation with firm performance when a division is unrelated to its parent firm's primary operations

time periods and within the same industries, the independent variables in this probit regression are total assets, total sales, net income, market capitalization, year fixed effects, and three-digit SIC code fixed effects. The five "nearest-neighbors" to each spinoff firm, as predicted by the propensity scores generated by this probit model, are then identified as the control group.

From there, Treated is defined as an indicator variable taking the value 1 if a firm-year observation pertains to one of the spinoff firms, and 0 if the observation pertains to one of the firms in the control group. Treated is used to implement differences-in-differences regressions testing how the alignment of managerial compensation with firm performance changes pre- to post-spinoff, for the spinoff firms in the sample versus the control group. Building on Equation 2, presented earlier in the article, Treated is interacted with each of the key independent variables in this equation, as follows:

group. Table 4 presents results of these differences-in-differences regressions.

In Regressions (1) and (2), the coefficients on Post $\times$ Market Cap $\times$ Treated are positive and significant, indicating that for the spinoff firms (relative to the control group), the alignment of incentive compensation with firm performance improves following the completion of a spinoff (relative to pre-spinoff alignment). However, the coefficients on Post $\times$ Market Cap are not significant, indicating that the post-spinoff improvement in the alignment of incentive compensation with firm performance is concentrated solely among the spinoff firms and not the control group. This pair of findings provides further support for Baseline Hypothesis 1, indicating that the alignment of spinoff firm managers' incentive compensation with stock market performance improves once spinoffs are complete.

Figure 4 plots the ratio of CEO compensation to market capitalization over time for the spinoff firms

$$\text{Comp}_{it} = \alpha + \beta_1 \text{Market Cap}_{it} + \beta_2 \text{Post}_{it} + \beta_3 \text{Post} \times \text{Market Cap}_{it} + \beta_4 \text{Treated}_{it}$$
$$+ \beta_5 \text{Post} \times \text{Market Cap} \times \text{Treated}_{it} + \Sigma_{j=6}^{n} \beta_j \text{Control}_{jit} + \varepsilon_{it}. \tag{4}$$

In this equation, Post $\times$ Market Cap $\times$ Treated is the key construct, whose coefficient, $\beta_5$, measures the post-spinoff change in incentive alignment for the spinoff firms relative to the control

and the control group. The average incentive compensation earned by the CEOs of the control group exceeds that of the divisional presidents up through the effective year of the spinoffs. However, in the

Copyright © 2015 John Wiley & Sons, Ltd.

*Strat. Mgmt. J.*, **37**: 2011–2030 (2016)
DOI: 10.1002/smj

Confidential

Noble_01382990

Table 4.    Differences-in-differences regressions. spinoff firms

| Dependent variable: Variable | Spinoff CEO compensation (1) | Spinoff executive compensation (2) |
|---|---|---|
| Market cap | 0.003 | 0.002 |
| | (0.009) | (0.001) |
| Post | 1.007 | −14.502 |
| | (111.807) | (41.931) |
| Post × market cap | −0.000 | 0.008 |
| | (0.002) | (0.007) |
| Post × market cap × treated | 0.025** | 0.012** |
| | (0.013) | (0.005) |
| ln(total assets) | 216.258** | 291.727*** |
| | (98.497) | (23.362) |
| Negative NI | −25.204 | −17.948 |
| | (229.390) | (74.257) |
| Leverage | −1,443.277*** | −90.002 |
| | (488.770) | (150.708) |
| Constant | 1,885.625* | −1,040.339** |
| | (1,098.279) | (436.768) |
| Observations | 6,279 | 6,635 |
| $R^2$ | 0.059 | 0.146 |

***$p < 0.01$; **$p < 0.05$; *$p < 0.1$
All regressions include firm and year fixed effects. Robust standard errors clustered by firm in parentheses.



Figure 4.    CEO compensation of spinoff firms and control group over time

years thereafter, the incentive compensation of the spinoff firms' CEOs becomes statistically identical to that of the control group's CEOs. This equalization reflects the positive and significant coefficients on Post × Market Cap × Treated in Table 4.

### Empirical extension: parent firm results

Having theorized about and explored the conditions under which spinoffs result in improved incentive alignment for spinoff firm managers, an important question remains outstanding: how, if at all, would spinoffs be expected to affect the incentive alignment of the parent firm managers who undertook these deals? Despite the clarity of the prediction that spinoffs would be expected to improve spinoff firm managers' incentive alignment, the same is not necessarily true for parent firm managers. Accordingly, in this subsection of the article, I first outline the two possible arguments for how spinoffs might affect parent firm managers' incentive alignment, and then go on to test these arguments empirically.

On the one hand, aligning parent firm managers' incentive compensation with stock market performance may not directly or adequately reward these managers for the attention that overseeing certain divisions might demand of them (Holmstrom and Milgrom, 1991). Stock market performance reflects the work that parent firm managers put into running that company's operations in the aggregate, but diversified firms are highly complex organizations with multiple divisions, some of which might demand more of parent firm managers' scarce attention than others (Ambos and Birkinshaw, 2010; Bouquet and Birkinshaw, 2008; Joseph, 2014; Joseph and Ocasio, 2012). Spinoffs could resolve this issue by removing businesses that consume a great deal of parent firm managers' attention, allowing parent firm managers' incentive compensation to reward them more directly for allocating their attention to a smaller and more focused set of operations. Thus, one possible argument for how spinoffs might affect parent firm managers' incentive alignment is that (conditional on weak pre-spinoff incentive alignment) parent firm managers' incentive compensation will be more closely aligned with parent firm performance post-spinoff than it had been pre-spinoff.

