## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| PARAGON OFFSHORE PLC, et al., | Case No. 16-10386 |
| Debtors. | |
| PARAGON LITIGATION TRUST, | |
| Plaintiff, | |
| v. | |
| NOBLE CORPORATION PLC, NOBLE CORPORATION HOLDINGS LTD, NOBLE CORPORATION, NOBLE HOLDING INTERNATIONAL (LUXEMBOURG) S.à.r.l., NOBLE HOLDING INTERNATIONAL (LUXEMBOURG NHIL) S.à.r.l., NOBLE FDR HOLDINGS LIMITED, NOBLE HOLDING INTERNATIONAL LIMITED, NOBLE HOLDING (U.S.) LLC, NOBLE INTERNATIONAL FINANCE COMPANY, MICHAEL A. CAWLEY, JULIE H. EDWARDS, GORDON T. HALL, JON A. MARSHALL, JAMES A. MACLENNAN, MARY P. RICCIARDELLO, JULIE J. ROBERTSON, AND DAVID W. WILLIAMS, | Adv. Proc. No. 17-51882 (CSS) |
| Defendants. | |

## APPENDIX AND DECLARATION OF JEFFREY J. ZEIGER IN SUPPORT OF REPLY IN SUPPORT OF THE PARAGON LITIGATION TRUST'S MOTION *IN LIMINE* TO PRECLUDE TESTIMONY FROM DANIEL OLIVARES

I, Jeffrey J. Zeiger, declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge:

1.    I am an attorney at law duly admitted to the practice of law in the State of Illinois and am a partner at the law firm of Kirkland & Ellis LLP, with an office located at

300 N. LaSalle St, Chicago, IL 60654.  Kirkland & Ellis is counsel to the Paragon Litigation Trust in the above-captioned matter.

2.	I respectfully submit this Declaration in Support of the Reply in Support of the Paragon Litigation Trust's Motion *In Limine* to Preclude Testimony from Daniel Olivares and to submit true and correct copies of the documents attached hereto.

3.	Attached hereto are true and correct copies of the following documents:

**APPENDIX**

| Date | Description | Page Nos. |
|---|---|---|
| 7/29/2011 | Project Sahara Update [Noble_00564608] | C1 -C12 |
| 6/00/2013 | Mexican Jackup Sale Analysis [Noble_00114741] | C13 - C28 |
| 11/21/2013 | D. Olivares Email [Noble_00150027] | C29 |
| 2/5/2014 | TSUL Servicios Limited Agency Agreement [PGN20190177188] | C30 - C51 |
| 2/5/2014 | Danter Investments Limited Agency Agreement [PGN20190177234] | C52 - C73 |
| 3/27/2019 | A. Sheehan Davis Letter | C74 - C82 |
| 4/12/2019 | A. Sheehan Davis Letter | C83 - C114 |
| 9/18/2019 | A. Sheehan Davis Letter | C115 - C117 |

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and information.

Dated: July 7, 2020

*/s/  Jeffrey J. Zeiger*
Jeffrey J. Zeiger

2

**7/29/2011 Project Sahara Update [Noble_00564608]**

Confidential



# Noble Corporation



# Board of Directors Meeting
# Project Sahara Update

## July 29, 2011

Noble_00564608

C1

Confidential

# Noble's Global Footprint





**14 – Semisubmersibles**
**14 – Drillships**
**49 – Jackups**
 **2 – Submersibles**
_____
**79 Total Rigs + FPSO +**
**Platform Operation**





Source: Noble

C2

2

Confidential

# Project Sahara
# Ongoing Fleet Strategy





**Add rigs with the latest technology, equipment, and capabilities**



**Maintain core rigs as long as competitive**

**Modify core rigs to their technical limit**

# Core Fleet

**Continually evaluate potentially non-core, uncompetitive assets that could be:**
➢ **Sold**
➢ **Spun-off, or**
➢ **Retired**

Noble_00564610



# Divesting Non-Core Assets

- Decision made earlier in the year to begin exploring possibility of divesting certain non-core jackup / submersible assets

- Certain market players expressed their desire to buy a package of rigs
  - Began with Seahawk expressing an interest before their bankruptcy
  - Ex Seahawk CEO then continued pursuit of the transaction
  - Led to 2 groups making offers: Hercules/Mike Mullen & Stilley/Castle Harlan
  - We hired Barclays to run process for the sale

- Hercules/Mullen offer
  - Purchase price:  $600 - $650 million in cash
  - Financed through a combination of debt and equity
  - Could have been revised upward or downward based on due diligence results
  - Hercules followed up with subsequent updated offer but at the same price range
    - Also included a termination provision in the event Hercules could not raise the funds

- In light of the Sahara offer and Hercules' unwillingness to increase price, Noble elected not to continue to pursue Hercules as a potential buyer

Confidential

Noble_00564611

Confidential

# Project Sahara
# Transaction Overview



- ➢ Twenty-one rig package as reviewed with board in prior meetings
  - ➢ Includes rigs in Mexico, West Africa, Middle East, India and U.S. Gulf of Mexico
  - ➢ Includes drilling contracts
  - ➢ Asset sale structure (will sell Mexico contracting entity to move those contracts)

- ➢ Price $845 million, including $30 million of working capital
  - ➢ If Noble walks, we reimburse expenses capped at $8.5 million, but only if we transact within <u>twelve</u> months on like transaction with another party

- ➢ Consideration
  - ➢ Cash - $668 million;  Seller Note $177 million (roughly 20%)
    - ➢ Buyer has right to increase size of Seller Note by an additional $70M if financing market not there
  - ➢ Seller Note – Bullet maturity;  66 months;  10% interest – first 24 mo PIK;  second lien to third party financing
  - ➢ Limit on Buyer financing levels
  - ➢ Noble taxes – Depends on several factors (location of various rigs at closing, outcome of like-kind exchange, etc.)
    - ➢ Range of approx. ~$40 – 110 million cash taxes

- ➢ Transition Services
  - ➢ We provide transition services for up to nine months
  - ➢ We continue to hold drilling contracts for their economic benefit until assigned (beyond 9 months through drilling contract term if no assignment)
  - ➢ Cash operating costs (including overhead allocation) covered plus Management Fee ($7k/rig/day, less in certain instances)
  - ➢ No Management Fee first three months

- ➢ Status
  - ➢ Currently negotiating definitive documents
  - ➢ Complex transaction and timing still not fixed

Noble_00564612

Confidential

# Economic Evaluation



| (S000's) unless otherwise stated | Rig Age (Years) | Water Depth | Model (Class) | Operating Area | Net Book Value 8/31/2011 | Noble Model DCF @ 12.0% | Noble Model DCF @ 15.0% | Jefferies NAV September 2011 ($000's) | Estimated Backlog as of Sep 30, 2011 ($000's) | Fearnley Offshore Mkt Values (a) Min | Max |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Carl Norberg | 35 | 250 | MLT 82-C | Mexico | 22,166 | 31,600 | 27,100 | 40,000 | 66,530 | 41,000 | 46,000 |
| 2 Earl Frederickson | 32 | 250 | MLT 82-SD-C | Mexico | 17,976 | 59,500 | 53,600 | 40,000 | 5,336 | 39,000 | 44,000 |
| 3 Tom Jobe | 29 | 250 | MLT 82-SD-C | Mexico | 14,765 | 36,200 | 33,300 | 45,000 | 5,241 | 44,000 | 49,000 |
| 4 Johnnie Hoffman | 35 | 300 | BMC 300 | Mexico | 47,265 | 74,300 | 65,800 | 60,000 | 36,640 | 44,000 | 52,000 |
| 5 Roy Butler | 29 | 300 | F&G L-780 Mod II | Mexico | 40,784 | 58,300 | 52,700 | 40,000 | 83,640 | 38,000 | 43,000 |
| 6 Gene Rosser | 34 | 300 | Levingston 111-C | Mexico | 25,361 | 88,300 | 77,100 | 53,000 | 46,726 | 44,000 | 52,000 |
| 7 John Sandifer | 36 | 300 | Levingston 111-C | Mexico | 37,655 | 92,700 | 81,900 | 60,000 | 38,197 | 44,000 | 52,000 |
| 8 Lewis Dugger | 34 | 300 | Levingston 111-C | Mexico | 24,610 | 97,100 | 85,800 | 58,000 | 35,945 | 44,000 | 52,000 |
| 9 Sam Noble | 29 | 300 | Levingston 111-C | Mexico | 15,295 | 62,400 | 55,800 | 53,000 | 7,452 | 44,000 | 52,000 |
| 10 Don Walker | 29 | 150 | BMC 150-SD | WA | 6,904 | 26,800 | 22,200 | 22,000 | - | 15,000 | 20,000 |
| 11 Ed Noble | 27 | 250 | MLT 82-SD-C | WA | 9,961 | - | - | 50,000 | 23,290 | 48,000 | 53,000 |
| 12 Lloyd Noble | 28 | 250 | MLT 82-SD-C | WA | 14,808 | - | - | 45,000 | 1,190 | 32,000 | 36,000 |
| 13 Percy Johns | 30 | 300 | F&G L-780 Mod II | WA | 33,911 | 5,400 | 4,100 | 60,000 | 22,185 | 46,000 | 51,000 |
| 14 Tommy Craighead | 29 | 300 | F&G L-780 Mod II | WA | 36,018 | 37,100 | 34,200 | 50,000 | - | 46,000 | 51,000 |
| 15 Dhabi II | 29 | 120 | BMC 150 | ME | 16,915 | 37,900 | 35,600 | 28,000 | 35,915 | 34,000 | 37,000 |
| 16 Dick Favor | 29 | 150 | BMC 150-SD | ME | 18,456 | 22,800 | 19,200 | 22,000 | 9,640 | 15,000 | 20,000 (b) |
| 17 Chuck Syring | 35 | 250 | MLT 82-C | ME | 13,918 | 71,100 | 64,900 | 40,000 | 4,464 | 26,000 | 29,000 |
| 18 Ed Holt | 30 | 300 | Levingston 111-C | India | 20,960 | 53,800 | 47,900 | 70,000 | 68,255 | 37,000 | 43,000 |
| 19 George McLeod | 30 | 300 | F&G L-780 Mod II | India | 22,038 | 111,000 | 103,100 | 55,000 | 8,778 | 84,000 | 90,000 |
| 20 Joe Alford | 29 | 70 | Pace Marine 85 G | US GOM | 15,139 | - | - | 10,000 | - | 5,000 | 7,000 |
| 21 Lester Pettus | 29 | 70 | Pace Marine 85 G | US GOM | 16,798 | - | - | 10,000 | - | 5,000 | 7,000 |
| **GRAND TOTAL (21 RIGS)** | **Avg 30.8** | | | | **$ 471,703** | **$ 966,300** | **$ 864,300** | **$ 911,000** | **$ 499,423** | **$775,000** | **$886,000** |

(a) Amounts shown are based on analysis provided to Noble on August 26, 2010.

(b) The *Noble Don Walker* value was used since Fearnley Offshore's valuation excluded the *Noble Dick Favor*.

* Current Offer Letter with Castle Harlan, Inc (Stilley) proposes a net purchase price of $815 million which would result in an IRR of 16.7%.

Noble_00564613

Source: Noble

Confidential

# Impact of Sahara on Jackup Fleet Age




**Current actions (addition of 6 newbuilds + Sahara divestitures) expected to cut jackup fleet age by 30%**








Noble_00564614

# Value Impact of Fleet Transformation
## Estimated Revenue Distribution by Asset Type





# Economic Evaluation



Confidential

|  | Outlook | Projection [b] | | | |
|---|---|---|---|---|---|
|  | 2011 [a] | 2012 | 2013 | 2014 | 2015 |
| Operating Revenues | $ 2,747 | $ 3,784 | $ 4,021 | $ 4,819 | $ 5,498 |
| Net Income (Net to Noble) | $ 391 | $ 802 | $ 992 | $ 1,310 | $ 1,648 |
| Net Income Per Diluted Share | $ 1.53 | $ 3.14 | $ 3.89 | $ 5.14 | $ 6.46 |
| Cash Flow from Operations | $ 1,018 | $ 1,592 | $ 1,880 | $ 2,280 | $ 2,721 |
| Capital Expenditures | $ 2,702 | $ 1,906 | $ 1,955 | $ 1,771 | $ 571 |
| Free Cash Flow | $ (1,684) | $ (314) | $ (75) | $ 509 | $ 2,150 |

**Fleet Rationalization - 19 Jackups / 2 Submersibles**

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Operating Revenues | $ 359 | $ 374 | $ 479 | $ 511 | $ 544 |
| Net Income | $ 38 | $ 75 | $ 163 | $ 180 | $ 200 |
| Net Income Per Diluted Share | $ 0.15 | $ 0.29 | $ 0.64 | $ 0.71 | $ 0.78 |
| Cash Flow from Operations | $ 135 | $ 160 | $ 251 | $ 274 | $ 301 |
| Capital Expenditures | $ 66 | $ 107 | $ 61 | $ 60 | $ 66 |
| Free Cash Flow | $ 69 | $ 53 | $ 190 | $ 214 | $ 235 |

(a) Per the September 2011 Current Estimate, which reflects full year earnings per share of $1.53.

(b) Per the Noble Model (Base Case) dated October 2011.

C9

9

Noble_00564616

Confidential

# Project Sahara
## Accounting and Reporting Considerations



➤   If approved, the Sahara transaction will result in net cash proceeds of approximately $500 million and a  gain, net of tax, expected to range from $200 million to $250 million. Seller financing will approximate $200 million (to be recorded at fair value which we believe approximates face value).

➤   The tax consequences are complex and the cash proceeds above assume certain planned structuring  is successful. If unsuccessful, the presently anticipated deferral of approximately $70 million of taxes would be accelerated.

➤   If approved, the transaction will be presented as a discontinued operation beginning in Q4 (period the final plan is approved); however, the Q3 10-Q will have robust disclosure of the transaction.

➤   This is a "material" disposition for SEC purposes requiring the preparation and filing of pro forma financial statements in our 1933 and 1934 Act filings.

➤   The deal structure will result in multiple closings (with certain rigs deferred until later events) which will cause the transaction (gain recognition) to be booked in steps. However, all 21 rigs will be presented as discontinued operations initially (pursuant to the formal plan if approved).

➤   The results of operations for the deferred rigs will accrue to the buyer's benefit to be transferred upon final closing for the rig; such results will be deferred by Noble as realized.

Confidential

# Project Sahara
# Potential Use of Proceeds Options



> ### Cash proceeds after tax around $600 million

➢ Debt Repayment
  - ➢ Of $3.2 billion 2012 forward newbuild capital, $2.4 billion is speculative
  - ➢ Revolver balance of $1.1 billion in 2012 without a pay down
  - ➢ Debt pay down will relieve credit metrics
  - ➢ Sale viewed as a reinvestment in the fleet

➢ Share Repurchase
  - ➢ Enable ~17 million share repurchase; 2012 EPS accretion ~$0.30
  - ➢ Will stress credit metrics
  - ➢ Rating agencies will view as aggressive change in financial policy
  - ➢ Likely downgrade
  - ➢ Sale viewed as shareholder friendly action rather than fleet reinvestment

➢ Special Dividend
  - ➢ Special dividend would be ~$2.50 per share
  - ➢ Same considerations as share repurchases

➢ Acquisitions
  - ➢ Opportunities available to pursue additional jackup newbuild units for sale by speculative Norwegian companies

C11

Noble_00564618

Confidential

# Project Sahara
# Market Reaction



- ➤ Market reaction generally expected to be positive as we take definitive action (market has been expecting to see action in 2011)

- ➤ Sale begins to address issues with aging portion of our jackup fleet and combined with recent newbuilds, improves the average jackup age by 30%

- ➤ Market views on best use of proceeds will vary
  - ➤ Hedge funds might prefer special dividend, though more likely to hear call for increased yield post-2014 when newbuild program is complete and cash flow improved
  - ➤ Longer-term investors would likely prefer stock buyback, debt repayment, or continued investment in fleet

- ➤ May see comments to the effect that we still have more to do in terms of reshaping the fleet
  - ➤ Large number of jackups still over 25 years old

- ➤ Some investors may question the short-term wisdom of selling jackups with current earnings, however a well-articulated rationale should address any concerns
  - ➤ Focus will be on unit price and earnings dilution, but we have been preparing the market for a strategic sale for many months

Noble_00564619

**6/00/2013 Mexican Jackup Sale Analysis [Noble_00114741]**

DRAFT

Confidential





# Mexican Jackup Sale Analysis

June 2013

Private & Confidential

Noble_00114741

Confidential

# Mexican Jackup Rig Package

Noble_00114742

DRAFT

Confidential

# Mexican Jackup Fleet Detail

| Noble Corporation Mexican Rigs | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Jackups (11)** | | | | | | | | |
| Rig Name | Rig Class | Country | Year Built/ Rebuilt | Water Depth | Customer | Free Date | Current Dayrate ($000's) | ISI NAV |
| Bill Jennings | Jackup: Premium (< 2mm lb hookload, > 350 ft) | Mexico | 1997 R | 390 | Pemex | 1/31/2015 | $112 | $69.5 |
| Eddie Paul | Jackup: Premium (< 2mm lb hookload, > 350 ft) | Mexico | 1995 R | 390 | Pemex | 3/1/2016 | $112 | $70.0 |
| Leonard Jones | Jackup: Premium (< 2mm lb hookload, > 350 ft) | Mexico | 1998 R | 390 | Pemex | 4/4/2015 | $112 | $75.0 |
| Gene Rosser | Jackup: Water Depth > 300 ft; <350 ft | Mexico | 1996 R | 300 | Pemex | 6/30/2013 | $81 | $48.0 |
| John Sandifer | Jackup: Water Depth > 300 ft; <350 ft | Mexico | 1995 R | 300 | Pemex | 4/15/2016 | $101 | $48.0 |
| Johnnie Hoffman | Jackup: Water Depth > 300 ft; <350 ft | Mexico | 1993 R | 300 | Pemex | 4/1/2016 | $101 | $45.0 |
| Roy Butler | Jackup: Water Depth > 300 ft; <350 ft | Mexico | 1998 R | 300 | Pemex | 7/15/2014 | $82 | $45.0 |
| Sam Noble | Jackup: Water Depth > 300 ft; <350 ft | Mexico | 1982 | 300 | Pemex | 10/31/2014 | $90 | $48.0 |
| Carl Norberg | Jackup: Water Depth < 300 ft | Mexico | 2003 R | 250 | Pemex | 8/22/2014 | $68 | $35.0 |
| Earl Frederickson | Jackup: Water Depth < 300 ft | Mexico | 1999 R | 250 | Pemex | 9/9/2014 | $85 | $40.0 |
| Tom Jobe | Jackup: Water Depth < 300 ft | Mexico | 1982 | 250 | Pemex | 5/8/2015 | $85 | $40.0 |
| | | | | | | Total | | $563.5 |

Noble_0011474





DRAFT

Confidential

# Cash Flow Overview & PPR Analysis

## Cash Flow Overview

| ($ in millions) | 2013E | 2014E | 2015E | 2016E | 2017E |
|---|---|---|---|---|---|
| Revenue | $346.6 | $374.3 | $383.2 | $381.1 | $371.4 |
| Operating Expenses | (170.9) | (179.3) | (186.4) | (191.0) | (190.9) |
| EBITDA | $175.8 | $195.0 | $196.9 | $190.1 | $180.4 |
| Cash Taxes[1] | (22.8) | (25.4) | (25.6) | (24.7) | (23.5) |
| Capital Expenditures | (54.9) | (35.7) | (34.1) | (37.5) | (48.5) |
| **Unlevered Free Cash Flow** | **$98.0** | **$134.0** | **$137.2** | **$127.8** | **$108.5** |

## Purchase Price Ratio Analysis at Illustrative Valuations

| ($ in millions) | | | | | | | | NOBLE | Hercules | DIAMOND |
|---|---|---|---|---|---|---|---|---|---|---|
| **Purchase Price (Before Taxes)** | | $620 | $640 | $660 | $680 | $700 | $720 | $14,828 | $1,774 | $9,373 |
| **Multiple of:** | **Stat** | | | | | | | | | |
| 2013E EBITDA | $175.8 | 3.5x | 3.6x | 3.8x | 3.9x | 4.0x | 4.1x | 7.6x | 5.4x | 7.3x |
| 2014E EBITDA | $195.0 | 3.2x | 3.3x | 3.4x | 3.5x | 3.6x | 3.7x | 5.6x | 4.0x | 4.9x |
| 2015E EBITDA | $196.9 | 3.1x | 3.3x | 3.4x | 3.5x | 3.6x | 3.7x | 4.9x | 4.3x | 4.2x |
| Purchase Price / ISI NAV:[2] | $563.5 | 1.10x | 1.14x | 1.17x | 1.21x | 1.24x | 1.28x | 1.14x | 1.69x | 1.00x |
| Purchase Price per Rig: | 11 | $56 | $58 | $60 | $62 | $64 | $65 | | | |
| **Purchase Price (After Taxes)[3]** | | $449 | $463 | $478 | $492 | $507 | $521 | | | |
| **Multiple of:** | **Stat** | | | | | | | | | |
| 2013E EBITDA | $175.8 | 2.6x | 2.6x | 2.7x | 2.8x | 2.9x | 3.0x | 7.6x | 5.4x | 7.3x |
| 2014E EBITDA | $195.0 | 2.3x | 2.4x | 2.5x | 2.5x | 2.6x | 2.7x | 5.6x | 4.0x | 4.9x |
| 2015E EBITDA | $196.9 | 2.3x | 2.4x | 2.4x | 2.5x | 2.6x | 2.6x | 4.9x | 4.3x | 4.2x |
| Purchase Price / ISI NAV:[2] | $563.5 | 0.80x | 0.82x | 0.85x | 0.87x | 0.90x | 0.93x | 1.14x | 1.69x | 1.00x |
| Purchase Price per Rig: | 11 | $41 | $42 | $43 | $45 | $46 | $47 | | | |

Note: Projections per Noble Management.
1. Cash taxes are calculated based off of individual rig cash flows.
2. NAV values per January 2013 ISI Monthly Offshore Drilling Update.
3. Tax leakage at purchase price of $700 million per management estimates. Percentage tax leakage held constant at lower purchase prices.





Noble_00114744

Confidential

Noble_00114745

DRAFT

# DCF Analysis Analysis

**The End-of-Life DCF valuation suggests that the Mexico rigs have substantially more value to Noble than the after-tax proceeds that would be received from PetroSaudi**

## End-of-Life DCF Analysis As of 6/30/13

| ($ in millions) | | 2013E[1] | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Unlevered Free Cash Flow** | | | | | | | | | | | | |
| EBITDA | | $87.9 | $195.0 | $196.9 | $190.1 | $180.4 | $189.2 | $187.2 | $118.2 | $117.9 | $95.9 | $43.0 |
| Cash Taxes | | (11.4) | (25.4) | (25.6) | (24.7) | (23.5) | (24.6) | (24.3) | (15.4) | (15.3) | (12.5) | (5.6) |
| Capital Expenditures | | (27.4) | (35.7) | (34.1) | (37.5) | (48.5) | (36.7) | (37.4) | (21.7) | (21.9) | (23.8) | (6.6) |
| Unlevered Free Cash Flow | | 49.0 | 134.0 | 137.2 | 127.8 | 108.5 | 127.9 | 125.5 | 81.2 | 80.7 | 59.6 | 30.8 |
| Salvage Value | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.5 | 0.0 | 0.5 | 2.0 | 1.0 |
| Free Cash Flows | | 49.0 | 134.0 | 137.2 | 127.8 | 108.5 | 127.9 | 128.0 | 81.2 | 81.2 | 61.6 | 31.8 |
| | | | | | | | | | | | | |
| Discount Rate | 12.0% | 0.97x | 0.89x | 0.80x | 0.71x | 0.64x | 0.57x | 0.51x | 0.45x | 0.40x | 0.36x | 0.32x |
| Present Value of Cash Flows | | $47.6 | $119.6 | $109.4 | $91.0 | $68.9 | $72.6 | $63.6 | $36.7 | $32.6 | $21.5 | $9.9 |

| | 10% | 11% | 12% |
|---|---|---|---|
| **Discount Rate** | | | |
| **Net Present Value** | $719.8 | $695.9 | $673.4 |
| **Per Rig** | $65.4 | $63.3 | $61.2 |

Note: Projections per Noble Management.
1.  Represents second half of 2013 cash flows.



3



Confidential

# Noble's Fleet Quality Comparison

## Divestiture of the Mexico rigs does not substantively change Noble's fleet profile

### Floater Fleet Composition [1] [2]

| | ORIG | PACD | RDC | SDRL | ATW | RIG | NE Excl. MX | ESV | SQ NE | DO |
|---|---|---|---|---|---|---|---|---|---|---|
| UDW Drillships | 8 80% | 8 100% | 4 100% | 14 48% | 4 40% | 26 33% | 8 30% | 8 28% | 8 30% | 5 13% |
| UDW / High-Spec Semis | 2 20% | 0 0% | 0 0% | 14 48% | 2 20% | 9 11% | 6 22% | 8 28% | 6 22% | 8 21% |
| DP Deepwater Floaters | 0 0% | 0 0% | 0 0% | 0 0% | 0 0% | 6 8% | 3 11% | 6 21% | 3 11% | 1 3% |
| Moored Semis | 0 0% | 0 0% | 0 0% | 1 3% | 4 40% | 37 47% | 7 26% | 6 21% | 7 26% | 23 61% |
| Other | 0 0% | 0 0% | 0 0% | 0 0% | 0 0% | 1 1% | 3 11% | 1 3% | 3 11% | 1 3% |
| **Total Floaters** | **10 100%** | **8 100%** | **4 100%** | **29 100%** | **10 100%** | **79 100%** | **27 100%** | **29 100%** | **27 100%** | **38 100%** |
| | | | | | | | | | | |
| % High-Spec / UDW (Rigs) | 100% | 100% | 100% | 97% | 60% | 44% | 52% | 55% | 52% | 34% |
| % High-Spec / UDW (NAV) | 100% | 100% | 100% | 98% | 80% | 72% | 69% | 73% | 69% | 60% |

### Jackup Fleet Composition [1] [2]

| | ORIG | PACD | RDC | SDRL | ATW | RIG | NE Excl. MX | ESV | SQ NE | DO |
|---|---|---|---|---|---|---|---|---|---|---|
| High-Spec (> 2mm lb hookload, > 350 ft) | 0 0% | 0 0% | 19 63% | 15 52% | 0 0% | 0 0% | 9 25% | 4 9% | 9 19% | 1 14% |
| Premium (< 2mm lb hookload, > 350 ft) | 0 0% | 0 0% | 6 20% | 14 48% | 5 83% | 12 75% | 3 8% | 15 33% | 6 13% | 1 14% |
| Water Depth > 300 ft; <350 ft | 0 0% | 0 0% | 2 7% | 0 0% | 1 17% | 2 13% | 15 42% | 6 13% | 20 43% | 5 71% |
| Water Depth < 300 ft | 0 0% | 0 0% | 3 10% | 0 0% | 0 0% | 2 13% | 9 25% | 21 46% | 12 26% | 0 0% |
| **Total Jackups** | **0 0%** | **0 0%** | **30 100%** | **29 100%** | **6 100%** | **16 100%** | **36 100%** | **46 100%** | **47 100%** | **7 100%** |
| | | | | | | | | | | |
| % High-Spec / Premium (Rigs) | NA | NA | 83% | 100% | 83% | 75% | 33% | 41% | 32% | 29% |
| % High-Spec / Premium (NAV) | NA | NA | 98% | 100% | 96% | 100% | 74% | 73% | 64% | 54% |
| **Aggregate:** | | | | | | | | | | |
| % High-Spec (Rigs) | 100% | 100% | 85% | 98% | 69% | 49% | 41% | 47% | 39% | 33% |
| % High-Spec (NAV) | 100% | 100% | 98% | 97% | 82% | 74% | 70% | 73% | 67% | 59% |

Note: NAV values per January 2013 ISI Monthly Offshore Drilling Update.
1.  UDW defined as water depth greater than or equal to 7,500 ft; DW defined as water depth greater than or equal to 5,000 ft.  High-spec semis include 5th and 6th generation semis regardless of water depth.  Other drillships include rigs with water depths less than 5,000 ft. High-spec jackups defined as having hookload of ~2mm pounds or greater.  Premium jackups include IC jackups with a water depth greater than or equal to 350 ft. All water depths and hookloads per ODS-Petrodata.
2.  For the purposes of NAV, newbuilds are included at estimated cost.