On the other hand, it could equally be the case that spinoffs might not improve the alignment of parent firm managers' incentive compensation with parent firm performance. Firms often undertake spinoffs in conjunction with other corporate scope-altering strategies, such as mergers and acquisitions, alliances and joint ventures, and even internal development into new areas (Capron, Mitchell, and Swaminathan, 2001; Chang, 1996; Helfat and Eisenhardt, 2004). Additionally, the implementation of spinoffs itself requires a great deal of managerial attention and effort, in that these deals necessitate the separation of previously-integrated assets, capabilities, and human capital

Copyright © 2015 John Wiley & Sons, Ltd.

*Strat. Mgmt. J.*, **37**: 2011–2030 (2016)
DOI: 10.1002/smj

Confidential

Noble_01382991

(Corley and Gioia, 2004; Gilson, 2000; Semadeni and Cannella, 2011; Seward and Walsh, 1996; Woo, Willard, and Daellenbach, 1992). As a result, even if spinoffs do remove businesses that consume a great deal of parent firm managers' attention, the link between these managers' incentive compensation and their firm's stock market performance may still be blurred by these (and possibly other) alternative demands. Thus, the other possible argument for how spinoffs might affect parent firm managers' incentive alignment is that there will be no post-spinoff improvement in the alignment of parent firm managers' incentive compensation with parent firm performance.

To test which of these two opposing arguments is at play empirically, I re-ran all of the spinoff firm results presented previously for the parent firms in my sample. I gathered pre- and post-spinoff data on the parent firm managers' executive compensation from ExecuComp, and financial data from Compustat. The core variables used in my regressions are constructed analogously to their spinoff firm counterparts: Parent CEO Compensation is the incentive compensation earned by the CEOs of the parent firms; Parent Executive Compensation is the average incentive compensation earned by the top management teams of the parent firms; and Parent Market Capitalization is the parent firm's market capitalization, measured on the last trading day of each fiscal year. The same control variables used in the spinoff firm regressions, measured for the parent firms, are also included in my models. Table 5 presents descriptive statistics for all of the parent firm variables.

Table 6 presents the results of first-differences regressions testing how the alignment of parent firm managers' incentive compensation with parent firm performance changes following the completion of a spinoff. Panel A presents these results for CEO compensation, and Panel B presents analogous results for average top management team compensation. All models include deal and year fixed effects with robust standard errors clustered by deal.

In both panels, Regression (1) is the baseline regression testing the overall relationship between parent firm managers' incentive compensation and firm performance. The coefficients on Market Cap are positive and significant, suggesting that the incentive compensation of parent firm managers is well-aligned with firm performance in both the pre- and post-spinoff time periods. The magnitude of these coefficients indicates that for every

1,000-dollar increase in a firm's market capitalization, CEO compensation rises by about 22 dollars, and average executive compensation rises by about 6 dollars. By contrast, the coefficients on Post × Market Cap are not significant in Regression (2) in either panel, indicating that even though parent firm managers' incentive compensation appears to be well-aligned with firm performance overall, there is no incremental post-spinoff improvement in this relationship. As noted above, the finding that there is no post-spinoff improvement in parent firm managers' incentive alignment is not too surprising, given that there is no empirical evidence that these managers' incentive alignment was weak pre-spinoff.

Table 7 presents the results of differences-in-differences regressions testing how the alignment of parent firm managers' incentive compensation with stock market performance changes pre- to post-spinoff, for the parent firms in the sample versus their control group of comparable companies (which were identified using the same propensity score matching procedure that was employed to construct the control group for the spinoff firms). In Regressions (1) and (2), the coefficient on Market Cap is positive and significant, meaning that incentive compensation is aligned with stock market performance overall for managers of both the parent firms and the control group. By contrast, however, the coefficients on Post × Market Cap × Treated are not significant in either regression, indicating that for the parent firms (relative to the control group), the alignment of incentive compensation with firm performance does not improve following the completion of a spinoff (relative to pre-spinoff alignment).

In sum, both the first-differences and differences-in-differences results indicate that there is no post-spinoff improvement in the alignment of parent firm managers' incentive compensation with parent firm stock market performance. To shed additional light on why this might be the case, Figure 5 plots the ratio of CEO incentive compensation to market capitalization over time for the parent firms and the control group. The compensation levels of the parent firms' and the control group's CEOs are statistically identical through the effective year of the spinoffs. However, the compensation of the parent firms' CEOs jumps dramatically in the year following the completion of these deals, returning to its normal levels thereafter. This increase in parent firms' CEO compensation

Copyright © 2015 John Wiley & Sons, Ltd.

*Strat. Mgmt. J.*, **37**: 2011–2030 (2016)
DOI: 10.1002/smj

**C38**

Confidential

Noble_01382992

Table 5.    Descriptive statistics, parent firms

| Variable | Mean | Std. dev. | Min | Max |
|---|---|---|---|---|
| Parent CEO compensation ($000) | 1,002.041 | 2,308.415 | 0.000 | 25,197.160 |
| Parent executive compensation ($000) | 451.143 | 886.389 | 0.000 | 9,698.665 |
| Market cap ($000) | 20,785.280 | 39,144.590 | 0.034 | 310,218.700 |
| Post | 0.571 | 0.495 | 0.000 | 1.000 |
| Post × market cap ($000) | 8,324.137 | 26,238.160 | 0.000 | 276,428.600 |
| ln(total assets) | 8.993 | 1.683 | 3.025 | 14.593 |
| Negative net income | 0.176 | 0.381 | 0.000 | 1.000 |
| Leverage | 0.276 | 0.187 | 0.000 | 1.477 |
| Number of segments | 3.565 | 1.821 | 1.000 | 12.000 |
| Total executives | 5.186 | 2.889 | 0.000 | 12.000 |