Noble_00114746

Confidential

# Standard Co

Noble_00114747

DRAFT

Confidential

# Pro Forma Standard Co Fleet Detail

- **Status Quo Standard Co. excludes the Lewis Dugger, Don Walker, George Sauvageau and Lorris Bouzigard**

| ($ in millions) | Standard Co. | | Mexican Rig Package | | PF Standard Co. | |
|---|---|---|---|---|---|---|
| | Rigs [2] | % | Rigs | % | Rigs [2] | % |
| **Floaters:** | | | | | | |
| UDW Drillships | 0 | 0% | 0 | 0% | 0 | 0% |
| UDW / High-Spec Semis | 0 | 0% | 0 | 0% | 0 | 0% |
| DP Deepwater Drillships | 3 | 7% | 0 | 0% | 3 | 10% |
| Moored Semis | 2 | 5% | 0 | 0% | 2 | 6% |
| Other Drillships | 2 | 5% | 0 | 0% | 2 | 6% |
| **Total Floaters** | **7** | **17%** | **0** | **0%** | **7** | **23%** |
| | | | | | | |
| **Total Floater NAV [3]** | **$1,638** | **49%** | **$0** | **0%** | **$1,638** | **59%** |
| **Total Floater Backlog [4]** | **$1,962** | **58%** | **$0** | **0%** | **$1,962** | **71%** |
| | | | | | | |
| **Jackups:** | | | | | | |
| High-Spec (> 2mm lb hookload, > 350 ft) | 0 | 0% | 0 | 0% | 0 | 0% |
| Premium (< 2mm lb hookload, > 350 ft) | 5 | 12% | 3 | 27% | 2 | 6% |
| Water Depth > 300 ft; <350 ft | 16 | 38% | 5 | 45% | 11 | 35% |
| Water Depth < 300 ft | 11 | 26% | 3 | 27% | 8 | 26% |
| **Total Jackups** | **32** | **76%** | **11** | **100%** | **21** | **68%** |
| | | | | | | |
| **Total Jackup NAV [3]** | **$1,562** | **47%** | **$564** | **100%** | **$999** | **36%** |
| **Total Jackup Backlog [4]** | **$1,420** | **42%** | **$608** | **100%** | **$812** | **29%** |
| | | | | | | |
| Submersibles | 2 | 5% | 0 | 0% | 2 | 6% |
| FPSO | 1 | 2% | 0 | 0% | 1 | 3% |
| | | | | | | |
| **Total Fleet NAV [3]** | **$3,358** | **100%** | **$564** | **100%** | **$2,795** | **100%** |
| **Total Fleet Backlog [4]** | **$3,382** | **100%** | **$608** | **100%** | **$2,774** | **100%** |

Note: NAV values per January 2013 ISI Monthly Offshore Drilling Update.
1. UDW defined as water depth greater than or equal to 7,500 ft; DW defined as water depth greater than or equal to 5,000 ft. High-spec semis include 5th and 6th generation semis regardless of water depth. Other drillships include rigs with water depths less than 5,000 ft. High-spec jackups defined as having hookload of ~2mm pounds or greater. Premium jackups include IC jackups with a water depth greater than or equal to 350 ft. All water depths and hookloads per ODS-Petrodata.
2. Standard Co total fleet NAV includes submersibles NAV of $8 million and FPSO NAV of $150 million.
3. NAV adjusted for estimated newbuild capex.
4. Backlog as of December 31, 2012 per management.





Noble_00114748

DRAFT

# Cash Flow Comparison

| Standard Co Status Quo [1] | | | | | |
|---|---|---|---|---|---|
| ($ in millions) | 2013E | 2014E | 2015E | 2016E | 2017E |
| Revenue | $1,615.1 | $1,759.8 | $1,784.1 | $1,753.3 | $1,719.3 |
| Operating Expenses | (890.4) | (969.7) | (1,007.8) | (1,035.4) | (1,048.7) |
| SG&A | (60.0) | (60.0) | (60.0) | (60.0) | (60.0) |
| EBITDA | $664.7 | $730.1 | $716.3 | $657.9 | $610.6 |
| Cash Taxes [2] | (59.1) | (52.3) | (47.6) | (35.5) | (19.5) |
| Capital Expenditures | (442.6) | (367.0) | (379.2) | (394.5) | (432.6) |
| **Unlevered Free Cash Flow** | **$162.9** | **$310.8** | **$289.6** | **$227.9** | **$158.5** |

| Standard Co Pro Forma for Mexican Rig Sale | | | | | |
|---|---|---|---|---|---|
| ($ in millions) | 2013E | 2014E | 2015E | 2016E | 2017E |
| Revenue | $1,268.5 | $1,385.5 | $1,400.9 | $1,372.2 | $1,347.9 |
| Operating Expenses | (719.6) | (790.5) | (821.5) | (844.4) | (857.7) |
| SG&A | (60.0) | (60.0) | (60.0) | (60.0) | (60.0) |
| EBITDA | $488.9 | $535.1 | $519.4 | $467.8 | $430.2 |
| Cash Taxes [2] | (39.2) | (31.2) | (25.4) | (15.0) | (1.8) |
| Capital Expenditures | (387.8) | (331.2) | (345.1) | (357.0) | (384.1) |
| **Unlevered Free Cash Flow** | **$61.9** | **$172.6** | **$149.0** | **$95.8** | **$44.3** |

1. *Assumes Lewis Dugger, Don Walker, George Sauvageau and Lorris Bouzigard are excluded.*
2. *Cash taxes are calculated at a corporate level based on an income tax rate of 19%.*





Confidential

Noble_00114749

DRAFT

Confidential

# Illustrative Equity Value

| Noble Valuation – No Spin-Off | Noble SQ (W / 4 Rig Sale) | Sale of Mexican Rigs [1] |
|---|---|---|
| 2014E EBITDA Mulitple [2] | 6.3x | 6.3x |
| 2014E Pro Forma EBITDA | $2,537 | $2,342 |
| | | |
| Status Quo Co Adjusted Enterprise Value | 16,073 | 14,837 |
| Remaining Capex through YE 2013 (Q2 - Q4) | (1,593) | (1,593) |
| Less: YE 2013 Net Debt | (6,179) | (6,179) |
| Plus: Proceeds From Asset Sale | 168 | 673 |
| Less: Non-Controlling Interest (Bully JVs) | (767) | (767) |
| Plus: Incremental Debt  (Q2 - Q4) | 1,534 | 1,534 |
| Status Quo Co Equity Value | $9,237 | $8,505 |
| | | |
| Current Fully Diluted Share Count | 254.9 | 254.9 |
| Implied Share Price | $36.24 | $33.37 |
| Premium / Discount to Current | (1.7%) | (9.4%) |
| | | |
| Current Share Price | $36.85 | |

| Noble Valuation – Spin-Off | | |
|---|---|---|
| **High-Spec Co Valuation** | | **No Sale of Mexican Rigs** |
| 2014E Adjusted EBITDA Multiple | | 8.0x |
| 2014E Pro Forma EBITDA | | $1,766 |
| | | |
| High-Spec Co Adjusted Enterprise Value | | 14,127 |
| Remaining Capex through YE 2013  (Q2 - Q4) | | (1,593) |
| Less: Pro Forma Net Debt | | (6,058) |
| Plus: Proceeds From Asset Sale / Spin Proceeds | | 1,932 |
| Less: Non-Controlling Interest (Bully JVs) | | (767) |
| High-Spec Co Equity Value | | $7,641 |
| **Standard Co Valuation** | | **No Sale of Mexican Rigs** |
| 2014E Adjusted EBITDA Multiple | | 5.0x |
| 2014E Pro Forma EBITDA | | $730 |
| | | |
| Standard Co Enterprise Value | | 3,650 |
| Less: Pro Forma Net Debt at IPO | | (1,395) |
| Fully Distributed Standard Co Equity Value | | $2,255 |
| Less: IPO Discount | | 15% |
| Equity Value at IPO | | $1,961 |
| | | |
| Illustrative IPO Size | | $386 |
| Implied % of Equity | | 19.7% |
| **Aggregate Valuation** | | **No Sale of Mexican Rigs** |
| High-Spec Co Equity Value | | $7,641 |
| Standard Co Equity Value | | 2,255 |
| Less: Value Attributable to IPO Equity | | (444) |
| Plus: Incremental Net Debt  (Q2 - Q4) | | 1,534 |
| Equity Value to Current Shareholders | | $10,986 |
| | | |
| Current Fully Diluted Share Count | | 254.9 |
| Implied Share Price | | $43.10 |
| Premium / Discount to Current | | 17.0% |

Note: 2013E and 2014E EBITDA per management estimates.
1.  Assumes a $700 million pre-tax purchase price.
2.  Based on current Adjusted EBITDA multiple implied by current management estimates.





Noble_00114750

DRAFT

# Pro Forma Capitalization

## Capitalization [1]

- **Status Quo includes the 4 rig sale of the Lewis Dugger, Don Walker, George Sauvageau and Lorris Bouzigard**

| ($ in millions) | SQ Noble 12/31/2013 | PF Noble For Sale of Mexican Rigs 12/31/2013 | Spin-off / With IPO Proceeds No Sale of Mexican Rigs | |
|---|---|---|---|---|
| | | | High-Spec Co 12/31/2013 | Standard Co 12/31/2013 |
| Cash and Equivalents | $150.4 | $150.4 | $175.0 | $100.0 |
| | | | | |
| Senior Unsecured Credit Facility | $2,327.6 | $2,327.6 | $467.9 | $0.0 |
| Cash Proceeds From Asset Sale | (165.7) | (672.5) | (168.1) | - |
| NE Senior Notes due 2013 | - | - | - | - |
| NE Senior Notes due 2014 | 250.0 | 250.0 | 250.0 | - |
| NE Senior Notes due 2015 | 350.0 | 350.0 | 350.0 | - |
| NE Senior Notes due 2016 | 300.0 | 300.0 | 300.0 | - |
| NE Senior Notes due 2017 | 300.0 | 300.0 | 300.0 | - |
| NE Senior Notes due 2019 | 201.7 | 201.7 | 201.7 | - |
| NE Senior Notes due 2020 | 500.0 | 500.0 | 500.0 | - |
| NE Senior Notes due 2021 | 400.0 | 400.0 | 400.0 | - |
| NE Senior Notes due 2022 | 400.0 | 400.0 | 400.0 | - |
| NE Senior Notes due 2040 | 400.0 | 400.0 | 400.0 | - |
| NE Senior Notes due 2041 | 400.0 | 400.0 | 400.0 | - |
| NE Senior Notes due 2042 | 500.0 | 500.0 | 500.0 | - |
| NewCo Debt | - | - | - | 1,495.5 |
| Total Debt | $6,163.7 | $5,656.8 | $4,301.4 | $1,495.5 |
| | | | | |
| Total Equity | $9,020.0 | $8,915.3 | $7,576.1 | $1,936.4 |
| | | | | |
| **Total Capitalization** | **$15,183.6** | **$14,572.1** | **$11,877.5** | **$3,431.9** |
| | | | | |
| 2013E EBITDA (PF for Sale of Rigs) | $1,895.3 | $1,719.5 | $1,191.0 | $664.7 |
| 2014E EBITDA | $2,537.1 | $2,342.0 | $1,765.9 | $730.1 |
| | | | | |
| **Credit Metrics** | | | | |
| Total Debt / Total Capitalization | 40.6% | 38.8% | 36.2% | 43.6% |
| Total Debt / 2013E EBITDA | 3.25x | 3.29x | 3.61x | 2.25x |
| Total Debt / 2014E EBITDA | 2.43x | 2.42x | 2.44x | 2.05x |

Note: 2013E and 2014E EBITDA per management estimates. Kulluck currently not allocated to either High-Spec Co or Standard Co in model.
1. Assumes proceeds from Standard Co senior notes issuance and IPO are distributed to High-Spec Co and used to pay down High-Spec Co debt at par. Cash to High-Spec Co is net of IPO proceeds and transaction fees and expenses. Assumes no upfront tax costs..





Confidential

Noble_00114751

DRAFT

Confidential

# Preliminary Conclusions

- The 11 Mexican jackup rigs are generally older and standard-specification, but the rigs do have significant value and generate strong cash flow over the next several years

  - The rigs are projected to generate between $176 - $197 million in EBITDA and $98 - $137 million in free cash flow per year from 2013 through 2017

- PetroSaudi's offer of $620 million values the package on a pre-tax basis at $56 million per rig and represents a multiple of 3.5x 2013 EBITDA and 3.2x 2014 EBITDA; at a $720 million purchase price, the resulting EBITDA multiples would be 4.1x and 3.7x, respectively (pre-tax)

  - These purchase price multiples are significantly lower than both Noble's current trading multiples (7.6x 2013 EBITDA and 5.6x 2014 EBITDA) and Hercules' multiples (5.4x 2013 EBITDA and 4.0 2014 EBITDA)

  - There are expected to be significant cash taxes that will result from a sale of the Mexico rigs; up to ~$200 million in taxes could become due from selling the rigs, reducing net proceeds to $449 - $521 million after taxes

    - Based on net proceeds, the purchase multiples decline to less than 3.0x EBITDA

  - Based on the Noble corporate model, the after-tax blowdown value of the rigs is $673 - 720 million, more than 25% higher than expected after-tax proceeds at a $720 million purchase price ($521 million)

- Divesting the Mexico rigs does not materially change Noble's fleet composition and does not achieve the strategic objective of repositioning Noble as a high-spec / modern drilling contractor

- Without the Mexico rigs, a spin-off of Standard Co may become more challenging

  - The scale and footprint of the Standard Co assets will be diminished as a result of the divestiture

  - On average, free cash flow at Standard Co would be reduced by ~60%, which could impair the company's ability to delever or invest in growth

  - Cash flow volatility at Standard Co would also increase, with free cash flows ranging from $44 - $173 million per year from 2013 through 2017

  - As a result, Standard Co's IPO and debt financings may be less attractive to the capital markets



**C24**



Noble_00114752

Confidential

# Appendices

Noble_00114753

DRAFT

Confidential

# Comparable Companies

## Summary

| ($ in millions) Company Name: Ticker Symbol: Financial Data as of: | Atwood Oceanics ATW 3/31/13 | Diamond Offshore DO 3/31/13 | ENSCO International ESV 3/31/13 | Hercules Offshore HERO 3/31/13 | Noble Corporation NE 3/31/13 | Rowan Companies RDC 3/31/13 | Seadrill SDRL 3/31/13 | Transocean RIG 3/31/13 | Ocean Rig ORIG 3/31/13 | Pacific Drilling PACD 3/31/13 | Vantage Drilling VTG 3/31/13 | Median |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Current Stock Price as of 6/25/13: | $52.10 | $67.14 | $56.76 | $7.02 | $36.94 | $33.79 | $39.31 | $47.53 | $17.07 | $9.35 | $1.82 | |
| As a % of 52-Week High | 92% | 87% | 86% | 90% | 87% | 86% | 94% | 80% | 93% | 85% | 90% | |
| Fully Diluted Shares Outstanding | 65.2 | 139.0 | 233.2 | 160.6 | 254.9 | 124.4 | 470.0 | 360.3 | 131.8 | 216.9 | 302.1 | |
| Equity Market Value | $3,396 | $9,335 | $13,235 | $1,128 | $9,415 | $4,202 | $18,477 | $17,127 | $2,250 | $2,028 | $550 | |
| Preferred Stock | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Total Debt | 1,040 | 1,496 | 4,831 | 866 | 4,844 | 2,010 | 10,754 | 11,203 | 2,812 | 2,200 | 2,837 | |
| Cash and Equivalents | (118) | (1,458) | (562) | (219) | (215) | (1,019) | (2,797) | (3,689) | (248) | (468) | (457) | |
| Minority Interest | 0 | 0 | 7 | 0 | 783 | 0 | 639 | (22) | 0 | 0 | 0 | |
| Enterprise Value | $4,319 | $9,373 | $17,510 | $1,774 | $14,828 | $5,193 | $27,073 | $24,619 | $4,814 | $3,760 | $2,930 | |
| **Equity Market Value as a Multiple of:** | | | | | | | | | | | | |
| CFFO: 2013E | 7.2 x | 8.5 x | 6.2 x | 5.1 x | 5.5 x | 7.6 x | 9.2 x | 6.6 x | 8.2 x | 8.6 x | 6.8 x | 7.2 x |
| 2014E | 6.0 x | 6.5 x | 5.3 x | 3.6 x | 4.4 x | 5.4 x | 7.3 x | 5.1 x | 4.0 x | 4.9 x | 2.6 x | 5.1 x |
| 2015E | NM | 6.0 x | 4.9 x | 3.9 x | 4.1 x | 4.0 x | NM | 4.8 x | 3.2 x | 3.6 x | 2.0 x | 4.0 x |
| Net Income: 2013E | 9.6 x | 14.5 x | 8.7 x | 23.7 x | 13.2 x | 15.3 x | 14.3 x | 10.8 x | 43.7 x | 34.1 x | 36.4 x | 14.5 x |
| 2014E | 7.8 x | 9.4 x | 7.3 x | 9.0 x | 8.2 x | 9.2 x | 11.0 x | 7.9 x | 7.9 x | 12.0 x | 5.3 x | 8.2 x |
| 2015E | NM | 8.3 x | 6.5 x | 9.9 x | 6.8 x | 5.9 x | 9.1 x | 7.4 x | 6.3 x | 6.5 x | 3.9 x | 6.6 x |
| Net Asset Value: | 1.1 x | 1.0 x | 1.1 x | 2.8 x | 1.2 x | 0.8 x | 2.0 x | 0.7 x | NA | 1.3 x | NA | 1.1 x |
| Replacement Value: | 1.0 x | 0.6 x | 0.9 x | 0.2 x | 0.7 x | 0.6 x | 2.6 x | 0.6 x | NA | 1.7 x | NA | 0.7 x |
| **Enterprise Value as a Multiple of:** | | | | | | | | | | | | |
| EBITDA: 2013E | 7.6 x | 7.3 x | 6.9 x | 5.4 x | 7.6 x | 8.2 x | 10.2 x | 6.7 x | 10.0 x | 10.7 x | 8.4 x | 7.6 x |
| 2014E | 6.1 x | 4.9 x | 6.0 x | 4.0 x | 5.6 x | 5.8 x | 8.3 x | 5.5 x | 5.5 x | 6.3 x | 6.4 x | 5.8 x |
| 2015E | NM | 4.2 x | 5.4 x | 4.3 x | 4.9 x | 4.2 x | 7.0 x | 5.2 x | 4.9 x | 4.7 x | 6.1 x | 4.9 x |
| Net PP&E: | 1.5 x | 1.9 x | 1.3 x | 1.2 x | 1.1 x | 0.9 x | 2.1 x | 1.2 x | 0.9 x | 1.0 x | 1.1 x | 1.2 x |
| Backlog: | 1.8 x | 1.2 x | 1.5 x | 2.7 x | 1.0 x | 1.6 x | 1.4 x | 0.9 x | 1.0 x | 1.1 x | 0.9 x | 1.2 x |
| Asset Value: | 1.1 x | 1.0 x | 1.1 x | 1.7 x | 1.1 x | 0.8 x | 1.5 x | 0.8 x | NA | 1.1 x | NA | 1.1 x |
| **Adjusted Enterprise Value as a Multiple of:** | | | | | | | | | | | | |
| EBITDA: 2013E | 7.6 x | 7.3 x | 6.9 x | 5.4 x | 7.6 x | 8.2 x | 10.2 x | 6.7 x | 10.0 x | 10.7 x | 8.4 x | 7.6 x |
| 2014E | 6.4 x | 5.7 x | 6.3 x | 4.2 x | 6.2 x | 6.6 x | 9.1 x | 5.8 x | 7.1 x | 7.7 x | 7.5 x | 6.4 x |
| 2015E | NA | 5.4 x | 6.0 x | 4.5 x | 5.8 x | 5.6 x | 8.3 x | 5.6 x | 6.3 x | 5.9 x | 7.2 x | 5.9 x |
| **Credit Statistics:** | | | | | | | | | | | | |
| Total Debt / Total Book Cap | 33.0% | 24.4% | 28.6% | 48.5% | 35.9% | 30.4% | 62.5% | 41.1% | 49.1% | 48.5% | 86.4% | 41.1% |
| Total Debt / 2013E EBITDA | 1.8 x | 1.2 x | 1.9 x | 2.6 x | 2.5 x | 3.2 x | 4.0 x | 3.1 x | 5.8 x | 6.3 x | 8.1 x | 3.1 x |
| Net Debt / 2013E EBITDA | 1.6 x | 0.0 x | 1.7 x | 2.0 x | 2.4 x | 1.6 x | 3.0 x | 2.1 x | 5.3 x | 4.9 x | 6.8 x | 2.1 x |
| Total Debt / 2014E EBITDA | 1.5 x | 0.8 x | 1.7 x | 1.9 x | 1.8 x | 2.2 x | 3.3 x | 2.5 x | 3.2 x | 3.7 x | 6.2 x | 2.2 x |
| Net Debt / 2014E EBITDA | 1.3 x | 0.0 x | 1.5 x | 1.4 x | 1.8 x | 1.1 x | 2.4 x | 1.7 x | 2.9 x | 2.9 x | 5.2 x | 1.7 x |
| **Credit Ratings:** | | | | | | | | | | | | |
| S&P Rating (Outlook) | BB (Stbl.) | A- (Stbl.) | BBB+ (Stbl.) | B (Stbl.) | BBB+ (Stbl.) | WR | NR | BBB- (Neg.) | BB (Stbl.) | NR | B- (Stbl.) | |
| Moody's Rating (Outlook) | Ba2 (Stbl.) | A3 (Stbl.) | Baa1 (Stbl.) | B2 (Stbl.) | WR | WR | NR | Baa3 (Neg.) | B (Neg.) | B (Stbl.) | NR | |





Noble_00114754

DRAFT

# Asset Sale Proceeds

## Summary[1]

| ($ in millions) | Without a Spin | |
| --- | --- | --- |
| **Non-Core** | **Estimated Taxes** | **After Tax Proceeds** |
| Lewis Dugger | $15.3 | $45.7 |
| Don Walker | 5.1 | 12.9 |
| Lorris Bouzigard | 24.1 | 50.9 |
| George Sauvageau | 23.8 | 56.2 |
| **Subtotal** | **$68.3** | **$165.7** |

| | Without a Spin | |
| --- | --- | --- |
| **Petrosaudi Mexico Sale** | **Estimated Taxes** | **After Tax Proceeds** |
| Bill Jennings | $23.9 | $51.1 |
| Eddie Paul | 22.7 | 52.3 |
| Leonard Jones | 22.9 | 52.1 |
| Roy Butler | 14.0 | 51.0 |
| Johnnie Hoffman | 16.9 | 48.1 |
| Gene Rosser | 14.6 | 50.4 |
| John Sandifer | 19.9 | 45.1 |
| Sam Noble | 16.7 | 48.3 |
| Earl Fredrickson | 14.6 | 35.4 |
| Tom Jobe | 13.0 | 37.0 |
| Carl Norberg | 14.0 | 36.0 |
| Subtotal | **$193.2** | **$506.8** |
| **Total** | **$261.5** | **$672.5** |

1.    *Per Noble Management.*





Confidential

DRAFT

# Disclaimer

This document has been prepared by Barclays Capital, the investment banking division of Barclays Bank PLC ("Barclays"), for information purposes only. This document is an indicative summary of the terms and conditions of the securities described herein and may be amended, superseded or replaced by subsequent summaries. The final terms and conditions of the securities will be set out in full in the applicable offering document(s) or binding transaction document(s).

This document shall not constitute an underwriting commitment, an offer of financing, an offer to sell, or the solicitation of an offer to buy any securities described herein, which shall be subject to Barclays' internal approvals. No transaction or services related thereto is contemplated without Barclays' subsequent formal agreement. Barclays is not acting as a fiduciary.  Accordingly you must independently determine, with your own advisors, the appropriateness for you of the securities before investing or transacting. Barclays accepts no liability whatsoever for any consequential losses arising from the use of this document or reliance on the information contained herein.

Barclays does not guarantee the accuracy or completeness of information which is contained in this document and which is stated to have been obtained from or is based upon trade and statistical services or other third party sources. Any data on past performance, modeling or back-testing contained herein is no indication as to future performance. No representation is made as to the reasonableness of the assumptions made within or the accuracy or completeness of any modeling or back-testing or any other information contained herein. All opinions and estimates are given as of the date hereof and are subject to change and Barclays assumes no obligation to update this document to reflect any such changes. The value of any investment may fluctuate as a result of market changes. The information herein is not intended to predict actual results and no assurances are given with respect thereto. Nothing herein shall be deemed to constitute investment, legal, tax, financial, accounting or other advice.

Barclays, its affiliates and the individuals associated therewith may (in various capacities) have positions or deal in transactions or securities (or related derivatives) identical or similar to those described herein.

IRS Circular 230 Disclosure: Barclays Capital and its affiliates do not provide tax advice. Please note that (i) any discussion of U.S. tax matters contained in this communication (including any attachments) cannot be used by you for the purpose of avoiding tax penalties; (ii) this communication was written to support the promotion or marketing of the matters addressed herein; and (iii) you should seek advice based on your particular circumstances from an independent tax advisor. Notwithstanding anything herein to the contrary, each recipient hereof (and their employees, representatives, and other agents) may disclose to any and all persons, without limitation of any kind from the commencement of discussions, the U.S. federal and state income tax treatment and tax structure of the proposed transaction described herein and all materials of any kind (including opinions or other tax analyses) that are provided relating to such tax treatment and tax structure.  For this purpose, "tax structure" is limited to facts relevant to the U.S. federal and state income tax treatment of the proposed transaction described herein and does not include information relating to the identity of the parties, their affiliates, agents or advisors.

BARCLAYS CAPITAL INC., THE UNITED STATES AFFILIATE OF BARCLAYS CAPITAL, THE INVESTMENT BANKING DIVISION OF BARCLAYS BANK PLC, ACCEPTS RESPONSIBILITY FOR THE DISTRIBUTION OF THIS DOCUMENT IN THE UNITED STATES. ANY TRANSACTIONS BY U.S. PERSONS IN ANY SECURITY DISCUSSED HEREIN MUST ONLY BE CARRIED OUT THROUGH BARCLAYS CAPITAL INC., 745 SEVENTH AVENUE, NEW YORK, NY 10019.

NO ACTION HAS BEEN MADE OR WILL BE TAKEN THAT WOULD PERMIT A PUBLIC OFFERING OF THE SECURITIES DESCRIBED HEREIN IN ANY JURISDICTION IN WHICH ACTION FOR THAT PURPOSE IS REQUIRED. NO OFFERS, SALES, RESALES OR DELIVERY OF THE SECURITIES DESCRIBED HEREIN OR DISTRIBUTION OF ANY OFFERING MATERIAL RELATING TO SUCH SECURITIES MAY BE MADE IN OR FROM ANY JURISDICTION EXCEPT IN CIRCUMSTANCES WHICH WILL RESULT IN COMPLIANCE WITH ANY APPLICABLE LAWS AND REGULATIONS AND WHICH WILL NOT IMPOSE ANY OBLIGATION ON BARCLAYS OR ANY OF ITS AFFILIATES.

THIS DOCUMENT DOES NOT DISCLOSE ALL THE RISKS AND OTHER SIGNIFICANT ISSUES RELATED TO AN INVESTMENT IN THE SECURITIES. PRIOR TO TRANSACTING, POTENTIAL INVESTORS SHOULD ENSURE THAT THEY FULLY UNDERSTAND THE TERMS OF THE SECURITIES AND ANY APPLICABLE RISKS.

Barclays Bank PLC is registered in England No. 1026167. Registered Office: 1 Churchill Place, London E14 5HP. Copyright Barclays Bank PLC, 2011 (all rights reserved). This document is confidential, and no part of it may be reproduced, distributed or transmitted without the prior written permission of Barclays.

Noble_00114756





**11/21/2013 D. Olivares Email [Noble_00150027]**

**From:** Bodley Thornton [BThornton@noblecorp.com]
**Sent:** Monday, November 25, 2013 2:45 PM
**To:** Roger Hunt
**Subject:** FW: Pemex meeting nov 14


-----Original Message-----
From: Daniel Olivares [mailto:dolivares@spdmx.com]
Sent: Thursday, November 21, 2013 12:37 PM
To: Bodley Thornton
Cc: Jim Ruehlen
Subject: Pemex meeting nov 14

Budly,

Ken Nettles and I had a meeting with Ing Martin Terrazas who is acting as Sub director of the drilling unit while Ing Baudelio is in charge of controlling a Gas well in land in Tabasco.

Mr Terrazas insisted that we have to substitute the old rigs for new rigs. They have plans to renew the five rigs that are going out of contract this year for maximum of two years and as new rigs show up in Pemex they will start to substitute the new rigs for the standard rigs and at the end they will only keep some standard rigs to do work overs.

He want us to come up with a plan. If our intention is to renew our Mexican fleet, Pemex will work together with us to renew the fleet in a period of 4 to 5 years. We also asked him about their needs for deep water and he was very clear that they don't have nothing in their mind for the next 3 to 5 years all they are considering is a1500' semi for next year.

Their renewal program for our rigs that are going out of contract on 2014 is as follow, please note that this information is subject to change.

300' NRB finishes june 16 program 286 days
250' NCN sept 14 762
300' NSN oct 20 667
250' NEF nov 14 732
350' NLJ dec 31 622

Regards

Daniel Olivares

**C29**

Confidential

Noble_00150027

**2/5/2014 TSUL Servicios Limited Agency Agreement [PGN20190177188]**

## LIMITED AGENCY AGREEMENT

THIS LIMITED AGENCY AGREEMENT (this "*Agreement*") is made as of the 5th. day of February 2014, between **TSUL Servicios, S.A.P.I. de C.V.**, having an office at Professor J.H. Bavincklaan 7, 1183 AT, Amstelveen, hereinafter collectively referred to as "*Agent*," and **Noble Leonard Jones LLC**, company registered in Switzerland having an office at Dorfstrasse 19a, 6340 Baar, Zug, Switzerland, hereinafter referred to as "*Company*". Company and Agent are each hereinafter referred to as a "*Party*" and collectively as the "*Parties*".

WHEREAS, Company and its affiliated companies are engaged in the business of drilling or reworking oil and gas and other wells on a contract basis for other companies, and in the course of such business regularly and customarily enter into contracts with independent contractors for the performance of service or the provision of equipment and goods relating thereto; and

WHEREAS, Agent represents that it is capable of efficiently performing its duties under this Agreement;

NOW THEREFORE, in consideration of the mutual promises, conditions and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto mutually agree as follows:

### 1. APPOINTMENT

Company hereby appoints and confirms Agent as its agent, on a non-exclusive basis, having the duties described herein with respect to employment of Company's affiliate's offshore drilling rigs (the "*Rig*" or "*Rigs*"), as specifically named in Exhibit C hereof and as amended from time to time by the Company, within the territorial waters of the country of Mexico pursuant to one or more drilling contracts (the "Drilling Contracts")., which have been or will be entered into pursuant to a tender ("*Tender*") with PEMEX EXPLORACION E PRODUCCION ("*Client*"). 