Table 6.    First-differences regressions, parent firm CEOs and executives

| Dependent variable: | Panel A<br>Parent CEO comp | | Panel B<br>Parent exec comp | |
|---|---|---|---|---|
| Variable | (1) | (2) | (1) | (2) |
| Market cap | 0.022** | 0.022** | 0.006** | 0.006** |
| | (0.009) | (0.009) | (0.003) | (0.003) |
| Post | | 241.827 | | 118.921 |
| | | (268.455) | | (86.975) |
| Post × market cap | | 0.005 | | 0.001 |
| | | (0.007) | | (0.003) |
| ln(total assets) | 135.055 | 134.330 | 3.328 | 25.423 |
| | (231.596) | (256.630) | (79.178) | (85.322) |
| Negative net income | 71.917 | 87.920 | −0.087 | −3.286 |
| | (159.656) | (156.965) | (54.979) | (55.821) |
| Leverage | −326.435 | −379.558 | −33.035 | −42.217 |
| | (1,137.187) | (1,154.987) | (232.982) | (235.464) |
| Number of segments | −96.204 | −102.610 | −42.862* | −41.245 |
| | (69.023) | (67.297) | (25.477) | (25.128) |
| Total executives | 26.885 | 30.062 | 8.798 | 9.686 |
| | (50.089) | (49.472) | (17.871) | (18.119) |
| Constant | 97.230 | −623.375 | 199.050 | −255.752 |
| | (1,916.442) | (2,333.685) | (664.608) | (820.272) |
| Observations | 979 | 979 | 1,174 | 1,174 |
| $R^2$ | 0.107 | 0.112 | 0.064 | 0.066 |

**p < 0.05 (not mentioned in this table); *p < 0.1
All regressions include deal and year fixed effects. Robust standard errors clustered by deal in parentheses.

above "peer" levels could explain the lack of significance of the coefficients on Post × Market Cap × Treated in Table 7.

Implicitly, there are two possible explanations for this pattern of results. The first is that parent firm managers deserved this increased level of pay because the spinoffs they undertook created shareholder value (Daley *et al.*, 1997; Desai and Jain, 1999; Krishnaswami and Subramaniam, 1999). The second is that parent firm managers behaved self-interestedly, using their spinoffs as an

opportunity to temporarily boost their compensation above normal levels. The latter interpretation is consistent with results produced by Pathak, Hoskisson, and Johnson (2014), who established that CEO compensation increases following refocusing events, as a sort of *ex post* settling up for reducing firm scope. To determine which of these explanations is at play, Table 8 presents the results of regressions testing the relationship between the post-spinoff change in compensation and two new variables: CAR, measuring the stock market's

Copyright © 2015 John Wiley & Sons, Ltd.

*Strat. Mgmt. J.*, **37**: 2011–2030 (2016)
DOI: 10.1002/smj

Confidential

Noble_01382993

2026    *E. R. Feldman*

Table 7.    Differences-in-differences regressions, parent firms

| Dependent variable: Variable | Parent CEO comp (1) | Parent exec comp (2) |
|---|---|---|
| Market cap | 0.014** | 0.033*** |
| | (0.006) | (0.008) |
| Post | 252.098** | 70.232 |
| | (100.917) | (117.442) |
| Post × market cap | 0.004 | 0.003 |
| | (0.003) | (0.005) |
| Post × market cap × treated | −0.011 | −0.004 |
| | (0.008) | (0.008) |
| ln(total assets) | 349.773*** | 733.974*** |
| | (118.612) | (158.698) |
| Negative NI | −350.983*** | −169.595* |
| | (88.370) | (91.854) |
| Leverage | −1,395.473*** | −1,317.518*** |
| | (448.175) | (317.278) |
| Constant | −252.766 | −4,133.686*** |
| | (1,110.349) | (1,438.676) |
| Observations | 5,577 | 5,936 |
| $R^2$ | 0.124 | 0.163 |

***$p < 0.01$; **$p < 0.05$; *$p < 0.1$
All regressions include firm and year fixed effects. Robust standard errors clustered by firm in parentheses.



Figure 5.    CEO compensation of parent firms and control group over time

reaction to spinoff announcements, and G-Index, measuring the quality of corporate governance within the parent firms (Gompers, Ishii, and Metrick, 2003).

In Panel A, the dependent variable is the change in the ratio of parent firm CEO compensation to market capitalization between the effective year of the spinoff and the year thereafter. The dependent variable in Panel B is the analogous change in the ratio of mean parent firm executive compensation to market capitalization.

CAR is defined as the cumulative abnormal returns to spinoff announcements, generated using an event study that measures the shareholder value created by these deals. Following Anand and Singh (1997), normal returns are predicted from firms' daily stock returns and the stock market's returns during a 250-day estimation window [-800, -551] before each spinoff's announcement date. Abnormal returns are then predicted on the basis of these normal returns within a three-day event window [-1, +1] surrounding these announcement dates. Finally, cumulative abnormal returns are calculated as the cumulative sum of abnormal returns within the event window. If the argument is correct that the post-spinoff pay increase enjoyed by parent firm managers is a reward for creating shareholder value, CAR should be positively associated with the change in CEO and executive compensation.

G-Index is Gompers *et al.*'s (2003) index of governance quality, which awards firms a point for each of the 16 provisions they have in place that restrict shareholder rights (e.g., poison pills, staggered boards, etc.). Accordingly, higher values of G-Index reflect worse corporate governance. If the argument is correct that parent firm managers behave self-interestedly by using spinoffs as an opportunity to raise their compensation, G-Index should be positively associated with the change in CEO and executive compensation.

The coefficient on CAR is not significant in Table 8, suggesting that the increase in compensation earned by parent firm managers following the completion of their spinoffs is not a reward for creating shareholder value.[4] However, the positive and significant coefficient on G-Index reveals that the parent firms in which the quality of governance is the worst experience the largest increases in CEO and executive compensation following the completion of those spinoffs. Because the firms in which the quality of governance is the worst may be run by the most opportunistic or self-serving managers, this finding provides some evidence that parent firm managers may use spinoffs to temporarily boost their compensation levels.

---

[4] This non-result is unchanged when alternate estimation ([-515, -366]) and event windows ([0, +1] and [-2, +2]) are employed, or when shareholder value is measured using the parent firms' annual returns.