Agent is not appointed to represent Company for any other purpose under this Agreement. Company does not appoint Agent to act as its general agent, or as an agent for any purpose other than as explicitly set forth in this Agreement. Agent and its employees and representatives shall at all times be independent contractors, and shall not under any circumstance be deemed employees of Company.

### 2. DUTIES

Agent agrees to use its best efforts to perform the following duties for Company under this Agreement (the "Duties"):

A.     To provide advice and counsel pertaining to local laws and customs which would affect the operations of the Rigs in connection with the Drilling Contracts.

**C30**

CONFIDENTIAL                                        PGN20190177188

B.      To assist in the entry and departure of Company's equipment and personnel to and from the country of Mexico or any other country in connection with the Drilling Contracts.

C.      To assist, at the direction of Company, in the resolution of any disputed matters between Company and Client (including, without limitation, payment of sums due) arising out of, incidental to or in connection with the Drilling Contracts.

D.      To solicit further employment of the Rigs pursuant to Drilling Contracts entered as a result of the Tender at prices and upon terms and conditions approved in writing by Company prior to submission to Client. In the event that any Tender is successful, the Parties agree that Exhibit C shall be amended by Company reflecting the addition of the new Drilling Contract and the addition of the new Rig or Rigs. Correspondingly, Exhibit C shall be amended by Company to reflect the termination or cancellation of any Drilling Contract or the loss or substitution of any Rig as described in Exhibit C.

### 3. COMMISSIONS

A.      As Agent's sole compensation for the services rendered under this Agreement, Company shall pay to Agent a commission equal to two percent (2%) of the total day rate actually paid to Company by Client under the relevant Drilling Contract pursuant to the Line Items with the wording "Daily Operating Rate for Jackup Rig" and "Daily Rate During Move of the Rig Between Well Sites" or other similar wording in the relevant Appendix of the Drilling Contract (the "**Commission**"). Notwithstanding anything else contained herein, the Commission to be paid to Agent under this Agreement shall in no event be calculated based on a day rate that exceeds Two Hundred Thousand and no/100 United States Dollars (US$ 200,000.00), regardless of whether the actual day rate paid to the Company by the Client under the Drilling Contract exceeds Two Hundred Thousand and no/100 United States Dollars (US$ 200,000.00). The Commission shall be paid by Company to Agent in accordance with Section 3(E) below. 

B.      Notwithstanding anything to the contrary in this Agreement, Agent understands and agrees that neither Company shall have an obligation to pay the Commission to Agent unless and until (1) the final written Drilling Contract for the Rig is entered into between Company and Client, and (2) Company receives payment from Client for services rendered under the Drilling Contract; and, under no circumstances will the Commission be due to Agent based on any other amounts paid to Company with respect to the Drilling Contract, including amounts reimbursable to Company by Client, including, without limitation, Line Items in the relevant Appendix of the Drilling Contract representing "Mobilization of Jackup Rig to Well Site to Commence Leasing Agreement", "Sonar Equipment Service", "Autonomous DGPS Positioning Equipment Service, Including Operator and Additional GPS Antenna for Tugboats" and "Demobilization of Jackup Rig at End of Leasing Agreement", "Reimbursable Expenses" or other similar wording as indicated by either Company.

C.      Agent agrees and understands that should Company at any time discover that Company has overpaid the Commission, including, without limitation, in the case of overpayment by Client of the day rate amount, Agent shall return such overpayment to the paying Company within fifteen (15) days of receipt by Agent of written notice from said Company of the same.

2

**C31**

D.     It is understood that (1) Company and its affiliates' officers, employees and agents may market Company's and its affiliates' rigs, equipment and services in Mexico, (2) other rigs, equipment and services of Company and its affiliates are marketed and/or operated in Mexico, (3) Company  and its affiliates' officers, employees and agents may market the Rig to and operate the Rig for Client pursuant to contracts entered into other than as a result of a Tender and (4) Company and its affiliates may market the Rig to and operate the Rig for other clients in Mexico other than Client, and that in each such case no commission shall be payable to Agent for such activities.

E.     Payment of the Commission due to Agent under this Agreement shall be made by the applicable Company within fifteen (15) days of receipt by Company of invoice from Agent pursuant to Section 3(A) above. All amounts due and payable to Agent pursuant to this Agreement shall be paid in United States Dollars. The Commission shall be paid by the applicable Company to Agent by wire transfer to a United States bank account in Agent's name, which has previously been identified to Company (the "*Bank Account*"):

F.     Agent specifically stipulates and acknowledges that in executing this Agreement and, further, insofar as this Agreement refers to the Rig or a mobile offshore drilling unit of Company or its affiliates, that the Agent is relying solely and exclusively upon Company for payment. Agent, in furtherance of and in performance of this Agreement, stipulates and acknowledges that it is not relying upon the credit of the Rig or any such other mobile offshore drilling unit or upon the credit of any vessel, equipment or material owned by Company or its affiliates.



## 4. NO AUTHORITY TO BIND

Agent shall not have, nor shall it represent itself as having, any authority to bind or commit Company or its affiliates, enter into any contract or other legal commitments in the name of, or binding on, Company or its affiliates or to pledge their respective credit or to extend credit in their respective names.

## 5. EXPENSES

Agent shall be solely responsible for all fees and expenses incurred by or on behalf of Agent or any of its employees or on behalf of Company in connection with this Agreement.

## 6. COMPANY'S PROPERTY

All records or papers of any kind relating to the business of Company shall remain the property of Company and shall be returned by Agent to Company on demand at Agent's expense.

## 7. TRADE SECRETS; CONFIDENTIALITY

A.     Agent shall not acquire any rights to any good will, trademark, copyright, trade secret, customer or client lists, or other property of Company or its affiliates. If during the term of this Agreement any such rights should become vested in Agent by imposition of law or otherwise, Agent agrees that it will, upon request or upon termination of this Agreement,

3

**C32**

whichever shall first occur, assign any and all such rights to Company of its affiliates for nil consideration at Agent's expense.

B.     In the course of performing its obligations under this Agreement, Agent may obtain non-public, confidential or proprietary information regarding Company and its affiliates. Any such information that Agent receives from Company, whether oral, written or in any other form and whether furnished before or after the date of this Agreement, together with any analyses or documents prepared by Agent that contains or otherwise reflects such information, is hereinafter referred to as "*Confidential Information*".  Except as required by law, Agent agrees that it will keep confidential and will not disclose or divulge any Confidential Information to any third party without the prior written consent of Company, unless such Confidential Information is known, or until such Confidential Information becomes known, to the public without wrongful disclosure by any disclosing party or its attorneys, accountants, consultants, other professionals, affiliates, or partners.  Upon termination of this Agreement, Agent shall promptly (1) return to Company any Confidential Information in written form provided to Agent or any other persons to which Agent disclosed such information (and all copies thereof), and (2) destroy all other Confidential Information that may exist in the records of Agent or any person to which it disclosed such information (whether in written, electronic or other form).  Without prejudice to the rights and remedies otherwise available to Company, Company shall be entitled to the restraint by injunction of any actual or threatened violation of the provisions of this Section 7(B), it being understood that the rights of Company set forth in this Section 7(B) are of a special, unique and extraordinary character and that monetary damages are not an adequate remedy for the breach by Agent of its obligations under this Section 7(B).



## 8. INDEMNIFICATION; LIMITATION ON LIABILITY

A.     Agent agrees to protect, defend, indemnify and hold harmless the Company, its affiliates, and their respective officers, directors, employees, customers (including Client), contractors, subcontractors of any tier, and invitees (collectively, the "*Company Indemnitees*") from and against any and all damages, liabilities, losses, costs, expenses (including attorney's fees), claims, demands and causes of action of every kind and character (collectively, "*Indemnifiable Claims*"), without regard to the cause or causes thereof or the negligence or fault (active or passive) of any party or parties, including the sole, joint or concurrent negligence of the Company Indemnitees, arising in favor of any of the employees, subcontractors or their employees, or invitees of Agent on account of personal injury, death or loss of, damage to, property or from Agent's failure to comply with any law, rule or regulation of any applicable governmental authority, irrespective of the cause of such failure.

B.     Company agrees to protect, defend, indemnify and hold harmless Agent, and its officers, directors, employees, and customers (collectively, the "*Agent Indemnitees*") from and against  any and all Indemnifiable Claims, without regard to the cause or causes thereof or the negligence or fault (active or passive) of any party or parties, including the sole, joint or concurrent negligence of the Agent Indemnitees, arising in favor of any of the employees, subcontractors or their employees, or invitees of the Company or its affiliates on account of personal injury, death or loss of, damage to, property or from Company's failure to comply with any law, rule or regulation of any applicable governmental authority, irrespective of the cause of such failure.

4

**C33**

C.      Both Company and Agent shall notify each of the other Parties immediately of any loss, claim, demand, or suit that may be presented to or served upon it, or its Indemnitees, as a result of the performance of the Services.

D.      Neither Company nor Agent shall be liable to the other, or the Indemnitees of the other, for special, indirect or consequential damages resulting from or arising out of this Agreement, including loss of profit or business interruptions, however same may be caused; and Company and Agent shall protect, defend, indemnify and hold harmless the other and the Indemnitees of the other against any Indemnifiable Claim that may be brought by such indemnifying Party or its Indemnitees on the basis of any such special, indirect or consequential damages.

## 9. REPRESENTATIONS AND AGREEMENTS OF AGENT

A.      Agent hereby represents and warrants to Company as follows:

1.      Agent is a company duly organized, validly existing and in good standing under the laws of the Netherlands and has all requisite power and authority to own and operate its business and properties and to carry on its business as such business is now being conducted and is duly qualified to do business in Mexico and in any other jurisdiction in which the transaction of its business makes such qualification necessary.



2.      Agent has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution, delivery and performance of this Agreement by Agent have been duly authorized by all necessary action on the part of Agent. This Agreement has been duly executed and delivered by Agent and is the legal, valid and binding obligation of Agent enforceable in accordance with its terms.

3.      The execution, delivery and performance of this Agreement by Agent do not and will not contravene the by-laws or other organizational documents of Agent and do not and will not conflict with or result in a breach of or default under any agreement to which Agent is a party or by which it or any of its properties, rights or assets is bound or affected.

4.      All governmental or other authorizations, approvals, orders or consents required in connection with the execution, delivery and performance of this Agreement by Agent have been obtained or will be obtained in due course.

5.      Agent is, and at all times during the term of this Agreement, will be, the sole owner of the Bank Account.

6.      Daniel Olivares is, and at all times during the term of this Agreement, will be, the sole shareholder of Agent.

B.      Agent hereby convents and agrees with Company that during the term of this Agreement:

5

**C34**

CONFIDENTIAL                                                                                    PGN20190177192

1.      Agent will not make any direct or indirect payments to any government officials, including directors, officers, or employees of Client, or any direct or indirect payments which are illegal under any applicable law or regulation.

2.      Agent will conduct its activities in accordance with all applicable laws and regulations, and in a manner that will not cause Company to be in violation of any applicable law or regulation.

3.      Agent will not (i) act as a commercial agent (or in any similar capacity) with respect to any Tender for any other person, or (ii) entity or perform any services for any other person or entity that are similar or related to the Duties to be performed by Agent under this Agreement.

4.      Agent represents that Daniel Olivares is a principal of Agent, and Agent agrees that during the term of this Agreement such individual will remain principal of Agent unless Company shall previously consent otherwise in writing.

5.      Agent shall ensure that Daniel Olivares, or some other representative of Agent that Company in its sole discretion deems to be acceptable, shall be available to Company, at all times during the term of this Agreement.



## 10. TERM

This Agreement shall be effective upon execution and shall continue in effect until terminated in accordance with the following:

A.      Company may terminate this Agreement upon thirty (30) days prior written notice to the Agent.

B.      If either Party materially breaches the terms hereof, and such breach is not remedied to the sole and complete satisfaction of non-breaching Party within fifteen (15) days after notice thereof to the breaching Party by the non-breaching Party, then this Agreement may be terminated by the non-breaching Party upon written notice to the breaching Party.

C.      This Agreement will terminate automatically if Agent or Company becomes bankrupt or insolvent or are unable to satisfy their respective financial obligations as they become due.

D.      This Agreement will terminate automatically if Agent or Daniel Olivares ceases to be eligible to represent Company in Mexico or Company ceases to be able to legally carry on its business in Mexico.

E.      Upon termination of this Agreement, the obligations of the Parties to each other shall immediately cease, other than any obligation under Articles 5, 6, 7, 8, 13, 14 and 15; *provided, however,* that notwithstanding termination by Company under Section 10(A), Company shall continue to pay the Commission due to Agent pursuant to Section 3(A) above.

6

**C35**

F.   Notwithstanding the above provisions, Company may terminate this Agreement immediately pursuant to Article 15.

## 11. ASSIGNMENT

Agent agrees that, without the prior written consent of Company, which may be withheld at their discretion, Agent will not assign or delegate this Agreement or any of the rights, duties or obligations hereunder; provided, however, that Agent shall remain fully liable and responsible for all duties and obligations hereunder irrespective of an assignment hereof. Notwithstanding the foregoing, upon giving written notice to Agent, Company may assign any of its rights, duties or obligations hereunder to any affiliate or third party.

## 12. NOTICES

All notices, requests and other communications provided for herein (including, without limitation, any modifications of, or waivers, requests or consents under, this Agreement) shall be given or made in writing (including, without limitation, by facsimile), and be delivered personally or by certified or registered mail, postage prepaid, to the address shown below.

Agent:   **TSUL Servicios, S.A.P.I. de C.V.**
Represented by Daniel Olivares
Paseo de la Reforma 342 Piso 26
Torre New York Life
Col. Cuauhtémoc C.P. 06600
México, Distrito Federal
Telephone: +52 55 28816761

Company:   Noble Leonard Jones LLC
c/o Noble Drilling Services Inc.
13135 S. Dairy Ashford, Suite 800
Sugar Land, Texas 77478
Attention: Mr. Andrew Tietz
Facsimile: (281) 276-6301
Telephone: (281) 276-6100

Either Party may change its address for notices under this Agreement by notice to the other Party as outlined above.

## 13. GOVERNING LAW

This Agreement shall be governed by the internal laws of the State of Texas, without regard to principles of conflicts of law. Any dispute arising out of or relating to this Agreement may be brought in any court of appropriate jurisdiction in Houston, Texas, and the Parties irrevocably submit to the exclusive jurisdiction of each such court in any such dispute. THE PARTIES WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT. THE PARTIES AGREE THAT ANY OF

7

**C36**

THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES TO IRREVOCABLY WAIVE TRIAL BY JURY, AND THAT ANY DISPUTE BETWEEN THEM RELATING TO THIS AGREEMENT SHALL INSTEAD BE TRIED BY A COURT OF COMPETENT JURISDICTION SITTING WITHOUT A JURY. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be deemed prohibited or invalid under such applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, and such prohibition or invalidity shall not invalidate the remainder of such provision or the other provisions of this Agreement.

## 14. TAXES AND CLAIMS

A.      Agent shall pay, and be solely responsible for, (a) all taxes, licenses, and fees levied or assessed on Agent by any governmental agency in connection with and/or incident to this Agreement or the performance of the Duties and (b) all unemployment compensation insurance, old age benefits, social security, or any other taxes upon the wages of Agent or any of its agents, employees or representatives.

B.      Agent shall reimburse Company on demand for all taxes or governmental charges (local, state, provincial, national or federal) that Company may be required to pay or withhold on account of Agent or any of the employees or principals of Agent. At its election, Company may deduct the amount of any such charges paid by Company from any amounts payable to Agent by Company pursuant to this Agreement.  Furthermore, Agent agrees that Company shall have the right, but not the obligation, to make any and all necessary filings with respect to amounts paid to Agent under this Agreement. 

C.      Agent shall pay, and cause to be paid, all claims for labor, materials, services, and supplies furnished to or utilized by Agent or any subcontractor in connection with this Agreement or the performance of the Duties.  Agent shall take, or cause to be taken, any and all action as may be necessary or appropriate to ensure that no lien or charge is fixed upon any assets, equipment or vessels of the Company Indemnitees. AGENT SHALL PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS THE COMPANY INDEMNITEES FROM AND AGAINST ALL INDEMNIFIABLE CLAIMS ASSOCIATED WITH SUCH LIENS. If Agent fails to pay, or cause to be paid, any claims or indebtedness incurred by Agent or any subcontractor in connection with this Agreement or the performance of the Duties, Company shall have the right (but not the obligation) to pay such claims or indebtedness and to deduct the amount of such claims or indebtedness from any amounts payable by Company to Agent under this Agreement.

## 15. ANTI-CORRUPTION AND ANTI-BRIBERY

A.      Contractor agrees to, and to cause its Subcontractors to, provide the Services in an ethical and professional manner and Contractor shall not, and shall cause its Subcontractors to not, do or cause to be done anything which would diminish the value of Company's name or good will. Consistent with this, Contractor represents and warrants to Company and agrees with Company that:

8

**C37**

PGN20190177195

1.     In performing the activities contemplated under this Agreement, Contractor and its Subcontractors, and their principals, shareholders, directors, officers, employees, agents and other representatives working on their behalf in connection with this Agreement, will read and comply with Company's standards of business practice and conduct adopted by Company and its Affiliates from time to time, including Company's internal policy on compliance with the United States Foreign Corrupt Practices Act of 1977, as amended and attached hereto as Exhibit A, and the United Kingdom Bribery Act 2010 (collectively referred to as "ACAB"). Contractor further represents and warrants that it, and each of its Subcontractors, understands the purpose and provisions of ACAB, particularly the prohibition on offering, making or promising anything of value to individuals as set forth in paragraph (iii) below.

2.     In connection with the performance of its obligations under this Agreement, all applicable existing and future laws, regulations and requirements of the United States, the United Kingdom, and any other applicable countries will apply to its, and its Subcontractors', performance under this Agreement and Contractor shall not engage, and shall take steps, which include the implementation of policies and procedures, to ensure that Contractor and its Subcontractors and its Subcontractors' principals, shareholders, directors, officers, employees, agents and other representatives working on their behalf in connection with performance under this Agreement do not engage, in any activity that would expose Company or any Affiliate of Company to a risk of criminal or civil penalties under such laws, regulations and requirements, including ACAB and laws of other jurisdictions relating to improper payments, as well as applicable export control and sanctions laws, regulations, orders and requirements and any provisions, representations or agreements, or contractual clauses required thereby to be included or incorporated by reference or by operation of law in this Agreement.



3.     None of Contractor, any of its Subcontractors, nor any of their principals, shareholders, officers, directors, employees, agents or any other representatives, affiliated companies or any other person or entity acting on their behalf, has made or promised, and none will make or promise, in connection with this Agreement or the performance thereof, any offer, payment, loan, gift, or anything of value to a Government Official, political party or official thereof, candidate for political office, or any person while knowing or having reason to suspect that all or a portion of such payment, loan, gift, promise or thing of value will be offered, given or promised, directly or indirectly, to a Government Official, political party or official thereof, or to any candidate for political office, for the purpose of obtaining or retaining business or favorable governmental action, influencing any official act or decision of a Government Official, political party or official thereof, or any candidate for political office, or inducing such person to use his or her influence to affect or influence any governmental act or decision, or otherwise secure any improper advantage for Company, Contractor or any of its Subcontractors. As used in this Agreement, "*Government Official*" means: any official or employee or agent of a government or any federal, regional or local department, agency, state-owned enterprise or corporation or other instrumentality thereof, or any person acting in an official capacity for or on behalf of any such government or governmental department, agency or instrumentality (such as government-owned companies); or any official or employee or agent acting for or on behalf of a public international organization (such as the World Bank, the International Finance Corporation, the International Monetary Fund or the Inter-American Development Bank).

**C38**

4.      None of Contractor, any of its Subcontractors, nor any of their principals, officers, directors, employees, agents or any other representatives, affiliated companies or any other person or entity acting on their behalf, has made or promised, and none will make or promise, in connection with this Agreement or the performance thereof, any offer, payment, loan, gift, or anything of value to any person for the purpose of inducing a person to perform a relevant function or activity improperly or to reward a person for the improper performance of a relevant function or activity in connection with this Agreement, in violation of the United Kingdom Bribery Act 2010.

5.      Neither Contractor, any of its Subcontractors nor any of their principals, shareholders, officers, directors, employees, agents or other representatives working on their behalf in connection with their performance under this Agreement, are or during the term of this Agreement shall become a Government Official, an officer or representative of any political party, or a candidate for political office.  Further, no ownership interest in Contractor, any Subcontractor, or any of their parent or affiliated companies, or in the contractual relationship established by this Agreement, is or will be during the term of this Agreement held or controlled directly or indirectly by a Government Official, an officer or representative of any political party, or a candidate for political office.  Contractor further agrees to make immediate, complete and accurate written disclosure to Company in the event that during the term of this Agreement (1) any of Contractor's or its Subcontractors' principals, shareholders, officers, directors, employees, agents or other representatives working on its behalf in connection with performance under this Agreement, becomes a Government Official, an officer or representative of any political party, or a candidate for political office or (2) a Government Official, an officer or representative of any political party, or a candidate for political office directly or indirectly acquires an interest of any sort or nature in Contractor, any Subcontractor, or any of their parent or affiliated companies, or in the contractual relationship established by this Agreement.



B.      Contractor shall, and shall cause its Subcontractors to, maintain books and records that fairly and accurately reflect all of its transactions relating to this Agreement.  Contractor shall, and shall cause its Subcontractors to, retain such records for at least two years from the end of this Agreement.  Contractor agrees that these books and records relating to transactions pursuant to this Agreement shall be subject to audit, at Company's request, by Company or its designated representative at reasonable times as Company shall consider necessary to ensure compliance with the FCPA and this Agreement.

C.      Contractor will, and will cause its Subcontractors to, provide to Company such documents or other evidence (whether written, oral or otherwise) as Company may request from time to time so that Company may determine and establish compliance with the provisions of this Article 15.0.  Contractor agrees to, and to cause it Subcontractors to, cooperate fully with any such audit or investigation, the scope, method, nature and duration of which shall be at the sole discretion of Company.

D.      Contractor agrees to, and shall cause each of its Subcontractors to, cause at least one of its (or its Subcontractor's, as applicable) directors or officers who is a duly authorized representative of Contractor and has direct involvement with this Agreement and the Services as well as any such other Contractor (or Subcontractor, as applicable) employees identified by Company from time to time to provide Company with an Annual Certification of Compliance in

10

**C39**

the form hereto attached as <u>Exhibit B or another as directed by either Company</u>. The Annual Certification of Compliance covering shall be provided to Company no later than January 31 of each calendar year during the term of this Agreement. Contractor will also submit the Annual Certification of Compliance immediately upon a request from Company. Failure to timely submit the Annual Certification may result in suspension of services and payment under this Agreement.

E.      Contractor acknowledges and agrees that Company, at any time and from time to time, may conduct a due diligence review of Contractor, or any of its Subcontractors, with respect to this Agreement. Contractor agrees to, and shall cause its Subcontractors to, assist and fully cooperate with any such due diligence review, including providing Company with such documents or other evidence (whether written, oral or otherwise) as Company may request.

F.      Contractor acknowledges that all payments to it under this Agreement shall be made by check or wire transfer, and that none shall be made by cash or other negotiable instrument.

G.      Notwithstanding any other provision of this Agreement, Company shall have the right to terminate this Agreement immediately in the event of Contractor's or any of its Subcontractors' failure to comply with any of the foregoing provisions, including Contractor's failure to complete the Annual Certification of Compliance. In the event of termination: (i) Company shall have a right of action against Contractor for the amount of any monetary payment or thing of value made or given by Contractor in breach of any of the provisions of this Article 1.0; (ii) all obligations of Company to pay Contractor's fees shall cease forthwith; and (iii) Contractor shall immediately return to Company all commissions arising from any transaction in which there was a violation of this <u>Article 15</u>.



H.      A facilitating payment is a payment or offer of payment of anything of value to a foreign official, political party, or political party official or candidate, the purpose of which is to expedite, facilitate or secure the performing of a "routine governmental action" by any of those individuals. Notwithstanding that the United States Foreign Corrupt Practices Act of 1977, as amended, may permit certain such facilitating payments, the laws of other countries applicable hereto, such as the United Kingdom, do not permit such payments. In addition, Noble policy also prohibits facilitation payments. For avoidance of doubt, facilitating or expediting payments are not permitted under this Agreement.

## 16. MISCELLANEOUS

A.      Agent shall not register this Agreement or its appointment as Agent with any governmental authority, except as required by law, without the prior written consent of Company. Agent shall promptly inform Company of all registrations and filings made by Agent as a representative of Company and Agent shall cancel immediately any such registration upon termination of this Agreement or upon receiving written notice from Company to do the same.

B.      This Agreement constitutes the entire agreement between the Parties regarding the subject matter hereof, and this Agreement supersedes, cancels and replaces any previous agreements, writings and understandings regarding such matters.

**C40**

CONFIDENTIAL                                                                      PGN20190177198

C.      This Agreement is made and shall be construed in English.  All notices to be given by any Party hereunder and all other communications and documentation relating to this Agreement, including any dispute resolution proceedings, shall be in the English language.

D.      This Agreement may be amended only pursuant to a written agreement executed by all Parties.

E.      The headings herein are for reference only and shall not be utilized in interpreting this Agreement.

F.      This Agreement may be executed in any number of counterparts, including facsimile or electronic mail counterparts, with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.  Delivery of a copy of this Agreement bearing an original signature by facsimile transmission or by electronic mail in "portable document format" form shall have the same effect as physical delivery of the paper document bearing the original signature.



G.      In this Agreement, unless there is something in the subject matter or context inconsistent therewith, words importing the singular shall include the plural and vice versa, words importing gender shall include the masculine, feminine and neuter genders and where a term or expression is defined herein, derivations thereof shall have corresponding meanings.

*Signature Page Follows*

12

**C41**

CONFIDENTIAL                                          PGN20190177199

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

"AGENT"

**TSUL Servicios, S.A.P.I. de C.V.**

By:_____

Name: Daniel Olivares

Title:   Authorized Representative

"COMPANY"

**Noble Leonard Jones LLC**

By:_____

Name:

Title:

13

**C42**

CONFIDENTIAL                                                                                    PGN20190177200

## EXHIBIT A

## NOBLE CORPORATION'S INTERNAL POLICY ON COMPLIANCE WITH THE FOREIGN CORRUPT PRACTICES ACT

### EXCERPT FROM NOBLE'S ADMINISTRATIVE POLICY MANUAL

### 7.6    *ANTI-CORRUPTION AND ANTI-BRIBERY COMPLIANCE*

It is the policy of the Company to maintain the highest level of professional and ethical standards in the conduct of its business affairs. The Company places the greatest importance upon its reputation for honesty, integrity and high ethical standards. This policy statement is a reaffirmation that the Company places the greatest importance on making sure its management and employees also adhere to the same high ethical standards. The foundation of this policy is the Company's commitment to comply with all applicable laws governing the conduct of the Company's worldwide operations (see Section 7.1 (Legal Conduct of Business) of this Manual), including all applicable anti-corruption and anti-bribery laws, such as the United States Foreign Corrupt Practices Act (the "FCPA"), the U.K. Bribery Act 2010 ("UKBA") and those adopted pursuant to the Organization for Economic Co-operation and Development ("OECD") Convention on Combating Bribery of Foreign Public Officials in International Business Transactions. This Section 7.6 details Noble's policy regarding compliance with the FCPA and UKBA. See also Section 7.5 (Appointment of Agents), and Section 3.3 (Company Contributions) of this Manual. 

This policy applies to Noble Corporation and all of its subsidiaries, whether in the United Kingdom, the United States, or abroad. This policy also applies to all of the officers, directors, employees, Agents (as defined below), consultants and other representatives of the Company, regardless of their nationality and including any member (shareholder) acting on behalf of the Company. Each of these individuals has an obligation to conduct himself or herself in a manner that complies with these standards. Disregard for the requirements or principles set forth in this policy statement will be grounds for appropriate disciplinary action, including, but not limited to, immediate termination of employment.

In adhering to this policy, all officers, directors, employees, Agents, consultants and other representatives of the Company must understand the requirements of all applicable laws and regulations that apply to the conduct of the Company's business affairs. When any question or uncertainty arises with respect to those laws, it is the obligation of each affected person to seek guidance from the Chief Compliance Officer ("CCO") or the Company Legal Department.

A-1

CONFIDENTIAL                                                                    PGN20190177201

### 7.6.1  ANTI-CORRUPTION / ANTI-BRIBERY PROVISIONS

The FCPA, UKBA and other applicable laws prohibit the making of any payment or offer of payment of anything of value to a Government Official (as defined below), political party, or political party official or candidate in order to assist in obtaining or retaining business or to secure any improper advantage.

It is also prohibited to make any payment or offer of payment of anything of value to any other person, such as an Agent, while knowing or having reasonable grounds to believe that all or a portion of such payment will be given or offered to any Government Official, political party, or political party official or candidate.

Prohibited Payments to Persons Who Are Not Government Officials: Under the UKBA it is also illegal to promise or give any financial or other advantage to any person for the purpose of inducing a person to perform a relevant function or activity improperly or to reward a person for the improper performance of a relevant function or activity in connection with the conduct of the Company's business.

As used in this policy:

"Agent" means a company or an individual (who is neither a Noble employee nor an independent contractor who serves in a functionally equivalent position) who is acting on behalf of or represents Noble to Government Officials, a political party, official thereof or candidate for political office.

> Examples may include, but are not limited to, service providers who are: marketing or commercial agents, joint venture partners, customs-clearance agents, freight-forwarders, visa/immigration agents, tax or legal representatives, consultants, or intermediaries.

"Government Official" means any official, employee or agent at a federal, regional, local or any other level of any government, department, agency, state-owned, -controlled, or -operated enterprise or corporation or other instrumentality thereof, or any official, employee or agent of a public international organization.

### 7.6.2  RECORD-KEEPING PROVISIONS

The FCPA and other applicable laws have significant accounting requirements which require the Company to maintain accurate and reasonably detailed books, records and accounts which fairly reflect all transactions and dispositions of assets.