Copyright © 2015 John Wiley & Sons, Ltd.

*Strat. Mgmt. J.*, **37**: 2011–2030 (2016)
DOI: 10.1002/smj

Confidential

Noble_01382994

Table 8.    Post-spinoff changes in parent firm executive compensation

| Variable | Panel A DV: Δ(CEO comp) | | | Panel B DV: Δ(Exec comp) | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (1) | (2) | (3) |
| CAR | 0.466 | | 0.751 | 1.244 | | 2.847 |
| | (1.405) | | (1.630) | (5.481) | | (6.807) |
| G-index | | 0.108** | 0.110** | | 0.456** | 0.464** |
| | | (0.045) | (0.046) | | (0.189) | (0.195) |
| ln(total assets) | −0.116* | −0.251*** | −0.250*** | −0.461* | −1.063*** | −1.058*** |
| | (0.065) | (0.083) | (0.086) | (0.277) | (0.351) | (0.362) |
| Leverage | 0.908 | 1.438* | 1.493* | 3.475 | 6.057* | 6.250* |
| | (0.666) | (0.803) | (0.830) | (2.813) | (3.374) | (3.491) |
| Negative NI | −0.252 | −0.571* | −0.562* | −0.803 | −2.446* | −2.403* |
| | (0.258) | (0.312) | (0.326) | (1.079) | (1.318) | (1.380) |
| Total executives | 0.403*** | 0.509*** | 0.510*** | 1.630*** | 2.181*** | 2.189*** |
| | (0.075) | (0.086) | (0.089) | (0.314) | (0.365) | (0.375) |
| Constant | −1.580* | 0.065 | 0.701 | −5.569 | 2.821 | 2.783 |
| | (0.928) | (1.264) | (1.121) | (3.585) | (4.562) | (4.706) |
| Observations | 215 | 215 | 215 | 206 | 206 | 206 |
| $R^2$ | 0.307 | 0.392 | 0.396 | 0.295 | 0.394 | 0.397 |

***$p < 0.01$; **$p < 0.05$; *$p < 0.1$
All regressions include year fixed effects. Standard errors in parentheses.

## DISCUSSION AND CONCLUSION

### Summary of results

This study has investigated how the alignment of spinoff and parent firm managers' incentive compensation with stock market performance changes following corporate spinoffs.

For spinoff firm managers, the alignment of incentive compensation with stock market performance improves post-spinoff, both in absolute terms and relative to a matched sample of companies that were not involved in these deals. This improvement is even larger when one or more of the spun-off subsidiary's divisional managers move to the spinoff firm, when the spun-off subsidiary performed better than the remaining businesses within its parent firm, and when the spun-off subsidiary is unrelated to its parent firm's primary operations. However, there is no analogous post-spinoff improvement (either in absolute or relative terms) in the alignment of parent firm managers' incentive compensation with stock market performance.

Further analysis of the parent firm results reveals that the level of parent firm managers' incentive compensation rises significantly in the year immediately following the completion of their spinoffs, relative to a matched sample of firms that did not undertake these deals. The firms in which parent firm managers' incentive compensation rises most dramatically are found to have the lowest quality corporate governance, yet their shareholders do not enjoy significantly higher returns from their firms' spinoffs than the shareholders of firms in which parent firm managers' incentive compensation increases more modestly.

### Theoretical contributions

The core conceptual insight to emerge from this study is that spinoffs would be expected to, and do, improve the incentive alignment of spinoff firm managers. A major challenge experienced by divisional managers in diversified firms is that aligning their incentive compensation with overall stock market performance may not properly motivate them to maximize shareholder value. The root cause of this challenge is that aligning incentive compensation with stock market performance may obscure the link between the effort these managers put into running their division and the incentive compensation they receive, since the metric on which their incentive compensation is based is influenced by the performance of the other divisions within their firm. Spinoffs would be expected to resolve this problem because these deals permit the spinoff firm managers' incentive compensation to be based directly on the performance of the actual entity that they

Copyright © 2015 John Wiley & Sons, Ltd.

*Strat. Mgmt. J.*, **37**: 2011–2030 (2016)
DOI: 10.1002/smj

Confidential

Noble_01382995

oversee, clarifying the link between effort and outcomes for these managers. Together, these points suggest that divisional managers face significant challenges in doing their jobs in diversified firms, and that spinoffs resolve these difficulties, with important implications for the efficiency with which spinoff firm managers are compensated.

Building on these insights, a key finding that comes out of this study is that although spinoffs are associated with improvements in the alignment of spinoff firm managers' incentives with stock market performance, the same benefits do not appear to accrue to parent firm managers. On the one hand, this finding is somewhat counterintuitive: managerial attention and corporate scope are at odds with one another, and given that spinoffs reduce firm scope, these deals should forge a closer link between the attention that parent firm managers devote to their firms' remaining operations and corporate outcomes. On the other hand, the reason why incentive alignment may not improve is that the level of compensation earned by parent firm managers jumps post-spinoff, and the magnitude of this compensation increase is inversely related to governance quality (but uncorrelated with shareholder returns to the spinoff). The juxtaposition of these points suggests that a tension may exist between spinoffs improving the focus of parent firm managers' attention and spinoffs facilitating opportunistic behavior among parent firm managers. When it comes to parent firm managers' incentive alignment, the cost outweighs the benefit, but an interesting direction for future research might be to explore other outcomes in which the opposite may or may not true.

Finally, this article highlights an interesting empirical context in which to study the conditions under which the alignment of spinoff firm managers' incentive compensation with firm performance changes pre- to post-spinoff. One important reason why existing research has not quantified the implications of spinoffs for spinoff firm managers' incentive alignment is that detailed data about the management, compensation, and performance of spun-off subsidiaries is not available electronically. However, when a firm undertakes a spinoff, it must disclose pre-spinoff data about the business unit it is divesting to the SEC. Additionally, because the spinoff firm trades publicly following its separation from its corporate parent, identical post-spinoff data is necessarily

available for the same entity. Thus, spinoffs facilitate a nearly-exact comparison of the functioning of the same entity in two different "states of the world": as a division within a diversified firm, and as an independent, publicly-traded company. For the purposes of this article, this empirical context facilitated the study of how the alignment of incentive compensation with firm performance changes following the completion of spinoffs, but it could easily be leveraged by future studies seeking to investigate changes in other key operational and performance metrics that may follow spinoffs.