A-2

**C44**

PGN20190177202

The Company is required to devise and maintain a system of internal accounting controls that provides reasonable assurances that:

- transactions are executed in accordance with management's general or specific authorization;
- transactions are recorded as necessary to permit the proper preparation of the Company's financial statements and maintain accountability for assets;
- access to the Company's assets is permitted only in accordance with management's general or specific authorization; and
- the recorded accountability for the Company's assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

These record-keeping provisions of the FCPA prohibit the mischaracterization or omission of any transaction on the Company's books or any failure to maintain proper accounting controls that result in such a mischaracterization or omission.

### 7.6.3 POLICY



7.6.3.1    INTRODUCTION

It is the policy of the Company to comply fully with all the provisions of the FCPA, UKBA and other applicable laws. All of the officers, directors, employees, Agents, consultants and other representatives of the Company, including any members (shareholders) acting on behalf of the Company, shall comply with this policy and conduct the Company's business ethically and in accordance with all applicable laws.

1. The Company's Agents will be appointed only in accordance with the provisions set forth in this policy and in Section 7.5 (Appointment of Agents) of this Manual.

2. Applicable standards, principles, laws, and practices and policies of the Company for accounting and financial reporting shall be followed by all officers, directors and employees.

3. The Company's books, records and accounts shall be kept accurately and shall fairly reflect all transactions and dispositions of assets.

4. No undisclosed or unrecorded accounts are to be established for any purpose. False or misleading entries are strictly prohibited.

7.6.3.2    PROHIBITED PAYMENTS

1. No one shall authorize or make any payment or offer of payment of anything of value to a Government Official, political party, official thereof, or candidate for political office or any other person in violation of this policy.

A-3

**C45**

CONFIDENTIAL

2. No one shall authorize or make any payment or offer of payment of any money or anything of value to any third party while knowing or having reasonable grounds to believe that the third party is or may be giving, offering or promising all or a portion of the thing of value, directly or indirectly, to a Government Official, political party, official thereof, or candidate for political office or any other person in violation of this policy.

3. No one shall authorize or make a facilitating payment. While "facilitating payments" are permissible under the FCPA in certain limited circumstances, they are prohibited by Noble policy.

7.6.3.3    PERMISSIBLE PAYMENTS

1. **Imminent Threats to Personal Safety** - If a demand for payment is made in connection with an imminent threat to the personal safety of someone or those around them, such payment may be permitted under this policy. If a payment is made, it must be immediately reported to the CCO or General Counsel and must be accurately recorded and fully described in the Company's books and records. In some instances, Government Officials may request or solicit improper payment or attempt to obtain payment by means of duress such as detention or confiscation of property The fact that someone simply requests or solicits an improper payment does not make such payment permissible as an imminent threat to personal safety. 

2. **Promotional or Marketing Expenses** - In certain circumstances the payment of some promotional or marketing expenses is permissible under the law. These payments are referred to herein as "Promotional Expenses".

   Payments considered to be legitimate Promotional Expenses under the law are those reasonable and bona fide expenses, such as for meals, travel, lodging expenses, entertainment or gifts (promotional items or Company merchandise) incurred by, or on behalf of, a Government Official, political party, official thereof, or candidate for political office that are directly related to:

   a. the promotion, demonstration or explanation of the Company's products or services; or
   b. the execution or performance of a particular contract between the Company and a government or instrumentality thereof.

   The directors, officers, employees, Agents, consultants and other representatives of the Company may pay or authorize the payment or reimbursement of Promotional Expenses incurred by, or on behalf of, Government Officials, political parties, or officials thereof, or candidates for political office ONLY if:

A-4

**C46**

CONFIDENTIAL
PGN20190177204

a. they are directly related to the promotion, demonstration or explanation of the Company's products or services or with the execution or performance of a particular contract between the Company and a government or instrumentality thereof, and the payment or benefit is NOT provided for the purpose of inducing a Government Official to misuse his/her official position;

b. they are reasonable and bona fide expenditures for meals, travel, lodging expenses, entertainment or gifts (promotional items or Company merchandise) in light of what is customary and within the bounds of ethical business practices;

c. they do not create the appearance of being an improper payment under the circumstances and do not place the recipient under any obligation;

d. they are legal under the written laws, rules or regulations of the particular country and do not create the appearance of being an improper payment;

e. they have been incurred in accordance with other Company policies, especially the "Travel and Entertainment" section of this Manual; and

f. they are accurately recorded and fully described in the Company's books and records.

The Company shall, with concurrence of the CCO and General Counsel, establish guidelines from time to time as necessary for the implementation of this policy statement, and it shall be the responsibility of every director, officer, employee, Agent, consultant and representative of the Company to follow those guidelines. Where a person is in doubt about the application of the policy or the guidelines, it shall be his or her obligation to bring any questions to the CCO or the General Counsel before taking any action. 

In addition, in order to comply with the accounting provisions of the FCPA, all such Permissible Payments shall be accurately recorded in the Company's books and records in order to reflect properly the true nature of the transaction. The entry should show the amount and purpose of the payment, and the name and/or title of the person to whom the payment was made. The Chief Financial Officer is responsible for procedures related to reporting and accounting of such payments. Copies of any documents (*i.e.*, correspondence, reports, receipts, expense reports, etc.) relating to or made in connection with any Permissible Payment should be handled in accordance with policy and guidelines established by the Company.

Nothing in this policy authorizes, endorses or encourages the offering or making of any corrupt payment of anything of value to a Government Official, political party, official thereof, or candidate for political office, in violation of applicable laws and regulations.

A-5

**C47**

PGN20190177205

7.6.3.4    POLITICAL AND CHARITABLE CONTRIBUTIONS

No charitable contribution may be made on behalf of the Company without the prior written approval of Noble's Chief Executive Officer. Contributions to non-U.S. political parties, candidates, campaigns, political action committees or officials are not permitted. See Section 3.3 (Company Contributions).

7.6.4    RESPONSIBILITY FOR COMPLIANCE WITH THIS POLICY

1. **Management and all Employees** - Management of the Company and all employees are responsible for compliance with this policy and are instructed to seek guidance from the CCO or General Counsel if they have questions concerning this policy, or in situations that appear not to be covered by the policy. All officers, managers and supervisors of the Company are responsible for effecting the policies stated herein in the management of the business of the Company. All employees of the Company are responsible for reporting any questionable conduct pursuant to the procedures set forth herein (see below).

2. **Chief Compliance Officer** - The CCO will report to the Company's Audit Committee for the effective implementation and enforcement of this policy. The particular responsibilities of the CCO are further outlined in the Corporate Compliance Charter.

3. **Audit Committee** - The Company's Audit Committee has ultimate authority and responsibility for overseeing this policy and reviewing any policy changes made thereto.



7.6.5    EMPLOYEE OBLIGATIONS AND REPORTING

1. **Reporting Obligation** - Employees must report promptly any violation or suspected violation of this policy or applicable law (whether or not based upon personal knowledge), including violations of the FCPA or UKBA through one of the following options:

    a. The employee may make such a report via the NobleLine (toll-free and anonymous) at 877-285-4162, or collect at +1-704-544-2879, or via email at compliance@noblecorp.com; or

    b. An employee may make such a report to the CCO, the General Counsel or a member of the Company Legal Department, or a member of the Audit Committee.

2. **New Hire Acknowledgment Statement** - Each employee is required to complete and sign an acknowledgment statement that the employee fully understands the Company's policy with respect to anti-corruption and anti-bribery, the FCPA, UKBA and acknowledges his

**C48**

CONFIDENTIAL
PGN20190177206

or her commitment to adhere to that policy. Signed statements will be kept in employees' personnel files.

3. **Violation of Policy or Law** - If an employee violates this policy or any applicable law in the course of his or her employment, then the employee will be subject to appropriate disciplinary action, including, without limitation, termination, suspension, demotion, reduction in pay, and/or reprimand.

**Annual Certification of Compliance** - All members of corporate management, division managers, division controllers, and specified employees (including employees who have or are expected to interact with any Agent), and any other employee selected by the CCO or the General Counsel, must certify annually in writing that they have reviewed and are familiar with the Anti-Corruption and Anti-Bribery Compliance Program and any supplementary material dealing with the FCPA, UKBA or other applicable anti-corruption and anti-bribery laws, that they have complied with the law and will continue to do so, and that they have communicated to their supervisor, the CCO, the General Counsel or a member of the Company Legal Department, or a member of the Audit Committee any information they may have related to possible violations of this policy, the FCPA, the UKBA or other applicable anti-corruption and anti-bribery laws by other Company personnel or by Agents. All certifications must be delivered to the CCO for review.



## 7.6.6        EDUCATION PROGRAM

In order to ensure that all Company personnel are thoroughly familiar with the areas of law that apply to the business affairs of the Company, the Company provides appropriate training programs for its personnel. The CCO, in cooperation with the General Counsel, shall have responsibility for developing the educational materials and overseeing which personnel should participate. The training will be mandatory for personnel identified by the CCO or the General Counsel as having need for training in anti-corruption and anti-bribery compliance issues.

A-7

**C49**

PGN20190177207

**EXHIBIT B**

**NOBLE CORPORATION AND SUBSIDIARIES ("Noble")**

**CERTIFICATION OF COMPLIANCE**

I, DANIEL OLIVARES, a duly authorized representative of TSUL Servicios, S.A.P.I. de C.V., ("**Company**"), do hereby certify for and on behalf of **Company**, that neither I nor, to my knowledge, any other person, including, but not limited to, every officer, director, stockholder, employee, representative and agent of **Company**, in connection with **Company's** work for Noble or any of Noble's affiliates, directly or indirectly, have made, offered or authorized or will make, offer or authorize any payment, gift or anything else of value to a Government Official, political party or official thereof, candidate for political office, or any other person while knowing or having reason to suspect that all or a portion of such payment, gift or thing of value will be offered, given or promised to a Government Official, political party or official thereof, or to any candidate for political office, for the purpose of obtaining or retaining business or favorable governmental action, influencing any official act or decision of a Government Official, political party or official thereof, candidate for political office or inducing such person to use his or her influence to affect or influence any governmental act or decision, or otherwise secure any improper advantage for Noble or any of Noble's affiliates.

For purposes of this certification, the term "Government Official" includes: any official, employee or agent at a federal, regional, local or any other level of any government, department, agency, state-owned, -controlled, or -operated enterprise or corporation or other instrumentality thereof, or any official, employee or agent of a public international organization.

I also hereby certify for and on behalf of **Company**, that neither I nor, to my knowledge, any other person, including, but not limited to, every officer, director, stockholder, employee, representative and agent of **Company**, in connection with **Company's** work for Noble or any of Noble's affiliates, directly or indirectly, have promised or given, or will promise or give, any financial or other advantage to any person for the purpose of inducing a person to perform a relevant function or activity improperly or to reward a person for the improper performance of a relevant function or activity in connection with **Company's** work for Noble or any of Noble's affiliates.

I also hereby confirm that **Company** nor any of their principals, shareholders, officers, directors, employees, agents or other representatives working on **Company's** behalf in connection with **Company's** work for Noble or any of Noble's affiliates, is a Government Official. I also hereby confirm that **Company** does inform its principals, shareholders, owners, officers, directors, employees, agents and other representatives about **Company's** and Noble's obligations under the UK Bribery Act, U.S. Foreign Corrupt Practices Act, any other applicable anti-corruption laws and Noble's Administrative Policy Manual.

Company: Tsul Servicios, SAPi de CU.
Signature and Date: _[signature]_ 02/05/14
Name: Daniel Olivares
Title: Legal Representative.

**C50**

## EXHIBIT C

| Rig | Agent | Company |
|---|---|---|
| Noble Bill Jennings | Tsul | Noble Leonard Jones LLC |
| Noble Leonard Jones – | Tsul – | Noble Leonard Jones LLC |
| Noble Eddie Paul – | Tsul – | Noble Leonard Jones LLC |

B-2

**C51**

CONFIDENTIAL

**2/5/2014 Danter Investments Limited Agency Agreement [PGN20190177234]**

# LIMITED AGENCY AGREEMENT

THIS LIMITED AGENCY AGREEMENT (this "*Agreement*") is made as of the 5th. day of February 2014, between **Danter Investments C.V.**, represented by Daniel Olivares, having an office at Professor J.H. Bavincklaan 7, 1183 AT, Amstelveen, hereinafter collectively referred to as "*Agent*," and **Noble Contracting GmbH** (formerly known as Noble Contracting S.a r.l.) a company registered in Switzerland having an office at Dorfstrasse 19a, 6340 Baar, Zug, Switzerland, hereinafter referred to as "*Company*". Company and Agent are each hereinafter referred to as a "*Party*" and collectively as the "*Parties*".

WHEREAS, Company and its affiliated companies are engaged in the business of drilling or reworking oil and gas and other wells on a contract basis for other companies, and in the course of such business regularly and customarily enter into contracts with independent contractors for the performance of service or the provision of equipment and goods relating thereto; and

WHEREAS, Agent represents that it is capable of efficiently performing its duties under this Agreement;

NOW THEREFORE, in consideration of the mutual promises, conditions and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto mutually agree as follows:

## 1. APPOINTMENT



Company hereby appoints and confirms Agent as its agent, on a non-exclusive basis, having the duties described herein with respect to employment of Company's affiliate's offshore drilling rigs (the "*Rig*" or "*Rigs*"), as specifically named in Exhibit C hereof and as amended from time to time by the Company, within the territorial waters of the country of Mexico pursuant to one or more drilling contracts (the "Drilling Contracts")., which have been or will be entered into pursuant to a tender ("*Tender*") with PEMEX EXPLORACION E PRODUCCION ("*Client*").

Agent is not appointed to represent Company for any other purpose under this Agreement. Company does not appoint Agent to act as its general agent, or as an agent for any purpose other than as explicitly set forth in this Agreement. Agent and its employees and representatives shall at all times be independent contractors, and shall not under any circumstance be deemed employees of Company.

## 2. DUTIES

Agent agrees to use its best efforts to perform the following duties for Company under this Agreement (the "Duties"):

1

**C52**

PGN20190177234

A.      To provide advice and counsel pertaining to local laws and customs which would affect the operations of the Rigs in connection with the Drilling Contracts.

B.      To assist in the entry and departure of Company's equipment and personnel to and from the country of Mexico or any other country in connection with the Drilling Contracts.

C.      To assist, at the direction of Company, in the resolution of any disputed matters between Company and Client (including, without limitation, payment of sums due) arising out of, incidental to or in connection with the Drilling Contracts.

D.      To solicit further employment of the Rigs pursuant to Drilling Contracts entered as a result of the Tender at prices and upon terms and conditions approved in writing by Company prior to submission to Client. In the event that any Tender is successful, the Parties agree that Exhibit C shall be amended by Company reflecting the addition of the new Drilling Contract and the addition of the new Rig or Rigs. Correspondingly, Exhibit C shall be amended by Company to reflect the termination or cancellation of any Drilling Contract or the loss or substitution of any Rig as described in Exhibit C.

## 3. COMMISSIONS

A.      As Agent's sole compensation for the services rendered under this Agreement, Company shall pay to Agent a commission equal to two percent (2%) of the total day rate actually paid to Company by Client under the relevant Drilling Contract pursuant to the Line Items with the wording "Daily Operating Rate for Jackup Rig" and "Daily Rate During Move of the Rig Between Well Sites" or other similar wording in the relevant Appendix of the Drilling Contract (the "***Commission***"). Notwithstanding anything else contained herein, the Commission to be paid to Agent under this Agreement shall in no event be calculated based on a day rate that exceeds Two Hundred Thousand and no/100 United States Dollars (US$ 200,000.00), regardless of whether the actual day rate paid to the Company by the Client under the Drilling Contract exceeds Two Hundred Thousand and no/100 United States Dollars (US$ 200,000.00). The Commission shall be paid by Company to Agent in accordance with Section 3(E) below. 

B.      Notwithstanding anything to the contrary in this Agreement, Agent understands and agrees that neither Company shall have an obligation to pay the Commission to Agent unless and until (1) the final written Drilling Contract for the Rig is entered into between Company and Client, and (2) Company receives payment from Client for services rendered under the Drilling Contract; and, under no circumstances will the Commission be due to Agent based on any other amounts paid to Company with respect to the Drilling Contract, including amounts reimbursable to Company by Client, including, without limitation, Line Items in the relevant Appendix of the Drilling Contract representing "Mobilization of Jackup Rig to Well Site to Commence Leasing Agreement", "Sonar Equipment Service", "Autonomous DGPS Positioning Equipment Service, Including Operator and Additional GPS Antenna for Tugboats" and "Demobilization of Jackup Rig at End of Leasing Agreement", "Reimbursable Expenses" or other similar wording as indicated by either Company.

C.      Agent agrees and understands that should Company at any time discover that Company have overpaid the Commission, including, without limitation, in the case of

2

**C53**

PGN20190177235

overpayment by Client of the day rate amount, Agent shall return such overpayment to the paying Company within fifteen (15) days of receipt by Agent of written notice from said Company of the same.

      D.     It is understood that (1) Company and its affiliates' officers, employees and agents may market Company's and its affiliates' rigs, equipment and services in Mexico, (2) other rigs, equipment and services of Company and its affiliates are marketed and/or operated in Mexico, (3) Company and its affiliates' officers, employees and agents may market the Rig to and operate the Rig for Client pursuant to contracts entered into other than as a result of a Tender and (4) Company and its affiliates may market the Rig to and operate the Rig for other clients in Mexico other than Client, and that in each such case no commission shall be payable to Agent for such activities.

      E.     Payment of the Commission due to Agent under this Agreement shall be made by the applicable Company within fifteen (15) days of receipt by Company of invoice from Agent pursuant to Section 3(A) above. All amounts due and payable to Agent pursuant to this Agreement shall be paid in United States Dollars. The Commission shall be paid by the applicable Company to Agent by wire transfer to a United States bank account in Agent's name, which has previously been identified to Company (the "***Bank Account***"):

      F.     Agent specifically stipulates and acknowledges that in executing this Agreement and, further, insofar as this Agreement refers to the Rig or a mobile offshore drilling unit of Company or its affiliates, that the Agent is relying solely and exclusively upon Company for payment. Agent, in furtherance of and in performance of this Agreement, stipulates and acknowledges that it is not relying upon the credit of the Rig or any such other mobile offshore drilling unit or upon the credit of any vessel, equipment or material owned by Company or its affiliates. 

## 4. NO AUTHORITY TO BIND

      Agent shall not have, nor shall it represent itself as having, any authority to bind or commit Company or its affiliates, enter into any contract or other legal commitments in the name of, or binding on, Company or its affiliates or to pledge their respective credit or to extend credit in their respective names.

## 5. EXPENSES

      Agent shall be solely responsible for all fees and expenses incurred by or on behalf of Agent or any of its employees or on behalf of Company in connection with this Agreement.

## 6. COMPANY'S PROPERTY

      All records or papers of any kind relating to the business of Company shall remain the property of Company and shall be returned by Agent to Company on demand at Agent's expense.

3

**C54**

## 7. TRADE SECRETS; CONFIDENTIALITY

A.    Agent shall not acquire any rights to any good will, trademark, copyright, trade secret, customer or client lists, or other property of Company or its affiliates.  If during the term of this Agreement any such rights should become vested in Agent by imposition of law or otherwise, Agent agrees that it will, upon request or upon termination of this Agreement, whichever shall first occur, assign any and all such rights to Company of its affiliates for nil consideration at Agent's expense.

B.    In the course of performing its obligations under this Agreement, Agent may obtain non-public, confidential or proprietary information regarding Company and its affiliates. Any such information that Agent receives from Company, whether oral, written or in any other form and whether furnished before or after the date of this Agreement, together with any analyses or documents prepared by Agent that contains or otherwise reflects such information, is hereinafter referred to as "***Confidential Information***".  Except as required by law, Agent agrees that it will keep confidential and will not disclose or divulge any Confidential Information to any third party without the prior written consent of Company, unless such Confidential Information is known, or until such Confidential Information becomes known, to the public without wrongful disclosure by any disclosing party or its attorneys, accountants, consultants, other professionals, affiliates, or partners.  Upon termination of this Agreement, Agent shall promptly (1) return to Company any Confidential Information in written form provided to Agent or any other persons to which Agent disclosed such information (and all copies thereof), and (2) destroy all other Confidential Information that may exist in the records of Agent or any person to which it disclosed such information (whether in written, electronic or other form).  Without prejudice to the rights and remedies otherwise available to Company, Company shall be entitled to the restraint by injunction of any actual or threatened violation of the provisions of this Section 7(B), it being understood that the rights of Company set forth in this Section 7(B) are of a special, unique and extraordinary character and that monetary damages are not an adequate remedy for the breach by Agent of its obligations under this Section 7(B). 

## 8. INDEMNIFICATION; LIMITATION ON LIABILITY

A.    Agent agrees to protect, defend, indemnify and hold harmless the Company, its affiliates, and their respective officers, directors, employees, customers (including Client), contractors, subcontractors of any tier, and invitees (collectively, the "***Company Indemnitees***") from and against any and all damages, liabilities, losses, costs, expenses (including attorney's fees), claims, demands and causes of action of every kind and character (collectively, "***Indemnifiable Claims***"), without regard to the cause or causes thereof or the negligence or fault (active or passive) of any party or parties, including the sole, joint or concurrent negligence of the Company Indemnitees, arising in favor of any of the employees, subcontractors or their employees, or invitees of Agent on account of personal injury, death or loss of, damage to, property or from Agent's failure to comply with any law, rule or regulation of any applicable governmental authority, irrespective of the cause of such failure.

B.    Company agrees to protect, defend, indemnify and hold harmless Agent, and its officers, directors, employees, and customers (collectively, the "***Agent Indemnitees***") from and against  any and all Indemnifiable Claims, without regard to the cause or causes thereof or the

4

**C55**

PGN20190177237

negligence or fault (active or passive) of any party or parties, including the sole, joint or concurrent negligence of the Agent Indemnitees, arising in favor of any of the employees, subcontractors or their employees, or invitees of the Company or its affiliates on account of personal injury, death or loss of, damage to, property or from Company's failure to comply with any law, rule or regulation of any applicable governmental authority, irrespective of the cause of such failure.

C.       Both Company and Agent shall notify each of the other Parties immediately of any loss, claim, demand, or suit that may be presented to or served upon it, or its Indemnitees, as a result of the performance of the Services.

D.       Neither Company nor Agent shall be liable to the other, or the Indemnitees of the other, for special, indirect or consequential damages resulting from or arising out of this Agreement, including loss of profit or business interruptions, however same may be caused; and Company and Agent shall protect, defend, indemnify and hold harmless the other and the Indemnitees of the other against any Indemnifiable Claim that may be brought by such indemnifying Party or its Indemnitees on the basis of any such special, indirect or consequential damages.

## 9. REPRESENTATIONS AND AGREEMENTS OF AGENT

A.       Agent hereby represents and warrants to Company as follows:



1.       Agent is a company duly organized, validly existing and in good standing under the laws of the Netherlands and has all requisite power and authority to own and operate its business and properties and to carry on its business as such business is now being conducted and is duly qualified to do business in Mexico and in any other jurisdiction in which the transaction of its business makes such qualification necessary.

2.       Agent has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution, delivery and performance of this Agreement by Agent have been duly authorized by all necessary action on the part of Agent. This Agreement has been duly executed and delivered by Agent and is the legal, valid and binding obligation of Agent enforceable in accordance with its terms.

3.       The execution, delivery and performance of this Agreement by Agent do not and will not contravene the by-laws or other organizational documents of Agent and do not and will not conflict with or result in a breach of or default under any agreement to which Agent is a party or by which it or any of its properties, rights or assets is bound or affected.

4.       All governmental or other authorizations, approvals, orders or consents required in connection with the execution, delivery and performance of this Agreement by Agent have been obtained or will be obtained in due course.

5.       Agent is, and at all times during the term of this Agreement, will be, the sole owner of the Bank Account.

5

**C56**

      6.     Daniel Olivares is, and at all times during the term of this Agreement, will be, the sole shareholder of Agent.

      B.     Agent hereby convents and agrees with Company that during the term of this Agreement:

      1.     Agent will not make any direct or indirect payments to any government officials, including directors, officers, or employees of Client, or any direct or indirect payments which are illegal under any applicable law or regulation.

      2.     Agent will conduct its activities in accordance with all applicable laws and regulations, and in a manner that will not cause Company to be in violation of any applicable law or regulation.

      3.     Agent will not (i) act as a commercial agent (or in any similar capacity) with respect to any Tender for any other person, or (ii) entity or perform any services for any other person or entity that are similar or related to the Duties to be performed by Agent under this Agreement.

      4.     Agent represents that Daniel Olivares is a principal of Agent, and Agent agrees that during the term of this Agreement such individual will remain principal of Agent unless Company shall previously consent otherwise in writing.



      5.     Agent shall ensure that Daniel Olivares, or some other representative of Agent that Company in its sole discretion deems to be acceptable, shall be available to Company, at all times during the term of this Agreement.

<div align="center">10. TERM</div>

This Agreement shall be effective upon execution and shall continue in effect until terminated in accordance with the following:

      A.     Company may terminate this Agreement upon thirty (30) days prior written notice to the Agent.

      B.     If either Party materially breaches the terms hereof, and such breach is not remedied to the sole and complete satisfaction of non-breaching Party within fifteen (15) days after notice thereof to the breaching Party by the non-breaching Party, then this Agreement may be terminated by the non-breaching Party upon written notice to the breaching Party.

      C.     This Agreement will terminate automatically if Agent or Company becomes bankrupt or insolvent or are unable to satisfy their respective financial obligations as they become due.

      D.     This Agreement will terminate automatically if Agent or Daniel Olivares ceases to be eligible to represent Company in Mexico or Company ceases to be able to legally carry on its business in Mexico.

<div align="center">6</div>

<div align="center">**C57**</div>

PGN20190177239

E.    Upon termination of this Agreement, the obligations of the Parties to each other shall immediately cease, other than any obligation under Articles 5, 6, 7, 8, 13, 14 and 15; *provided*, *however*, that notwithstanding termination by Company under Section 10(A), Company shall continue to pay the Commission due to Agent pursuant to Section 3(A) above.

F.    Notwithstanding the above provisions, Company may terminate this Agreement immediately pursuant to Article 15.

## 11. ASSIGNMENT

Agent agrees that, without the prior written consent of Company, which may be withheld at their discretion, Agent will not assign or delegate this Agreement or any of the rights, duties or obligations hereunder; provided, however, that Agent shall remain fully liable and responsible for all duties and obligations hereunder irrespective of an assignment hereof.  Notwithstanding the foregoing, upon giving written notice to Agent, Company may assign any of its rights, duties or obligations hereunder to any affiliate or third party.

## 12. NOTICES

All notices, requests and other communications provided for herein (including, without limitation, any modifications of, or waivers, requests or consents under, this Agreement) shall be given or made in writing (including, without limitation, by facsimile), and be delivered personally or by certified or registered mail, postage prepaid, to the address shown below.



> Agent:        Danter Investments C.V.
>               Represented by Daniel Olivares
>               Professor J.H. Bavincklaan 7
>               1183 AT,
>               Amstelveen, Netherlands
>               Facsimile: +52-55-55-45-3238
>               Telephone: +52-55-52-54-0588
>
> Company:      Noble Contracting GmbH
>               c/o Noble Drilling Services Inc.
>               13135 S. Dairy Ashford, Suite 800
>               Sugar Land, Texas 77478
>               Attention: Mr. Andrew Tietz
>               Facsimile: (281) 276-6301
>               Telephone: (281) 276-6100

Either Party may change its address for notices under this Agreement by notice to the other Party as outlined above.

## 13. GOVERNING LAW

This Agreement shall be governed by the internal laws of the State of Texas, without regard to principles of conflicts of law.  Any dispute arising out of or relating to this Agreement

7

**C58**

CONFIDENTIAL                                                    PGN20190177240

may be brought in any court of appropriate jurisdiction in Houston, Texas, and the Parties irrevocably submit to the exclusive jurisdiction of each such court in any such dispute. THE PARTIES WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES TO IRREVOCABLY WAIVE TRIAL BY JURY, AND THAT ANY DISPUTE BETWEEN THEM RELATING TO THIS AGREEMENT SHALL INSTEAD BE TRIED BY A COURT OF COMPETENT JURISDICTION SITTING WITHOUT A JURY. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be deemed prohibited or invalid under such applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, and such prohibition or invalidity shall not invalidate the remainder of such provision or the other provisions of this Agreement.

## 14. TAXES AND CLAIMS

A.      Agent shall pay, and be solely responsible for, (a) all taxes, licenses, and fees levied or assessed on Agent by any governmental agency in connection with and/or incident to this Agreement or the performance of the Duties and (b) all unemployment compensation insurance, old age benefits, social security, or any other taxes upon the wages of Agent or any of its agents, employees or representatives. 

B.      Agent shall reimburse Company on demand for all taxes or governmental charges (local, state, provincial, national or federal) that Company may be required to pay or withhold on account of Agent or any of the employees or principals of Agent. At its election, Company may deduct the amount of any such charges paid by Company from any amounts payable to Agent by Company pursuant to this Agreement. Furthermore, Agent agrees that Company shall have the right, but not the obligation, to make any and all necessary filings with respect to amounts paid to Agent under this Agreement.

C.      Agent shall pay, and cause to be paid, all claims for labor, materials, services, and supplies furnished to or utilized by Agent or any subcontractor in connection with this Agreement or the performance of the Duties. Agent shall take, or cause to be taken, any and all action as may be necessary or appropriate to ensure that no lien or charge is fixed upon any assets, equipment or vessels of the Company Indemnitees. AGENT SHALL PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS THE COMPANY INDEMNITEES FROM AND AGAINST ALL INDEMNIFIABLE CLAIMS ASSOCIATED WITH SUCH LIENS. If Agent fails to pay, or cause to be paid, any claims or indebtedness incurred by Agent or any subcontractor in connection with this Agreement or the performance of the Duties, Company shall have the right (but not the obligation) to pay such claims or indebtedness and to deduct the amount of such claims or indebtedness from any amounts payable by Company to Agent under this Agreement.