## ACKNOWLEDGEMENTS

I am very grateful to *Strategic Management Journal* Editor Connie Helfat and two anonymous reviewers for their helpful input throughout the review process. I thank Raffi Amit, Matthew Bidwell, Olivier Chatain, Alex Edmans, Vit Henisz, Zeke Hernandez, Rahul Kapoor, Xavier Martin, Ethan Mollick, Evan Rawley, and seminar participants at Wharton, the 2015 Atlanta Competitive Advantage Conference, the 2014 Academy of Management Annual Meeting, the 2013 Strategic Management Society Annual Meeting, and the 2012 Strategy Research Initiative for their helpful comments and suggestions on this article. I also thank Levi Abramson, Kelsey Brongo, Michael Buzinover, Robbie Grove, Thomas Ippolito, Jason Rudin, Rebecca Schmierer, Nicole Webster, Serena Zhou, and especially, Jeff Wen for their assistance in collecting and coding the data from the Securities and Exchange Commission filings. I gratefully acknowledge the financial support of the Mack Center for Technological Innovation, the Jacobs Levy Center, the Dean's Research Fund at the Wharton School, and the PURM program at the University of Pennsylvania. Any errors are my own.

## REFERENCES

Ambos TC, Birkinshaw J. 2010. Headquarters' attention and its effect on subsidiary performance. *Management International Review* **50**(4): 449–469.

Anand J, Singh H. 1997. Asset redeployment, acquisitions and corporate strategy in declining industries. *Strategic Management Journal* **18**: 99–118.

Aron DJ. 1991. Using the capital market as a monitor: corporate spinoffs in an agency framework. *Rand Journal of Economics* **22**(4): 505–518.

Copyright © 2015 John Wiley & Sons, Ltd.

*Strat. Mgmt. J.*, **37**: 2011–2030 (2016)
DOI: 10.1002/smj

Confidential

Noble_01382996

Berger PG, Ofek E. 1995. Diversification's effect on firm value. *Journal of Financial Economics* **37**(1): 39–65.

Bergh DD. 1995. Size and relatedness of units sold: an agency theory and resource-based perspective. *Strategic Management Journal* **16**(3): 221–239.

Bergh DD. 1998. Product-market uncertainty, portfolio restructuring, and performance: an information-processing and resource-based view. *Journal of Management* **24**(2): 135–155.

Bergh DD, Johnson RA. DeWitt R-L. 2008. Restructuring through spinoff or sell−off: transforming information asymmetries into financial gain. *Strategic Management Journal* **29**: 133–148.

Berle AA, Means GC. 1932. *The Modern Corporation and Private Property*. Harcourt, Brace, & World: New York.

Bouquet C, Birkinshaw J. 2008. Weight versus voice: how foreign subsidiaries gain attention from corporate headquarters. *Academy of Management Journal* **51**(3): 577–601.

Capron L, Mitchell W, Swaminathan A. 2001. Asset divestiture following horizontal acquisitions: a dynamic view. *Strategic Management Journal* **22**: 817–844.

Chang SJ. 1996. An evolutionary perspective on diversification and corporate restructuring: entry, exit, and economic performance during 1981–1989. *Strategic Management Journal* **17**: 587–611.

Corley KG, Gioia DA. 2004. Identity ambiguity and change in the wake of a corporate spinoff. *Administrative Science Quarterly* **49**(2): 173–208.

Cusatis PJ. Miles JA, Woolridge JR. 1993. Restructuring through spinoffs: the stock market evidence. *Journal of Financial Economics* **33**(3): 293–311.

Daley L, Mehrotra V, Sivakumar R. 1997. Corporate focus and value creation: evidence from spinoffs. *Journal of Financial Economics* **45**: 257–281.

Desai H, Jain PC. 1999. Firm performance and focus: long-run stock market performance following spinoffs. *Journal of Financial Economics* **54**: 75–101.

Devers CE, Cannella AA. Reilly GP, Yoder ME. 2007. Executive compensation: a multidisciplinary review of recent developments. *Journal of Management* **33**(6): 1016–1072.

Duchin R, Sosyura D. 2013. Divisional managers and internal capital markets. *Journal of Finance* **68**(2): 387–429.

Eisenreich J. 2014. Interview with Joel Eisenreich (Principal, Deloitte Tax LLP), conducted on November 26, 2014.

Feldman ER. 2015. Corporate spinoffs and analysts' coverage decisions: the implications for diversified firms. *Strategic Management Journal* (Forthcoming).

Feldman ER, Gilson SC, Villalonga B. 2014. Do analysts add value when they most can? Evidence from corporate spinoffs. *Strategic Management Journal* **35**(10): 1446–1463.

Finkelstein S, Hambrick DC. 1988. Chief executive compensation: a synthesis and reconciliation. *Strategic Management Journal* **9**(6): 543–558.

Gabaix X, Landier A. 2008. Why has CEO pay increased so much? *Quarterly Journal of Economics* **123**: 49–100.

Gertner R, Powers E, Scharfstein D. 2002. Learning about internal capital markets from corporate spinoffs. *Journal of Finance* **57**(6): 2479–2506.

Gilson S. 2000. Analysts and information gaps: lessons from the UAL buyout. *Financial Analysts Journal* **56**: 82–110.

Gilson S, Healy P. Noe C, Palepu K. 2001. Analyst specialization and conglomerate stock breakups. *Journal of Accounting Research* **39**: 565–582.