CONFIDENTIAL

## 15. ANTI-CORRUPTION AND ANTI-BRIBERY

A.      Contractor agrees to, and to cause its Subcontractors to, provide the Services in an ethical and professional manner and Contractor shall not, and shall cause its Subcontractors to not, do or cause to be done anything which would diminish the value of Company's name or good will. Consistent with this, Contractor represents and warrants to Company and agrees with Company that:

1.      In performing the activities contemplated under this Agreement, Contractor and its Subcontractors, and their principals, shareholders, directors, officers, employees, agents and other representatives working on their behalf in connection with this Agreement, will read and comply with Company's standards of business practice and conduct adopted by Company and its Affiliates from time to time, including Company's internal policy on compliance with the United States Foreign Corrupt Practices Act of 1977, as amended and attached hereto as Exhibit A, and the United Kingdom Bribery Act 2010 (collectively referred to as "ACAB").  Contractor further represents and warrants that it, and each of its Subcontractors, understands the purpose and provisions of ACAB, particularly the prohibition on offering, making or promising anything of value to individuals as set forth in paragraph (iii) below.

2.      In connection with the performance of its obligations under this Agreement, all applicable existing and future laws, regulations and requirements of the United States, the United Kingdom, and any other applicable countries will apply to its, and its Subcontractors', performance under this Agreement and Contractor shall not engage, and shall take steps, which include the implementation of policies and procedures, to ensure that Contractor and its Subcontractors and its Subcontractors' principals, shareholders, directors, officers, employees, agents and other representatives working on their behalf in connection with performance under this Agreement do not engage, in any activity that would expose Company or any Affiliate of Company to a risk of criminal or civil penalties under such laws, regulations and requirements, including ACAB and laws of other jurisdictions relating to improper payments, as well as applicable export control and sanctions laws, regulations, orders and requirements and any provisions, representations or agreements, or contractual clauses required thereby to be included or incorporated by reference or by operation of law in this Agreement. 

3.      None of Contractor, any of its Subcontractors, nor any of their principals, shareholders, officers, directors, employees, agents or any other representatives, affiliated companies or any other person or entity acting on their behalf, has made or promised, and none will make or promise, in connection with this Agreement or the performance thereof, any offer, payment, loan, gift, or anything of value to a Government Official, political party or official thereof, candidate for political office, or any person while knowing or having reason to suspect that all or a portion of such payment, loan, gift, promise or thing of value will be offered, given or promised, directly or indirectly, to a Government Official, political party or official thereof, or to any candidate for political office, for the purpose of obtaining or retaining business or favorable governmental action, influencing any official act or decision of a Government Official, political party or official thereof, or any candidate for political office, or inducing such person to use his or her influence to affect or influence any governmental act or decision, or otherwise secure any improper advantage for Company, Contractor or any of its Subcontractors. As used in this Agreement, "*Government Official*" means: any official or employee or agent of a

9

**C60**

government or any federal, regional or local department, agency, state-owned enterprise or corporation or other instrumentality thereof, or any person acting in an official capacity for or on behalf of any such government or governmental department, agency or instrumentality (such as government-owned companies); or any official or employee or agent acting for or on behalf of a public international organization (such as the World Bank, the International Finance Corporation, the International Monetary Fund or the Inter-American Development Bank).

4.    None of Contractor, any of its Subcontractors, nor any of their principals, officers, directors, employees, agents or any other representatives, affiliated companies or any other person or entity acting on their behalf, has made or promised, and none will make or promise, in connection with this Agreement or the performance thereof, any offer, payment, loan, gift, or anything of value to any person for the purpose of inducing a person to perform a relevant function or activity improperly or to reward a person for the improper performance of a relevant function or activity in connection with this Agreement, in violation of the United Kingdom Bribery Act 2010.

5.    Neither Contractor, any of its Subcontractors nor any of their principals, shareholders, officers, directors, employees, agents or other representatives working on their behalf in connection with their performance under this Agreement, are or during the term of this Agreement shall become a Government Official, an officer or representative of any political party, or a candidate for political office. Further, no ownership interest in Contractor, any Subcontractor, or any of their parent or affiliated companies, or in the contractual relationship established by this Agreement, is or will be during the term of this Agreement held or controlled directly or indirectly by a Government Official, an officer or representative of any political party, or a candidate for political office. Contractor further agrees to make immediate, complete and accurate written disclosure to Company in the event that during the term of this Agreement (1) any of Contractor's or its Subcontractors' principals, shareholders, officers, directors, employees, agents or other representatives working on its behalf in connection with performance under this Agreement, becomes a Government Official, an officer or representative of any political party, or a candidate for political office or (2) a Government Official, an officer or representative of any political party, or a candidate for political office directly or indirectly acquires an interest of any sort or nature in Contractor, any Subcontractor, or any of their parent or affiliated companies, or in the contractual relationship established by this Agreement. 

B.    Contractor shall, and shall cause its Subcontractors to, maintain books and records that fairly and accurately reflect all of its transactions relating to this Agreement. Contractor shall, and shall cause its Subcontractors to, retain such records for at least two years from the end of this Agreement. Contractor agrees that these books and records relating to transactions pursuant to this Agreement shall be subject to audit, at Company's request, by Company or its designated representative at reasonable times as Company shall consider necessary to ensure compliance with the FCPA and this Agreement.

C.    Contractor will, and will cause its Subcontractors to, provide to Company such documents or other evidence (whether written, oral or otherwise) as Company may request from time to time so that Company may determine and establish compliance with the provisions of this Article 15.0. Contractor agrees to, and to cause it Subcontractors to, cooperate fully with

**C61**

CONFIDENTIAL                                                      PGN20190177243

any such audit or investigation, the scope, method, nature and duration of which shall be at the sole discretion of Company.

D.      Contractor agrees to, and shall cause each of its Subcontractors to, cause at least one of its (or its Subcontractor's, as applicable) directors or officers who is a duly authorized representative of Contractor and has direct involvement with this Agreement and the Services as well as any such other Contractor (or Subcontractor, as applicable) employees identified by Company from time to time to provide Company with an Annual Certification of Compliance in the form hereto attached as <u>Exhibit B or another as directed  by either Company</u>. The Annual Certification of Compliance covering shall be provided to Company no later than January 31 of each calendar year during the term of this Agreement. Contractor will also submit the Annual Certification of Compliance immediately upon a request from Company. Failure to timely submit the Annual Certification may result in suspension of services and payment under this Agreement.

E.      Contractor acknowledges and agrees that Company, at any time and from time to time, may conduct a due diligence review of Contractor, or any of its Subcontractors, with respect to this Agreement. Contractor agrees to, and shall cause its Subcontractors to, assist and fully cooperate with any such due diligence review, including providing Company with such documents or other evidence (whether written, oral or otherwise) as Company may request.

F.      Contractor acknowledges that all payments to it under this Agreement shall be made by check or wire transfer, and that none shall be made by cash or other negotiable instrument.

G.      Notwithstanding any other provision of this Agreement, Company shall have the right to terminate this Agreement immediately in the event of Contractor's or any of its Subcontractors' failure to comply with any of the foregoing provisions, including Contractor's failure to complete the Annual Certification of Compliance. In the event of termination: (i) Company shall have a right of action against Contractor for the amount of any monetary payment or thing of value made or given by Contractor in breach of any of the provisions of this Article 1.0; (ii) all obligations of Company to pay Contractor's fees shall cease forthwith; and (iii) Contractor shall immediately return to Company all commissions arising from any transaction in which there was a violation of this <u>Article 15</u>.

H.      A facilitating payment is a payment or offer of payment of anything of value to a foreign official, political party, or political party official or candidate, the purpose of which is to expedite, facilitate or secure the performing of a "routine governmental action" by any of those individuals. Notwithstanding that the United States Foreign Corrupt Practices Act of 1977, as amended, may permit certain such facilitating payments, the laws of other countries applicable hereto, such as the United Kingdom, do not permit such payments. In addition, Noble policy also prohibits facilitation payments. For avoidance of doubt, facilitating or expediting payments are not permitted under this Agreement.

## 16. MISCELLANEOUS

C62

                                                                                      PGN20190177244

A.      Agent shall not register this Agreement or its appointment as Agent with any governmental authority, except as required by law, without the prior written consent of Company. Agent shall promptly inform Company of all registrations and filings made by Agent as a representative of Company and Agent shall cancel immediately any such registration upon termination of this Agreement or upon receiving written notice from Company to do the same.

B.      This Agreement constitutes the entire agreement between the Parties regarding the subject matter hereof, and this Agreement supersedes, cancels and replaces any previous agreements, writings and understandings regarding such matters.

C.      This Agreement is made and shall be construed in English. All notices to be given by any Party hereunder and all other communications and documentation relating to this Agreement, including any dispute resolution proceedings, shall be in the English language.

D.      This Agreement may be amended only pursuant to a written agreement executed by all Parties.

E.      The headings herein are for reference only and shall not be utilized in interpreting this Agreement.



F.      This Agreement may be executed in any number of counterparts, including facsimile or electronic mail counterparts, with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument. Delivery of a copy of this Agreement bearing an original signature by facsimile transmission or by electronic mail in "portable document format" form shall have the same effect as physical delivery of the paper document bearing the original signature.

G.      In this Agreement, unless there is something in the subject matter or context inconsistent therewith, words importing the singular shall include the plural and vice versa, words importing gender shall include the masculine, feminine and neuter genders and where a term or expression is defined herein, derivations thereof shall have corresponding meanings.

*Signature Page Follows*

**C63**

CONFIDENTIAL                                                                                    PGN20190177245

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

"AGENT"

**Danter Investments C.V.**

By:_____

Name: Daniel Olivares

Title:   Authorized Representative

"COMPANY"

**Noble Contracting GmbH**

By:_____

Name:

Title:

13

**C64**

## EXHIBIT A

## NOBLE CORPORATION'S INTERNAL POLICY ON COMPLIANCE WITH THE FOREIGN CORRUPT PRACTICES ACT

EXCERPT FROM NOBLE'S ADMINISTRATIVE POLICY MANUAL

### 7.6    *ANTI-CORRUPTION AND ANTI-BRIBERY COMPLIANCE*

It is the policy of the Company to maintain the highest level of professional and ethical standards in the conduct of its business affairs. The Company places the greatest importance upon its reputation for honesty, integrity and high ethical standards. This policy statement is a reaffirmation that the Company places the greatest importance on making sure its management and employees also adhere to the same high ethical standards. The foundation of this policy is the Company's commitment to comply with all applicable laws governing the conduct of the Company's worldwide operations (see Section 7.1 (Legal Conduct of Business) of this Manual), including all applicable anti-corruption and anti-bribery laws, such as the United States Foreign Corrupt Practices Act (the "FCPA"), the U.K. Bribery Act 2010 ("UKBA") and those adopted pursuant to the Organization for Economic Co-operation and Development ("OECD") Convention on Combating Bribery of Foreign Public Officials in International Business Transactions. This Section 7.6 details Noble's policy regarding compliance with the FCPA and UKBA. See also Section 7.5 (Appointment of Agents), and Section 3.3 (Company Contributions) of this Manual. 

This policy applies to Noble Corporation and all of its subsidiaries, whether in the United Kingdom, the United States, or abroad. This policy also applies to all of the officers, directors, employees, Agents (as defined below), consultants and other representatives of the Company, regardless of their nationality and including any member (shareholder) acting on behalf of the Company. Each of these individuals has an obligation to conduct himself or herself in a manner that complies with these standards. Disregard for the requirements or principles set forth in this policy statement will be grounds for appropriate disciplinary action, including, but not limited to, immediate termination of employment.

In adhering to this policy, all officers, directors, employees, Agents, consultants and other representatives of the Company must understand the requirements of all applicable laws and regulations that apply to the conduct of the Company's business affairs. When any question or uncertainty arises with respect to those laws, it is the obligation of each affected person to seek guidance from the Chief Compliance Officer ("CCO") or the Company Legal Department.

CONFIDENTIAL                                                          PGN20190177247

### 7.6.1 ANTI-CORRUPTION / ANTI-BRIBERY PROVISIONS

The FCPA, UKBA and other applicable laws prohibit the making of any payment or offer of payment of anything of value to a Government Official (as defined below), political party, or political party official or candidate in order to assist in obtaining or retaining business or to secure any improper advantage.

It is also prohibited to make any payment or offer of payment of anything of value to any other person, such as an Agent, while knowing or having reasonable grounds to believe that all or a portion of such payment will be given or offered to any Government Official, political party, or political party official or candidate.

Prohibited Payments to Persons Who Are Not Government Officials: Under the UKBA it is also illegal to promise or give any financial or other advantage to any person for the purpose of inducing a person to perform a relevant function or activity improperly or to reward a person for the improper performance of a relevant function or activity in connection with the conduct of the Company's business.

As used in this policy:

"Agent" means a company or an individual (who is neither a Noble employee nor an independent contractor who serves in a functionally equivalent position) who is acting on behalf of or represents Noble to Government Officials, a political party, official thereof or candidate for political office.



> Examples may include, but are not limited to, service providers who are: marketing or commercial agents, joint venture partners, customs-clearance agents, freight-forwarders, visa/immigration agents, tax or legal representatives, consultants, or intermediaries.

"Government Official" means any official, employee or agent at a federal, regional, local or any other level of any government, department, agency, state-owned, -controlled, or -operated enterprise or corporation or other instrumentality thereof, or any official, employee or agent of a public international organization.

### 7.6.2 RECORD-KEEPING PROVISIONS

The FCPA and other applicable laws have significant accounting requirements which require the Company to maintain accurate and reasonably detailed books, records and accounts which fairly reflect all transactions and dispositions of assets.

CONFIDENTIAL                                                    PGN20190177248

The Company is required to devise and maintain a system of internal accounting controls that provides reasonable assurances that:

- transactions are executed in accordance with management's general or specific authorization;
- transactions are recorded as necessary to permit the proper preparation of the Company's financial statements and maintain accountability for assets;
- access to the Company's assets is permitted only in accordance with  management's general or specific authorization; and
- the recorded accountability for the Company's assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

These record-keeping provisions of the FCPA prohibit the mischaracterization or omission of any transaction on the Company's books or any failure to maintain proper accounting controls that result in such a mischaracterization or omission.

### 7.6.3 POLICY

7.6.3.1    INTRODUCTION

It is the policy of the Company to comply fully with all the provisions of the FCPA, UKBA and other applicable laws. All of the officers, directors, employees, Agents, consultants and other representatives of the Company, including any members (shareholders) acting on behalf of the Company, shall comply with this policy and conduct the Company's business ethically and in accordance with all applicable laws.



1.  The Company's Agents will be appointed only in accordance with the provisions set forth in this policy and in Section 7.5 (Appointment of Agents) of this Manual.

2.  Applicable standards, principles, laws, and practices and policies of the Company for accounting and financial reporting shall be followed by all officers, directors and employees.

3.  The Company's books, records and accounts shall be kept accurately and shall fairly reflect all transactions and dispositions of assets.

4.  No undisclosed or unrecorded accounts are to be established for any purpose. False or misleading entries are strictly prohibited.

7.6.3.2    PROHIBITED PAYMENTS

1.  No one shall authorize or make any payment or offer of payment of anything of value to a Government Official, political party, official thereof, or candidate for political office or any other person in violation of this policy.

**C67**

CONFIDENTIAL

2. No one shall authorize or make any payment or offer of payment of any money or anything of value to any third party while knowing or having reasonable grounds to believe that the third party is or may be giving, offering or promising all or a portion of the thing of value, directly or indirectly, to a Government Official, political party, official thereof, or candidate for political office or any other person in violation of this policy.

3. No one shall authorize or make a facilitating payment. While "facilitating payments" are permissible under the FCPA in certain limited circumstances, they are prohibited by Noble policy.

7.6.3.3        PERMISSIBLE PAYMENTS

1. **Imminent Threats to Personal Safety** - If a demand for payment is made in connection with an imminent threat to the personal safety of someone or those around them, such payment may be permitted under this policy. If a payment is made, it must be immediately reported to the CCO or General Counsel and must be accurately recorded and fully described in the Company's books and records. In some instances, Government Officials may request or solicit improper payments or attempt to obtain payment by means of duress such as detention or confiscation of property The fact that someone simply requests or solicits an improper payment does not make such payment permissible as an imminent threat to personal safety.



2. **Promotional or Marketing Expenses** - In certain circumstances the payment of some promotional or marketing expenses is permissible under the law. These payments are referred to herein as "Promotional Expenses".

Payments considered to be legitimate Promotional Expenses under the law are those reasonable and bona fide expenses, such as for meals, travel, lodging expenses, entertainment or gifts (promotional items or Company merchandise) incurred by, or on behalf of, a Government Official, political party, official thereof, or candidate for political office that are directly related to:

a. the promotion, demonstration or explanation of the Company's products or services; or

b. the execution or performance of a particular contract between the Company and a government or instrumentality thereof.

The directors, officers, employees, Agents, consultants and other representatives of the Company may pay or authorize the payment or reimbursement of Promotional Expenses incurred by, or on behalf of, Government Officials, political parties, or officials thereof, or candidates for political office ONLY if:

A-4

**C68**

a.  they are directly related to the promotion, demonstration or explanation of the Company's products or services or with the execution or performance of a particular contract between the Company and a government or instrumentality thereof, and the payment or benefit is NOT provided for the purpose of inducing a Government Official to misuse his/her official position;

b.  they are reasonable and bona fide expenditures for meals, travel, lodging expenses, entertainment or gifts (promotional items or Company merchandise) in light of what is customary and within the bounds of ethical business practices;

c.  they do not create the appearance of being an improper payment under the circumstances and do not place the recipient under any obligation;

d.  they are legal under the written laws, rules or regulations of the particular country and do not create the appearance of being an improper payment;

e.  they have been incurred in accordance with other Company policies, especially the "Travel and Entertainment" section of this Manual; and

f.  they are accurately recorded and fully described in the Company's books and records.



The Company shall, with concurrence of the CCO and General Counsel, establish guidelines from time to time as necessary for the implementation of this policy statement, and it shall be the responsibility of every director, officer, employee, Agent, consultant and representative of the Company to follow those guidelines. Where a person is in doubt about the application of the policy or the guidelines, it shall be his or her obligation to bring any questions to the CCO or the General Counsel before taking any action.

In addition, in order to comply with the accounting provisions of the FCPA, all such Permissible Payments shall be accurately recorded in the Company's books and records in order to reflect properly the true nature of the transaction. The entry should show the amount and purpose of the payment, and the name and/or title of the person to whom the payment was made. The Chief Financial Officer is responsible for procedures related to reporting and accounting of such payments. Copies of any documents (*i.e.*, correspondence, reports, receipts, expense reports, etc.) relating to or made in connection with any Permissible Payment should be handled in accordance with policy and guidelines established by the Company.

Nothing in this policy authorizes, endorses or encourages the offering or making of any corrupt payment of anything of value to a Government Official, political party, official thereof, or candidate for political office, in violation of applicable laws and regulations.

CONFIDENTIAL                                                                                    PGN20190177251

7.6.3.4    POLITICAL AND CHARITABLE CONTRIBUTIONS

No charitable contribution may be made on behalf of the Company without the prior written approval of Noble's Chief Executive Officer. Contributions to non-U.S. political parties, candidates, campaigns, political action committees or officials are not permitted. See Section 3.3 (Company Contributions).

7.6.4    RESPONSIBILITY FOR COMPLIANCE WITH THIS POLICY

1. **Management and all Employees** - Management of the Company and all employees are responsible for compliance with this policy and are instructed to seek guidance from the CCO or General Counsel if they have questions concerning this policy, or in situations that appear not to be covered by the policy. All officers, managers and supervisors of the Company are responsible for effecting the policies stated herein in the management of the business of the Company. All employees of the Company are responsible for reporting any questionable conduct pursuant to the procedures set forth herein (see below).



2. **Chief Compliance Officer** - The CCO will report to the Company's Audit Committee for the effective implementation and enforcement of this policy. The particular responsibilities of the CCO are further outlined in the Corporate Compliance Charter.

3. **Audit Committee** - The Company's Audit Committee has ultimate authority and responsibility for overseeing this policy and reviewing any policy changes made thereto.

7.6.5    EMPLOYEE OBLIGATIONS AND REPORTING

1. **Reporting Obligation** - Employees must report promptly any violation or suspected violation of this policy or applicable law (whether or not based upon personal knowledge), including violations of the FCPA or UKBA through one of the following options:

   a. The employee may make such a report via the NobleLine (toll-free and anonymous) at 877-285-4162, or collect at +1-704-544-2879, or via email at compliance@noblecorp.com; or

   b. An employee may make such a report to the CCO, the General Counsel or a member of the Company Legal Department, or a member of the Audit Committee.

2. **New Hire Acknowledgment Statement** - Each employee is required to complete and sign an acknowledgment statement that the employee fully understands the Company's policy with respect to anti-corruption and anti-bribery, the FCPA, UKBA and acknowledges his

A-6

**C70**

or her commitment to adhere to that policy. Signed statements will be kept in employees' personnel files.

3. **Violation of Policy or Law** - If an employee violates this policy or any applicable law in the course of his or her employment, then the employee will be subject to appropriate disciplinary action, including, without limitation, termination, suspension, demotion, reduction in pay, and/or reprimand.

**Annual Certification of Compliance** - All members of corporate management, division managers, division controllers, and specified employees (including employees who have or are expected to interact with any Agent), and any other employee selected by the CCO or the General Counsel, must certify annually in writing that they have reviewed and are familiar with the Anti-Corruption and Anti-Bribery Compliance Program and any supplementary material dealing with the FCPA, UKBA or other applicable anti-corruption and anti-bribery laws, that they have complied with the law and will continue to do so, and that they have communicated to their supervisor, the CCO, the General Counsel or a member of the Company Legal Department, or a member of the Audit Committee any information they may have related to possible violations of this policy, the FCPA, the UKBA or other applicable anti-corruption and anti-bribery laws by other Company personnel or by Agents. All certifications must be delivered to the CCO for review.

## 7.6.6    EDUCATION PROGRAM

In order to ensure that all Company personnel are thoroughly familiar with the areas of law that apply to the business affairs of the Company, the Company provides appropriate training programs for its personnel. The CCO, in cooperation with the General Counsel, shall have responsibility for developing the educational materials and overseeing which personnel should participate. The training will be mandatory for personnel identified by the CCO or the General Counsel as having need for training in anti-corruption and anti-bribery compliance issues.

CONFIDENTIAL

**EXHIBIT B**

**NOBLE CORPORATION AND SUBSIDIARIES ("Noble")**
**CERTIFICATION OF COMPLIANCE**

I, DANIEL OLIVARES, a duly authorized representative of **Danter Investments C.V.**, ("**Company**"), do hereby certify for and on behalf of **Company**, that neither I nor, to my knowledge, any other person, including, but not limited to, every officer, director, stockholder, employee, representative and agent of **Company**, in connection with **Company's** work for Noble or any of Noble's affiliates, directly or indirectly, have made, offered or authorized or will make, offer or authorize any payment, gift or anything else of value to a Government Official, political party or official thereof, candidate for political office, or any other person while knowing or having reason to suspect that all or a portion of such payment, gift or thing of value will be offered, given or promised to a Government Official, political party or official thereof, or to any candidate for political office, for the purpose of obtaining or retaining business or favorable governmental action, influencing any official act or decision of a Government Official, political party or official thereof, candidate for political office or inducing such person to use his or her influence to affect or influence any governmental act or decision, or otherwise secure any improper advantage for Noble or any of Noble's affiliates.

For purposes of this certification, the term "Government Official" includes: any official, employee or agent at a federal, regional, local or any other level of any government, department, agency, state-owned, -controlled, or -operated enterprise or corporation or other instrumentality thereof, or any official, employee or agent of a public international organization.

I also hereby certify for and on behalf of **Company**, that neither I nor, to my knowledge, any other person, including, but not limited to, every officer, director, stockholder, employee, representative and agent of **Company**, in connection with **Company's** work for Noble or any of Noble's affiliates, directly or indirectly, have promised or given, or will promise or give, any financial or other advantage to any person for the purpose of inducing a person to perform a relevant function or activity improperly or to reward a person for the improper performance of a relevant function or activity in connection with **Company's** work for Noble or any of Noble's affiliates.

I also hereby confirm that **Company** nor any of their principals, shareholders, officers, directors, employees, agents or other representatives working on **Company's** behalf in connection with **Company's** work for Noble or any of Noble's affiliates, is a Government Official. I also hereby confirm that **Company** does inform its principals, shareholders, owners, officers, directors, employees, agents and other representatives about **Company's** and Noble's obligations under the UK Bribery Act, U.S. Foreign Corrupt Practices Act, any other applicable anti-corruption laws and Noble's Administrative Policy Manual.

Company: Danter Investments CV
Signature and Date: 02/05/14
Name: Daniel Olivares
Title: Legal Representative.

B-1

**C72**

CONFIDENTIAL                                                                PGN20190177254

## EXHIBIT C

| Rig | Agent | Company |
|---|---|---|
| Noble Gene Rosser – | Danter – | Noble Contracting Sarl |
| Noble Sam Noble – | Danter – | Noble Contracting Sarl |
| Noble Carl Norberg – | Danter – | Noble Contracting Sarl |
| Noble Roy Butler – | Danter – | Noble Contracting Sarl |
| Noble Earl Frederickson – | Danter – | Noble Contracting Sarl |
| Noble Johnnie Hoffman – | Danter – | Noble Contracting Sarl |
| Noble John Sandifer – | Danter – | Noble Contracting Sarl |
| Noble Tom Jobe – | Danter – | Noble Contracting Sarl |



**C73**

CONFIDENTIAL

**3/27/2019 A. Sheehan Davis Letter**

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
### FOUR TIMES SQUARE
### NEW YORK 10036-6522

TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

DIRECT DIAL
2127353579
DIRECT FAX
9177773579
EMAIL ADDRESS
ABIGAIL.SHEEHAN@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

March 27, 2019

**BY E-MAIL**
Anne I. Salomon
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654

RE:    *Paragon Litigation Trust v. Noble Corporation plc, et al.* Adv. Proc. No.: 17-51882

Dear Anne:

I write in response to your March 12, 2019 letter (the "March 12 Letter") regarding purported deficiencies in Noble's document productions and interrogatory responses. Neither of your justifications for the Trust's delay alters Noble's view of what happened, as outlined in our letter from February 27, 2019 (the "February 27 Letter"). Furthermore, your letter demonstrates that the Trust still fundamentally misunderstands the issue. That the Trust took only a month to identify so-called gaps in Noble's production is beside the point; having possessed Noble's document production since December 2017, the Trust waited over a year—after the parties had already resolved the issues of search terms and custodians after significant negotiations and until the brink of the fact discovery deadline—to raise these concerns for the first time.

Nevertheless, Noble has already committed to accommodate the Trust's belated concerns where reasonable. For example, Noble has re-reviewed documents specifically challenged by the Trust and agreed to reproduce its privilege logs with

Anne I. Salomon
March 27, 2019
Page 2

additional information.  Noble will not, however, re-review every single one of the
thousands of document on its privilege logs in response to the Trust's amorphous
"concerns," nor undertake a review of tens of thousands of documents from several
new custodians or review thousands of additional documents from the existing
custodians based on new search terms.

With these considerations in mind, Noble responds to the Trust's specific
concerns below.

1.      **Custodians.**

The Trust's contention that *Noble* failed to designate certain custodians
ignores how discovery has proceeded in this case.  Nearly two years ago, Noble and
the Trust spent months negotiating the scope of proper custodians and search terms
to use during the Rule 2004 discovery process.  At that time, the Trust had already
received thousands of documents that Noble produced pursuant to the requests for
production served by the Official Committee of Unsecured Creditors (the
"Committee") on March 3, 2017.  When the Committee—represented by Jones
Day—was negotiating the scope of Rule 2004 discovery, it stated on June 14, 2017
that "we would like to reach an agreement with you to define the set of custodians
whose files should be searched."  To that end, on June 26, 2017, the Committee
asked Noble to "produce organization charts dating back to 2011 so that the
Committee can determine whether there are custodians, in addition to those that
Noble previously identified, whose files should be searched in response [to] the
subpoena."  Noble then produced those charts to the Trust, which had stepped into
the shoes of the Committee once the Committee was dissolved.

Over the following months, the Trust independently assessed what custodians
it believed were appropriate, and negotiated with Noble on that issue.  For instance,
on July 26, 2017, the Trust proposed six new custodians "[b]ased on its review of
Noble's prior production."  On August 18, 2017, the Trust proposed on August 18,
2017, that Noble produce from two additional custodians "based on documents that
have recently been reviewed."  And on September 18, 2017, the Trust "request[ed]
that Andrew Tietz be added as a custodian for all searches concerning Pemex or
Petrobras for the time period January 1, 2013 to February 14, 2016."

The Trust failed to raise any of the four custodians currently at issue during
these negotiations, or at any time in the months after receiving Noble's Rule 2004
productions.  Instead, the Trust waited until the brink of the initial discovery cutoff
to raise this issue.  The Trust argues that it needed additional time to conduct an
analysis to determine if there were gaps in Noble's production.  But the Trust was

Anne I. Salomon
March 27, 2019
Page 3

able to conduct this analysis in 2017—and in fact asked Noble to add Andrew Tietz as a custodian for issues relating to Pemex and Petrobras. Moreover, the Trust could have conducted this analysis at any time after receiving substantially all of Noble's document production by March 2018. If the Trust was able to inform Noble that it wanted four additional custodians in December 2018, surely it should not have needed another two months to explain why.