Gompers P, Ishii J, Metrick A. 2003. Corporate governance and equity prices. *Quarterly Journal of Economics* **118**: 107–155.

Hall BJ, Liebman JB. 1998. Are CEOs really paid like bureaucrats? *Quarterly Journal of Economics* **113**(3): 653–691.

Hambrick DC, Stucker K. 1999. Breaking away: executive leadership of corporate spinoffs. In *The Leader's Change Handbook: An Essential Guide to Setting Direction and Taking Action*, Jossey Bass Business and Management Series, Conger JA. Spreitzer GM. Lawler EE III (eds). Jossey-Bass: San Francisco, CA; 100–124.

Helfat CE, Eisenhardt KM. 2004. Inter-temporal economies of scope, organizational modularity, and the dynamics of diversification. *Organization Science* **25**(13): 1217–1232.

Hill CWL, Hitt MA, Hoskisson RE. 1992. Cooperative versus competitive structures in related and unrelated diversified firms. *Organization Science* **3**(4): 501–521.

Holmstrom B, Milgrom P. 1991. Multitask principal-agent analyses: incentive contracts, asset ownership, and job design. *Journal of Law, Economics, and Organization* **7**: 24–52.

Hoskisson RE, Hill CW, Kim H. 1993a. The multidivisional structure: organizational fossil or source of value? *Journal of Management* **19**(2): 269–298.

Hoskisson RE, Hitt MA, Hill CW. 1993b. Managerial incentives and investment in R&D in large multiproduct firms. *Organization Science* **4**(2): 325–341.

Jensen M, Meckling W. 1976. A theory of the firm: managerial behavior, agency costs, and ownership structure. *Journal of Financial Economics* **3**(4): 305–360.

Jensen MC, Murphy KJ. 1990. Performance pay and top-management incentives. *Journal of Political Economy* **98**: 225–264.

Jones GR, Hill CW. 1988. Transaction cost analysis of strategy-structure choice. *Strategic Management Journal* **9**(2): 159–172.

Joseph J. 2014. Corporate attention, divisional aspirations, and adaptation in the M-form firm. Working paper.

Joseph J, Ocasio W. 2012. Architecture, attention, and adaptation in the multibusiness firm: general electric from 1951 to 2001. *Strategic Management Journal* **33**(6): 633–660.

Krishnaswami S, Subramaniam V. 1999. Information asymmetry, valuation, and the corporate spinoff decision. *Journal of Financial Economics* **53**: 73–112.

Lamont O. 1997. Cash flow and investment: evidence from internal capital markets. *Journal of Finance* **52**(1): 83–109.

Copyright © 2015 John Wiley & Sons, Ltd.

*Strat. Mgmt. J.*, **37**: 2011–2030 (2016)
DOI: 10.1002/smj

**C43**

Confidential

Noble_01382997

2030    *E. R. Feldman*

Miles JA, Woolridge JR. 1999. *SpinOffs and Equity Carve-Outs: Achieving Faster Growth and Better Performance*. Financial Executives Research Foundation: Morristown, NJ.

Nickerson JA, Zenger TR. 2008. Envy, comparison costs, and the economic theory of the firm. *Strategic Management Journal* 29: 1429–1449.

Pathak S, Hoskisson RE, Johnson RA. 2014. Settling up in CEO compensation: the impact of divestiture intensity and contextual factors in refocusing firms. *Strategic Management Journal* 35(8): 1124–1143.

Rajan R, Servaes H, Zingales L. 2000. The cost of diversity: the diversification discount and inefficient investment. *Journal of Finance* 55(1): 35–80.

Rumelt RP. 1974. *Strategy, Structure, and Economic Performance*. Harvard University Press: Cambridge, MA.

Scharfstein DS, Stein JC. 2000. The dark side of internal capital markets: divisional rent-seeking and inefficient investment. *Journal of Finance* 55(6): 2537–2564.

Schipper K, Smith A. 1983. Effects of recontracting on shareholder wealth: the case of voluntary spinoffs. *Journal of Financial Economics* 12(4): 437–467.

Semadeni M, Cannella AA. 2011. Examining the performance effects of post spinoff links to parent firms: should the apron strings be cut? *Strategic Management Journal* 32: 1083–1098.

Seward JK, Walsh JP. 1996. The governance and control of voluntary corporate spinoffs. *Strategic Management Journal* 17(1): 25–39.

Stein JC. 1997. Internal capital markets and the competition for corporate resources. *Journal of Finance* 52(1): 111–133.

Thompson JD. 1967. *Organizations in Action: Social Science Bases of Administrative Theory*. McGraw-Hill Book Company: New York.

Woo CY, Willard GE, Daellenbach US. 1992. Spinoff performance: a case of overstated expectations? *Strategic Management Journal* 13(6): 433–447.

Wruck EG, Wruck KH. 2002. Restructuring top management: evidence from corporate spinoffs. *Journal of Labor Economics* 20: S176–S218.

Wulf J. 2002. Internal capital markets and firm-level compensation incentives for division managers. *Journal of Labor Economics* 20: S219–S262.

Wulf J. 2007. Authority, risk, and performance incentives: evidence from division manager positions inside firms. *Journal of Industrial Economics* 55(1): 169–196.

Zajac EJ, Westphal JD. 1994. The costs and benefits of managerial incentives and monitoring in large U.S. corporations: when is more not better? *Strategic Management Journal* 15: 121–142.

Zenger TR, Marshall CR. 2000. Determinants of incentive intensity in group-based rewards. *Academy of Management Journal* 43(2): 149–163.

Zuckerman EW. 1999. The categorical imperative: securities analysts and the illegitimacy discount. *American Journal of Sociology* 104(5): 1398–1438.

Zuckerman EW. 2000. Focusing the corporate product: securities analysts and de-diversification. *Administrative Science Quarterly* 45(3): 591–619.

Copyright © 2015 John Wiley & Sons, Ltd.