Nevertheless, as previously stated in the February 27 Letter, Noble is willing to harvest and review certain documents from Bodley Thornton, Bruno Morand, and Gene House. As Noble has noted, Daniel Olivares was not a Noble employee. However, Noble has reached out in good faith to Mr. Olivares to determine what documents, if any, he has, and will collect any potentially relevant files. Noble is available to meet and confer with the Trust to discuss appropriately narrowly-tailored search terms for these custodians which reflect their specific roles vis-a-vis the Paragon assets.

2.      **Privilege Assertions**.

As an initial matter, Noble has conducted thorough privilege reviews and produced extensive privilege logs that more than adequately describe the withheld or redacted documents, in full compliance with the requirements of Federal Rule of Civil Procedure 26(b)(5). Noble has repeatedly produced supplemental logs in response to the Trust's previous requests for additional information. While the Trust is correct that the party asserting privilege has the burden of proving its applicability, Noble's privilege logs do just that. If the Trust has concerns about specific documents on Noble's logs, it should identify them and Noble will consider re-reviewing them. Noble, however, will not conduct a wholesale re-review of thousands of pre-Spin documents based on the Trust's general concern about the possibility that some documents may have been improperly withheld.

(a)      **The Master Separation Agreement.**

Noble does not dispute the basis of the Trust's control of the Paragon privilege, or Paragon's control of the privilege as to documents relating to the "Paragon Business" under the MSA. Further, Noble agrees that the transfer of privilege under the MSA is consistent with the holding of *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985). Noble applied this understanding to its privilege reviews. But neither Paragon nor the Trust control the privilege as to Noble's business or the Spin-Off. In the September 25, 2018 stipulation (the "Stipulation"), Noble and the Trust agreed which otherwise-privileged documents relating to the Spin-Off were discoverable, and Noble

Anne I. Salomon
March 27, 2019
Page 4

produced documents in accordance with this agreement.  Documents that do not relate to the Paragon Business, or that relate to the Spin-Off but are outside of the time frame covered by the Stipulation may still be withheld as privileged.

The Trust has provided no evidence, nor pointed to any specific entries on Noble's privilege log, in support of its sweeping assertion that Noble has improperly withheld or redacted hundreds of pre-Spin documents discussing the Paragon Business.  Noble reviewed documents on its logs that included Pemex or Petrobras in their description because these were the only descriptions on the logs that, on their face, potentially involved the Paragon Business.  Additionally, in negotiating the Stipulation, Noble and the Trust agreed that Noble would not produce documents, such as Noble 10-Ks, that might include only peripheral discussions of the Paragon Business.  (*See* Stipulation ¶ 5.)  Despite this earlier agreement, the Trust now tries to walk away from it and apply a more aggressive standard to all pre-Spin documents, which is inconsistent with both the parties' negotiations and the transfer of privilege outlined in the MSA.  The Trust cannot now retrade this deal.  If the Trust is concerned that specific documents might relate to the Paragon Business, then Noble will consider whether it will review those documents.

### (b) The September 25, 2018 Privilege Stipulation.

Noble reviewed the privilege logs to identify documents that were dated between April 1, 2013 and August 1, 2014.  Noble produced all documents from that review which related to the Spin-Off or the Paragon Business.  Pursuant to the parties' agreement, Noble continued to withhold documents within that time frame that concerned the Noble Business, or that contained only a peripheral discussion of the Paragon Business.  Noble also reviewed the privilege logs to identify documents that were dated after December 13, 2013, and produced all documents it identified that were sent or received by members of the Paragon management team.  Finally, Noble reviewed the privilege logs to identify documents that were dated between December 13, 2013 and August 1, 2014 and produced those sent or received by James MacLennan.

To the extent the Trust has additional concerns about documents within the time frames covered by the Stipulation, it should follow the procedure outlined in Paragraph 9 of the Stipulation, and advise Noble of any communication for which it requires more detailed descriptions or that it believes is discoverable.  As Noble has already stated, it will not conduct a wholesale re-review of its logs in response to the Trust's generalized concern that certain unidentified documents might be discoverable.

Anne I. Salomon
March 27, 2019
Page 5

### (c)    Draft SEC Filings and Press Releases.

The Trust misstates both Noble's position and the applicable case law with respect to draft SEC filings and press releases. As Noble pointed out in its February 27 Letter, draft SEC filings are documents that, by their nature, are heavily reviewed and edited by attorneys. It was Noble's practice to have attorneys review and comment on all draft SEC filings. A review of different drafts will necessarily reveal confidential attorney-client communications. *See Jedwab v. MGM Grand Hotels, Inc.*, No. CIV.A. 8077, 1986 WL 3426, at *3 (Del. Ch. Mar. 20, 1986)("[N]ew information disclosed from comparing drafts of SEC filings with the filed documents themselves necessarily relates to and may inferentially disclose communications between a client and its lawyers charged with preparing the final documents. Communications of this kind are clearly made 'for the purpose of facilitating the rendition of professional legal services' and lie at the heart of the confidential communications that the lawyer-client privilege seeks to protect."). As a result, the Trust can hardly say that certain draft versions of these filings "no longer appear to be attorney drafts." Moreover, simply because drafts may have been sent to non-attorneys does not waive the privilege. *United Food & Commercial Workers Union v. Chesapeake Energy Corp.*, No. CIV-09-1114-D, 2012 WL 2370637, at *10 (W.D. Okla. June 22, 2012) (withholding draft SEC filings and press releases because "the attorney-client privilege remains applicable to drafts of documents which were *prepared or reviewed by* the attorney at the request of the client[.]") (emphasis added); *see also Smith v. Unilife Corp.*, No. CIV.A. 13-5101, 2015 WL 667432, at *3 (E.D. Pa. Feb. 13, 2015) ("Form 10–K requires extremely detailed financial, legal and structural information and that the determination of what information should be disclosed for compliance is not merely a business operation, but a legal concern.") (citing *Roth v. Aon Corp*., 254 F.R.D. 538, 541 (N.D. Ill. 2009)). And, as the Trust itself concedes, many of these drafts were sent to groups that *do* include attorneys. (*See* March 12 Letter at 5 (pointing to "documents sent to larger groups of non-attorneys such as an internal audit or business committee comprised *primarily of* non-attorneys.").)

Likewise, Noble's press releases were reviewed and approved by attorneys. Accordingly, drafts of these releases include privileged attorney-client communications. *See Macario v. Pratt & Whitney Canada, Inc*., No. CIV. A. 90-3906, 1991 WL 6117, at *1 (E.D. Pa. Jan. 17, 1991) ("[b]ecause the release was contingent on [the attorney's] approval and subject to his revision, it is reasonable to assume that [defendants] intended the document to remain confidential until a final draft was achieved, and thus the second draft would fall within the attorney-client privilege.").

Anne I. Salomon
March 27, 2019
Page 6

In an effort to resolve this dispute, Noble agrees to re-review these documents to determine if any drafts the Trust has challenged do not seek or reflect legal advice and should be produced.

**(d)    Outstanding Challenges.**

Noble is reviewing the documents the Trust listed in Appendix A of its February 14 letter, and will produce any documents that it determines are discoverable in the coming days.  However, Noble will not agree to re-review all family members, duplicates, or near duplicates of these documents in addition to reviewing the documents listed in Appendix A.  The Trust can hardly characterize this newly-minted request as a renewal of a previous request, and the notion that asking Noble re-review additional hundreds or thousands of documents is an "effort to streamline" the review process is simply false.

3.    **Search Terms**.

Like most of the Trust's requests, the Trust's position on search terms ignores the history of discovery in this case, particularly the extensive negotiations between the Trust and Noble throughout 2017 that culminated in the parties' agreement on what search terms would be used.  Almost two years ago, Noble and the Trust negotiated the search terms Noble would use to collect and produce documents.  At no point during these negotiations, nor during the period since, has the Trust argued that it was entitled to the overboard discovery it now seeks.  It is entirely unreasonable for the Trust to renegotiate its prior agreement and propose additional, expansive search terms at this late hour.  And the Trust knows this, as reflected in the Trust's narrowing of Noble's proposed search terms to run across documents from Lazard, Weil, AlixPartners, and Arosa Capital Management LP.   Nevertheless, Noble is similarly willing to run appropriately narrow search terms to identify potentially responsive information, and accordingly will run the search terms the parties have discussed and agreed upon in Noble's February 27 letter and the Trust's March 12 letter. Noble has run the Trust's proposed terms for identifying potentially-responsive documents relating to Houlihan Lokey and Barclays, and these terms return over 25,000 documents. Noble believes it is overly burdensome to have to review this large volume of documents, but is willing to meet-and-confer to discuss more appropriately-tailored search terms.

Anne I. Salomon
March 27, 2019
Page 7


4.      **Interrogatories**.

(a)      **Communication Objection**.

In its letter dated February 15, 2019, the Trust asked Noble to confirm that it did not withhold interrogatory responses on the basis of its objection to the definition of "communication." Noble's February 27 Letter did so. In keeping with its apparent strategy to bog down the parties in written discovery disputes, the Trust now takes aim at Noble's general understanding of the word "communication." According to the Trust, Noble must go beyond the scope of document discovery to identify communications in response to the Trust's interrogatories. Noble is under no such obligation.

The Federal Rules of Civil Procedure make clear that the scope of discovery is the same for both document production and interrogatory responses. Under Rule 33(a)(2), "[a]n interrogatory may relate to any matter that may be inquired into under Rule 26(b)." Rule 26(b), in turn, limits the scope of discovery to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. . . ." Here, the parties agreed to the appropriate scope of discovery when they negotiated the time frame, custodians, and search terms for document discovery. The parties necessarily determined that information outside of these parameters was either not relevant to this action or that a search of such information would not be proportional to the needs of the case. The Trust's assertion that Noble now must essentially undertake a scorched-earth policy in responding to interrogatories has no basis in the law. Indeed, it is another attempt to retrade the Trust's prior agreement on the relevant date range for document discovery. If the Trust has its way, then Noble would need to review an enormous collection of documents from 2011-12 simply to determine whether they contained any "communications" that were responsive to the interrogatories. Noble will not do so.

Moreover, the Trust's responses to Noble's interrogatories makes clear that Noble's understanding of the proper scope of interrogatory responses is the correct one. The Trust itself identified produced communications in response to Noble's interrogatories, and did not provide an exhaustive list of all documents that could possibly be responsive. *See e.g.,* Resp. to Interrog. No. 4 ("The Trust states that the factual basis . . . is derived from documents produced by the parties in this case."); Resp. to Interrog. No. 5 ("The Trust states the factual basis . . . is derived from documents including the following.").

Finally, negotiations over the scope of document discovery, particularly as it relates to Pemex and Petrobras, are ongoing. Consistent with Rules 33 and 26,

Anne I. Salomon
March 27, 2019
Page 8

Noble will review additional information produced as a result of these negotiations (if any), and supplement its interrogatory responses as required under Rule 26(e). This process will likely resolve the Trust's lingering concerns with Noble's interrogatory responses.

       (b)    **Time Period**.

The Trust requests that Noble provide legal support for its position that the time period for document discovery applies to interrogatory responses. Noble again refers the Trust to Rules 33(a)(2) and 26(b) of the Federal Rules of Civil Procedure, and the parties' prior agreements that set the appropriate scope of the parties' discovery obligations proportional to the needs of the case.

       (c)    **Interrogatory Nos. 3 and 4**.

Noble confirms that it did not exclude communications between Pemex and Petrobras and Paragon before August 2014, which should be readily apparent to the Trust from the face of the produced documents. *See e.g.*, Noble_00025750 (reflecting Pemex communication involving Lee Ahlstrom), Noble_00096058 (reflecting Petrobras communication involving Lee Ahlstrom and Andrew Tietz).

Noble has already explained its reference to "certain documents" and will not do so again here. *See* February 27 Letter, at pp. 7-8. To be clear, Noble's responses were fulsome at the time they were made and will be updated when appropriate under Rule 26(e). Furthermore, Noble notes that the Trust did not identify "all documents" in response to Noble's interrogatories, and only identified a handful of representative documents. *See e.g.*, Resp. to Interrog. No. 5 ("The Trust states the factual basis for its 'allegation that Noble was aware that in September 2013, Pemex had informed government regulators that it would no longer enter into new contracts for Rigs older than fifteen years' is derived from documents *including the following:*") (emphasis added). The Trust cannot have it both ways.

       (d)    **Interrogatory No. 5**.

Noble will shortly supplement its response to Interrogatory No. 5 based on its investigation and development of all facts and circumstances relating to this action, which is ongoing.

5.    **Earnings Transcripts**

For the first time in your email dated March 22, 2019, the Trust raised the issue that "Noble produced only a partial set of its earnings transcripts," and requests

Anne I. Salomon
March 27, 2019
Page 9

that Noble produce "a full set of transcripts, conference presentations, and drafts
scripts for these events from January 2011 through February 2016."  First, neither the
Trust, nor its predecessors have requested such documents from Noble.  Second, as
we have told you at length, the parties in this case negotiated the proper scope of
discovery, pursuant to which Noble produced documents from January 1, 2013 to
October 4, 2014, with certain limited exceptions.  Third, earnings transcripts from
Noble after the Spin-Off concern Noble's business, not Paragon's, and so are neither
relevant to the claims or defenses at issue nor proportional to the needs of the case.
That said, Noble will undertake reasonable efforts to identify and produce any non-
privileged earnings transcripts, conference presentations and scripts that are
responsive to the requests that have been served on Noble and that were created
between the time period of January 1, 2013 to October 4, 2014.


Very truly yours,

*/s/ Abigail E. Davis*

Abigail E. Davis

**4/12/2019 A. Sheehan Davis Letter**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE

NEW YORK 10036-6522

TEL: (212) 735-3000

FAX: (212) 735-2000

www.skadden.com

FIRM/AFFILIATE OFFICES
—
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
—
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

DIRECT DIAL
212-735-3579
DIRECT FAX
917-777-3579
EMAIL ADDRESS
ABIGAIL.SHEEHAN@SKADDEN.COM

April 12, 2019

**BY E-MAIL**

Anne I. Salomon
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654

RE:     *Paragon Litigation Trust v. Noble Corporation plc, et*
        *al.* Adv. Proc. No.: 17-51882

Dear Anne:

I write in response to your two letters dated April 5, 2019 and your letter dated April 8, 2019, regarding various discovery disputes that have arisen between the Trust and Noble.

**The Trust's Requests for Additional Noble Custodians**

Noble agreed to add Bodley Thornton, Bruno Morand, and Gene House as custodians, despite the fact that the Trust did not request that they be added until December 2018. Noble collected email from all three custodians, as well as the hard drive that housed any of their documents. Noble also searched for any hard copy documents for these custodians; there were none to collect. Noble plans to substantially complete production from these custodians this month.

The search terms proposed by the Trust last week are overbroad and unduly burdensome, and not narrowly tailored to Pemex and Petrobras issues, despite the fact that the Trust seeks documents from these custodians "relating to Pemex and

Anne I. Salomon
April 12, 2019
Page 2


Petrobras." (April 5 Letter at 1.)[1]  In order to review and produce documents from these custodians, Noble ran the search terms attached in **Appendix A**—which were based on previously-negotiated and agreed search terms—to identify potentially responsive documents related to the Pemex and Petrobras issues.

With respect to Daniel Olivares, as we explained, he was not a Noble employee, and does not have any documents on Noble's servers or at a Noble email address.[2]  As we also explained, we contacted Mr. Olivares to request documents in his possession concerning his work for Noble.  Mr. Olivares provided 323 documents, including emails, electronically-stored documents on Mr. Olivares' personal computer, and hard copy documents.  Rather than run search terms over these documents, Noble reviewed all of them, and will substantially complete production of responsive documents in the next week.

The Trust also resurrected its request that Noble collect and review documents from Rafael Andrade and Jim Ruehlen, despite the fact that (1) those individuals transitioned to Paragon, and (2) the Trust removed its request to add these custodians in its letter dated February 15, 2019.

As is clear from the recent privilege issue concerning potentially  privileged Noble documents that were transferred to Paragon in connection with the Spin-Off, Noble employees such as Andrade and Ruehlen (who transferred to Paragon) took with them documents, including emails, from their tenure at Noble.  Accordingly, when Paragon's documents were transferred to the Trust pursuant to the Confirmation Order and the Litigation Trust Agreement (*see* LTA § 2.4), the Trust gained possession, custody, and control of those documents.  Whether or not Borr Drilling has documents from Andrade or Ruehlen is irrelevant because Paragon has them.

Furthermore, the Trust's renewed request to add these custodians, after previously withdrawing it, is at odds with the Trust's representations to the Court during the March 20, 2019 conference that it was working to resolve "open document issues" with Noble within approximately two months.  Because the Trust had withdrawn its request for these custodians, that clearly was no longer an "open document issue," and Noble will not undertake the burden of collecting and reviewing documents from these two custodians.

---

[1]    Using the Trust's proposed search terms resulted in an unreasonable number of hits for each custodian:  Thornton (13,978); Morand (7,186); and House (9,091).

[2]    Mr. Olivares's agency agreement is attached hereto as **Appendix B**.

Anne I. Salomon
April 12, 2019
Page 3


**The Trust's Questions Regarding Certain of Noble's Privilege Assertions**

As an initial matter, the Trust's statement that it is the party acting swiftly to resolve privilege disputes simply is not an accurate characterization of the record. The Trust let a full year lapse between receiving Noble's privilege logs and raising these issues, which it did weeks before the parties' original fact-discovery cutoff. In any event, Noble continues to work diligently to address the Trust's questions.

I.    *Weintraub* and the MSA

Noble agrees with the Trust's position that Paragon maintains the attorney-client privilege over pre-spin documents concerning the Paragon Business, as that term is defined in the Master Separation Agreement ("MSA"). Noble disagrees, however, that it has improperly withheld any pre-spin or spin-related documents. The MSA makes clear that the attorney-client privilege for spin-related documents continues to reside with Noble. (MSA § 7.13.) Of course, after motion practice last year, the parties reached an agreement, memorialized in a stipulation dated September 25, 2018, regarding the proper treatment of Spin-related documents. The Trust's continued attempts to retrade that agreement is improper. Accordingly, for any privileged, Spin-related documents that fall outside the parameters set forth in that Stipulation that Noble agreed to produce, Noble will continue to assert the privilege.

II.   Documents Shared with Third Parties

In the Trust's April 8 Letter, it requests that Noble produce any documents that were sent to third parties because Noble asked the Trust to do so. In its April 3 Letter, Noble relied for this proposition on *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 361 (3d Cir. 2007). *Teleglobe*, however, recognizes that there are exceptions to the general rule that disclosure to third parties waives the attorney-client privilege. One of those exceptions is when a third party is necessary for the provision of legal advice. *Westinghouse Elec. v. Republic of Phil.*, 951 F.2d 1414, 1424 (3d Cir. 1991) ("When disclosure to a third party is necessary for the client to obtain informed legal advice, courts have recognized exceptions to the rule that disclosure waives the attorney-client privilege. For example, courts have held that the client may allow disclosure to an 'agent' assisting the attorney in giving legal advice to the client without waiving the privilege."). The documents Noble is continuing to withhold fall within this exception. The fact that the *Trust* re-reviewed documents that Paragon shared with third parties and produced them after determining they were not privileged does not impact Noble's analysis.

Anne I. Salomon
April 12, 2019
Page 4

III.    <u>Documents Listed in Appendix A to the Trust's April 5 Privilege Letter</u>

As indicated in my email dated April 9, 2019, Noble is conducting a re-review of the 192 documents identified by the Trust in Appendix A to its April 5 Privilege Letter, and will produce any de-designated documents promptly.

Although Noble has re-reviewed these documents, it is unreasonable to request that Noble re-review all documents that are duplicates, near duplicates, or family members of the challenged documents.  Also, the Trust has had ample time to identify all documents with which it has any privilege concerns.  Noble conducted a full review of the Trust's privilege logs and identified all problematic log entries, at one time, so that the parties could resolve the remaining privilege disputes efficiently, rather than piecemeal.

IV.    <u>Privilege Log Identifiers</u>

As the Trust is well aware, Noble produced four separate privilege logs, reflecting documents: (i) withheld in Rule 2004 discovery; (ii) redacted in Rule 2004 discovery; (iii) withheld in responding to the UCC's document requests; and (iv) redacted in responding to the UCC's document requests.  Each document on those logs contains a unique privilege identifier, and certainly the Trust can identify any challenged document using the document's Entry ID and the log on which that Entry ID appears.  Noble will not undertake the burden of re-naming each and every entry in the privilege logs when it is already possible for the parties to describe any challenged document.

V.    Documents on the Privilege Log with Bates Numbers
     <u>For Which No Document Has Been Produced</u>

The Trust has identified three entries on Noble's privilege logs that refer to a document by Bates number, but for which the Trust does not have a produced document.  Noble will produce the three identified documents shortly.

**<u>Additional Search Terms Proposed by the Trust</u>**

The Trust asked Noble to run the broad search terms "Barclays" and "Houlihan or HL" across all custodians during the time frame January 1, 2013 – October 4, 2014, and review those documents for production.  As Noble explained, those terms hit on approximately 25,000 documents, including family members.  Specifically, the term "Barclays" returned 20,991 documents, and "Houlihan or HL" returned 6,503 documents.

**C86**

Anne I. Salomon
April 12, 2019
Page 5

When discussing appropriate search terms with the Trust's counsel in 2017, the parties negotiated more narrowly-tailored terms. The Trust now seeks to abandon and retrade the previously-agreed search terms to impose additional, disproportionate burdens on Noble.

Noble should not have to undertake the additional burden of reviewing such a large number of documents, particularly when (1) Noble already produced thousands of responsive documents and communications concerning Barclays and Houlihan; (2) Barclays and Houlihan also produced thousands of documents; and (3) the Trust is continuing to seek documents from Barclays.

We are confirming the scope of the work performed for Noble by Barclays and Houlihan between January 1, 2011 and December 31, 2014.

**Noble's Interrogatory Responses**

The Trust misunderstands Noble's position with respect to the proper scope of Noble's interrogatory responses. As Noble explained in its March 27 Letter, and as the Federal Rules of Civil Procedure make clear, the scope of discovery is the same for both document production and interrogatory responses, and is governed by Rule 26(b). Rule 26(b) limits the proper scope of discovery to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. . . ." When the parties negotiated the proper scope of discovery in the context of document requests, they did so recognizing that the agreed-upon time frame, custodians, and search terms were relevant and proportional to the needs of the case.

In any event, Noble is undertaking a review of documents from Bodley Thornton, Bruno Morand, Gene House, and Daniel Olivares that may contain information responsive to the Trust's Interrogatories, and Noble will update its Interrogatory Responses consistent with Rule 26(e). Noble expects to produce supplemental Interrogatory Responses to Interrogatories 3, 4, and 5 later this month.

**Earnings Transcripts**

As an initial matter, Noble has never received a document request to produce earnings transcripts, conference presentations, or scripts, let alone "full sets" of those documents. In any event, as the Trust recognizes, Noble already produced documents in these categories that are responsive and non-privileged. Furthermore, earnings call transcripts and conference presentations are available online from

Anne I. Salomon
April 12, 2019
Page 6

sources readily accessible to the Trust.  That said, Noble has agreed to produce
responsive, non-privileged earnings transcripts, conference presentations, or scripts.

Further, the parties negotiated the proper scope of discovery, pursuant to
which Noble produced documents from January 1, 2013 to October 4, 2014, with
certain limited exceptions.  The fact that earnings calls concerning *Noble's* business
are not relevant to *Paragon's* post-spin performance is a far cry from taking the
position that post-October 4, 2014 market conditions are irrelevant to the case.  They
are, of course, extremely relevant insofar as they impact Paragon's performance and
eventual bankruptcy.  Noble will not undertake a collection and review of these
documents over a five year span.

### The Trust's Privilege Logs

I.    Attorney Affiliation List

Noble appreciates the Trust's willingness to prepare a list of attorneys acting
on behalf of Paragon to facilitate Noble's ability to assess the Trust's privilege calls,
but disagrees that the Trust's initial logs contained sufficient identifying information
to conduct such an analysis.  Noble, of course, identified (with an asterisk) every
attorney listed on its privilege logs to facilitate the Trust's review.  And although the
Trust faults Noble for "omitting domain names" in its privilege logs, as Noble
explained in its May 11, 2018 letter, "[b]ecause some email files did not include
email addresses, Noble was not able to list every email address on the privilege log.
Accordingly, Noble provided the accompanying affiliation list in an effort to convey
the various individuals' corporate affiliations in an efficient manner." (May 11
Letter at 2.)

II.   Entries Containing Missing Metadata Fields or Conflicting
      Author or Sender/Recipient and Document Description Fields

With respect to entries on the Trust's privilege log that contain conflicting
descriptions and metadata fields, Noble appreciates the Trust's willingness to re-
review certain of the documents that Noble identified.  Noble disagrees, however,
that there is "nothing for the Trust to update" in its log entries.  In fact, these
discrepancies create considerable concern that the attorney-created descriptions of
the documents are inaccurate.  Further, the fact that the Trust included a metadata
field for "author" that conflicts with its own descriptions of withheld documents does
not in any way obligate *Noble* to include additional metadata in *its* privilege logs—
which it already revised to include additional metadata previously requested by the
Trust.  In fact, instead of relying on possibly unreliable metadata, Noble attorneys

Anne I. Salomon
April 12, 2019
Page 7

manually reviewed and inputted the "legal source" for each privilege assertion where it was not clear from the sender/recipient metadata that the document was privileged. Noble reiterates its request that the Trust provide a revised log that eliminates these inconsistencies and expects the Trust to accurately identify the legal source of its documents.  If, during the course of doing so, the Trust determines that the documents are not, in fact, privileged, please produce them.

With respect to entry 300 on the Trust's privilege log, if that document was work product prepared at the request of counsel, and therefore covered by the work product protection, then the Trust would be entitled to withhold the document.  If, however, it is a business document that does not reflect legal advice, it must be produced.  Noble will not agree, however, that the Trust's waiver of any attorney-client privilege or work product protection by producing documents it believes are privileged means that Noble must do the same.  Noble will produce (and has produced) documents authored by business people that do not request or reflect legal advice.

III.    Weil/Lazard Documents

It strains credibility that the Trust could not identify the documents on its privilege log that contain descriptions reflecting that the documents were presentations prepared by Weil or Lazard.  Regardless, attached at **Appendix C** is a list of those log entries.  Noble reiterates its request that the Trust explain the basis for withholding the redacted information and also produce or identify by Bates number the engagement letter between Lazard and the Debtors indicating that Lazard's engagement went beyond any analysis of the Noble Settlement, with respect to which the Debtors waived all attorney-client and work product protections.

Noble looks forward to the Trust's production of its revised privilege logs and any de-designated documents in the next several days.

Very truly yours,

*/s/ Abigail E. Davis*

Abigail E. Davis

cc:    David Zott
       Jeffrey Zeiger
       William Arnault

Attachments

## APPENDIX A

## Search Terms for Custodians Bodley Thornton, Bruno Morand, and Gene House

1.    Pemex AND ((15 or fifteen) w/10 "years") AND (modern* OR age* OR old*)

2.    Pemex w/25 ((contrac* OR renew* OR cancel* OR terminate*) w/25 (modern* OR age* OR old*))

3.    Petrobras w/25 (("Leo Segerius" OR "Roger Eason" OR "Therald Martin" OR Phoenix OR NPh OR NRE OR NLS OR NTM OR DPDS3 OR DPDS2 OR MSS2 OR DPDS1) w/25 (terminat* OR renew* OR cancel*))

4.    Pemex AND ((September 17, 2013) OR (Sept. 17, 2013) OR (Septiembre w/10 "2013") OR (Pemex w/5 notice))

5.    PEP-229-2013

6.    PEP-259-2014

## APPENDIX B


## Limited Representative Agreement between
## Noble Drilling México, S. de R.L. de C.V. and Tsul Servicios, S.A.P.I. de C.V.

## LIMITED REPRESENTATIVE AGREEMENT

THIS LIMITED REPRESENTATIVE AGREEMENT (this "*Agreement*") is made as of the 25 day of July, 2017 (the 'Effective Date'), between:

1. **Noble Drilling México, S. de R.L. de C.V.**, a company incorporated and existing under the laws of Mexico and having an office at Galileo No. 55 1st floor Col. Polanco C.P. 11560 Mexico City, hereinafter called "*Company*," and

2. **Tsul Servicios, S.A.P.I. de C.V.**, represented by Daniel Lorenzo Olivares Guevara, a company incorporated and existing under the laws of Mexico and having an office at Eugenia 516 floor 4, Col. Del Valle Centro, c.p. 03100, Mexico City hereinafter called "*Representative*".

Company and Representative are each hereinafter referred to as a "*Party*" and collectively as the "*Parties*".

## RECITALS

WHEREAS, Company and its subsidiaries and affiliated companies are engaged in the business of drilling or reworking oil and gas and other wells on a contract basis for other companies, and in the course of such business regularly and customarily enter into contracts with independent contractors for the performance of ancillary services or the provision of equipment and goods relating thereto; and

WHEREAS, Company desires to conduct such business in Mexico, establish and maintain a business relationship with Petroleos Mexicanos  and its Affiliates ("*Pemex*"); and

WHEREAS, Representative is desirous of acting as representative on behalf of Company in Mexico only in respect of Pemex and represents that it is capable of efficiently performing its duties under this Agreement; and

NOW THEREFORE, in consideration of the mutual promises, conditions and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto mutually agree as follows:

## 1. APPOINTMENT



With effect from the Effective Date and for the Term the Company appoints Representative as its business liaison, on an exclusive basis, having the duties described herein with respect to employment of Company's or its Affiliates' offshore drilling unit or units to Pemex (may hereinafter be referred to as "Customer") within the territorial waters of Mexico pursuant to a drilling contract; provided that Company may, with sixty (60) days prior notice, convert the Representative's representation to non-exclusive representation if Company reasonably determines at its sole discretion that the Representative is not providing effective assistance in Mexico. In this Agreement, "Affiliate" of a party means an entity directly or indirectly controlling, controlled by or under common control with such party (for purposes of this definition, "control" means direct or indirect ownership of more than 50% of the voting shares of the controlled entity).