**C44**

Confidential    Noble_01382998

# 5/27/2016 E. Feldman Pittsburgh Post Gazette Interview



IN THE LEAD 2016 / TOP 50

# Analysis: Companies make up, then break up

May 27, 2016 12:00 AM

By Len Boselovic / Pittsburgh Post-Gazette

Today's sermon is taken from the Gospel of Mark, 10:9: "What therefore God hath joined together, let not man put asunder."

Corporate America didn't get the memo. Oftentimes, what one almighty CEO puts together through a value-enhancing merger or acquisition, another omnipotent CEO tears apart in the name of value creation. Examples of these transformational twofers abound.

U.S. Steel spent $6.2 billion in 1982 to acquire Marathon Oil as diversification insurance for its cyclical steel business. It spun off the energy unit 19 years later, rationalizing that steel dimmed investors' appreciation of the energy business.

In 2000, America Online and Time Warner announced a $350 billion merger, creating in their words "the world's first fully integrated media and communications company for the Internet Century." The century lasted eight years until the partners decided that separating the companies would generate "greater strategic, financial and operational flexibility."

In 2009, Xerox CEO Ursula Burns announced the $6.4 billion acquisition of Affiliated Computer Services, a business process outsourcing vendor. She said the marriage would "achieve significant incremental revenue growth." Seven years later, Ms. Burns assures shareholders that splitting the companies is the best way "to drive shareholder value."

"It's very common," West Virginia University finance professor Ashok Abbott says of the broken corporate marriages. "It's like they were dating, got married, and 10 or 20 years later find out it didn't work out."

A broken marriage isn't the only reason for pursuing a spinoff.

After spending billions on acquisitions that stoked its downstream business of making parts for the aerospace, automotive and other markets, Alcoa will spin the unit off into a new company, Arconic, later this year. The thinking: investors are not putting a high enough price tag on Arconic's fast-growing downstream operations because they perceive Alcoa to be a commodity aluminum producer plagued by global overcapacity and depressed metals prices.

**C45**

"It's hard for investors to get excited about that, particularly when commodities prices are falling," said Bruce Bachenheimer, executive director of Pace University's Entrepreneurship Lab.

The financial engineering requires the parent company to divide its assets — including management talent — and liabilities between the two new companies. That is pretty straightforward, but there can be complications.

When HP split its enterprise business from its personal computer and printer business, chairman Meg Whitman was named president and CEO of the enterprise unit, seen by many as the more attractive of the two. At Alcoa, chairman and CEO Klaus Kleinfeld will assume those positions at the more attractive downstream business.

Such decisions can lead to resentment among employees.

"There's definitely this ugly stepchild, poor stepchild mentality" with spinoffs, said Emilie Feldman, who teaches management at the University of Pennsylvania's Wharton School.

Ms. Feldman said that while there is a well-developed playbook for how to integrate two companies after a merger or acquisition, the same guidance isn't available when it comes to breaking them apart.

"We don't have a set of best practices for making these kinds of decisions," she said.

She studied about 260 spinoffs at Fortune 500 companies between 1995 and 2010 and found that 40 percent of them featured directors who were on the boards of both companies. Three years after the split, about 25 percent of them had dual directors, Ms. Feldman said. The overlap can produce conflicts of interest.

"It's a tricky situation," Ms. Feldman said. "What's good for one company may not be good for the other company."

Those challenges notwithstanding, Mr. Bachenheimer believes corporate divorces are generally more productive than marriages. He said that too often companies pursue a merger or acquisition for the wrong reason: to grow just for the sake of growing.

"Spinoffs are generally done for the right reason and do work," he said.

*Len Boselovic: lboselovic@post-gazette.com or 412-263-1941*.

**C46**

**4/21/2020 Excerpts from Deposition of Lord Jonathan Hugh Mance**

Page 1

```
 1           UNITED STATES BANKRUPTCY COURT
 2                DISTRICT OF DELAWARE
 3    In Re
      PARAGON OFFSHORE PLC,
 4    et al.,
      Debtors,
 5    Chapter 11
      Case No. 16-10386 (CSS)
 6    (Jointly Administered)
      PARAGON LITIGATION
 7    TRUST
      vs.
 8    NOBLE CORPORATION PLC,
      NOBLE CORPORATION
 9    HOLDINGS LTD, NOBLE
      CORPORATION, NOBLE
10    HOLDING INTERNATIONAL
      (LUXEMBOURG) S.A R.L.,
11    NOBLE HOLDING
      INTERNATIONAL
12    (LUXEMBOURG NHIL) S.A
      R.L., NOBLE FDR HOLDINGS
13    LIMITED, NOBLE HOLDING
      INTERNATIONAL LIMITED,
14    NOBLE HOLDING (U.S.)
      LLC, NOBLE INTERNATIONAL
15    FINANCE COMPANY, MICHAEL
      A. CAWLEY, JULIE H.
16    EDWARDS, GORDON T. HALL,
      JON A. MARSHALL, JAMES
17    A. MacCLENNAN, MARY P.
      RICCIARDELLO, JULIE J.
18    ROBERTSON, and DAVID W.
      WILLIAMS,
19              Defendants.
      ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
20          VIDEOTAPED REMOTE DEPOSITION OF
               LORD JONATHAN HUGH MANCE
21
                    April 21, 2020
22                   10:51 a.m.
23                London, England
          Stenographically Reported By:
24    Deanna Amore - CRR, RPR, CSR - 084-003999
```

Page 36

1    spin-off; is that right?

2        A.    I did not -- I'm not opining on it either

3    way or in any sense.  That's a factual question.

4        Q.    Fair enough.

5            Now, if we can move to Romanette (iv) of

6    your expert report, and here you discuss the

7    principle of authorizing or ratifying a breach of

8    fiduciary duty; is that right?

9        A.    Yes.

10       Q.    And the principles that you set out here

11   relating to authorization or ratification apply

12   only in circumstances involving a company that is

13   not insolvent or of doubtful solvency; is that

14   right?