Representative is not appointed to represent Company for any other purpose under this Agreement.  Company does not appoint Representative to act as its general agent or as an agent for any purpose other than as explicitly set forth in this Agreement (as the case may be).  **Representative shall not have, nor shall it represent itself as having, any authority to (i) bind or commit Company or its Affiliates, (ii) enter into any contract or other legal commitments in the name of, or binding on,**

1

Company or its Affiliates, (iii) make any commercial or other decisions on behalf of the Company or its Affiliates or (iv) pledge their respective credit or to extend credit in their respective names. Representative and its employees and representatives shall at all times be independent contractors, and shall not under any circumstance be deemed partners, co-ventures or employees of Company. Representative shall not solely by virtue of this Agreement be deemed to be Company's or its Affiliates' commercial agent under the provisions of Mexican law and will undertake not to permit and will not knowingly permit any of its officers employees, agents or sub-contractors to hold themselves out as, or claim to be, officers or employees of any of the Company or its Affiliates, its related corporations or its direct or indirect affiliates, by reason of this Agreement.

## 2. DUTIES

Representative undertakes to perform the following duties for Company under this Agreement (the "*Duties*"):

A.    To solicit employment of a drilling unit or units for offshore work in Mexico with Pemex (whether as the operator or non-operating partner) pursuant to a drilling contract or other definitive agreements, to be entered into as a result of tenders or through other means at prices and upon terms and conditions approved in writing by Company prior to submission to Customer (each a "*Drilling Contract*") and to assist in securing and/or obtaining on behalf of the Company all licences, permits, approvals, authorisations, consents from Pemex, any governmental or public authorities to carry out any operation of a drilling unit or units within the territorial waters of Mexico. For the avoidance of doubt, if Pemex is a non-operating partner, the Company and Representative shall discuss the Representative's roles and responsibilities prior to any discussion with Pemex and their co-venturers and/or partners.



B.    To provide information and procure advice and counsel pertaining to (1) conditions and developments in the market, (2) competing products and services and (3) local laws, customs and taxation which would affect the Company's services, including operation of a drilling unit or units in connection with a Drilling Contract(s).

C.    To assist in the entry and departure of Company's equipment and personnel to and from Mexico in connection with a Drilling Contract(s). In particular:



(i)     To obtain all necessary visas, residence and work permits for Company's employees  and other persons designated by Company to Representative as required for any Drilling Contract(s);

(ii)    To obtain all licences, permits, approvals, authorizations, consents from any governmental or public authorities; and

(iii)   To provide such other services to Company and its Affiliates in connection with any Drilling Contract(s) as Company may from time to time reasonably request.

D.    To assist, at the direction of Company, in the resolution of any disputed matters between Company and Customer (including, without limitation, payment of sums due) arising out of, incidental to or in connection with a Drilling Contract(s).

E.    Not Used.

F.    To act towards the Company conscientiously and in good faith and not to allow its interests to conflict with the duties that it owes to the Company under this Agreement and the general law.

2

**C93**

G.      Except as authorised by the Company, not to act in a way which will incur any liabilities on behalf of the Company nor to pledge the credit of the Company.

H.      To use its best endeavours to promote and sell the services of the Company to Pemex for work in Mexico with all due care and diligence and to seek to improve the Company's goodwill with Pemex.

I.      To maintain at its own expense appropriate offices and display and administration facilities and systems as may be necessary for the effective performance of its duties under this Agreement.

J.      To employ a sufficient number of suitably qualified dedicated personnel to ensure the proper fulfilment of the Representative's obligations under this Agreement, including without limitation making regular and sufficiently frequent calls on customers or potential customers to promote the Company's services and attending (on reasonable notice) meetings with the Company to discuss the marketing and selling of the Company's services at mutually agreed locations and attending trade exhibitions and other sales events as appropriate in Mexico.

K.      To keep the Company fully informed of its activities concerning the promotion and sale of the Company's services and to provide the Company with reports on request.

L.      To assist, at the direction of Company, with other matters specified by the Company in writing.

## 3. COMMISSIONS

A.      In addition to any expenses to be reimbursed pursuant to Article 5, as Representative's sole compensation for the services rendered under this Agreement, Company shall pay to Representative a commission for each Drilling Contract (including operating rate, moving rate, fishing rate, repair rate, or other similar time based dayrate income, but excluding any termination-related rate or for any zero rate greater than twelve (12) hours) in accordance with the Commission Structure as shown in Exhibit A, but only in relation to the day rate income actually paid to Company or its Affiliate by a Customer (always subject to Article 3(B) below) (the "**Commission**").  The Commission shall be paid by Company to Representative in accordance with Article 3(F) below.



Parties agree and acknowledge that Company may from time to time sell, transfer or otherwise convey any of its drilling units and assign the related Drilling Contract to the transferee or its related party in connection with such transaction. As part of such transaction, the Company shall procure that any such transferee commits to the payment of the Commission to the Representative on terms substantially similar with this Agreement until the completion of the relevant Drilling Contract. Representative agrees not to object or delay such transfer subject to the Company having obtained the commitment from the transferee.

B.      Notwithstanding anything to the contrary in this Agreement, Representative understands and agrees that Company shall have no obligation to pay the Commission to Representative unless and until (1) a final written Drilling Contract for a drilling unit is entered into between Company and Customer, and (2) Company receives payment from Customer for services rendered under a Drilling Contract; and, under no circumstances will the Commission be due to Representative based on any other amounts paid to Company under a Drilling Contract with a view of covering Company's costs, including, but not limited to, mobilization fees, demobilization fees, amounts paid for upgrades, standby time prior to the time of "commencement" under the Drilling Contract, or amounts reimbursable to Company by Customer. If the Representative's representation is converted to a non-exclusive representation, Company

3

shall have no obligation to pay any commission to Representative that is secured by a third party agent or representative of Company.

      C.     Company shall have a general right to set off any and all amounts due and owing by the Representative to the Company from the Commission payable under this Contract.

      D.     Representative agrees and understands that should Company at any time discover that Company has overpaid the Commission, including, without limitation, in the case of overpayment by Customer of the day rate amount, Representative shall return such overpayment to Company within fifteen (15) days of receipt by Representative of written notice from Company of the same.

      E.     Representative agrees and understands that should Company at any time receive any amount from a Customer and any part or the whole of such amount is repaid, recaptured or paid out by the Company as a result of or arising out of bankruptcy, other similar proceedings, legal or administrative proceedings of any nature or settlement of any claims in relation to the Customer, or as a result of overpayment by the Customer to the Company (the "***Recaptured Amount***"), then the Representative shall repay and reimburse the Company (as applicable) an amount equal to the amounts it may have previously received as Commission on any such Recaptured Amount, it being the intention of the Parties that the Representative will not be entitled to receive and retain the Commission on any amounts that the Company has not fully and finally retained, irrespective of whether the Commission on such amounts has been previously paid by the Company to the Representative.

      F.     Payment of the Commission due to Representative under this Agreement shall be made by Company within thirty (30) days of receipt by Company of invoice from Representative (but in no event before the Company receives funds from the Customer) pursuant to Article 3(A) above. All amounts due and payable to Representative pursuant to this Agreement shall be paid in United States Dollars. The Commission shall be paid by Company to Representative by wire transfer to the following bank account in Representative's name, (the "***Bank Account***"):




      Bank:   BBVA Bancomer, S.A.

      Address: Av. Eugenia 516 floor 4, Col. Del Valle Centro, c.p. 03100, Mexico City

      Tel. +52-55-11059660
      ACCOUNT NUMBER: 0191326597

      CLABE NUMBER:012180001913265975

      SWIFT: BCMRMXMM

      ABA: 122035487

      BANK'S ADDRESS: Avenida Universidad1200 Colonia Xoco, 06300 D.F. México

      Currency: US Dollars

      G.     It is understood It is understood that (1) Company, its Affiliates and their respective officers, employees and agents may market Company's and its Affiliates' offshore drilling units, equipment and services in Mexico; (2) Company, its Affiliates and their respective officers, employees and agents may market Company's and its Affiliates' offshore drilling units, equipment and services to clients in Mexico other than Customer; and (3) Company and/or its Affiliates may acquire drilling contracts or other assets in Mexico, including without limitation, offshore drilling units with pre-existing

drilling contracts with Customer or other clients; (4) Customer may decide to enter into a farm-out agreement with a third party operator and assign a Drilling Contract to such third party operator, and that in each such case, no Commission shall be payable to the Representative for such activities or drilling contracts.

H.      Representative specifically stipulates and acknowledges that in executing this Agreement and, further, insofar as this Agreement refers to a rig, a mobile offshore drilling unit or other vessel of Company or its Affiliates, that the Representative is relying solely and exclusively upon Company for payment.   Representative, in furtherance of and in performance of this Agreement, stipulates and acknowledges that it is not relying upon the credit of the rig, other mobile offshore drilling unit or other vessel or upon the credit of any vessel, equipment or material owned by Company or its Affiliates.

## 4. NO AUTHORITY TO BIND

Representative shall not have, nor shall it represent itself as having, any authority to bind or commit Company or its Affiliates, enter into any contract or other legal commitments in the name of, or binding on, Company or its Affiliates, make any commercial or other decisions on behalf of the Company or its Affiliates or to pledge their respective credit or to extend credit in their respective names.

## 5. EXPENSES

Unless authorized in advance by Company in writing, Representative shall bear and be solely responsible for all fees and expenses incurred by or on behalf of Representative or any of its employees or on behalf of Company in connection with this Agreement. Representative shall defend, indemnify, and hold harmless Company and its Affiliates from and against any loss, claim, expense (including, without limitation, reasonable attorneys' fees and expenses) or liability relating to any such expenses.

## 6. COMPANY'S PROPERTY

All records or papers of any kind relating to Company's business shall remain the property of Company and shall be returned by Representative to Company on demand at Representative's expense.

## 7. CONFIDENTIAL INFORMATION

A.      **Representative's Obligations.**   Representative understands and acknowledges that Representative will have access to confidential information ("*Confidential Information*") concerning Company's business and that Representative has a duty at all times: (i) not to use such Confidential Information for any purpose other than as directed by Company; and (ii) not to disclose such Confidential Information or permit such information to be disclosed to any other person, firm, corporation, or other third party during the Term of this Agreement or at any time thereafter.  For purposes of this Agreement, Confidential Information shall include, without limitation, this Agreement, Customer data, any and all trade secrets, undisclosed technology, proprietary information, customer lists, bid proposals, contract terms, patent applications, operating costs, revenue projections, business records, notes, memoranda, data, ideas, processes, methods, techniques, systems, formulas, models, devices, programs, computer software, writings, research, personnel information, customer information, plans, or any other information of whatever nature in the possession or control of Company that is not generally known or available to members of the general public, whether oral, written or in any other form, including any copies, worksheets, or extracts from any of the above.  Representative further agrees that if this Agreement is terminated for any reason, Representative will (1) neither take nor retain, without prior authorization from Company, originals or copies of anything that contains Confidential Information; (2) destroy all other Confidential Information that may exist in the Representative's records or any person to which it disclosed such information.

5

**C96**

B.      **Remedies for Breach of Confidentiality.** Representative specifically acknowledges and agrees to the following:  (i) that Representative's covenants set forth in Article 7(A) are of a special, unique, and extraordinary nature; (ii) that irreparable injury will result to Company and its businesses and properties in the event of any breach by Representative of any of the provisions of Article 7(A) of this Agreement; (iii) that such injury cannot easily be compensated by money damages; and (d) that Representative continued relationship with Company hereunder is predicated in part upon the covenants of Representative as set forth in Article 7(A).  In the event of any breach of any of Representative's covenants as set forth in Article 7(A), Company shall be entitled, in addition to any other remedies and damages available, to injunctive relief to restrain the violation of such covenants by Representative or by any person or persons acting for or with Representative in any capacity.  Company shall be entitled to such injunctive relief without the necessity of posting a bond of cash or otherwise and without actual proof of irreparable harm.  The obligations set forth in this Article 7(A) and Article 7(B) shall survive the termination of this Agreement.

## 8. INDEMNIFICATION; LIMITATION ON LIABILITY

A.      Representative agrees to protect, defend, indemnify and hold harmless Company and each of its Affiliates, and their respective officers, directors, employees, customers (including Customer), contractors, subcontractors of any tier, and invitees (collectively, the "*Company Indemnitees*") from and against any and all damages, liabilities, losses, costs, expenses (including attorney's fees and disbursements ), claims, demands and causes of action of every kind and character (collectively, "*Indemnifiable Claims*"), without regard to the cause or causes thereof or the negligence or fault (active or passive) of any party or parties, including the sole, joint or concurrent negligence of the Company Indemnitees, arising in favor of any of the employees, subcontractors or their employees, or invitees of Representative on account of personal injury, death or loss of, damage to, property or from Representative's failure to comply with any law, rule or regulation of any applicable governmental authority, irrespective of the cause of such failure. 

B.      Company agrees to protect, defend, indemnify and hold harmless Representative, and its officers, directors, employees, and customers (collectively, the "*Representative Indemnitees*") from and against  any and all Indemnifiable Claims, without regard to the cause or causes thereof or the negligence or fault (active or passive) of any party or parties, including the sole, joint or concurrent negligence of the Representative Indemnitees, arising in favor of any of the employees, subcontractors or their employees, or invitees of any of the Company Indemnitees on account of personal injury, death or loss of, damage to, property or from Company's failure to comply with any law, rule or regulation of any applicable governmental authority, irrespective of the cause of such failure. 

C.      Both Company and Representative shall notify the other Party immediately of any loss, claim, demand, or suit that may be presented to or served upon it, or its Indemnitees, as a result of the performance of the Duties.

D.      Neither Company nor Representative shall be liable to the other, or the Indemnitees of the other, for special, indirect or consequential damages resulting from or arising out of this Agreement, including loss of profit or business interruptions, however same may be caused; and both Company and Representative shall protect, defend, indemnify and hold harmless the other and the Indemnitees of the other against any Indemnifiable Claim that may be brought by such indemnifying Party or its Indemnitees on the basis of any such special, indirect or consequential damages.

## 9. REPRESENTATIONS AND AGREEMENTS OF REPRESENTATIVE

A.      Representative hereby represents and warrants to Company as follows:

6

**C97**

1.  Representative is a company duly organized, validly existing and in good standing under the laws of Mexico and has all requisite power and authority to own and operate its business and properties and to carry on its business as such business is now being conducted and is duly qualified to do business in Mexico and in any other jurisdiction in which the transaction of its business makes such qualification necessary.

2.  Representative has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution, delivery and performance of this Agreement by Representative have been duly authorized by all necessary action on the part of Representative. This Agreement has been duly executed and delivered by Representative and is the legal, valid and binding obligation of Representative enforceable in accordance with its terms.

3.  The execution, delivery and performance of this Agreement by Representative (i) do not and will not contravene the by-laws or other organizational documents of Representative; (ii) do not and will not exceed any power granted to Representative or violate the provisions of any of its constituent documents or law or regulation or any order or decree of any governmental authority, agency or court to which it is subject; and (iii) do not and will not conflict with or result in a breach of or default under any agreement to which Representative is a party or by which it or any of its properties, rights or assets is bound or affected.

4.  All governmental or other authorizations, approvals, orders, licences, exemptions or consents required in connection with the execution, delivery and performance of this Agreement by Representative have been obtained or will be obtained in due course and the Representative shall maintain them throughout the term of this Agreement. The Representative has provided the Company a true and accurate copy of its business registration certificate and other relevant authorizations, approvals, orders or consents and shall provide revised copies of these documents promptly after any changes are made to them and notifies the Company of their reissuance or revocation. 

5.  Representative is, and at all times during the term of this Agreement, will be, the sole owner of the Bank Account. 

6.  Representative has not been wound up and no winding up petition has been presented against it, no action has been taken to wind up or notice given of an intention to commence such action, and no receiver and or manager has been appointed over or in respect of its assets or any part of thereof.

7.  Daniel Lorenzo Olivares Guevara is, and at all times during the term of this Agreement, shall be, the principal shareholder of the Representative.

B.      Representative hereby covenants and agrees with Company that during the term of this Agreement:

1.  Representative will not make any direct or indirect payments to any government officials, including directors, officers, or employees of Customer, or any direct or indirect payments which are illegal under any applicable law or regulation.

2.  Representative will conduct its activities in accordance with all applicable laws and regulations, and in a manner that will not cause Company to be in violation of any applicable law or regulation.

7

3.  Representative will not (i) act as a commercial agent for any competitor of the Company or (ii) represent or act for entity or perform any services that are similar or related to the Duties to be performed by Representative under this Agreement for any other person or entity.

## 10.  TERM

This Agreement shall be effective upon execution and shall continue in effect for a period of twelve (12) months from the Effective Date and thereafter shall continue for a further twelve (12) months on each anniversary of the Effective Date unless at any time during the Term the Company notifies Representative in writing no less than sixty (60) days prior to the proposed termination date that it does not wish the agency to relationship continue, or as terminated in accordance with the following:

A.      If either Party materially breaches the terms hereof, and such breach is not remedied to the sole and complete satisfaction of non-breaching Party within fifteen (15) days after notice thereof to the breaching Party by the non-breaching Party, then this Agreement may be terminated by the non-breaching Party upon written notice to the breaching Party.

B.      This Agreement will terminate automatically if either Party becomes bankrupt or insolvent or is unable to satisfy its financial obligations as they become due.

C.      This Agreement will terminate automatically if Representative or Daniel Lorenzo Olivares Guevara ceases to be eligible to represent Company in Mexico or Company ceases to be able to legally carry on the Company's business in Mexico.

D.      Notwithstanding the above provisions, Company may terminate this Agreement immediately pursuant to Article 15 or Article 16 or if the Representative suspends or ceases, or threatens to suspend or cease, to carry on all or a substantial part of its business or to promote the Company's services. 

E.      The Representative shall have no right to damages or other compensation on the basis of the termination of the Agreement when the Agreement is terminated under this Article 10.

F.      Upon termination of this Agreement, the obligations of the Parties to each other shall immediately cease, other than any obligation under Articles 3, 5, 6, 7, 8, 12, 13, 14, 15 and 16 and any rights or obligations accrued prior to termination; provided that upon termination under Article 10(D) also obligations under Article 3 shall cease.

## 11.  ASSIGNMENT

Representative agrees that, without the prior written consent of Company, which may be withheld at the sole discretion of Company, Representative will not assign or delegate this Agreement or any of the rights, duties or obligations hereunder; provided, however, that Representative shall remain fully liable and responsible for all duties and obligations hereunder irrespective of an assignment hereof. Notwithstanding the foregoing, upon giving written notice to Representative, Company may assign any of its rights, duties or obligations hereunder to any Affiliate or third party.

## 12.  NOTICES

All notices, requests and other communications provided for herein (including, without limitation, any modifications of, or waivers, requests or consents under, this Agreement) shall be given or made in writing (including, without limitation, by facsimile), and be delivered personally or by certified or registered mail, postage prepaid, to the address shown below.

8

| Representative: | Tsul Servicios, S.A.P.I. de C.V.<br>Attn: Daniel Lorenzo Olivares Guevara<br>Eugenia 516 floor 4, Col. Del Valle Centro, c.p. 03100, Mexico City.<br>Phone:+52-55-11059660 |
| --- | --- |
| Company: | Noble Drilling México, S. de R.L. de C.V<br>Galileo No. 55 1st floor Col. Polanco C.P. 11560 Mexico City<br>Attn: President<br>Fax: +52 (55) 52 81 08 51 |
| | With a copy to:<br>Noble Drilling Services Inc.<br>Attn: Legal Department<br>Fax: +1 281 276 6336 |

Either Party may change its address for notices under this Agreement by notice to the other Party as outlined above.



### 13.  GOVERNING LAW AND DISPUTES

This Agreement shall be governed by the internal laws of the State of Texas, without regard to principles of conflicts of law. Any dispute arising out of or relating to this Agreement may be brought in any court of appropriate jurisdiction in Houston, Texas, and the Parties irrevocably submit to the exclusive jurisdiction of each such court in any such dispute. THE PARTIES WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS ARTICLE WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES TO IRREVOCABLY WAIVE TRIAL BY JURY, AND THAT ANY DISPUTE BETWEEN THEM RELATING TO THIS AGREEMENT SHALL INSTEAD BE TRIED BY A COURT OF COMPETENT JURISDICTION SITTING WITHOUT A JURY.

Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be deemed prohibited or invalid under such applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, and such prohibition or invalidity shall not invalidate the remainder of such provision or the other provisions of this Agreement.

### 14.  TAXES AND CLAIMS

A.      Representative shall pay, and be solely responsible for, (a) all taxes, licenses, and fees levied or assessed on Representative by any governmental agency in connection with and/or incident to this Agreement or the performance of the Duties and (b) all unemployment compensation insurance, old age benefits, social security, or any other taxes upon the wages of Representative or any of its agents, employees or representatives.

B.      Representative shall reimburse Company on demand for all taxes or governmental charges (local, state, provincial, national or federal) that Company may be required to pay or withhold on account of Representative or any of the employees or principals of Representative.  At its election,

9

Company may deduct the amount of any such charges paid by Company from any amounts payable to Representative by Company pursuant to this Agreement.    Furthermore, Representative agrees that Company shall have the right, but not the obligation, to make any and all necessary filings with respect to amounts paid to Representative under this Agreement.

C.    Representative shall pay, and cause to be paid, all claims for labor, materials, services, and supplies furnished to or utilized by Representative or any subcontractor in connection with this Agreement or the performance of the Duties.  Representative shall take, or cause to be taken, any and all action as may be necessary or appropriate to ensure that no lien or charge is fixed upon any assets, equipment or vessels of the Company Indemnitees.  REPRESENTATIVE SHALL PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS THE COMPANY INDEMNITEES FROM AND AGAINST ALL INDEMNIFIABLE CLAIMS ASSOCIATED WITH SUCH LIENS.  If Representative fails to pay, or cause to be paid, any claims or indebtedness incurred by Representative or any subcontractor in connection with this Agreement or the performance of the Duties, Company shall have the right (but not the obligation) to pay such claims or indebtedness and to deduct the amount of such claims or indebtedness from any amounts payable by Company to Representative under this Agreement.

### 15. GIFTS AND GRATUITIES

It is considered to be in conflict with the Company's interest for their employees or any member of the immediate family of such employees to accept gifts, payments, extravagant entertainment, services, or loans in any form from anyone soliciting business, or who may already have established business relations with the Company.  Gifts of nominal value and entertainment, such as meals and social invitations that are customary and proper under the circumstances and do not place the recipient under any obligation are acceptable.  If any employee of any Noble Company should solicit a gift or gratuity from any of the Representative Companies, Representative hereby agrees to notify an officer of Company of such act.  It is agreed that Company will hold such notification in confidence.  It is further understood that failure by the Representative to comply with the Company's policies regarding gifts and gratuities may, at Company's option, result in the suspension or termination of this Agreement or any work order and may further preclude any future dealing between the parties.



### 16. ANTI-CORRUPTION AND ANTI-BRIBERY

16.1    Representative agrees to, and to cause its subcontractors to, discharge its Duties in an ethical and professional manner and Representative shall not, and shall cause its subcontractors to not, do or cause to be done anything which would diminish the value of Company's name or good will.  Consistent with this, Representative represents and warrants to Company and agrees with Company that:

(i)    In performing the activities contemplated under this Agreement, Representative and its subcontractors, and their principals, shareholders, directors, officers, employees, agents and other representatives working on their behalf in connection with this Agreement, will read and comply with Company's standards of business practice and conduct adopted by Company and its Affiliates from time to time, including Company's internal policy on compliance with the United States Foreign Corrupt Practices Act of 1977, as amended, and the United Kingdom Bribery Act 2010, and any other applicable countries (collectively referred to as "ACAB") a copy of each, as currently in effect, are attached hereto as Exhibit B.  Representative further represents and warrants that it, and each of its subcontractors, understands the purpose and provisions of ACAB, particularly the prohibition on offering, making or promising anything of value to individuals as set forth in paragraph (iii) below.

10

(ii)    In connection with the performance of its obligations under this Agreement, all applicable existing and future ACAB laws, regulations and requirements, and any other applicable countries will apply to its, and its subcontractors', performance under this Agreement and Representative shall not engage, and shall take steps, which include the implementation of policies and procedures, to ensure that Representative and its subcontractors and its subcontractors' principals, shareholders, directors, officers, employees, agents and other representatives working on their behalf in connection with performance under this Agreement do not engage, in any activity that would expose Company or any Affiliate of Company to a risk of criminal or civil penalties under such laws, regulations and requirements, including ACAB and laws of other jurisdictions relating to improper payments, as well as applicable export control and sanctions laws, regulations, orders and requirements and any provisions, representations or agreements, or contractual clauses required thereby to be included or incorporated by reference or by operation of law in this Agreement.

(iii)    Economic Sanctions and Export Controls.  Both parties agree to fully comply with all applicable economic sanctions and export control laws and regulations, including those regulations maintained by the U.S. Commerce Department's Bureau of Industry and Security ("BIS") and the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").  Neither party will take any action that will place it or the other party in violation of such laws and regulations.  In addition, neither party shall, directly or indirectly, sell, provide, export, re-export, transfer, divert, loan, lease, consign or otherwise dispose of any equipment, product, supplies, services, software, source code, technical data or technology provided pursuant to this Agreement ("Items") to or via any person, entity or destination, or for any activity or end-use restricted by the laws or regulations of the United States or any other applicable jurisdiction (including nuclear, missile, chemical or biological weapons proliferation, military, or money laundering activities) without first obtaining all required government authorizations.



Further, none of the Items will be exported, re-exported, or otherwise resold or transferred to:

1.    any country subject to a comprehensive economic or export embargo imposed by the United States pursuant to regulations administered by OFAC (31 C.F.R. Pt. 500 et seq.) or BIS (15 C.F.R. Pt. 730 et seq.), as currently in force ("Prohibited Country");

2.    any entity that is organized under the laws of, or owned or controlled by a national of a Prohibited Country;

3.    any entity or individual that is identified on the OFAC Specially Designated and Blocked Persons List (Appendix A to 31 C.F.R. Ch. V), as amended from time to time, or any similar list or order published by the U.S. government ("Prohibited Person"); or

4.    any entity that is owned or controlled by a Prohibited Person.

Export Licensing Obligations of Representative:

Upon request, Representative will provide to Company information regarding the classification of any Items under the applicable export control regimes, including any applicable classification determinations issued by a governmental authority.

11

Unless otherwise agreed, in the event that any Items are to be exported, Representative will be solely responsible for determining whether any export licensing or other authorization is required and for obtaining such export license(s) or authorizations and for complying with any applicable export clearance requirements.

(iv)   None of Representative, any of its subcontractors, nor any of their principals, shareholders, officers, directors, employees, agents or any other representatives, affiliated companies or any other person or entity acting on their behalf, has made or promised, and none will make or promise, in connection with this Agreement or the performance thereof, any offer, payment, loan, gift, or anything of value to a Government Official, political party or official thereof, candidate for political office, or any person while knowing or having reason to suspect that all or a portion of such payment, loan, gift, promise or thing of value will be offered, given or promised, directly or indirectly, to a Government Official, political party or official thereof, any candidate for political office, or any other person for the purpose of obtaining or retaining business or favorable governmental or commercial action, influencing any official act or decision of a Government Official, political party or official thereof, any candidate for political office, or any other person, or inducing such person to use his or her influence to affect or influence any governmental or commercial act or decision, or otherwise secure any improper advantage for Company, Representative or any of its subcontractors.  As used in this Agreement, "*Government Official*" means: any official or employee or agent of a government or any federal, regional or local department, agency, state-owned enterprise or corporation or other instrumentality thereof, or any person acting in an official capacity for or on behalf of any such government or governmental department, agency or instrumentality (such as government-owned companies); or any official or employee or agent acting for or on behalf of a public international organization (such as the World Bank, the International Finance Corporation, the International Monetary Fund or the Inter-American Development Bank).



(v)   None of Representative, any of its subcontractors, nor any of their principals, officers, directors, employees, agents or any other representatives, affiliated companies or any other person or entity acting on their behalf, has made or promised, and none will make or promise, in connection with this Agreement or the performance thereof, any offer, payment, loan, gift, or anything of value to any person for the purpose of inducing a person to perform a relevant function or activity improperly or to reward a person for the improper performance of a relevant function or activity in connection with this Agreement, in violation of ACAB.

(vi)   Neither Representative, any of its subcontractors nor any of their principals, shareholders, officers, directors, employees, agents or other representatives working on their behalf in connection with their performance under this Agreement, are or during the term of this Agreement shall become a Government Official, an officer or representative of any political party, or a candidate for political office.  Further, no ownership interest in Representative, any subcontractor, or any of their parent or affiliated companies, or in the contractual relationship established by this Agreement, is or will be during the term of this Agreement held or controlled directly or indirectly by a Government Official, an officer or representative of any political party, or a candidate for political office. Representative further agrees to make immediate, complete and accurate written disclosure to Company in the event that during the term of this Agreement (1) any of Representative's or its subcontractors' principals, shareholders, officers, directors, employees, agents or other representatives working on its behalf in connection with performance under this Agreement, becomes a Government Official, an officer or

12

representative of any political party, or a candidate for political office or (2) a Government Official, an officer or representative of any political party, or a candidate for political office directly or indirectly acquires an interest of any sort or nature in Representative, any subcontractor, or any of their parent or affiliated companies, or in the contractual relationship established by this Agreement.

16.2    Representative shall, and shall cause its subcontractors to, maintain books and records that fairly and accurately reflect all of its transactions relating to this Agreement.  Representative shall, and shall cause its subcontractors to, retain such records for at least two years from the end of this Agreement.  Representative agrees that these books and records relating to transactions pursuant to this Agreement shall be subject to audit, at Company's request, by Company or its designated representative at reasonable times as Company shall consider necessary to ensure compliance with the ACAB and this Agreement.