15       A.    That is right in the sense that if it is

16   insolvent or of doubtful solvency, then any

17   decision taken by the shareholders must take into

18   account the interests of the creditors.  It doesn't

19   mean to say they can't make decisions on behalf of

20   the company or which bind the company, but those

21   decisions must take account of the interests of

22   creditors.

23       Q.    So if we put it another way, the

24   shareholders cannot authorize or ratify conduct

Page 37

1   that would constitute a breach of fiduciary duty if

2   the company is insolvent or of doubtful solvency if

3   the interest of creditors are not taken into

4   account; is that right?

5       A.   Yes.

6       Q.   Sorry.  Is that a yes?

7       A.   Yes.  Sorry.  Sorry.  I do apologize.

8       Q.   No problem.

9            And if we move to Romanette (v), here, you

10  note that the general principle that the duty of

11  disclosure of a potential conflict of interest in

12  relation to a proposed transaction with a company

13  does not apply in situations where there is a sole

14  director; is that right?

15      A.   Yes.

16      Q.   And if the company is insolvent or of

17  doubtful solvency, is there a duty to disclose a

18  potential conflict of interest where there is a

19  sole director?

20      A.   I don't think solvency or insolvency

21  affects or creates a duty of this measure.  The

22  significance of solvency or potential insolvency is

23  to shape the sort of decision which a director can

24  make, but a sole director is still entitled to act

**4/24/2020 Excerpts from Deposition of Emilie Feldman**

```
                                          Page 1

 1        IN THE UNITED STATES BANKRUPTCY COURT

 2            FOR THE DISTRICT OF DELAWARE

 3    In re:

 4    PARAGON OFFSHORE PLC,          Chapter 11

 5              Debtor.          Bankruptcy Case

 6    _____  No. 16-10386(CSS)

 7    PARAGON LITIGATION TRUST,

 8              Plaintiff,

 9    vs.

10    NOBLE CORPORATION PLC; NOBLE  Adv, Pro. No.

11    CORPORATION HOLDINGS LTD.;    17-51882(CSS)

12    NOBLE CORPORATION; NOBLE HOLDING

13    INTERNATIONAL (LUXEMBOURG)

14    S.a r.l.; NOBLE HOLDING

15    INTERNATIONAL (LUXEMBOURG NHIL)

16    S.a r.l.; NOBLE FDR HOLDINGS

17    LIMITED; MICHAEL A. CAWLEY;

18    JULIE H. EDWARDS; GORDON T.

19    HALL; JON A. MARSHALL; JAMES A.

20    MACLENNAN; MARY P. RICCIARDELLO;

21    JULIE J. ROBERTSON; and DAVID

22    WILLIAMS,

23              Defendants.

24         The videoconference deposition of

25    EMILIE FELDMAN, called for examination, taken
```

Page 2

1    pursuant to the Federal Rules of Civil

2    Procedure of the United States Bankruptcy

3    Courts pertaining to the taking of depositions,

4    taken before ANDREA L. KIM, CSR No. 84-3722, a

5    Certified Shorthand Reporter of said state on

6    the 24th day of April, A.D. 2020, at 9:06 a.m.

7

8    PRESENT:

9

10        KIRKLAND & ELLIS LLP,

11        (300 North LaSalle Street,

12        Chicago, Illinois 60654,

13        312-862-2000), by:

14        MR JASON A. FELD,

15        jason.feld@kirkland.com,

16        MS. KATE WALLING,

17        kate.walling@kirkland.com,

18            appeared via videoconference on

19            behalf of the Plaintiff;

20

21

22

23

24

25

Page 34

1   BY MR. FELD:

2          Q.          Have you ever advised a board

3   on its fiduciary duties?

4          A.          No, I have not.

5          Q.          Have you ever advised a bank

6   to lend money in connection with a spinoff?

7          A.          No, I have not.

8          Q.          Have you ever advised a

9   ratings agency in connection with a spinoff?

10         A.          No, I have not.

11         Q.          Have you ever worked in the

12  oil and gas industry?

13         A.          No, I have not.

14         Q.          Prior to being retained as an

15  expert for Noble, had you ever advised any

16  companies in the oil and gas industry?

17         A.          No, I had not.

18         Q.          You are not an oil and gas

19  industry expert, correct?

20         A.          Correct.

21         Q.          You are not a bankruptcy

22  expert, correct?

23         A.          Correct.

24         Q.          You are not a solvency expert,

25  correct?

Page 35

1          A.          Correct.

2          Q.          You are not a valuation

3  expert?

4          A.          Correct.

5          Q.          You are not a ratings agency

6  expert?

7          A.          Correct.

8          Q.          You are not an investment

9  banker?

10          A.          Correct.

11          Q.          You are not a legal expert?

12          A.          Correct.

13          Q.          You are not a fiduciary duty

14  expert?

15          A.          Correct.

16          Q.          When Noble retained you as an

17  expert witness in this case, did you view your

18  role as providing objective analysis?

19          A.          Yes, I did.

20          Q.          Do you agree it's important to

21  be objective when evaluating the subject that

22  you covered in your expert report?

23          A.          I do.

24          Q.          All right.  Do you agree that

25  you should consider evidence on both sides of

Dated: July 7, 2020

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Timothy P. Cairns*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
ljones@pszjlaw.com
tcairns@pszjlaw.com

- and -

KIRKLAND & ELLIS LLP
David J. Zott, P.C. (admitted *pro hac vice*)
Jeffrey J. Zeiger, P.C. (admitted *pro hac vice*)
William E. Arnault (admitted *pro hac vice*)
Anne I. Salomon (admitted *pro hac vice*)
Jason A. Feld (admitted *pro hac vice*)
300 N. LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
dzott@kirkland.com
jzeiger@kirkland.com
warnault@kirkland.com
anne.salomon@kirkland.com
jason.feld@kirkland.com

*Co-Counsel for Plaintiff*