16.3    Representative will, and will cause its subcontractors to, provide to Company such documents or other evidence (whether written, oral or otherwise) as Company may request from time to time so that Company may determine and establish compliance with the provisions of this Article 16.0. Representative agrees to, and to cause it subcontractors to, cooperate fully with any such audit or investigation, the scope, method, nature and duration of which shall be at the sole discretion of Company.

16.4    Representative agrees to, and shall cause each of its subcontractors to, cause at least one of its (or its subcontractor's, as applicable) directors or officers who is a duly authorized representative of Representative and has direct involvement with this Agreement and the Work as well as any such other Representative (or subcontractor, as applicable) employees identified by Company from time to time to provide Company with an Annual Certification of Compliance in the form hereto attached as Exhibit C. The Annual Certification of Compliance shall be provided at the request of Company, but at a minimum an annual certification covering the preceding year shall be provided no later than on January 31 of each calendar year during the term of this Agreement.

16.5    Representative acknowledges and agrees that Company, at any time and from time to time, may conduct a due diligence review of Representative, or any of its subcontractors, with respect to this Agreement.  Representative agrees to, and shall cause its subcontractors to, assist and fully cooperate with any such due diligence review, including providing Company with such documents or other evidence (whether written, oral or otherwise) as Company may request.



16.6    Representative acknowledges that all payments to it under this Agreement shall be made by check or wire transfer, and that none shall be made by cash or other negotiable instrument.

16.7    Notwithstanding any other provision of this Agreement, Company shall have the right to terminate this Agreement immediately in the event of Representative's or any of its subcontractors' failure to comply with any of the foregoing provisions.  In the event of termination:  (i) Company shall have a right of action against Representative for the amount of any monetary payment or thing of value made or given by Representative in breach of any of the provisions of this Article; (ii) all obligations by Company to pay Representative's fees shall cease forthwith; and (iii) Representative shall immediately return to Company all commissions arising from any transaction in which there was a violation of this Article.

16.8    A facilitating payment is a payment or offer of payment of anything of value to a foreign official, political party, or political party official or candidate, the purpose of which is to expedite, facilitate or secure the performing of a "routine governmental action" by any of those individuals. Notwithstanding that the United States Foreign Corrupt Practices Act of 1977, as amended, may permit certain such facilitating payments, the laws of other countries applicable hereto, such as the United

13

Kingdom, do not permit such payments. For avoidance of doubt, facilitating or expediting payments are not permitted under this Agreement.

**16.9    Contingency Based on Satisfactory Anti-Corruption Due Diligence Review of Representative**

**REPRESENTATIVE ACKNOWLEDGES THAT COMPANY IS CURRENTLY EVALUATING REPRESENTATIVE'S AND/OR ITS SUBCONTRACTORS' PRACTICES AND OPERATIONS TO DETERMINE COMPLIANCE WITH THE FCPA, UK BRIBERY ACT AND OTHER APPLICABLE LAWS. REPRESENTATIVE FURTHER ACKNOWLEDGES THAT THIS AGREEMENT IS CONDITIONED ON COMPANY'S SOLE SATISFACTION THAT REPRESENTATIVE AND ANY SUBCONTRACTOR HEREUNDER IS IN FULL COMPLIANCE WITH THE FCPA, UK BRIBERY ACT OR ANY OTHER APPLICABLE LAW. NOTWITHSTANDING ANY OTHER PROVISIONS OF THIS AGREEMENT, COMPANY MAY TERMINATE THIS AGREEMENT IMMEDIATELY SHOULD IT NOT BE SATISFIED WITH THE RESULTS OF ITS REVIEW OF REPRESENTATIVE'S AND SUCH SUBCONTRACTOR'S COMPLIANCE WITH THE FCPA, UK BRIBERY ACT OR OTHER APPLICABLE LAW.**

## 17.  NON-SOLICITATION OF COMPANY EMPLOYEES

During the Term of this Agreement and for a period of one year after the Agreement has terminated, Representative will not, directly or indirectly, either alone or in association with others:

1. solicit, or facilitate any organization with which Representative is associated in soliciting, any employee of the Company or any of its subsidiaries to leave the employ of the Company or any of its subsidiaries; and

2. solicit for employment, hire or engage as an independent contractor, or facilitate any organization with which Representative is associated in soliciting for employment, hire or engagement as an independent contractor, any person who was employed with the Company or any of its subsidiaries at any time during the Term of this Agreement (provided, that this subsection (ii) shall not apply to any individual whose employment with the Company or any of its subsidiaries has been terminated for a period of one year or longer).



## 18.  MISCELLANEOUS

A.    Representative shall not register this Agreement or its appointment as Representative with any governmental authority, except as required by law, without the prior written consent of Company. Representative shall promptly inform Company of all registrations and filings made by Representative as a representative of Company and Representative shall cancel immediately any such registration upon termination of this Agreement or upon receiving written notice from Company to do the same.

B.    This Agreement constitutes the entire agreement between the Parties regarding the subject matter hereof, and this Agreement supersedes, cancels and replaces any previous agreements, writings and understandings regarding such matters.

C.    This Agreement is made and shall be construed in English. All notices to be given by any Party hereunder and all other communications and documentation relating to this Agreement, including any dispute resolution proceedings, shall be in the English language.

14

D.     This Agreement may be amended only pursuant to a written agreement executed by both Parties.

E.     The headings herein are for reference only and shall not be utilized in interpreting this Agreement.

F.     This Agreement may be executed in any number of counterparts, including facsimile or electronic mail counterparts, with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument. Delivery of a copy of this Agreement bearing an original signature by facsimile transmission or by electronic mail in "portable document format" form shall have the same effect as physical delivery of the paper document bearing the original signature.

G.     In this Agreement, unless there is something in the subject matter or context inconsistent therewith, words importing the singular shall include the plural and vice versa, words importing gender shall include the masculine, feminine and neuter genders and where a term or expression is defined herein, derivations thereof shall have corresponding meanings.

H.     No remedy conferred by any of the provision of this Agreement is intended to be exclusive of any other remedy which is otherwise available at law, in equity, by statute or otherwise, and each and every other remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity, by statute or otherwise. The election of any one or more of such remedies by any of the Parties shall not constitute a waiver by such Party of the right to pursue any other available remedy.

I.     Unless prohibited by law, no rule of construction applies to the disadvantage of a Party because he or his solicitors were responsible for the preparation of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**REPRESENTATIVE**
**Tsul Servicios, S.A.P.I. de C.V.**

By: _____ (stamp)
Name:  Daniel Lorenzo Olivares Guevara
Title:    Authorized Representative

**COMPANY**
**Noble Drilling México, S. de R.L. de C.V**

By: _____
Name:
Title:

15

## EXHIBIT A

## COMMISSION STRUCTURE

Representative shall be entitled to the following fee(s) for each Drilling Contract secured by Representative on behalf of Company and entered into under a final written Drilling Contract between Company and Customer.

1.  JACKUP RIGS

    - Jackup Rig #1:
      - o   One Thousand Five Hundred United States Dollars (USD $1,500) per day.

    - Jackup Rigs #2-5:
      - o   One Thousand United States Dollars (USD $1,000) per day under each Jackup Drilling Contract up to a maximum of 5 Jackup Rigs at any given time.

    - Jackup Rigs in excess of #5:
      - o   Seven Hundred and Fifty United States Dollars (USD $750) per day under each subsequent Jackup Drilling Contract in excess of 5 Jackup Rigs at any given time.

2.  FLOATER RIGS (SEMI-SUBMERISBLES (MOORED) AND/OR DRILLSHIPS)

    - Floater Rigs #1:
      - o   Two Thousand United States Dollars (USD $2,000) per day. 

    - Floater Rigs #2-5:
      - o   One Thousand Five Hundred United States Dollars (USD $1,500) per day under each Floater Drilling Contract up to a maximum of 5 Floater Rigs at any given time. 

    - Floater Rigs in excess of #5:
      - o   One Thousand United States Dollars (USD $1,000) per day under each Floater Drilling Contract in excess of 5 Floater Rigs at any given time.

3.  PEMEX HOLDS A NON-OPERATING INTEREST IN A MEXICAN FIELD
    Should Pemex's non-operating interest cease in a Mexican field for any reason, Representative shall not be entitled to receive the Commission for such Drilling Contract.
    - Floater or Jackup Rigs:
      - o   Five Hundred United States Dollars (USD $500) per day under each Drilling Contract.

Note: In the event a Drilling Contract is terminated or completed during the term of this Agreement, then the remaining Drilling Contracts shall backfill such terminated or completed Drilling Contract based on the order in which the Drilling Contracts were executed by Company and Customer. Representative's Commission shall be adjusted to reflect the changes. As an example, if Company has 10 Jackup Rigs under contract and Jackup Rigs 1, 3 and 4 are completed on the same date, then Jackup Rigs 2 and 5 will become Jackup Rigs 1 and 2 and Jackup Rigs 6, 7 and 8 will backfill to become Jackup Rigs 3, 4 and 5. Jackup Rigs 9 and 10 will then effectively become Jackup Rigs 6 and 7.

A-1

EXHIBIT B

**NOBLE'S INTERNAL POLICY ON**
**ANTI-CORRUPTION AND ANTI-BRIBERY COMPLIANCE**
**EXCERPT FROM NOBLE'S ADMINISTRATIVE POLICY MANUAL**

**7.6    ANTI-CORRUPTION AND ANTI-BRIBERY COMPLIANCE**

It is the policy of the Company to maintain the highest level of professional and ethical standards in the conduct of its business affairs. The Company places the greatest importance upon its reputation for honesty, integrity and high ethical standards. This policy statement is a reaffirmation that the Company places the greatest importance on making sure its management and employees also adhere to the same high ethical standards. The foundation of this policy is the Company's commitment to comply with all applicable laws governing the conduct of the Company's worldwide operations, including all applicable anti-corruption and anti-bribery laws, such as the United States Foreign Corrupt Practices Act (the "FCPA"), the U.K. Bribery Act 2010 ("UKBA"), and those adopted pursuant to the Organization for Economic Co-operation and Development ("OECD") Convention on Combating Bribery of Foreign Public Officials in International Business Transactions. This Section 7.6 details Noble's policy regarding compliance with ACAB.

This policy applies to Noble Corporation and all of its subsidiaries, whether in Switzerland, the United States, or abroad. This policy also applies to all of the officers, directors, employees, agents, consultants and other representatives of the Company, regardless of their nationality and including any member (shareholder) acting on behalf of the Company. Each of these individuals has an obligation to conduct himself or herself in a manner that complies with these standards. Disregard for the requirements or principles set forth in this policy statement will be grounds for appropriate disciplinary action, including, but not limited to, immediate termination of employment.



In adhering to this policy, all officers, directors, employees, agents, consultants and other representatives of the Company must understand the requirements of all applicable United States and host-country laws and regulations that apply to the conduct of the Company's business affairs. When any question or uncertainty arises with respect to those laws, it is the obligation of each affected person to seek guidance from the Chief Compliance Officer ("CCO") or the Company Legal Department.

7.6.1    ANTI-BRIBERY / ANTI-CORRUPTION PROVISIONS

The FCPA, UKBA and other applicable laws prohibit the making of any payment or offer of payment of anything of value to any foreign official, political party, or political party official or candidate in order to assist in obtaining or retaining business or to secure any improper advantage.

It is also prohibited to make any payment or offer of payment of anything of value to any other person, such as an Agent or consultant, while knowing or having reasonable grounds to believe that all or a portion of such payment will be given or offered to any foreign official, political party, or political party official or candidate.

As used in this policy, "foreign official" means: (a) any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or any person acting in an official capacity for or on behalf of any such government or governmental department, agency or instrumentality (such as government-owned companies); and (b) any officer, employee or other

B-1

**C108**

person acting for, or on behalf of, a "public international organization" (such as the World Bank, the International Finance Corporation, the International Monetary Fund or the Inter-American Development Bank).

Payments to Persons Who Are Not Government Officials: Neither the Company nor any of its officers, directors, employees or agents may promise or give any financial or other advantage to any person for the purpose of inducing a person to perform a relevant function or activity improperly or to reward a person for the improper performance of a relevant function or activity in connection with the conduct of the Company's business, in violation of the UKBA.

7.6.2 RECORD-KEEPING PROVISIONS

The FCPA and other applicable laws have significant accounting requirements which require the Company to maintain accurate and reasonably detailed books, records and accounts which fairly reflect all transactions and dispositions of assets.

The Company is required to devise and maintain a system of internal accounting controls that provides reasonable assurances that:

•       transactions are executed in accordance with management's general or specific authorization;

•       transactions are recorded as necessary to permit the proper preparation of the Company's financial statements and maintain accountability for assets;

•       access to the Company's assets is permitted only in accordance with  management's general or specific authorization; and

•       the recorded accountability for the Company's assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

These record-keeping provisions of the FCPA prohibit the mischaracterization or omission of any transaction on the Company's books or any failure to maintain proper accounting controls that results in such a mischaracterization or omission.

7.6.3 POLICY

7.6.3.1 INTRODUCTION

It is the policy of the Company to comply fully with all the provisions of the FCPA, UKBA and other applicable laws. All of the officers, directors, employees, agents, consultants and other representatives of the Company, including any members (shareholders) acting on behalf of the Company, are expected to comply with this policy and to conduct the Company's business ethically and in accordance with the laws of the United States and the host-country.

7.6.3.2 PROHIBITED PAYMENTS

In particular:

1.      None of the abovementioned persons (which term includes, for purposes of this policy statement, entities) shall authorize or make any payment or offer of payment of anything of value to a foreign official, political party, or political party official or candidate in violation of this policy.

2.      None of the abovementioned persons shall authorize or make any payment or offer of payment of any money or anything of value to third parties while knowing or having reasonable grounds to believe that the third parties are or may be giving, offering or promising all or a portion of the thing of value, directly or indirectly, to a foreign official, political party, or political party official or candidate in violation of this policy.



B-2

**C109**

3.     Permissible payments to foreign officials, political parties, or political party officials or candidates may only be authorized and made if fully in accordance with the conditions set forth in this policy, and shall be fully and accurately described in the Company's books and records.

4.     Applicable standards, principles, laws, and practices and policies of the Company for accounting and financial reporting shall be followed by all officers, directors and employees.

5.     The Company's books, records and accounts shall be kept accurately and shall fairly reflect all transactions and dispositions of assets.

6.     No undisclosed or unrecorded accounts are to be established for any purpose. False or misleading entries are not to be made in the Company's books and records for any reason.

7.     The Company's Agents will be appointed only in accordance with the provisions set forth in this policy.

### 7.6.3.3 POLITICAL AND CHARITABLE CONTRIBUTIONS

No charitable contribution may be made on behalf of the Company outside the United States without the prior written approval of Noble's Chief Executive Officer. Contributions to non-U.S. political parties, candidates, campaigns, political action committees or officials are not permitted.

### 7.6.3.4 SOLICITATION AND EXTORTION

1.     SOLICITATION

In some instances, foreign officials may request or solicit improper payments or attempt to obtain such payments by detaining persons or property such as personal effects, vehicles, or company equipment or goods.  The fact that an official requests or solicits an improper payment does not make such payments permissible.  Requests or solicitations from foreign government officials for improper payments or inducements may not be complied with and must immediately be reported to the CCO or General Counsel. 

2.     EXTORTION

Personal safety is paramount.  Judgment may be required as to how to respond to extortion or duress if any person's personal safety is in jeopardy or if under a threat of significant property loss to the Company.  Assistance from direct or indirect supervisors, from the CCO, or from any other Company resource, should be sought immediately in such circumstances if possible.

Any payment made as a result of extortion or duress must be immediately reported to the CCO or General Counsel and must be accurately recorded and fully described in the Company's books and records.

### 7.6.4 SANCTIONS UNDER THE FCPA

The FCPA imposes criminal and civil liability on both individuals and corporations for knowing violations. For violations of the anti-bribery provisions of the FCPA, individuals may be subject to criminal penalties including fines of up to $100,000, imprisonment of up to five years, or both. Corporations may be fined up to $2,000,000. In addition, a civil penalty of up to $10,000 may be imposed against both corporations and individuals.

Individuals who willfully violate the record-keeping provisions of the FCPA may be fined up to $5,000,000, imprisoned up to twenty years, or both. A corporation may be fined up to $25,000,000.

Alternatively, by virtue of other applicable statutes, both individuals and corporations violating the FCPA's provisions may possibly be fined up to twice the amount of any pecuniary gain or loss resulting from such violation.

B-3

In addition to criminal and civil penalties, a person or company found in violation of the FCPA may be precluded from doing business with the U.S. government. Other consequences may include denial of export licenses and debarment from programs under the Commodity Futures Trading Commission and the Overseas Private Investment Corporation.

According to the law, fines imposed against individuals for violations of the anti-bribery provisions of the FCPA may not be paid or reimbursed directly or indirectly by the Company. Violation of the FCPA will also result in discipline by the Company, up to and including termination of employment.

7.6.5 PERMISSIBLE PAYMENTS

Under limited circumstances, the FCPA does allow certain types of payments to foreign officials. There are two categories of potentially permissible payments:

(1) small payments for routine governmental action, also known as "facilitating payments" or "expediting payments" (discussed below in Section 7.6.5.1); and (2) payments for bona fide promotional or marketing expenses (discussed below in Section 7.6.5.2) (these two categories of payments are referred to herein, collectively, as "Permissible Payments"). While these payments are permissible under the FCPA in certain limited circumstances, the laws of other countries (such as the UKBA and provisions of the OECD Convention) do not permit such payments. Therefore, no officer, director, employee, agent, consultant or other representative of the Company is authorized to make facilitating payments except as set forth in guidelines established by the Company and approved with the prior written authorization of CCO or the General Counsel.

In addition, in order to comply with the accounting provisions of the FCPA, all such Permissible Payments shall be accurately recorded in the Company's books and records in order to reflect properly the true nature of the transaction. The entry should show the amount and purpose of the payment, and the name and/or title of the person to whom the payment was made. The Chief Financial Officer is responsible for procedures related to reporting and accounting of such payments. Copies of any documents (i.e., correspondence, reports, receipts, expense reports, etc.) relating to or made in connection with any Permissible Payment should be handled in accordance with policy and guidelines established by the Company.

Nothing in this policy authorizes, endorses or encourages the offering or making of any corrupt payment of anything of value to a U.S. governmental official, political party, or political party official or candidate, in violation of applicable U.S. laws and regulations.


7.6.5.2 PROMOTIONAL OR MARKETING EXPENSES

As a general principle, the FCPA prohibits the payment, or even the promise of payment, "of any money or anything of value" to a foreign official, political party, or political party official or candidate. This broad language includes promotional or marketing expenses incurred on behalf of foreign officials as well as benefits such as meals, gifts, entertainment, travel, lodging, etc.

In certain circumstances, however, the payment of some promotional or marketing expenses is permissible under the FCPA. These payments fall within the second category of Permissible Payments described above and are referred to herein as "Promotional Expenses".

Payments considered to be legitimate Promotional Expenses under the FCPA are those reasonable and bona fide expenses, such as travel and lodging expenses, incurred by, or on behalf of, a foreign official, political party, or political party official or candidate that are directly related to:

- the promotion, demonstration or explanation of the Company's products or services; or

B-4

- the execution or performance of a particular contract between the Company and a foreign government or instrumentality thereof.

The directors, officers, employees, agents, consultants and other representatives of the Company may pay or authorize the payment or reimbursement of Promotional Expenses incurred by, or on behalf of, foreign officials, political parties, or political party officials or candidates ONLY if:

- they are directly related to the promotion, demonstration or explanation of the Company's products or services or with the execution or performance of a particular contract between the Company and a foreign government or instrumentality thereof, and the payment or benefit is NOT provided for the purpose of inducing a foreign official to misuse his/her official position;

- they are reasonable and bona fide expenditures for meals, travel, entertainment or gifts (promotional items or Company merchandise) in light of what is customary and within the bounds of ethical business practices;

- they do not create the appearance of being an improper payment under the circumstances and do not place the recipient under any obligation;

- they are legal under the written laws, rules or regulations of the particular foreign country and do not create the appearance of being an improper payment;

- they are refundable and have been incurred in accordance with other Company policies, especially the "Travel and Entertainment" section of this Manual; and 

- they are accurately recorded and fully described in the Company's books and records.

The Company shall, with concurrence of the CCO and General Counsel, establish guidelines from time to time as necessary for the implementation of this policy statement, and it shall be the responsibility of every director, officer, employee, agent, consultant and representative of the Company to follow those guidelines. Where a person is in doubt about the application of the policy or the guidelines, it shall be his or her obligation to bring any questions to the CCO or the General Counsel before taking any action. 

### 7.6.6. APPOINTMENT OF AGENTS

The FCPA prohibits both direct and indirect payments to foreign officials. Thus, the Company can face FCPA liability based on improper payments made by its agents or other business partners.

**Therefore, as stated above, this policy is also applicable to all of the Company's agents, consultants, joint venture partners and other representatives.**

B-5

**EXHIBIT C**


**NOBLE DRILLING MÉXICO, S. DE R.L. DE C.V. ("NOBLE")**
**ANNUAL CERTIFICATION OF COMPLIANCE**


I, Daniel Lorenzo Olivares Guevara, a duly authorized representative of Tsul Servicios, S.A.P.I. de C.V. ("Contractor"), do hereby certify for and on behalf of Contractor, that neither I nor, to my knowledge, any other person, including, but not limited to, every officer, director, stockholder, employee, representative and agent of Contractor, in connection with our Master Service Agent Contract dated July 25, 2017 (the "Contract") or the performance thereof, have made, offered to make or agreed to make any offer, payment, loan or gift of anything of value to a Government Official, political party or official thereof, candidate for political office, or any person while knowing or having reason to suspect that all or a portion of such money, promise or thing of value will be offered, given or promised, directly or indirectly, to a Government Official, foreign political party or official thereof, or to any candidate for foreign political office, for the purpose of obtaining or retaining business or favorable governmental action, influencing any official act or decision of a Government Official, political party or official thereof, candidate for political office or inducing such person to use his or her influence to affect or influence any governmental act or decision, or otherwise secure any improper advantage for Noble.

For purposes of this certification, the term "Government Official" includes: any official or employee or agent of a government or any federal, regional or local department, agency, state-owned enterprise or corporation or other instrumentality thereof, or any official or employee or agent of a public international organization.

I also hereby confirm that neither Contractor nor any of its principals, shareholders, officers, directors, employees, agents or other representatives working on Contractor's behalf in connection with performance under this Contract, is a Government Official.  I also hereby confirm that the Contractor informs its principals, shareholders, owners, officers, directors, employees, agents and other representatives about Contractor's and Noble's obligations under business ethics rules and anti-corruption laws.


Contractor:  Tsul Servicios, S.A.P.I. de C.V.


Signature: _____
Name:      Daniel Lorenzo Olivares Guevara
Title:     Legal Representative
Date:      July 25, 2017


**Please return this form to: Noble Drilling Services, Inc., Attn: Compliance Department,**
**13135 South Dairy Ashford, Suite 800, Sugar Land, Texas 77478, United States of America**


C-1


**C113**

# APPENDIX C

## Unique Privilege Identifier

35
40
41
88
94
117
120
124
586
587
590
1448
1449
1902
1903
1033
1216

**9/18/2019 A. Sheehan Davis Letter**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE

NEW YORK 10036-6522

———

TEL: (212) 735-3000

FAX: (212) 735-2000

www.skadden.com

DIRECT DIAL
212-735-3579
DIRECT FAX
917-777-3579
EMAIL ADDRESS
ABIGAIL.SHEEHAN@SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

September 18, 2019

**By Email**

Anne I. Salomon
Kirkland & Ellis
300 North LaSalle
Chicago, IL 60654

RE:    *Paragon Litigation Trust v. Noble Corporation PLC, et al.*
       Adv. Proc. No.: 17-51882

Dear Anne:

    I write in connection with Noble's Second Supplemental Responses and Objections (the "Additional Supplemental Responses") to the Trust's First Set of Interrogatories Directed to the Noble Corporate Defendants (the "First Interrogatories"), as well as to respond in particular to certain related issues raised by the Trust in your letter dated August 21, 2019 (the "Letter").

    As you are aware, Noble supplied its initial responses and objections to the Trust's First Interrogatories on December 19, 2018 and provided supplemental responses and objections on May 23, 2019 (the "Supplemental Responses"). In both its initial and Supplemental Responses, Noble provided answers to the Trust's First Interrogatories that fully satisfied its obligations under the Federal Rules.

    Noble also reviewed documents from Daniel Olivares, Bruno Morand, Bodley Thornton and Gene House—Noble employees or agents who had responsibility for Pemex and Petrobras contracting from January 1, 2012 to August 1, 2014—and produced responsive documents in April 2019.

    Nonetheless, in an effort to provide the Trust even more complete answers to the First Interrogatories, Noble has included with this letter its Additional

Anne I. Salomon
September 18, 2019
Page 2

Supplemental Responses, which identify additional documents and communications responsive to the First Interrogatories.

That said, the Trust's position that Noble must disclose *all* communications, written or oral, in response to the First Interrogatories, is incorrect, particularly where the Trust's interrogatories request that information from a period of time that is not sufficiently tailored and seek communications from more than five years ago.[1]

First, as Noble has pointed out several times, the scope of discovery for interrogatory responses is governed by Rule 26(b), and is limited to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  The Trust does not, and cannot, explain why its insistence that Noble identify any and all communications for a period of several years is proportionate.  Notably, the Trust does not cite a single case from within the Third Circuit in support of its position.  Indeed, the *Government Benefits Analysts* case that the Trust cites actually rejects its position.  In that case, the responding party had not objected to the interrogatory at issue on the grounds that it was overbroad and unduly burdensome (as Noble has here), so the court did not even consider that objection.  But when the responding party did so object to an interrogatory requesting "all communications," the Court agreed that the interrogatory was "overly broad and unduly burdensome on its face," and "replac[ed] the word 'all' with the phrase 'principal and material.'"  *Gov't Benefits Analysts, Inc. v. Gradient Ins. Brokerage, Inc.*, No. 10-2558-KHV-DJW, 2012 WL 3292850, at *15 (D. Kan. Aug. 13, 2012).

Other courts have held that blockbuster interrogatories like the Trust's are inappropriate, and that these types of "oral communications between [] employees  . . . are more reasonably obtained through depositions and not by an interrogatory."  *See, e.g., Bat v. A.G. Edwards & Sons, Inc.*, No. 04-cv-02225-REB-BNB, 2005 WL 6776838, at *8 (D. Colo. Nov. 18, 2005).  *See also IBEW v. Star-Lo Electric*, No. 08–900 (SRC), 2010 WL 11530624, at *4 (D.N.J. Mar. 1, 2010) ("The Court finds that Interrogatory Number 20 is overly broad.  Defendants failed to provide reasonable limitations to their request, failed to provide a time frame and did not state with specificity what type of information they requested.  The interrogatory requests information pertaining to oral communications that may not have been

---

[1]     Interrogatory 3 requests "*all Communications* You had with Pemex prior to August 1, 2014 Concerning its drilling plans or its relationship with You"; Interrogatory 4 requests "*all Communications* You had with Petrobras prior to August 1, 2014 Concerning its drilling plans or its relationship with You"; and Interrogatory 5 requests "*any Communications* with potential customers Concerning the potential customers' intentions to contract for the Lorris Bouzigard, Muravlenko, or Seilliean rigs."

Anne I. Salomon
September 18, 2019
Page 3


memorialized in writing and/or that is simply impossible to recollect, particularly with no time frame in mind.  Therefore, the Court denies Defendants' motion to compel as to Interrogatory 20."); *Sussman v. Paradigm Partners, Inc.*, No. 91 Civ. 2891 (KMW), 1993 WL 385752, at *2 (S.D.N.Y. Sept. 22, 1993) ("Depositions are surely a more efficient means than interrogatories of eliciting information about oral conversations. Thus, these interrogatories need not be answered.").

With respect to Interrogatory 5, Noble has provided the Trust with additional responsive communications in its Additional Supplemental Responses.

With respect to Interrogatory 3, Noble has also provided the Trust with additional responsive communications in its Additional Supplemental Responses. The Trust has taken issue with certain documents identified in Noble's Supplemental Responses.  Documents Noble_00177523; Noble_00177524; Noble_00177525; Noble_00177526 were included in Noble's Supplemental Response for sake of completeness because they were family members of Noble_001177522 and Noble_00177527.  Noble will produce these four documents this week.  The other documents with which the Trust takes issue were included for sake of completeness because they are cover emails to documents identified in the Supplemental Responses, and so were included because they reflect the recipients of the responsive attachments.

Finally, Noble has provided in its Additional Supplemental Responses additional communications responsive to Interrogatory 4.  With respect to the Trust's question about the document bearing Bates PGN20180001470, that is the correct Bates number for the document; we are unsure why the Trust was not able to identify it, but are happy to discuss on a meet and confer if helpful.


Very truly yours,

*/s/ Abigail E. Davis*

Abigail E. Davis

Dated: July 7, 2020

PACHULSKI STANG ZIEHL & JONES LLP

*/s/  Timothy P. Cairns*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
ljones@pszjlaw.com
tcairns@pszjlaw.com

- and -

KIRKLAND & ELLIS LLP
David J. Zott, P.C. (admitted *pro hac vice*)
Jeffrey J. Zeiger, P.C. (admitted *pro hac vice*)
William E. Arnault (admitted *pro hac vice*)
Anne I. Salomon (admitted *pro hac vice*)
Jason A. Feld (admitted *pro hac vice*)
300 N. LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
dzott@kirkland.com
jzeiger@kirkland.com
warnault@kirkland.com
anne.salomon@kirkland.com
jason.feld@kirkland.com

*Co-Counsel for Plaintiff*